IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| **Bryndon Fisher**, **Bruce Reid**, and **Erick Shipmon**, derivatively on behalf of **Federal National Mortgage Association**,<br><br>    Plaintiffs,<br>v.<br><br>**The United States of America**,<br><br>    Defendant,<br><br>and **Federal National Mortgage Association**<br><br>    Nominal Defendant. | No. 1:13-cv-00608-MMS |

**FIRST AMENDED CONSOLIDATED DERIVATIVE COMPLAINT**

Upon personal knowledge as to their own acts and status, and based upon their investigation, their counsel's investigation, and information and belief as to all other matters, Plaintiffs Bryndon Fisher, Bruce Reid, and Erick Shipmon ("Plaintiffs"), derivatively on behalf of the Federal National Mortgage Association ("Fannie Mae" or the "Company"), allege as follows:

**SUMMARY OF THE ACTION**

1.      This is a shareholder derivative action on behalf of Fannie Mae against The United States of America ("United States" or the "Government") and nominal defendant Fannie Mae. This derivative action seeks just compensation for the taking of the private property of Fannie Mae for public use by the United States, including the

Department of the Treasury ("Treasury"), the Federal Housing Finance Agency ("FHFA"), and their respective agents.

2. In 2012, the Government imposed a "Net Worth Sweep" on Fannie Mae, which required the Company to pay its entire net worth to the U.S. Treasury every quarter in perpetuity. The Government's taking of the entire net worth of Fannie Mae effectively destroyed all value in the Company and amounts to a blatant overreach by the Government in violation of the Takings Clause of the Fifth Amendment to the U.S. Constitution.

3. Fannie Mae is a private corporation charged with maintaining a stable and liquid secondary mortgage market by purchasing mortgage loans from other financial institutions, issuing and purchasing mortgage-backed securities ("MBS"), and guaranteeing privately-owned mortgage-backed securities.

4. During the mortgage-related financial crisis that began in 2007, Congress created the FHFA, a federal administrative agency designed to oversee the operations of Fannie Mae, and empowered it to serve as Conservator of the Company when necessary to preserve its financial health. When exercising its statutory powers as Conservator, the FHFA is obligated to manage the Company with the goal of putting it in a sound and solvent financial condition while preserving and conserving its assets.

5. Congress also authorized the Treasury Department to provide financial assistance to Fannie Mae. Treasury was authorized to provide this assistance by purchasing securities issued by the Company if it determined that such purchases would help stabilize financial markets, prevent disruptions in the mortgage markets, and protect taxpayers.

6.     On September 7, 2008, the Director of the FHFA, who is nominated by the President and confirmed by the U.S. Senate, placed Fannie Mae into conservatorship, committing to "operate the [Company] until [it is] stabilized."[1] This suit does not challenge the legality of the FHFA's initial placement of Fannie Mae into conservatorship or claim that action was a taking—but rather challenges the Government's subsequent amendment to the terms of the conservatorship through the imposition of the "Net Worth Sweep" in 2012.

7.     In conjunction with the conservatorship in 2008, Treasury and the FHFA executed a Preferred Stock Purchase Agreement ("PSPA"). Under the PSPA, the Treasury Department purchased one million shares of Government Preferred Stock from Fannie Mae in exchange for a funding commitment that allowed the Company to draw up to $100 billion from Treasury as needed to ensure it maintained a positive net worth. The Government Preferred Stock has a liquidation preference equal to $1 billion plus the sum of all draws by the Company against Treasury's funding commitment (the "Liquidation Preference). The Government was entitled to a cumulative annual dividend equal to 10% of the outstanding Liquidation Preference. The PSPA also grants Treasury warrants to purchase up to 79.9% of the Company's common stock at a nominal price.

8.     Shortly after the FHFA imposed the conservatorship, Fannie Mae declared large non-cash losses, largely due to the write-down of substantial deferred tax assets on its balance sheet and taking large loss reserves. These accounting adjustments, which reflected an overly pessimistic view of the value of the mortgages owned by Fannie Mae, depleted the Company's operating capital. As a result, the Government advanced over a

---

[1] *See* Press Release, FHFA, Statement of FHFA Director James B. Lockhart, at 6 (Sept. 7, 2008), available at http://www.fhfa.gov/webfiles/23/FHFAStatement9708final.pdf.

hundred billion dollars pursuant to the PSPA to shore up the Company's balance sheet. These actions, in turn, substantially increased the annual dividends due to the Government.

9.      By 2012, with the housing market on a recovery path, Fannie Mae was again profitable. The Company's actual realized loan losses were tens of billions of dollars less than had been expected. As a result, the Company reversed many of its earlier write-downs of deferred tax assets and mortgages. Beginning in 2012, the Company posted multi-billion dollar profits and announced that it expected to be profitable into the foreseeable future.

10.     By the end of the first quarter of 2012, Fannie Mae was so profitable that it had sufficient money to pay all the dividends that it owed the Government pursuant to the PSPA. With future profits expected to increase dramatically, the Company was positioned to redeem all the Government Preferred Stock pursuant to the terms of the the pre-Third Amendment PSPA by paying the entire Liquidation Preference and all accrued dividends. This redemption would have permitted the Company to continue as a financially solvent, viable, and valuable entity. The Government did not allow this to happen. Instead, the Government acted unilaterally to amend the terms of the PSPA and expropriated all remaining profits and value in the Company for its own public use, without providing just compensation to the Company. Two government agencies conspired to effectively dismantle Fannie Mae as a profitable company, and in the process, swept every last penny of value from the Company. This action constituted an unlawful taking in violation of the Fifth Amendment to the U.S. Constitution.

11.     On August 17, 2012, two Government agencies, the FHFA and Treasury, executed the Third Amendment to the Amended & Restated Senior Preferred Stock Purchase Agreement (the "Third Amendment"). Under the Third Amendment, which went into effect on January 1, 2013, the Government required Fannie Mae to pay the Treasury Department dividends each fiscal quarter equal to the Company's entire net worth (the "Net Worth Sweep"). Under the Net Worth Sweep, the Government took the entirety of the Company's value in perpetuity. Instead of the Government requiring Fannie Mae pay a quarterly dividend equal at an annual rate of ten percent of the Government Preferred Stock's Liquidation Preference, the Third Amendment required Fannie Mae to pay every dollar of its net worth, less a small, temporary capital reserve, to the Government, irrespective of the the outstanding Liquidation Preference.[2] Under the terms of the Third Amendment, payments made by the Company to Treasury pursuant to the Net Worth Sweep, no matter how large, do not reduce the Government's outstanding Liquidation Preference. Accordingly, the Third Amendment completely deprived Fannie Mae of all of its reasonable economic value.

12.     By unilaterally imposing the Net Worth Sweep, the Government has reaped—and will continue to reap—an enormous windfall for the U.S. Treasury. On or about June 30, 2013, Fannie Mae paid the Treasury Department the largest quarterly dividend in U.S. history: $59.4 billion. In September 2013, Fannie Mae made a $10.2 billion quarterly dividend payment to Treasury, and in December 2013, the Company will make an $8.6 billion quarterly dividend payment to Treasury. Since the imposition of the Net Worth Sweep, Fannie Mae will have paid the Government $78.2 billion in

---

[2] The specified capital reserve steadily declines to zero in 2018.

dividends, while under the pre-Third Amendment PSPA, the Company would have been obligated to pay only $8.8 billion. By the terms of the Third Amendment, the additional $69.4 billion that Fannie Mae paid to Treasury this year does not reduce the Liquidation Preference at all. Absent the Third Amendment, Fannie Mae would have been able to use its substantial profits in 2013 to dramatically reduce its Government obligations. But the Third Amendment forbids it from doing so.

13.     Under the Third Amendment, the amounts paid by Fannie Mae in dividends do not—and will not ever—reduce the outstanding Liquidation Preference of the Government Preferred Stock or reduce the amount of such stock outstanding. As a result, the total Liquidation Preference remains $117.1 billion, even though the Company has paid an additional $69.4 billion in dividends under the Net Worth Sweep. If Fannie Mae had been allowed to reduce the Government's Liquidation Preference through its Government dividend payments, it would now be on track to completely pay off its Government draws in 2014.

14.     Instead, because the Third Amendment now requires that the Government's dividend payments be equal to the total net worth of the entire Company, it will *never* be possible for Fannie Mae to reduce, much less eliminate, the Liquidation Preference. The Government will continue to take the Company's entire net worth for as long as it remains in business. And it will *never* be possible for Fannie Mae to escape conservatorship.

15.     As the Government itself has acknowledged, the Government's actions are designed to benefit taxpayers, at the expense of the Company. Far from hiding its

motive, the Government's stated goal of the Net Worth Sweep is to take "every dollar of earnings [Fannie Mae] generates … to benefit taxpayers."[3]

16.     However, under the Fifth Amendment to the U.S. Constitution, the Government cannot simply expropriate private property, let alone take the entire net worth of a legal, private company, without the payment of just compensation. And the Government cannot enrich itself through a self-dealing pact among Government agencies to take the entire value of Fannie Mae for public use by taxpayers.

17.     The Third Amendment was not the result of an arm's length agreement. To the contrary, the Government amended its own Government Preferred Stock Agreement by way of an "agreement" between two agencies of the federal government: the Treasury Department and the FHFA. In essence, the Government agreed with itself to expropriate the private property of Fannie Mae for the use of the Government.

18.     In executing the Third Amendment, the Treasury Department openly acknowledged that a primary purpose was to "expedite the wind down of Fannie Mae" as a going concern.[4] As Treasury explained, as a result of the Net Worth Sweep, Fannie Mae "will be wound down and will not be allowed to retain profits, rebuild capital, [or] return to the market in [its] prior form." Since this purpose falls outside the scope of the FHFA's statutory authority when acting as Conservator to Fannie Mae, the FHFA was not acting as Conservator when it signed the Third Amendment. Instead, the FHFA was acting as a Government agent when it signed the Third Amendment, and its and Treasury's actions amounted to a taking of private property for public, not private use.

---

[3] Press Release, Treasury, Treasury Department Announces Further Steps To Expedite Wind Down Of Fannie Mae And Freddie Mac (Aug. 17, 2012), *available at* http://www.treasury.gov/press-center/press-releases/Pages/tg1684.aspx.

[4] *Id.*

19.    While it is debatable whether the Net Worth Sweep constitutes sound economic policy, one fact is unmistakable: the result of the Government's actions is a total taking of all economic value of Fannie Mae. Under the Fifth Amendment to the U.S. Constitution, Fannie Mae is owed just compensation.

## JURISDICTION AND VENUE

20.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1491(a). Venue is proper in this Court pursuant to 28 U.S.C. § 1491(a).

21.    Pursuant to Rule of the Court of Federal Claims 23.1(b)(2), this is not a collusive action to confer jurisdiction that this Court would otherwise lack.

## PARTIES

22.    Plaintiff Bryndon Fisher ("Fisher") is a citizen of California. Fisher currently owns and, at all relevant times, has owned 3,250 shares of nominal defendant Fannie Mae's common stock. Fisher has owned Fannie Mae common stock prior to, at the time of, and continuously since the Government imposed the Third Amendment on August 17, 2012.

23.    Plaintiff Bruce Reid ("Reid") is a citizen of California. Reid currently owns and, at all relevant times, has owned 29,000 shares of nominal defendant Fannie Mae's common stock. Reid has owned Fannie Mae common stock prior to, at the time of, and continuously since the Government imposed the Third Amendment on August 17, 2012.

24.    Plaintiff Erick Shipmon ("Shipmon") is a citizen of Arizona. Shipmon currently owns and, at all relevant times, has owned shares of nominal defendant Fannie Mae's common stock. Shipmon purchased 68,100 shares of Fannie Mae

common stock prior to Government's imposition of the Third Amendment on August 17, 2012, has owned these shares continuously since that time, and continues to own these shares.

25.     Defendant United States of America ("United States") includes the U.S. Department of Treasury ("Treasury") and agents acting at the direction of Treasury. Defendant United States also includes the Federal Housing Finance Agency ("FHFA") and agents acting at the direction of the FHFA when the FHFA acts outside the scope of its statutory authority as Conservator to Fannie Mae under the Housing and Economic Recovery Act of 2008 ("HERA").

26.     Nominal Defendant Federal National Mortgage Association ("Fannie Mae" or the "Company") is a federally chartered, government-sponsored enterprise that supplies capital and liquidity for residential mortgages. Fannie Mae is a publicly traded private corporation, has a Board of Directors ("Board"), and is required to report to the Securities and Exchange Commission ("SEC"). Fannie Mae's by-laws expressly provide that Delaware General Corporation Law applies to the conduct of the Company.

### Non-Defendant Directors

27.     Amy E. Alving ("Alving") has served as a member of the Board of Directors of Fannie Mae since October 2013.

28.     William Thomas Forrester ("Forrester") has served as a member of the Board of Directors of Fannie Mae since 2008.

29.     Brenda J. Gaines ("Gaines") initially became a member of the Board of Directors of Fannie Mae in September 2006, before the conservatorship, and the FHFA reappointed her to Fannie Mae's Board in December 2008.

30.     Charlynn Goins ("Goins") has served as a member of the Board of Directors of Fannie Mae since 2008.

31.     Frederick B. "Bart" Harvey III ("Harvey") initially became a member of the Board of Directors of Fannie Mae in August 2008, before the conservatorship, and the FHFA reappointed him to Fannie Mae's Board in December 2008.

32.     Robert H. Herz ("Herz") has served as a member of the Board of Directors of Fannie Mae since 2011.

33.     Philip A. Laskawy ("Laskawy") became a member of the Board of Directors and Chairman of the Board of Fannie Mae in September 2008.

34.     Timothy J. Mayopoulos ("Mayopoulos") has served as a member of the Board of Directors of Fannie Mae since June 2012.

35.     Diane C. Nordin ("Nordin") has served as a member of the Board of Directors of Fannie Mae since November 2013.

36.     Egbert L. J. Perry ("Perry") has served as a member of the Board of Directors of Fannie Mae since December 2008.

37.     Jonathan Plutzik ("Plutzik") has served as a member of the Board of Directors of Fannie Mae since November 2009.

38.     David H. Sidwell ("Sidwell") has served as member of the Board of Directors of Fannie Mae since December 2008.

39.     The directors of Fannie Mae are not named as defendants because, as explained *infra*, the FHFA has effectively assumed all of the powers of the directors. The directors, therefore, are not indispensable parties to this action.

## CONSTITUTIONAL PROVISION

40.     Plaintiffs' claim is governed by the Fifth Amendment to the United States

Constitution, which provides in pertinent part that no person shall "be deprived of life,

liberty, or property, without due process of law; nor shall private property be taken for

public use, without just compensation."

## FACTUAL ALLEGATIONS

### History of Fannie Mae and Relevant Statutes

41.     Fannie Mae was created by federal statute in 1938, at the request of

President Franklin D. Roosevelt, in an effort to provide a much needed supply of capital

to the nation's home mortgage industry. Initially, it was authorized to purchase only

those mortgages that were insured by the Federal Housing Administration ("FHA"). For

the first thirty years of its existence, Fannie Mae was operated by the federal

government.

42.     In 1968, Fannie Mae was privatized pursuant to the Housing and Urban

Development Act of 1968 ("HUD Act"). The HUD Act effectively partitioned Fannie Mae

into two separate and distinct entities: a reconstituted Fannie Mae and the Government

National Mortgage Association ("Ginnie Mae"). Fannie Mae was reorganized as a

government-sponsored private corporation tasked with serving the self-supporting

secondary mortgage market and authorized to purchase both FHA-insured and non-

insured mortgages. Ginnie Mae continued as a federal agency, responsible for the then-

existing special assistance programs.

43.     Together with their sister entity, the Federal Home Loan Mortgage

Association ("Freddie Mac"), these private companies are commonly referred to as

Government Sponsored Enterprises ("GSEs"), reflecting the fact that they are private corporations created by Congress with the goal of increasing liquidity in the mortgage market. Today, Fannie Mae endeavors to achieve this goal by purchasing mortgages originated by private banks and bundling these mortgages into mortgage-related securities that can be sold to investors. By creating this secondary mortgage market, Fannie Mae increases liquidity for private banks, allowing them to make additional loans to individuals to purchase homes.

44.     Since 1968, Fannie Mae has been a privately-owned corporation, has obtained funding from private capital, including common and preferred stock, which have publicly traded on the New York Stock Exchange ("NYSE").[5] Prior to September 6, 2008, Fannie Mae regularly paid dividends on its common and preferred stock. And before 2007, the Company was consistently profitable. In fact, Fannie Mae had not reported a full-year loss since 1985.

45.     In 1992, Congress enacted the Federal Enterprises Financial Safety and Soundness Act (the "Safety and Soundness Act"). The Safety and Soundness Act created the Office of Federal Housing Enterprise Oversight ("OFHEO") as the new regulator for Fannie Mae, imposed minimum capital requirements on the Company, and provided OFHEO with the authority to impose a conservatorship in the event that Fannie Mae became critically undercapitalized.

46.     In 2007, the nation's mortgage market began a precipitous decline as part of the global financial crisis, and an increasing number of mortgages fell into

_____

[5] On June 16, 2010, Fannie Mae announced that, at the direction of the FHFA, its stock would be delisted from the NYSE. On July 7, 2010, Fannie Mae stock ceased trading on the NYSE, and on the following day, July 8, 2010, the Company began trading on the OTC Bulletin Board under the symbol FNMA. Fannie Mae stock continues to be publicly traded on the OTC Bulletin Board.

delinquency and default. Consequently, the markets lost confidence in the financial health of Fannie Mae. Government officials attempted to allay these concerns and shore up confidence in the GSEs. James B. Lockhart, then-Director of OFHEO confirmed that Fannie Mae was "adequately capitalized, holding capital well in excess of [regulatory requirements]" and had a "large liquidity portfolio[], access to the debt market and over $1.5 trillion in unpledged assets."[6]

47.     Nevertheless, given the critical importance of the housing market to the broader U.S. economy and the need to instill confidence in the market, Congress enacted the Housing and Economic Recovery Act of 2008 ("HERA"). HERA created the Federal Housing Finance Agency ("FHFA") as the successor to OFHEO and provided the FHFA with expanded regulatory powers. HERA further defined the FHFA's powers to place Fannie Mae into conservatorship and authorized Fannie Mae to be placed into receivership under certain statutorily-defined circumstances.

## FHFA Places Fannie Mae in Conservatorship

48.     On September 7, 2008, Lockhart announced that the FHFA had placed Fannie Mae in conservatorship.[7] Lockhart described conservatorship as "a statutory process designed to stabilize a troubled institution with the objective of returning [Fannie Mae] to normal business operations." The FHFA pledged to act as the Company's conservator until it was stabilized.

49.     Under HERA, the FHFA's powers as Conservator are limited to only those "necessary to put the [Company] in a sound and solvent condition" and those that

_____

[6] Lockhart would later become Director of the FHFA.

[7] The actual imposition of the conservatorship occurred on September 6, 2008.

"preserve and conserve the assets and property of the [Company]." 12 U.S.C. § 4617(b)
(2)(D). Furthermore, the FHFA, acting in its capacity as Conservator to Fannie Mae,
may "perform all functions of the [Company] in the name of the [Company]" only to the
extent they are "consistent with [its] appointment as conservator." 12 U.S.C. § 4617(b)
(2)(B)(iii).

50.    Lockhart announced that "in order to conserve over $2 billion in capital
every year, the common and preferred stock dividends will be eliminated, but the
common and all preferred stocks will continue to remain outstanding. Subordinated
debt interest and principal payments will continue to be made." However, the
conservatorship did not expropriate any of the outstanding preferred or common stock
in the Company, and the terms of the Company's stock were not formally modified.

51.    Lockhart's announcement envisioned that the Company would eventually
be returned to profitability, and the conservatorship would be lifted. He made clear that
the conservatorship would be run with an eye toward attracting additional private
investment to the Company, noting that "some of the key regulations will be minimum
capital standards, prudential safety and soundness standards and portfolio limits."
According to Lockhart, the purpose of the new regulations was "so that any new investor
will understand the investment proposition."

52.    HERA also authorized Treasury to strengthen Fannie Mae's balance sheet
by purchasing its securities within set time limits and consistent with certain statutory
requirements. Congress authorized Treasury to "purchase any obligations and other
securities issued by the [Company] … on such terms and conditions as the Secretary
may determine and in such amounts as the Secretary may determine" during the time

period from HERA's enactment in 2008 through December 31, 2009. 12 U.S.C. §§ 1455(l)(1)(A), 1719(g)(1)(A). Before exercising that authority, HERA required the Treasury Secretary to determine that purchasing Fannie Mae's securities was "necessary to … provide stability to the financial markets; prevent disruptions in the availability of mortgage finance; and protect the taxpayer." 12 U.S.C. §§ 1455(l)(1)(B), 1719(g)(1)(B).

53.     Pursuant to this temporary authority, Treasury entered into a Preferred Stock Purchase Agreement ("PSPA") with the Company under which the Government would receive a newly-issued series of preferred stock that was senior in priority to all other Fannie Mae stock ("Government Preferred Stock"). Treasury Secretary Henry Paulson ("Paulson") announced, "With this agreement, Treasury receives senior preferred equity shares and warrants that protect taxpayers. Additionally, under the terms of the agreement, common and preferred shareholders bear losses ahead of the new government preferred shares."

54.     In exchange, Fannie Mae was permitted to draw up to $100 billion from Treasury.[8] The Government Preferred Stock had a Liquidation Preference equal to $1 billion plus the sum of all draws by the Company against Treasury's funding commitment and is entitled to a cumulative annual dividend equal to ten percent of the outstanding Liquidation Preference. The PSPA also grants Treasury warrants to purchase up to 79.9% of the Company's common stock at a nominal price.

55.     According to a Treasury fact sheet, the agreement "provides significant protections for the taxpayer, in the form of senior preferred stock with a liquidation

---

[8] In the First Amendment to the PSPA, Treasury and the FHFA agreed to expand this funding commitment to $200 billion in May 2009. In the Second Amendment to the PSPA, on December 24, 2009, Treasury and the FHFA agreed to a funding commitment that would be sufficient to enable the Company to satisfy its capitalization requirements for 2010, 2011, and 2012 and to a funding commitment in subsequent years up to a limit determined by an agreed-upon formula.

preference, an upfront $1 billion issuance of senior preferred stock with a 10% coupon from [Fannie Mae], quarterly dividend payments, warrants representing an ownership stake of 79.9% of [Fannie Mae] going forward, and a quarterly fee starting in 2010."

56.     Fannie Mae's agreement with Treasury expressly contemplated that the Government Preferred Stock would be redeemed at some future date, the agreement with Treasury would be terminated, and the Company would return to full private financing. According to Fannie Mae's Form 8-K, filed with the SEC on September 11, 2008, "If after termination of the [Treasury Department] Commitment, Fannie Mae pays down the liquidation preference of each outstanding share of Senior Preferred Stock in full, the shares will be deemed to have been redeemed as of the payment date."

57.     Under the direction of the FHFA, the Company expected to incur substantial loan losses in the years after being placed in conservatorship. Therefore, the Company booked substantial reserves, recorded anticipated, unrealized loan losses, and under applicable accounting standards, eliminated the value of non-cash deferred tax assets from its balance sheet. These impairments required the Company to draw increasing amounts against Treasury's funding commitment.

58.     As of August 17, 2012, prior to the Third Amendment, the total outstanding Liquidation Preference on the Government Preferred Stock was $117.1 billion.

**Fannie Mae Returns to Profitability**

59.     In 2012, as the housing market and the broader economy began to recover, Fannie Mae returned to profitability again. After three years in conservatorship, it became clear that the Company's financial position was not as bad as had been feared.

The Company's actual realized losses on its mortgages were far less than had been anticipated, and the assets that the Company had initially written down were worth more than was reflected on the Company's balance sheet.

60.    On May 9, 2012, Fannie Mae filed its Form 10-Q with the SEC for the first quarter of 2012. It disclosed the Company's first quarterly profit since the imposition of the conservatorship: a net quarterly income of $2.7 billion and a positive net worth of $268 million (after its payment to Treasury of $2.8 billion in dividends). The Company also announced that as a result of its positive net worth, it would not request a draw from Treasury under the PSPA for the quarter.

61.    At the closing of the second quarter of 2012, the Company announced that it expected to be profitable for the foreseeable future. As a result, the Company would be able to remove the valuation allowance against its deferred tax assets—worth approximately $100 billion—in future years.

62.    After having been placed in conservatorship, Fannie Mae had declared massive non-cash losses, including write-downs of the value of tax assets and loss reserves. As of December 31, 2008, Fannie Mae had established combined loss reserves of $24.8 billion and written down tens of billions more in deferred tax assets. Yet by the close of the first quarter of 2013, it had become clear that these non-cash losses were substantially overstated. The Company, as part of its earnings for that quarter, released $50.6 billion in deferred tax assets and loss reserves, and the Company is expected to release tens of billions more from these accounting reversals next year.

63.    In 2012 and 2013, Fannie Mae's profits grew handsomely. The Company reported quarterly net income of $2.7 billion for the first quarter of 2012, $5.1 billion for

the second quarter of 2012, $1.8 billion for the third quarter of 2012, $7.6 billion for the fourth quarter of 2012, $58.7 billion for the first quarter of 2013,[9] $10.1 billion for the second quarter of 2013, and $8.7 billion for the third quarter of 2013. Since the start of 2012 through the present, Fannie Mae has reported total net income of $94.7 billion.

64.     After nearly two years of profitability, Fannie Mae's balance sheet shows that the Company, absent the Net Worth Sweep, would soon be able to redeem all outstanding Government Preferred Stock pursuant to the terms of the the pre-Third Amendment PSPA. This redemption would enable the Company to continue as a financially solvent, viable, and valuable entity. Absent the Net Worth Sweep, the Company's rapidly growing profitability and net worth would provide a roadmap to exit from the Conservatorship and a return to fully private ownership and operation.

**Treasury and FHFA Execute the Third Amendment**

65.     On August 17, 2012, the Company's optimistic, favorable outlook abruptly ended with the announcement by the Government that it was unilaterally amending the terms of its agreements with Fannie Mae, effective January 1, 2013. The change was devastating. Instead of taking steps to aid in Fannie Mae's return to profitability and exit from conservatorship, Treasury and the FHFA together entered into the Third Amendment to the PSPA. The Third Amendment ensured that Treasury—and not Fannie Mae—would reap the entire benefit of Fannie Mae's newfound profitability. As

---

[9] Fannie Mae's extraordinary first quarter of 2013 reflected a $50.6 billion release of the valuation allowance on the Company deferred tax assets, as discussed *supra*. According to the Company's May 9, 2013 press release, these accounting adjustments were due to "[i]mprovement in Fannie Mae's financial results, the strong credit profile of the company's new book of business, and other factors." Without these adjustments, the Company's pre-tax income for the first quarter of 2013 was $8.1 billion.

explained *infra*, Treasury has not only admitted this was the purpose and effect of the Third Amendment, it expressed pride in its self-serving action.[10]

66.     Under the terms of the Third Amendment, rather than paying Treasury a 10% annual dividend on its Government Preferred Stock, Fannie Mae would now be required to pay every dollar of its entire quarterly net worth, above a nominal, temporary capital reserve, to Treasury as a dividend.[11] In a press release announcing the change, the Treasury Department summarized the new policy as a "Full Income Sweep of All Future Fannie Mae … Earnings to Benefit Taxpayers." In Treasury's own words, the Government would now take "a quarterly sweep of every dollar of profit that [Fannie Mae] earns going forward."[12]

67.     Any increase in the net worth of Fannie Mae flowing from net income or other comprehensive income will automatically be swept to Treasury in its entirety, no matter how large that increase in net worth is or how much it exceeds the 10% dividend that Fannie Mae was obligated to pay pursuant to the pre-Third Amendment PSPA. Furthermore, this new net-worth dividend must be paid to Treasury in cash, even though the net worth of the Company may include non-cash assets, e.g., the deferred tax assets. As a result, Fannie Mae has had to sell non-liquid assets or issue additional debt

---

[10] *See* Press Release, Treasury, Treasury Department Announces Further Steps To Expedite Wind Down Of Fannie Mae And Freddie Mac (Aug. 17, 2012), *available at* http://www.treasury.gov/press-center/press-releases/Pages/tg1684.aspx.

[11] The capital reserve amount starts at $3 billion and steadily decreases by $600 million each year until it is eliminated on January 1, 2018. Under the Net Worth Sweep, the Company's net worth is defined as the amount by which its total assets (excluding Treasury's funding commitment and any unfunded amounts related to the commitment) exceed its total liabilities (excluding any obligation in respect of capital stock), as reflected on the Company's balance sheet with generally accepted accounting principles.

[12] *See* Press Release, Treasury, Treasury Department Announces Further Steps To Expedite Wind Down Of Fannie Mae And Freddie Mac (Aug. 17, 2012), *available at* http://www.treasury.gov/press-center/press- releases/Pages/tg1684.aspx.

to pay the net-worth dividend. This requirement has prevented the Company from maximizing the value of its assets.

68.     The Net Worth Sweep will also permanently prevent Fannie Mae from accumulating any capital, redeeming the Government Preferred Stock, investing in its business, or retaining any profits. And since the Net Worth Sweep, under Treasury's new rules, applies to all new net worth *in perpetuity*, Fannie Mae will *never* be able to do any of these things. Essentially, Treasury and the FHFA have forever converted Fannie Mae's entire net worth into an unlimited Government slush fund. So long as Fannie Mae remains in operation, all of its net worth will be transferred to Treasury, but the outstanding Liquidation Preference will always remain at $117.1 billion. Under the Net Worth Sweep, not a single dollar of Fannie Mae's value can be used for anything except to pay the Government, and even those payments cannot be counted against the Government's outstanding Liquidation Preference.

69.     The Government's purpose in imposing the Net Worth Sweep was remarkably transparent. Treasury unabashedly stated that one of the objectives for the Net Worth Sweep was "[m]aking sure that every dollar of earnings that Fannie Mae … generates[s] will be used to benefit taxpayers for their investment in those firms."[13] In other words, the purpose was not to put the Company on sound financial footing or conserve its assets—but rather to expropriate all of the Company's assets solely to benefit taxpayers.

---

[13] *See* Press Release, Treasury, Treasury Department Announces Further Steps To Expedite Wind Down Of Fannie Mae And Freddie Mac (Aug. 17, 2012), *available at* http://www.treasury.gov/press-center/press-releases/Pages/tg1684.aspx.

70.     Another justification for the Net Worth Sweep was to wind down Fannie Mae as a private company. Treasury explained that the Net Worth Sweep was designed to fulfill "the commitment made in the Administration's 2011 White Paper that the GSEs will be wound down and will not be allowed to retain profits, rebuild capital, and return to the market in their prior form." In another press release, Treasury noted that the Net Worth Sweep would "help expedite the wind down of Fannie Mae" and "support the continued flow of mortgage credit during a responsible transition to a reformed Housing market."

71.     As *Fortune Magazine's* Term Sheet blog explained:[14]

> Why did the Treasury enact the so-called Third Amendment that so radically altered the preferred-stock agreement? By mid-2012, Fannie and Freddie were beginning to generate what would become gigantic earnings as the housing market rebounded. If the original agreement remained in place, the GSEs would build far more than $100 billion in retained earnings, and hence fresh capital, in 2013 alone. That would exert pressure for Congress to allow Fannie and Freddie to pay back the government in full, and reemerge as private players. [Treasury Secretary] Timothy Geithner was strongly opposed to the rebirth of the old Fannie and Freddie. The "sweep clause" that grabbed the entire windfall in profits was specifically designed to ensure that Fannie and Freddie remained wards of the state that would eventually be liquidated.

72.     Indeed, in remarks in Phoenix, AZ on August 6, 2013, President Barack Obama ("President Obama") announced that his Administration would follow through on its promises to wind down Fannie Mae. President Obama explained, "So the good news is, right now there's a bipartisan group of senators working to end Fannie and Freddie as we know them. And I support these kinds of reform efforts."

---

[14] Shawn Tully, *What's Behind Perry Capital's Fannie and Freddie Gambit*, CNN MONEY: A SERVICE OF CNN, FORTUNE, AND MONEY, Jul. 8, 2013, *available at* http://finance.fortune.cnn.com/2013/07/08/whats-behind-perry-capitals-fannie-freddie-gambit/.

73.     The purposes of the Third Amendment—to enrich the Treasury and prepare to wind down Fannie Mae as a private company—were directly at odds with the statutory duties and powers of the FHFA when it acts as Conservator to the Company. Under HERA, the FHFA's powers as Conservator are limited to only those "necessary to put the [Company] in a sound and solvent condition" and those that "preserve and conserve the assets and property of the [Company]." 12 U.S.C. § 4617(b)(2)(D). Furthermore, the FHFA, acting in its capacity as Conservator to Fannie Mae, may "perform all functions of the [Company] in the name of the [Company]" only to the extent they are "consistent with [its] appointment as conservator." 12 U.S.C. § 4617(b)(2)(B)(iii).

74.     The Third Amendment, however, was not necessary to put the company in a "sound and solvent condition" or "preserve and conserve the assets and property" of the Company. At the time the Third Amendment was agreed to, Fannie Mae was already profitable and had announced that it expected to be profitable for the foreseeable future. Instead of preserving and conserving the Company's property, the Third Amendment squandered that property by allowing Treasury to expropriate it.

75.     By agreeing to the Third Amendment, the FHFA took actions that fell outside the scope of its statutory authority when acting as Conservator to Fannie Mae. Therefore, when Fannie Mae signed the Third Amendment, it was not—and could not have been—acting in it capacity as Conservator to Fannie Mae. Instead, the FHFA was acting as a Government agent when it signed the Third Amendment.

76.     The dividends that are being paid to Treasury pursuant to the Third Amendment have resulted in enormous payments to the Government—and will

continue to do so. In 2012, Fannie Mae earned profits of approximately $17.2 billion, and in the first three quarters of 2013, the Company earned profits of approximately $77.5 billion. This includes approximately $50 billion in recaptured tax assets the Company had written off in prior years, and Fannie Mae is expected to recognize tens of billions more in income from deferred tax benefits in the near future. Since the imposition of the Net Worth Sweep, Fannie Mae will have paid the Government an additional $69.4 billion over and above what the Company was obligated to pay in dividends under the pre-Third Amendment PSPA.

77.     While these payments from Fannie Mae to Treasury were enormous, they were not unexpected. According to a report issued by the FHFA's Inspector General ("IG"), the IG noted that the Net Worth Sweep could result in "an extraordinary payment to Treasury."[15] These payments are so large that they even affected the debt-ceiling crisis in 2013. According to a report published by *Politico*, "A Treasury Department official confirmed that the funds returned by [Fannie Mae] will be deposited into the general fund and will be factored into how long the department can continue to pay the government's bills before running up against the debt ceiling."[16] *Politico* further explained that according to the Bipartisan Policy Center, Fannie Mae's nearly $60 billion dollar dividend payment from the first quarter of 2013 "would likely push back the date when the government will breach the debt ceiling until October, if it is not raised before then."

---

[15] *See* FHFA Office of Inspector General, *Analysis of the 2012 Amendments to the Government Stock Purchase Agreements*, at 15 (Mar. 20, 2013).

[16] *See* Jon Prior, F*annie Mae's Big Payoff: $59B Sent to Feds*, Politico, May 9, 2013, *available at* http://www.politico.com/story/2013/05/fannie-mae-to-send-treasury-big-payday-91128.html.

78.     Pursuant to the Third Amendment, the Government will likely recoup every dollar of the $117.1 billion it infused into Fannie Mae, with interest, by early 2014. And over the next decade, the Government will collect tens of billions of additional dollars in profits from Fannie Mae.

### The Net Worth Sweep Is an Unlawful Taking of Fannie Mae's Private Property Without Just Compensation

79.     Before the imposition of the conservatorship, Fannie Mae operated as a private company, which secured capital from private investors and was traded on a public stock exchange.

80.     Under HERA, the FHFA's limited role as Conservator was to operate Fannie Mae so as to render it "sound and solvent" and to "conserve [its] assets and property" with the goal of returning the Company to financial health. But instead of attempting to rehabilitate Fannie Mae in good faith, the FHFA exceeded its statutory authority as Conservator and, together with Treasury, raided the Company's assets for use by the Government.

81.     By unilaterally imposing the Third Amendment, the Government required Fannie Mae to provide the United States with "every dollar of earnings" from the Company in perpetuity. It entirely deprives Fannie Mae of all of its reasonable value for as long as the Company remains in business.

82.     For all intents and purposes, the Government's Net Worth Sweep is indistinguishable from simply "taking" the Company outright. By taking "every dollar of earnings" of Fannie Mae in perpetuity, the Government has effectively nationalized the Company, albeit without the attendant stigma of such a brazen act. Were the

Government to simply "take" a private company for public use, the Fifth Amendment would mandate the payment of "just compensation." Likewise, when the effect of Government action is the total deprivation of all reasonable economic value of the property, a taking also exists, and "just compensation" must be paid.

83.     As a direct result of the Government's imposition of the Third Amendment, Fannie Mae has no reasonable economic value. By the Third Amendment's express terms, Fannie Mae cannot have net worth. It cannot accumulate any capital, invest in its business, or retain profits. And since the Net Worth Sweep applies now and forever, Fannie Mae's predicament is permanent; it will *never* have any reasonable economic value.

84.     Additionally, by executing the Net Worth Sweep, the Government's actions had the effect of permanently depriving the Company of all economic value, defeated the reasonable, investment-backed expectations of the Company under the original PSPA, and unilaterally abrogated the Company's rights under the original PSPA.

85.     Fannie Mae's economic value was taken, not to make the Company "sound and solvent" or "conserve [its] assets and property," but rather for the public use of the Government. As Treasury has admitted on numerous occasions, its plan is to unwind the Company and maximize its return not for the Company but for the Government. And it has generated massive new revenues for that purpose. By December 31, 2013, Fannie Mae will have paid $113.9 billion in dividends to taxpayers, and it is on track to transfer tens, if not hundreds, of billions more. Fannie Mae's website, now operated by the Government, even boasts of its enormous payments to taxpayers in a banner

headline on its homepage.[17] As Guggenheim Partners analyst Jaret Seiberg wrote in a note to clients, "Washington could quickly get addicted to the revenue from Fannie and Freddie."

86.     While the Government has collected over a hundred billion dollars in dividend payments from Fannie Mae—and is on track to collect billions more—the Company has never been provided with just compensation for the loss of its entire economic value. Indeed, it has not been provided with any compensation at all. Therefore, the Government's Net Worth Sweep constitutes an unlawful taking without just compensation in violation of the Fifth Amendment to the U.S. Constitution.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

### Demand on Fannie Mae's Board Would Be Futile and Is Excused

87.     Demand on Fannie Mae's Board to institute this litigation would be futile and is excused. Because the Conservator has assumed all of the powers of the Board, there are no independent directors who could consider a pre-suit demand.

88.     As reported in the Company's public filings, on September 6, 2008, at the request of the Secretary of the Treasury, the Chairman of the Board of Governors of the Federal Reserve, and the Director of FHFA, Fannie Mae's Board adopted a resolution consenting to the Company's placement into conservatorship. The Director of FHFA then appointed the FHFA as Fannie Mae's Conservator on September 6, 2008, in accordance with the Regulatory Reform Act and the Federal Housing Enterprises Financial Safety and Soundness Act.

---

[17] *See* Fannie Mae website, *Fannie Mae reports 7th consecutive quarterly profit and will pay $114 billion\* in dividends to taxpayers*, http://www.fanniemae.com (Nov. 18., 2013). In a video posted on the Company's web site, the FHFA enthusiastically declares that the Company will "be providing value to taxpayers for years to come."

89.     As confirmed by the Company's public filings, upon its appointment, the FHFA "immediately succeeded to all rights, titles, powers and privileges of Fannie Mae, and of any ... director of Fannie Mae with respect to Fannie Mae and its assets, and succeeded to the title to all books, records and assets held by any other legal custodian or third party [of Fannie Mae]. The conservator has the power to take over [Fannie Mae's] assets and to operate [Fannie Mae's] business ... and to conduct all business of the company." The FHFA has overall management authority over Fannie Mae's business when it acts in accordance with its statutory authority as Conservator.

90.     In announcing the appointment of FHFA as Conservator of Fannie Mae, Director Lockhart stated on September 7, 2008 that "FHFA will assume the power of the Board and management." Accordingly, Fannie Mae's Board no longer has the power or duty to manage, direct, or oversee the business and affairs of the Company, including whether to bring suit for the taking of the Company's property by the Government.

91.     Even if Fannie Mae's directors did have the power to initiate this action, which they clearly do not, Fannie Mae's directors, and each of them individually, lack the necessary independence to do so. Fannie Mae's directors were appointed by, and thereby are beholden to and controlled by, the FHFA. As the Company reported in its Form 8-K filing with the SEC on December 24, 2008, the FHFA reconstituted Fannie Mae's Board by handpicking and appointing Fannie Mae's directors. The FHFA also directs the function and authorities of the Board.

92.     Fannie Mae's Code of Conduct and Conflicts of Interest Policy for Members of the Board ("Code of Conduct") further confirms that Fannie Mae's directors

are entirely beholden to the FHFA and lack the independence necessary to consider a pre-suit demand. Fannie Mae's Code of Conduct states, in relevant part:

> For as long as the Corporation remains under the conservatorship, the directors of the Corporation shall serve on behalf of the Conservator and shall be required to exercise authority as directed by and with the approval, where required, of the Conservator and shall have no duties to any person or entity except to the Conservator. Accordingly, the directors are not obligated to consider the interests of the Corporation, the holders of the Corporation's equity or debt securities or the holders of the Corporation's mortgage-backed securities, unless specifically directed to do so by the Conservator.

93.     Both Fannie Mae's public filings with the SEC and its by-laws confirm that the Board has no independent power separate from the FHFA. According to Fannie Mae's 2011 and 2012 10-K statements, "Our directors serve on behalf of the conservator and exercise authority as directed by and with the approval, where required, of the conservator. Our directors do not have any duties to any person or entity except the conservator. Accordingly, our directors are not obligated to consider the interests of the company … unless specifically directed to do so by the conservator."

94.     Additionally, the 10-Ks acknowledge that the FHFA has "directed the Board to consult with and obtain the approval of the conservator" before taking action in specific areas, including: actions involving capital stock; dividends; the Stock Purchase Agreement; increases in risk limits; material changes in accounting policy and reasonably foreseeable material increases in operational risk; matters that relate to the conservatorship; and any action that in the reasonable business judgment of the Board at the time that is likely to cause significant reputational risk.

95.     Likewise, the Company's by-laws confirm, "The Board serves on behalf of the conservator and shall exercise their authority as directed by the conservator."

96.    Since the Board is both completely controlled by the FHFA and lacks the authority to take action against the Government, demand on the Board would be futile and is excused.

### Demand on the FHFA Would Be Futile and Is Excused

97.    To the extent that demand would, or should, be made on the FHFA itself, such demand also would be futile because the FHFA has manifest, disabling, and irreconcilable conflicts of interest with respect to this action and lacks the independence necessary to consider a pre-suit demand.

98.    It would be impractical, if not absurd, for the FHFA, an agency of the United States government, to sue the United States government, alleging claims based on both the Treasury Department's—and its own—actions. As a party to the Third Amendment, the FHFA's conduct is at the heart of this action, which challenges the very unconstitutional actions in which the FHFA participated. As an agency of the federal government, the FHFA is interested in and benefits from the Third Amendment and cannot reasonably be expected to initiate litigation for the 5th Amendment takings claims alleged herein.

99.    Moreover, any takings action initiated by the FHFA against the United States would necessarily implicate not only itself but also the U.S. Department of Treasury. Yet, as explained *infra*, Treasury exercises *de facto* control over the actions of the FHFA, further exposing the FHFA's manifest conflict of interest.

100.    The Treasury Department is a closely-related sister federal agency that has acted in concert with the FHFA throughout the conservatorship. Together, the FHFA and Treasury placed Fannie Mae in conservatorship; established the Preferred Stock

Purchase Agreement between Treasury and Fannie Mae and then amended the PSPA three times, including the Third Amendment at issue in this Action; established a new secured lending credit facility available to Fannie Mae; and initiated a new program to purchase the mortgage-backed securities of Fannie Mae. Furthermore, the Secretary of the Treasury occupies one of the four reserved seats on the Federal Housing Oversight Board ("FHOB"), which is statutorily required to "advise the Director [of FHFA] with respect to overall strategies and policies in carrying out the duties of the Director under [HERA]." 12 U.S.C. § 4513a.

101.    It is the Treasury Department's actions, together with the FHFA, which comprise the heart of this action. The Net Worth Sweep was instituted through an agreement between the FHFA and Treasury (the "Third Amendment"), and both the FHFA and Treasury directly reap the benefits of this incestuous relationship to the detriment of the Company. These close and disabling ties between the FHFA and Treasury—and the FHFA's own actions—preclude the FHFA from exercising independent judgment. In fact, without the close and disabling ties between Treasury and the FHFA, the unlawful conduct complained of herein may have never occurred in the first instance.

102.    The FHFA is statutorily required to operate Fannie Mae so as to render it "sound and solvent" and to "conserve [its] assets and property." Yet despite that mandate, the FHFA exceeded the scope of its statutory authority as Conservator under HERA and entered into a self-dealing pact with Treasury to provide the United States with "every dollar of earnings" from the Company in perpetuity. These two federal government agencies did not act separately in agreeing to the Third Amendment.

Instead, the FHFA's actions were motivated by its conflicted relationship with Treasury. As a practical matter, any entity that has so capitulated to Treasury that it exceeds its statutory authority as Conservator and permits Treasury to execute a "Net Worth Sweep" of all of Fannie Mae's earnings in perpetuity cannot reasonably be expected to sue itself and allege its own conduct was unconstitutional.

103.    In signing the Third Amendment, the FHFA was not managing Fannie Mae for the benefit of the Company but rather for the benefit of the Government. On March 4, 2013, FHFA Acting Director DeMarco delivered remarks to the National Association for Business Economics's annual policy conference, entitled "FHFA's Conservatorship Principles for 2013." DeMarco explained, "FHFA has reported on numerous occasions that, with taxpayers providing capital supporting [Fannie Mae's] operations, this 'preserve and conserve' mandate directs FHFA to minimize losses on behalf of taxpayers." Instead of "preserving and conserving" the assets of Fannie Mae for the Company, as mandated by statute, DeMarco unmasked the FHFA's—and the Treasury Department's—real directive: to "preserve and conserve" the private assets of Fannie Mae for public use by the Government.

104.    Under these circumstances, the FHFA, as a federal government agency at the heart of the unlawful conduct, cannot be expected to pursue a lawsuit against the United States, necessarily based on both its own actions and those of the Treasury Department with which it conspired. As a result of these manifest, disabling, and irreconcilable conflicts of interest, the FHFA is incapable of pursuing a derivative claim for an unlawful taking on behalf of the Company against the United States. Therefore, to

the extent demand would, or should, be made on the FHFA, such demand would be futile and is excused.

105.    Additionally, demand would also be futile and is excused, because the Third Amendment served no legitimate business purpose of Fannie Mae. Instead, the Third Amendment was solely designed to benefit the Government and was plainly counter to the interests of the Company.

## CLAIMS FOR RELIEF

### Unlawful Taking Without Just Compensation
### Under the Fifth Amendment to U.S. Constitution

106.    Plaintiffs incorporate by reference and reallege each and every allegation of the preceding paragraphs, as though fully set forth herein.

107.    The Fifth Amendment to the United States Constitution provides that no person shall "be deprived of life liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."

108.    By imposing the Third Amendment, which in Treasury's own words was designed to take "every dollar of earnings [Fannie Mae] generates … to benefit taxpayers," the Government took all reasonable value of the Company for public use.

109.    When the Government takes private property for a public use or a public purpose, the Fifth Amendment requires the payment of "just compensation."

110.    The Government did not pay—and under the Third Amendment will not pay—just compensation to Fannie Mae for its taking of the entire net worth of the Company. As a result, Fannie Mae has been injured and is entitled to just compensation

in a sum equal to the amounts taken by the Government through its unconstitutional imposition of the Third Amendment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of Fannie Mae, demand judgment against the United States of America as follows:

A.  Finding that the United States has unlawfully taken the private property of Fannie Mae for public use without just compensation in violation of the Takings Clause of the Fifth Amendment to the U.S. Constitution;

B.  Determining and awarding Fannie Mae just compensation for the Government's taking of its property;

C.  Awarding Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, experts' fees, costs, and other expenses; and

D.  Granting such other and further relief as the Court deems just and proper.

DATED: December 2, 2013                    **SCHUBERT JONCKHEER & KOLBE LLP**


BY:     /s/ Robert C. Schubert
       ROBERT C. SCHUBERT

Robert C. Schubert
Attorney of Record
*rschubert@schubertlawfirm.com*

Three Embarcadero Ctr Ste 1650
San Francisco, CA 94111-4018
Ph: 415-788-4220
Fx: 415-788-0161


OF COUNSEL:                    **SCHUBERT JONCKHEER & KOLBE LLP**

Noah M. Schubert
*nschubert@schubertlawfirm.com*

Miranda P. Kolbe
*mkolbe@schubertlawfirm.com*

Three Embarcadero Ctr Ste 1650
San Francisco, CA 94111-4018
Ph: 415-788-4220
Fx: 415-788-0161


**SHAPIRO HABER & URMY LLP**

Edward F. Haber
*ehaber@shulaw.com*

53 State Street
Boston, MA 02109
Ph: 617-439-3939
Fx: 617-439-0134

*Attorneys for Plaintiffs*

## VERIFICATION

I, **Bryndon Fisher**, hereby verify and declare under penalty of perjury that I have reviewed the First Amended Consolidated Derivative Complaint, know the contents thereof, and authorize its filing. The foregoing is true and correct to the best of my knowledge, information, and belief, based on investigation of counsel. I have personal knowledge of the facts stated in paragraph 22 of the Complaint, which are true and correct.

DATED: 11/28/2013

_____
BRYNDON FISHER

I, **Bruce Reid,** hereby verify and declare under penalty of perjury that I have reviewed the First Amended Consolidated Derivative Complaint, know the contents thereof, and authorize its filing. The foregoing is true and correct to the best of my knowledge, information, and belief, based on investigation of counsel. I have personal knowledge of the facts stated in paragraph 23 of the Complaint, which are true and correct.

DATED: 11/28/2013

_____
BRUCE REID

## VERIFICATION

I, **Erick Shipmon**, hereby verify and declare under penalty of perjury that I have reviewed the First Amended Consolidated Derivative Complaint, know the contents thereof, and authorize its filing. The foregoing is true and correct to the best of my knowledge, information, and belief, based on investigation of counsel. I have personal knowledge of the facts stated in paragraph 24 of the Complaint, which are true and correct.

DATED: 11/27/13

_____

ERICK SHIPMON