IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| WASHINGTON FEDERAL, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | No. 13-385C |
| | ) | (Chief Judge Sweeney) |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| FAIRHOLME FUNDS, INC., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 13-465C |
| v. | ) | (Chief Judge Sweeney) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

*Additional plaintiffs on following pages

## DEFENDANT'S AMENDED OMNIBUS MOTION TO DISMISS

JOSEPH H. HUNT
Assistant Attorney General

ROBERT E. KIRSCHMAN, JR.
Director

KENNETH M. DINTZER
Deputy Director
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
Telephone: (202) 616-0385
Facsimile:  (202) 307-0973
Email:      Kenneth.Dintzer@usdoj.gov

October 1, 2018                    Attorneys for Defendant

| | | |
|---|---|---|
| JOSEPH CACCIAPALLE, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | No. 13-466C |
| | ) | (Chief Judge Sweeney) |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| BRYNDON FISHER, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | No. 13-608C |
| | ) | (Chief Judge Sweeney) |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| ARROWOOD INDEMNITY | ) | |
| COMPANY, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | No. 13-698C |
| | ) | (Chief Judge Sweeney) |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| BRUCE REID, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | No. 14-152C |
| | ) | (Chief Judge Sweeney) |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

| | | |
|---|---|---|
| LOUISE RAFTER, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | No. 14-740C |
| | ) | (Chief Judge Sweeney) |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| OWL CREEK ASIA I, L.P., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | No. 18-281C |
| | ) | (Chief Judge Sweeney) |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| AKANTHOS OPPORTUNITY MASTER FUND, L.P., | ) | |
| | ) | |
| Plaintiff, | ) | No. 18-369C |
| | ) | (Chief Judge Sweeney) |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| APPALOOSA INVESTMENT LIMITED PARTNERSHIP I, *et al.*, | ) | |
| | ) | |
| Plaintiff, | ) | No. 18-370C |
| | ) | (Chief Judge Sweeney) |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

| | | |
|---|---|---|
| CSS, LLC, | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | No. 18-371C |
| | ) | (Chief Judge Sweeney) |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

| | | |
|---|---|---|
| MASON CAPITAL L.P., *et al.*, | ) | |
| | ) | |
| Plaintiff, | ) | No. 18-529C |
| | ) | (Chief Judge Sweeney) |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... v

GLOSSARY ........................................................................................................................ xviii

INTRODUCTION ..................................................................................................................... 1

QUESTIONS PRESENTED ...................................................................................................... 6

STATEMENT OF THE CASE................................................................................................... 7

    I.      Background.................................................................................................... 7

    II.     Conservatorship And Treasury's Stock Purchase Agreements With The
          Enterprises................................................................................................... 8

    III.    FHFA As Conservator And Treasury Execute The Third Amendment ............... 11

    IV.   Procedural History Of The Third Amendment Cases........................................... 12

          A.      The Court Of Federal Claims Actions ....................................................... 12

          B.      The District Court Actions........................................................................ 13

                1.      In *Perry Capital*, Courts In The District Of Columbia Circuit
                          Rejected Plaintiffs' Efforts To Unwind The Third Amendment ...14

                2.      Federal Courts Have Uniformly Dismissed Other Third
                          Amendment Shareholder Challenges.............................................16

ARGUMENT ......................................................................................................................... 18

    I.      Standards Of Review .................................................................................. 18

          A.      Rule 12(b)(1).......................................................................................... 18

          B.      Rule 12(b)(6).......................................................................................... 19

    II.     The Court Lacks Jurisdiction To Entertain The Complaints Because FHFA Is Not
          The United States For Tucker Act Purposes When Acting As The Enterprises'
          Conservator ................................................................................................ 20

           A.      FHFA As Conservator Stands In The Enterprises' Shoes ......................... 22

B.    Plaintiffs' Own Allegations Confirm That Treasury And FHFA Acted Independently When They Entered Into The Third Amendment .............23

III.    Under HERA's Succession Clause, Enterprise Shareholders Lack Standing To Bring Derivative Suits...........................................................................26

A.    All Of Plaintiffs' Claims Against The United States Are Derivative Because They Arise From The Enterprises' Alleged Injuries ..................27

B.    HERA Contains No Implicit "Conflict of Interest" Exception To The Succession Clause ......................................................................32

C.    Issue Preclusion Compels Dismissal Of Shareholder Derivative Claims ...........................................................................37

IV.    This Court Does Not Possess Jurisdiction To Entertain Plaintiffs' Allegedly Direct Contract Claims Because No Plaintiff Is Party To A Contract With The United States ....................................................................40

A.    Plaintiffs Are Not In Contractual Privity With The United States ............41

B.    Plaintiffs Are Not Third-Party Beneficiaries Of Any Contract With The United States ..........................................................42

V.    The Court Lacks Jurisdiction To Entertain Claims That Sound In Tort...............43

A.    Plaintiffs' Breach Of Fiduciary Duty Claims Sound In Tort....................43

B.    Plaintiffs' Takings And Illegal Exaction Claims Sound In Tort...............44

VI.    Plaintiffs That Did Not Own Shares At The Time Of The Alleged Taking, Illegal Exaction, or Breach Lack Standing To Pursue Their Claims....................46

VII.    Under 28 U.S.C. § 1500, The Court Lacks Jurisdiction To Entertain The *Fairholme*, *Cacciapalle*, And *Arrowood* Complaints............................................48

VIII.    Plaintiffs Fail To State A Plausible Takings Claim ...............................................50

A.    Plaintiffs' Purported "Economic Interests" In Fannie Mae And Freddie Mac Stock Do Not Create A Legally Cognizable Property Right Under The Takings Clause.................................................................51

B.    The *Cacciapalle* Plaintiffs Have No Compensable Property Rights In Either A Shareholder Derivative Suit Or A Declaratory/Injunctive Relief Claim................................................................54

C.      Allegations That The Government Frustrated Performance Of A Private Contract Do Not State A Takings Claim ....................................................55

D.      In Any Case, The Complaints Fail To Allege A Regulatory Taking.........58

       1.      Plaintiffs Cannot Plausibly Allege A Categorical Regulatory Taking Because They Cannot Show That The Third Amendment Impacted Their Existing Rights In Fannie Mae And Freddie Mac Stock .....................................................................................59

       2.      Plaintiffs Cannot Allege The Elements Of A *Penn Central* Regulatory Taking .......................................................................62

             a.      The Third Amendment Did Not Impose An Economic Impact On Plaintiffs Because Their "Economic Interests" In The Enterprises Were Worth The Same Before And After The Third Amendment ...............................................62

             b.      Enterprise Shareholders Have No Reasonable Investment-Backed Expectation That The Enterprises Would Rebuild Capital ..................................................................63

             c.      Plaintiffs Do Not Bear A Financial Burden That Should Again Fall On The Public ..................................................67

E.    Plaintiffs' Allegations Of Unauthorized Conduct Defeat Their Takings Claims ...................................................................................................68

IX.      Plaintiffs Fail To State A Plausible Illegal Exaction Claim ...................................69

     A.      The Government Has None Of Plaintiffs' Monies Or Other Property "In Its Pocket"....................................................................................................70

     B.      HERA Is Not A Money-Mandating Statute And, In Any Event, The Third Amendment Was Within The Scope Of FHFA's Authority Under HERA........................................................................................................70

X.      Plaintiffs Fail To State A Plausible Breach Of Fiduciary Duty Claim .................71

     A.      HERA Preempts Plaintiffs' Breach Of Fiduciary Duty Claims Against FHFA ......................................................................................................72

     B.      HERA Preempts Plaintiffs' Breach Of Fiduciary Duty Claims Against Treasury ...................................................................................................74

XI.      Plaintiffs Fail To State A Plausible Breach of Contract Claim ............................75

XII.   The *Washington Federal* Plaintiffs' Claims Stemming From FHFA's Appointment As Conservator Are Untimely Under HERA ................................79

CONCLUSION ............................................................................................................81

LIST OF COMPLAINTS ............................................................................................82

# TABLE OF AUTHORITIES

## Cases

*767 Third Ave. Assocs. v. United States*,
    48 F.3d 1575 (Fed. Cir. 1995) ........................................................................... 57

*A&D Auto Sales, Inc. v. United States*,
    748 F.3d 1142 (2014) ................................................................................... 59, 62

*Acceptance Ins. Cos. v. United States*,
    583 F.3d 849 (Fed. Cir. 2009) ............................................................... 19, 51, 53

*Adams v. United States*,
    20 Cl. Ct. 132 (1990) ........................................................................................ 46

*Aerolineas Argentinas v. United States*,
    77 F.3d 1564 (Fed. Cir. 1996) .......................................................................... 69

*Agostino v. Hicks*,
    845 A.2d 1110 (Del. Ch. 2004) ........................................................................ 29

*Air Pegasus of D.C., Inc. v. United States*,
    424 F.3d 1206 (Fed. Cir. 2005) ................................................................... 56, 57

*Am. Cont'l Corp. v. United States*,
    22 Cl. Ct. 692 (1991) .......................................................................... 51, 63, 64

*Ameristar Fin. Servicing Co. v. United States*,
    75 Fed. Cl. 807 (2007) ..................................................................................... 22

*Arduini v. Hart*,
    774 F.3d 622 (9th Cir. 2014) ........................................................................... 39

*Arizona v. California*,
    530 U.S. 392 (2000) ......................................................................................... 38

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ......................................................................................... 19

*B&B Hardware Inc. v. Hargis Indus., Inc.*,
    135 S. Ct. 1293 (2015) ..................................................................................... 38

*Baldwin v. Iowa State Traveling Men's Ass'n*,
    283 U.S. 522 (1931) ......................................................................................... 38

*Banks v. United States*,
    88 Fed. Cl. 665 (2009) ................................................................ 47

*Banner v. United States*,
    238 F.3d 1348 (Fed. Cir. 2001)................................................... 38

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)..................................................................... 19

*Bell/Heery v. United States*,
    106 Fed. Cl. 300 (2012) ......................................................... 19, 20

*Beneficial Indus. Loan Corp. v. Smith*,
    170 F.2d 44 (3d Cir. 1948)......................................................... 54

*Bhatti v. Fed. Hous. Fin. Agency*,
    No. 17-2185, 2018 WL 3336782 (D. Minn. July 6, 2018) ............... 16, 17

*Blasband v. Rales*,
    971 F.2d 1034 (3d Cir. 1992)..................................................... 29

*Bowers v. Whitman*,
    671 F.3d 905 (9th Cir. 2012) ..................................................... 55

*Boyle v. United Techs. Corp.*,
    487 U.S. 500 (1988)..................................................................... 72

*Branch v. United States*,
    69 F.3d 1571 (Fed. Cir. 1995)............................................... 51, 67

*Brandt v. United States*,
    710 F.3d 1369 (Fed. Cir. 2013)................................................... 50

*Brooks v. Dunlop Mfg.*,
    702 F.3d 624 (Fed. Cir. 2012)..................................................... 76

*Brown v. United States*,
    105 F.3d 621 (Fed. Cir. 1997)............................................... 20, 46

*Cal. Hous. Sec., Inc. v. United States*,
    959 F.2d 955 (Fed. Cir. 1992)............................................ *passim*

*Camellia Apartments, Inc. v. United States*,
    334 F.2d 667 (Ct. Cl. 1964) ....................................................... 69

*Campbell v. United States*,
    134 Fed. Cl. 764 (2017) ........................................................................... 53

*Campbell v. United States*,
    137 Fed. Cl. 54 (2018) ......................................................................... 54, 55

*Castle v. United States*,
    301 F.3d 1328 (Fed. Cir. 2002).............................................................. 42, 43

*Clapp v. United States*,
    127 Ct. Cl. 505 (1954) ............................................................................. 69

*Collins v. Mnuchin*,
    No. 17-20364, 2018 WL 3430826 n.67 (5th Cir. July 16, 2018) ........................ 17, 18

*Cont'l W. Ins. Co. v. Fed. Hous. Fin. Agency*,
    83 F. Supp. 3d 828 (S.D. Iowa 2015) ............................................................ 17

*Copar Pumice Co. v. United States*,
    112 Fed. Cl. 515 (2013) ........................................................................... 19

*Corrigan v. United States*,
    82 Fed. Cl. 301 (2008) ............................................................................ 19

*Cottrell v. Duke*,
    737 F.3d 1238 (8th Cir. 2013) .................................................................... 39

*Cowin v. Bresler*,
    741 F.2d 410 (D.C. Cir. 1984)..................................................................... 29

*Crosby v. Nat'l Foreign Trade Council*,
    530 U.S. 363 (2000)................................................................................ 72

*CRV Enters., Inc. v. United States*,
    626 F.3d 1241 (Fed. Cir. 2010)................................................................... 46

*Cyprus Amax Coal Co. v. United States*,
    205 F.2d 1369 (Fed. Cir. 2000).................................................................... 70

*D&N Bank v. United States*,
    331 F.3d 1374 (Fed. Cir. 2003).................................................................... 77

*De-Tom Enters., Inc. v. United States*,
    552 F.2d 337 (Ct. Cl. 1977) ....................................................................... 46

*Delta Sav. Bank v. United States,*
    265 F.3d 1017 (9th Cir. 2001) ....................................................... 33, 34

*Dole Food Co. v. Patrickson,*
    538 U.S. 468 (2003)........................................................................... 27

*Domino's Pizza, Inc. v. McDonald,*
    546 U.S. 470 (2006)........................................................................... 27

*Eastport S.S. Corp. v. United States,*
    372 F.2d 1002 (Ct. Cl. 1967) ............................................................ 69

*El Paso Pipeline GP Co. v. Brinckerhoff,*
    152 A.3d 1248 (Del. 2016) ........................................................... 28, 31

*First Hartford Corp. Pension Plan & Trust v. United States,*
    194 F.3d 1279 (Fed. Cir. 1999)............................................. 33, 34, 35, 37

*Franklin Sav. Corp. v. United States,*
    56 Fed. Cl. 720 (2003) ................................................................. 38, 43

*Franklin Sav. Corp. v. United States,*
    46 Fed. Cl. 533 (2000) ...................................................................... 45

*Gaff v. Fed. Deposit Ins. Corp.,*
    814 F.2d 311 (6th Cir. 1987), *aff'd*, 409 F.3d 1360 (Fed. Cir. 2005) ...................................... 29

*German Alliance Ins. Co. v. Home Water Supply Co.,*
    226 U.S. 220 (1912)........................................................................... 42

*Gibson v. Resolution Trust Corp.,*
    51 F.3d 1016 (11th Cir. 1995) ...................................................... 79, 80

*Glass v. United States,*
    258 F.3d 1349 (Fed. Cir. 2001).................................................... 42, 43

*Globex Corp. v. United States,*
    54 Fed. Cl. 343 (2002) ...................................................................... 40

*Golden Pacific Bancorp v. United States,*
    25 Cl. Ct. 768 (1992) ................................................................... 45, 46

*Golden Pacific Bancorp v. United States,*
    15 F.3d 1066 (Fed. Cir. 1994)........................................................ *passim*

*Hartsel v. Vanguard Grp., Inc.*,
   No. 5394, 2011 WL 2421003 (Del. Ch. June 15, 2011), *aff'd*, 38 A.3d 1254 (Del.2012)........ 28

*Hawkeye Commodity Promotions, Inc. v. Vilsack*,
   486 F.3d 430 (8th Cir. 2007) ................................................................. 59

*Herron v. Fannie Mae*,
   861 F.3d 160 (D.C. Cir. 2017) ............................................................... 22

*Hillman v. Maretta*,
   569 U.S. 483 (2013)............................................................................ 72

*Holland v. United States*,
   59 Fed. Cl. 735 (2004) ......................................................................... 30

*Hometown Fin., Inc. v. United States*,
   56 Fed. Cl. 477 (2003) .................................................................... 29, 30

*Huntleigh USA Corp. v. United States*,
   525 F.3d 1370 (Fed. Cir. 2008).............................................................. 55

*In re Ionosphere Clubs, Inc.*,
   17 F.3d 600 (2d Cir. 1994).................................................................... 29

*In re Morgan Stanley Info. Fund Sec. Litig.*,
   592 F.3d 347 (2d Cir. 2010).................................................................. 11

*In re Sonus Networks, Inc. S'holder Derivative Litig.*,
   499 F.3d 47 (1st Cir. 2007)................................................................... 39

*Jacobs v. Fed. Hous. Fin. Agency*,
   No. 15-708-GMS, 2017 WL 5664769 (D. Del. Nov. 27, 2017)............................. 17

*John v. United States*,
   77 Fed. Cl. 788 (2007) ......................................................................... 38

*Kauffman v. Dreyfus Fund, Inc.*,
   434 F.2d 727 (3d Cir. 1970)................................................................... 28

*Keene Corp. v. United States*,
   508 U.S. 200 (1993)............................................................................ 50

*Kellmer v. Raines*,
   674 F.3d 848 (D.C. Cir. 2012) .......................................................... 26, 27

*Kramer v. W. Pac. Indus., Inc.*,
546 A.2d 348 (Del. 1988) ................................................................. 28

*Kroeger v. U.S. Postal Serv.*,
865 F.2d 235 (Fed. Cir. 1988) .......................................................... 38

*Lewis v. United States*,
99 Fed. Cl. 772 (2011) ..................................................................... 19

*Love Terminal Partners L.P. v. United States*,
889 F.3d 1331 (Fed. Cir. 2018) ............................................. 59, 62, 63

*Lucas v. S. Carolina Coastal Council*,
505 U.S. 1003 (1992) ................................................................ *passim*

*Mangiafico v. Blumenthal*,
471 F.3d 391 (2d Cir. 2006) ............................................................. 20

*Maniere v. United States*,
31 Fed. Cl. 410 (1994) ................................................................ 46, 47

*Matter of Lifschultz Fast Freight*,
132 F.3d 339 (7th Cir. 1997) ....................................................... 74-75

*Matthews v. United States*,
72 Fed. Cl. 274 (2006) ..................................................................... 18

*McNutt v. Gen. Motors Acceptance Corp. of Indiana*,
298 U.S. 178 (1936) ..................................................................... 18-19

*Meridian Invs., Inc. v. Fed. Home Loan Mort. Corp.*,
855 F.3d 573 (4th Cir. 2017) ........................................................... 22

*Moda Health Plan, Inc. v. United States*,
892 F.3d 1311 (Fed. Cir. 2018) .................................................. 41, 76

*Montana v. United States*,
440 U.S. 147 (1979) ......................................................................... 38

*Nathan v. Rowan*,
651 F.2d 1223 (6th Cir. 1981) ......................................................... 39

*National R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry.*,
470 U.S. 451 (1985) ......................................................................... 76

*Newby v. United States*,
    57 Fed. Cl. 283 (2003) ..................................................................................... 43

*Norman v. United States*,
    429 F.3d 1081 (Fed. Cir. 2005)............................................................. 21, 69, 70

*Northstar Fin. Advisors, Inc. v. Schwab Invs.*,
    779 F.3d 1036 (9th Cir. 2015) ......................................................................... 11

*O. Ahlborg & Sons, Inc. v. United States*,
    74 Fed. Cl. 178 (2006) ..................................................................................... 40

*Omnia Commercial Co. v. United States*,
    261 U.S. 502 (1923)............................................................................. 55, 56, 57

*O'Melveny & Myers v. Fed. Deposit Ins. Corp.*,
    512 U.S. 79 (1994)............................................................................................ 22

*Pac. Gas & Elec. Co. v. United States*,
    838 F.3d 1341 (Fed. Cir. 2016).......................................................................... 41

*Palmyra Pac. Seafoods LLC v. United States*,
    561 F.3d 1361 (Fed. Cir. 2009)........................................................................ 56

*Pareto v. FDIC*,
    139 F.3d 696 (9th Cir. 1998) ........................................................................... 29

*Penn Central Transportation Co. v. City of New York*,
    438 U.S. 104 (1978)............................................................................. 62, 63, 67

*Perry Capital LLC v. Lew*,
    70 F. Supp. 3d 208 (D.D.C. 2014) ............................................................ *passim*

*Perry Capital LLC v. Mnuchin*,
    864 F.3d 591 (D.C. Cir. 2017), *cert. denied*, 138 S. Ct. 978 (2018) ................ *passim*

*PIN/NIP, Inc. v. Platte Chem. Co.*,
    304 F.3d 1235 (Fed. Cir. 2002).......................................................................... 18

*Piszel v. United States*,
    833 F.3d 1366 (Fed. Cir. 2016), *cert. denied*, 138 S. Ct. 85 (2017) ............. 56, 57, 58

*Regents of Univ. of New Mexico v. Knight*,
    321 F.3d 1111 (Fed. Cir. 2003).......................................................................... 43

*Res. Invs., Inc. v. United States,*
    85 Fed. Cl. 447 (200) ........................................................................... 62

*Resolution Trust Corp. v. Commerce Partners,*
    132 F.R.D. 443 (W.D. La. 1990) ........................................................... 80

*Reynolds v. Army & Air Force Exch. Serv.,*
    846 F.2d 746 (Fed. Cir. 1988) ............................................................... 19

*Rick's Mushroom Serv., Inc. v. United States,*
    521 F.3d 1338 (Fed. Cir. 2008) ............................................................. 46

*Roberts v. Fed. Hous. Fin. Agency,*
    243 F. Supp. 3d 950 (N.D. Ill. 2017) ..................................................... 17

*Roberts v. Fed. Hous. Fin. Agency,*
    889 F.3d 397 (7th Cir. 2018) ........................................................ *passim*

*Robinson v. Fed. Hous. Fin. Agency,*
    223 F. Supp. 3d 659 (E.D. Ky. 2016) .................................................... 17

*Robinson v. Fed. Hous. Fin. Agency,*
    876 F.3d 220 (6th Cir. 2017) ................................................... 17, 18, 73

*Robo Wash, Inc. v. United States,*
    223 Ct. Cl. 693 (1980) .......................................................................... 42

*Rose Acre Farms, Inc. v. United States,*
    559 F.3d 1260 (Fed. Cir. 2009).............................................................. 67

*San Carlos Irrigation & Drainage Dist. v. United States,*
    877 F.2d 957 (Fed. Cir. 1989)................................................................ 75

*Saxton v. Fed. Hous. Fin. Agency,*
    245 F. Supp. 3d 1063 (N.D. Iowa 2017).......................................... *passim*

*Scott Timber Co. v. United States,*
    692 F.3d 1365 (Fed. Cir. 2012).............................................................. 47

*Spengler v. United States,*
    127 Fed. Cl. 597 (2016) ........................................................................ 43

*Starr Int'l Co. v. United States,*
    856 F.3d 953 (Fed. Cir. 2017), *cert. denied*, 138 S. Ct. 1324 (2018) ................................ 27, 28

*Statesman Sav. Holding Corp. v. United States*,
   41 Fed. Cl. 1 (1998) ........................................................................... 30

*Stephen Slesinger, Inc. v. Disney Enters., Inc.*,
   702 F.3d 640 (Fed. Cir. 2012) ........................................................... 38

*Suess v. United States,*
   535 F.3d 1348 (Fed. Cir. 2008) ......................................................... 78

*Taylor v. Sturgell*,
   553 U.S. 880 (2008) ..................................................................... 38, 40

*Tecon Engineers, Inc. v. United States*,
   343 F.2d 943 (Ct. Cl. 1965) ......................................................... 48, 49

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ........................................................................... 20

*Tenerife Real Estate Holdings LLC v. United States*,
   136 Fed. Cl. 156 (2018) ............................................................... 20, 22

*Textainer Equip. Mgmt. Ltd. v. United States*,
   115 Fed. Cl. 708, 715 (2014) ............................................................ 47

*Thomas v. Gen. Serv. Admin.*,
   794 F.2d 661 (Fed. Cir. 1986) ........................................................... 38

*Tooley v. Donaldson, Lufkin & Jenrette, Inc.*,
   845 A.2d 1031 (Del. 2004) ...................................................... 28, 29, 31

*Two Shields v. United States*,
   119 Fed. Cl. 762 (2014) ..................................................................... 54

*Ultra-Precision Mfg., Ltd. v. Ford Motor Co.*,
   338 F.3d 1353 (Fed. Cir. 2003) ......................................................... 18

*United States ex rel. Adams v. Aurora Loan Servs., Inc.*,
   813 F.3d 1259 (9th Cir. 2016) ........................................................... 22

*United States ex rel. Work v. Boutwell*,
   3 MacArth. 172 (D.C. 1879) .............................................................. 36

*United States v. Dow*,
   357 U.S. 17 (1958) ............................................................................. 46

*United States v. Mitchell*,
    445 U.S. 535 (1980) ............................................................................ 20

*United States v. Mitchell*,
    463 U.S. 206 (1983) ............................................................................ 43

*United States v. Tohono O'Odham Nation*,
    536 U.S. 307 (2011) ...................................................................... 48, 50

*UNR Industries, Inc. v. United States*,
    962 F.2d 1013 (Fed. Cir. 1992) .......................................................... 49

*Usery v. Turner Elkhorn Mining Co.*,
    428 U.S. 1 (1976) ................................................................................ 67

*Voacolo v. Fannie Mae*,
    224 F. Supp. 3d 39 (D.D.C. 2016) ...................................................... 17

*Voacolo v. Fannie Mae*,
    No. 17-5667, slip. op. (D.N.J. May 4, 2018) ...................................... 17

*Wyatt v. United States*,
    271 F.3d 1090 (Fed. Cir. 2001) .......................................................... 46

## **Statutes**

5 U.S.C. § 701 ............................................................................................. 14

12 U.S.C. § 1451 .................................................................................... 41, 70

12 U.S.C. § 1455(*l*) ..................................................................................... 37

12 U.S.C. § 1455(*l*)(1)(A) ...................................................................... 36, 71

12 U.S.C. § 1455(*l*)(1)(B) ............................................................................ 74

12 U.S.C. § 1455(*l*)(1)(B)(iii) ...................................................................... 75

12 U.S.C. § 1455(*l*)(1)(C) ............................................................................ 74

12 U.S.C. § 1455(*l*)(1)(C)(vi) ...................................................................... 65

12 U.S.C. § 1455(*l*)(1)(D) ............................................................................ 71

12 U.S.C. § 1455(*l*)(4) ................................................................................. 71

12 U.S.C. § 1464(d)(2)(B) .................................................................................... 79, 80

12 U.S.C. § 1716 ...................................................................................................... 41

12 U.S.C. § 1719 ...................................................................................................... 36

12 U.S.C. § 1719(g) ................................................................................................. 37

12 U.S.C. § 1719(g)(1)(B) ....................................................................................... 74

12 U.S.C. § 1719(g)(1)(B)(iii) .......................................................................... 8, 44, 75

12 U.S.C. § 1719(g)(1)(C) ....................................................................................... 74

12 U.S.C. § 1719(g)(1)(C)(vi) ............................................................................. 8, 65

12 U.S.C. § 1719(g)(2)(A) ....................................................................................... 71

12 U.S.C. § 1719(g)(2)(D) .................................................................................. 8, 74

12 U.S.C. § 1719(g)(4) ...................................................................................... 8, 71

12 U.S.C. § 4511 ....................................................................................................... 7

12 U.S.C. § 4511(a) .................................................................................................. 36

12 U.S.C. § 4617(a)(1) ........................................................................................ 37, 52

12 U.S.C. § 4617(a)(2) ...................................................................................... *passim*

12 U.S.C. § 4617(a)(4) ............................................................................................. 73

12 U.S.C. § 4617(a)(4)(A) ......................................................................................... 9

12 U.S.C. § 4617(a)(5) ........................................................................................ 79, 80

12 U.S.C. § 4617(a)(5)(A) ........................................................................................ 79

12 U.S.C. § 4617(a)(6) ............................................................................................. 78

12 U.S.C. § 4617(a)(7) ............................................................................................. 68

12 U.S.C. § 4617(b)(2) ............................................................................................. 52

12 U.S.C. § 4617(b)(2)(A) ............................................................................. 8, 27, 35

12 U.S.C. § 4617(b)(2)(A)(i) ............................................................................. 22, 26, 37

12 U.S.C. § 4617(b)(2)(B) ...................................................................................... 36, 71

12 U.S.C. § 4617(b)(2)(B)(i) ........................................................................................... 8

12 U.S.C. § 4671(b)(2)(D) ........................................................................................ 8, 71

2 U.S.C. § 4617(b)(2)(D)(ii) ................................................................................... 36, 71

2 U.S.C. § 4617(b)(2)(G) ................................................................................................ 8

12 U.S.C. § 4617(b)(2)(J) ................................................................................... 8, 44, 53

12 U.S.C. § 4617(b)(2)(J)(ii) ........................................................................................ 73

12 U.S.C. § 4617(b)(2)(K)(i) ........................................................................................ 35

12 U.S.C. § 4617(b)(5) .................................................................................................. 35

12 U.S.C. § 4617(b)(6) .................................................................................................. 35

12 U.S.C. § 4617(f) .................................................................................................... 8, 15

12 U.S.C. § 4619(a) ...................................................................................................... 52

28 U.S.C. § 1491 ..................................................................................................... 20, 40

28 U.S.C. § 1491(a)(1) .......................................................................................... 20, 43, 44

28 U.S.C. § 1500 ........................................................................................................ 6, 48

28 U.S.C. § 2680(a) ...................................................................................................... 45

Federal Housing Enterprises Financial Safety and Soundness Act of 1992,
    Pub. L. No. 102-550 ................................................................................................ 52

Pub. L. No. 110-289, 122 Stat. 2767 (2008) ................................................................ 52

**Rules**

RCFC 12(b)(1) ............................................................................................................... 18

RCFC 12(b)(6) ............................................................................................................... 19

RCFC 12(h)(3) ............................................................................................................... 18

**Regulations**

Conservatorship and Receivership, 76 Fed. Reg. 35,724 (June 20, 2011) ....................................72

**Other Authorities**

Black's Law Dictionary (9th ed. 2009).........................................................................................10

GLOSSARY

Key Terms

| | |
|---|---|
| 1992 Safety and Soundness Act | Federal Housing Enterprises Financial Safety and Soundness Act of 1992, Pub. L. No. 102-550, 106 Stat. 3941 (1992) (codified at 12 U.S.C. § 4501 *et seq.*) |
| Enterprises or Companies | Federal National Mortgage Association and Federal Home Loan Mortgage Corporation |
| Fannie Mae or Fannie | Federal National Mortgage Association |
| FDIC | Federal Deposit Insurance Corporation |
| FHFA | Federal Housing Finance Agency |
| Freddie Mac or Freddie | Federal Home Loan Mortgage Corporation |
| HERA | Housing and Economic Recovery Act of 2008, Pub. L. No. 110-289, 122 Stat. 2654 (2008) (codified at 12 U.S.C. § 1451 *et seq.*) |
| OFHEO | Office of Federal Housing Enterprise Oversight |
| *Perry Capital I* | *Perry Capital LLC v. Lew*, 70 F. Supp. 3d 208 (D.D.C. 2014) |
| *Perry Capital II* | *Perry Capital LLC v. Mnuchin*, 864 F.3d 591 (D.C. Cir. 2017), *cert. denied*, 138 S. Ct. 978 (2018). |
| Stock Purchase Agreements or PSPAs | Senior Preferred Stock Purchase Agreements between Treasury and FHFA as Conservator for Fannie Mae and Freddie Mac |
| Third Amendment | Third Amendment to the Senior Preferred Stock Purchase Agreements |

Complaints

| | |
|---|---|
| Akanthos | First Am. Compl., *Akanthos Opportunity Master Fund L.P. v. United States*, No. 18-369 (Fed. Cl. Aug. 16, 2018), ECF No. 14. |
| Appaloosa | Second Am. Compl., *Appaloosa Inv. Ltd. P'Ship I v. United States*, No. 18-370 (Fed. Cl. Aug. 16, 2018), ECF No. 17. |
| Arrowood | Second Am. Compl., *Arrowood Indemn. Co. v. United States*, No. 13-698 (Fed. Cl. Sept. 17, 2018), ECF No. 44. |

Cacciapalle                 Am. Consol. Class Action Compl., *Cacciapalle v. United States*,
                            No. 13-466 (Fed. Cl. Mar. 8, 2018), ECF No. 67.

CSS                         First Am. Compl., *CSS, LLC v. United States*, No. 18-371 (Fed.
                            Cl. Aug. 16, 2018), ECF No. 14.

Fairholme                   Second Am. Compl., *Fairholme Funds, Inc. v. United States*,
                            No. 13-465 (Fed. Cl. Aug. 3, 2018), ECF No. 413.

Fisher                      Second Am. Derivative Compl., *Fisher v. United States*, No. 13-
                            608 (Fed. Cl. Mar. 8, 2018), ECF No. 36.

Mason                       First Am. Compl., *Mason Cap. L.P. v. United States*, No. 18-529
                            (Fed. Cl. Aug. 16, 2018), ECF No. 14.

Owl Creek                   First. Am. Compl., *Owl Creek Asia I, L.P. v. United States*, No.
                            18-281 (Fed. Cl. Aug. 16, 2018), ECF No. 16.

Rafter                      Second Am. Verified Compl., *Rafter v. United States*, No. 14-
                            740 (Fed. Cl. Mar. 8, 2018), ECF No. 25.

Reid                        Am. Derivative Compl., *Reid v. United States*, No. 14-152 (Fed.
                            Cl. Mar. 8, 2018), ECF No. 22.

WF                          Am. Compl., *Washington Federal v. United States*, No. 13-385
                            (Fed. Cl. Mar. 8, 2018), ECF No. 57.

<u>DEFENDANT'S OMNIBUS MOTION TO DISMISS</u>

Pursuant to Rules 12(b)(1) and 12(b)(6) of the Rules of the United States Court of Federal Claims (RCFC), defendant, the United States, respectfully requests that the Court dismiss the complaints[1] for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted.  In support of this motion, we rely upon the complaints and the following brief.

<u>INTRODUCTION</u>

These cases stem from the United States' rescue of Fannie Mae and Freddie Mac (collectively, the Enterprises) during the most disastrous economic crisis in decades.  In 2008, Congress enacted the Housing and Economic Recovery Act of 2008 (HERA), which created the Federal Housing Finance Agency (FHFA) and empowered it to act as the Enterprises' conservator or receiver.  Congress recognized that the Enterprises may require significant Federal financial assistance and authorized the Department of the Treasury (Treasury) to purchase Enterprise stock on terms designed "to protect the taxpayer."  After FHFA placed the Enterprises into conservatorships, Treasury entered into stock purchase agreements with FHFA in its capacity as conservator on behalf of the Enterprises.  Under the stock purchase agreements, each Enterprise issued senior preferred stock to Treasury in exchange for Treasury's commitments to provide hundreds of billions of dollars in taxpayer funds when an Enterprise's liabilities exceeded its assets.  The senior preferred stock entitled Treasury to receive:  (1) a senior liquidation preference of $1 billion for each Enterprise, which would increase dollar-for-dollar each time the Enterprises drew upon Treasury's funding commitment; (2) dividends equal

---

[1]  A list of the operative complaints is attached to this motion.

to 10 percent of its existing liquidation preference, paid quarterly; and (3) a periodic commitment fee to compensate taxpayers for their ongoing funding commitment.

By June 2012, to avoid mandatory placement of the Enterprises in statutory receivership, Treasury had infused $187.5 billion.  Under the stock purchase agreements' fixed 10 percent dividend obligation, these cash infusions required combined dividend payments of nearly $19 billion per year from the Enterprises to Treasury—more money than the Enterprises had made in all but one year of their existence.  FHFA and Treasury amended the stock purchase agreements (Third Amendment) in August 2012 to replace the fixed 10 percent dividend and periodic commitment fee with a variable dividend based on the amount, if any, by which either Enterprise's net worth exceeds a set capital buffer.

After the Third Amendment was executed, groups of Fannie Mae and Freddie Mac shareholders—many of whom did not purchase stock until after the amendment's execution— filed suits in this Court and in Federal district courts alleging, among other things, that the Third Amendment took their "economic interests" in Fannie Mae and Freddie Mac stock.

The United States moved to dismiss the first wave of complaints in this Court and in district court for lack of jurisdiction and failure to state a claim upon which relief can be granted. In response to the dismissal motions filed in this Court, plaintiffs asked the Court to authorize jurisdictional discovery while suspending motion to dismiss briefing.  In February 2014, the Court granted plaintiffs' discovery motion and stayed briefing on the United States' pending motions to dismiss; the Court permitted plaintiffs to seek documents and depositions regarding, among other things, whether FHFA—as the Enterprises' conservator—is the United States for Tucker Act purposes.  *See* Order at 3, *Fairholme Funds, Inc. v. United States*, No. 13-465 (Fed. Cl. Feb. 26, 2014), ECF No. 32.  As the Court reasoned, unless plaintiffs can allege sufficient

facts to show that "FHFA was an agent and arm of the Treasury," the Court lacks jurisdiction to entertain the complaints.  *Id.*  The Court permitted plaintiffs to amend their complaints after discovery to properly allege facts to support the claimed jurisdiction.

Despite four years of discovery, however, in which plaintiffs received over 500,000 pages of documents and took nine depositions, the amended complaints suffer from the same defects as the original pleadings.  In broad terms, plaintiffs allege that the Third Amendment "expropriated" the Enterprises' net worth, which frustrated shareholders' purported "economic interests" (*i.e.*, dividends and liquidation preferences) in their Fannie Mae and Freddie Mac stock.  Whether characterized as a taking, illegal exaction, breach of fiduciary duty, or breach of contract, all of the complaints rely on this essential, but erroneous, theory.

The complaints must be dismissed because the Court does not possess jurisdiction to entertain them.  First, plaintiffs' claims are not against the United States; FHFA as conservator stands in the Enterprises' private shoes and plaintiffs cannot show that FHFA as conservator is an "agent and arm of Treasury" such that it should be treated as the United States for Tucker Act purposes.  This point is dispositive.  Plaintiffs have no independent basis to challenge Treasury's actions because Treasury, alone, could not and did not implement the Third Amendment. Because FHFA as the Enterprises' conservator is not the United States, and therefore not subject to suit under the Tucker Act, the Court lacks jurisdiction to entertain plaintiffs' claims about the Third Amendment.

Second, even if the Court were to determine that the complaints sufficiently allege that FHFA as conservator is the United States, the complaints nonetheless should be dismissed because they allege substantively derivative claims, which are barred by HERA.  In fact, since plaintiffs filed their initial complaints, the legal landscape has changed significantly such that

numerous Federal district and appeals courts have conclusively determined that HERA's

succession clause—pursuant to which FHFA succeeded to "all rights" of "any stockholder" of

Fannie Mae and Freddie Mac—(1) bars plaintiffs from pursuing shareholder derivative claims on

the Enterprises' behalf, and (2) contains no conflict-of-interest exception.  These rulings bind all

Enterprise shareholders and preclude them from pursuing derivative claims in this Court.

Third, should the complaints survive both of these dispositive jurisdictional bars, the

Court nonetheless lacks jurisdiction to entertain any of the allegedly "direct" contract claims

because plaintiffs are not in contractual privity with the United States and have no plausible basis

to allege third-party beneficiary status.  Similarly, plaintiffs' common-law tort-like claims fall

beyond the Court's jurisdiction; thus, the breach of fiduciary duty claims must also be dismissed.

Even if the Court were to determine that plaintiffs could overcome each of these

independent jurisdictional hurdles, the complaints still must be dismissed because they fail to

state claims upon which relief can be granted.  Plaintiffs' alleged "economic interests" in Fannie

Mae and Freddie Mac stock do not create a legally cognizable property right necessary to assert a

takings claim.  Further, allegations that the Government frustrated performance of a contract

between two private parties—as in the case of plaintiffs' Fannie Mae and Freddie Mac stock

certificates—are likewise insufficient to state a takings claim.  And plaintiffs allege no plausible

regulatory takings claim under either a *Lucas* "wipeout" theory or a *Penn Central* balancing

analysis.  Thus, the Court should dismiss plaintiffs' claims based on an alleged taking of their

"economic interests" in Fannie Mae and Freddie Mac stock.

Plaintiffs' illegal exaction claims fare no better because plaintiffs identify neither

"illegal" conduct nor an "exaction" of their money.  Every court to consider a shareholder

challenge to the Third Amendment has determined that FHFA and Treasury acted within the

scope of their HERA authority when they executed the Third Amendment.  Moreover, plaintiffs fail to allege a Government statutory violation that required them to pay money to (1) the Government or (2) a third party on the Government's behalf.

Plaintiffs' common-law breach of fiduciary duty claims also fail because no fiduciary duty runs to Enterprise shareholders from either FHFA or Treasury.  In like manner, plaintiffs' breach of contract claims are undone by their failure to identify a contract between the United States and Enterprise shareholders.

Notwithstanding the gloss plaintiffs have added to their complaints after jurisdictional discovery, the fundamental defects remain.  Because plaintiffs cannot establish this Court's jurisdiction and otherwise fail to state a claim upon which relief can be granted, the complaints should be dismissed.

## QUESTIONS PRESENTED

1.  Whether the Court lacks jurisdiction to entertain plaintiffs' claims when:

    a.  FHFA, as the Enterprises' conservator, is not the United States for Tucker Act purposes;

    b.  Plaintiffs' claims are derivative and HERA bars derivative suits;

    c.  Plaintiffs are neither parties to, nor third-party beneficiaries of, any contract with the United States;

    d.  Plaintiffs' breach of fiduciary duty claims, and their takings and illegal exaction claims, are substantively tort claims;

    e.  Plaintiffs that did not own Enterprise stock before the Third Amendment lack standing; and

    f.  28 U.S.C. § 1500 should bar plaintiffs from pursuing their Third Amendment claims in multiple fora.

2.  Whether plaintiffs fail to state claims upon which relief can be granted when:

    a.  Plaintiffs do not possess a legally cognizable property right required for a takings claim and, in any case, do not allege a plausible regulatory takings claim;

    b.  Plaintiffs fail to identify illegal conduct or money exacted in support of their illegal exaction claim;

    c.  HERA preempts plaintiffs' allegations that FHFA and Treasury owe common-law fiduciary duties to Enterprise shareholders; and

    d.  Plaintiffs fail to allege elements of a breach of contract claim.

3.  Whether the Court lacks jurisdiction to consider the *Washington Federal* plaintiffs' challenge to the imposition of the conservatorship when those plaintiffs failed to raise such a challenge within the statutory limitations period.

## STATEMENT OF THE CASE

I.    Background

As government-sponsored enterprises chartered by Congress, the Enterprises play key roles in the housing finance market and the United States economy by owning or guaranteeing trillions of dollars of residential mortgages and mortgage-backed securities.  *See*, *e.g.*, *WF* ¶¶ 25, 29 (describing the Enterprises' "public mission"); *see also Arrowood* ¶ 28.  The Enterprises provide liquidity to the mortgage market by purchasing residential loans from lenders, thereby facilitating lenders' ability to make additional loans.  *See*, *e.g.*, *WF* ¶¶ 24-25; *Fairholme* ¶ 36; *Cacciapalle* ¶ 19; *Fisher* ¶¶ 43-45; *Rafter* ¶ 23; *Owl Creek* ¶¶ 23-24.

In 2007-2008, the United States economy fell into a severe recession, in large part due to a sharp decline in the national housing market.  *See WF* ¶ 2.  In response to the developing financial crisis, Congress passed HERA in July 2008.  *See*, *e.g.*, *id.* ¶ 3; *Fairholme* ¶ 2; *Cacciapalle* ¶ 4; *Fisher* ¶ 53; *Rafter* ¶ 2; *Owl Creek* ¶ 4.  For many years, the Office of Federal Housing Enterprise Oversight (OFHEO) had regulated the Enterprises.  In HERA, Congress created FHFA as OFHEO's successor.  12 U.S.C. § 4511.  Congress granted FHFA broad authority to supervise and regulate the Enterprises.  *Id.* § 4511 *et seq.*  HERA also granted the Director of FHFA discretionary authority to place the Enterprises into conservatorships "for the purpose of reorganizing, rehabilitating, or winding up the[ir] affairs[.]"  *Id.* § 4617(a)(2).

In conservatorship, FHFA has broad authority to manage the Enterprises' affairs.  HERA provides that, upon FHFA's appointment as conservator, FHFA shall "immediately succeed to . . . all rights, titles, powers, and privileges of the regulated entity, and of any stockholder, officer, or director of such regulated entity with respect to the regulated entity and the assets of

the regulated entity[.]"  *Id*. § 4617(b)(2)(A).  Congress empowered FHFA as the Enterprises'

conservator to "operate" and "conduct all business" of the Enterprises.  *Id.* § 4617(b)(2)(B)(i).

Under HERA, Congress invested FHFA as conservator with discretion to "take such

action as may be . . . necessary to put the regulated entity in a sound and solvent condition,"

including the authority to "transfer or sell" Enterprise assets or liabilities.  *Id*. § 4617(b)(2)(D),

(G).  As the Enterprises' conservator, FHFA exercises both its express powers and any other

"necessary," "incidental powers" in the manner that FHFA "determines is in the best interests of

the regulated entity or [FHFA]."  *Id.* § 4617(b)(2)(J).

Through amendments to the Enterprises' statutory charters, Congress granted Treasury

temporary authority to "purchase any obligations and other securities issued by" the Enterprises.

*See Owl Creek* ¶ 37.  As a condition of such purchases, Congress directed Treasury to make a

specific determination that the purchase terms would "protect the taxpayer" and, to that end,

specifically authorized "limitations on the payment of dividends[.]"  *See*, *e.g.*, 12 U.S.C.

§ 1719(g)(1)(B)(iii), (C)(vi).  Treasury's purchase authority sunsetted on December 31, 2009;

Treasury, however, could exercise any rights with respect to previously purchased securities after

then.  *See*, *e.g.*, *id.* § 1719(g)(2)(d), (g)(4).

Finally, HERA limited judicial review of FHFA's activities as conservator, directing that

"no court may take any action to restrain or affect the exercise of powers or functions of [FHFA]

as a conservator[.]"  *Id*. § 4617(f).

II.     Conservatorship And Treasury's Stock Purchase Agreements With The Enterprises

On September 6, 2008, the Director of FHFA placed the Enterprises into conservatorship.

*See*, *e.g.*, *Fairholme* ¶ 4; *Cacciapalle* ¶ 5; *Fisher* ¶ 4; *Rafter* ¶ 41.  At the creation of the

conservatorships, FHFA eliminated dividends on common and preferred stock.  *Owl Creek* ¶ 45;

*Reid* ¶ 64; *Fisher* ¶ 63.  The next day, FHFA in its capacity as conservator on behalf of the Enterprises entered into Senior Preferred Stock Purchase Agreements (the PSPAs or stock purchase agreements) with Treasury.  *See*, *e.g.*, *Fairholme* ¶ 4; *Cacciapalle* ¶ 5; *Owl Creek* ¶ 6.  Under the stock purchase agreements, the Enterprises issued senior preferred stock to Treasury, and Treasury committed $100 billion to each Enterprise to ensure that it maintained a positive net worth.  *See Fairholme* ¶ 72; PSPA § 2.1.[2]  Maintenance of positive net worth is necessary because if either Enterprise's net worth is negative for 60 days, the Enterprise must enter receivership and FHFA will liquidate the Enterprise's assets.  *See* 12 U.S.C. § 4617(a)(4)(A) (FHFA must place the Enterprise in receivership if Enterprise obligations exceed its assets for 60 calendar days).  Thus, to the extent that either Enterprise's net worth falls below zero,[3] the stock purchase agreements authorize "Fannie and Freddie to draw upon Treasury's commitment in an amount equal to the difference between its liabilities and its assets" to restore each Enterprise's positive net worth.  *See Fairholme* ¶ 72; *see also* PSPA § 2.2.

Under the stock purchase agreements, when either Enterprise requires a draw to restore its positive net worth, FHFA submits a request to Treasury.  *See* PSPA § 2.2.  Treasury then provides funds sufficient to eliminate any net worth deficit.  *See id*.

In exchange for Treasury's capital commitment and infusions, each Enterprise (1) issued senior preferred stock to Treasury, (2) provided Treasury with warrants to purchase 79.9 percent of the Enterprise's common stock, and (3) obligated itself to pay commitment fees to compensate taxpayers for the market value of the continuing commitment.  *See*, *e.g.*, *WF* ¶ 8; *Fairholme* ¶ 4;

---

[2]  The stock purchase agreements are available at https://go.usa.gov/xUyCz (Fannie Mae) and https://go.usa.gov/xUyCu (Freddie Mac).

[3]  As measured by generally accepted accounting principles (GAAP).

*Cacciapalle* ¶ 5; *Fisher* ¶ 5; *Rafter* ¶ 46; *Owl Creek* ¶ 6; *see also* PSPA §§ 3.1-3.4.  The senior preferred stock came with a liquidation preference: if the Enterprises were liquidated, Treasury would receive a distribution before common or junior preferred shareholders received anything.[4] On Treasury's senior preferred stock, the initial liquidation preference was $1 billion from each Enterprise; the preference increased dollar-for-dollar as either Enterprise drew on the Treasury commitment.  *See*, *e.g.*, *WF* ¶ 8; *Fairholme* ¶ 74; *Cacciapalle* ¶ 5; *Fisher* ¶ 5; *Rafter* ¶ 47; *Owl Creek* ¶ 6; *see also* PSPA § 3.3.  Treasury, however, received no additional shares of stock when the Enterprises made draws under the stock purchase agreements.  *Compare* PSPA §§ 3.1, 3.3, *with Fairholme* ¶¶ 7-8.

The stock purchase agreements also committed the Enterprises to pay a 10 percent annual dividend to Treasury (assessed quarterly).  *See* Senior Preferred Stock Certificate of Designation §§ 2(c), 8.[5]  Payment of dividends did not reduce Treasury's liquidation preference.  *See Fairholme* ¶¶ 74-75.  If, however, Fannie Mae or Freddie Mac failed to make a required dividend payment, its dividend rate would rise to 12 percent and the unpaid amount would be added to Treasury's liquidation preference.  *See* Senior Preferred Stock Certificate of Designation § 2(c); *see also Fairholme* ¶ 5.  Also, the stock purchase agreements restricted the Enterprises from declaring or paying any dividend or distribution to private shareholders without Treasury's advanced consent.  PSPA § 5.1; *see also WF* ¶ 78; *Fairholme* ¶ 82.

Although the stock purchase agreements initially capped Treasury's commitment at $100 billion per Enterprise, in May 2009, FHFA and Treasury amended the agreements to double the

---

[4]  *See Liquidation Preference*, Black's Law Dictionary 1298 (9th ed. 2009).

[5]  The Senior Preferred Stock Certificates of Designation are available at https://go.usa.gov/xUyNA (Fannie Mae) and https://go.usa.gov/xUyN6 (Freddie Mac).

commitment (the first amendment).  *See Fairholme* ¶ 84.  In a second amendment, in December 2009, FHFA and Treasury modified the method for calculating the commitment cap, raising the commitments to approximately $234 billion for Fannie Mae and $212 billion for Freddie Mac. *See generally id.*  Treasury's commitments were, by far, the largest capital commitments in history.

III.    FHFA As Conservator And Treasury Execute The Third Amendment

        Between 2009 and 2011, the Enterprises routinely failed to earn sufficient income to pay Treasury dividends and regularly drew on Treasury's commitment to meet those obligations.  *See* Fannie Mae 10-Q for the quarterly period ended June 30, 2012 at 4 (Aug. 8, 2012), *available at* https://tinyurl.com/y964cvc9; *see also* Freddie Mac 10-Q for the quarterly period ended June 30, 2012 at 8 (Aug. 7, 2012), *available at* https://tinyurl.com/ybp3y9zg.[6]  By June 30, 2012, Fannie Mae had drawn $116.1 billion and Freddie Mac had drawn $72.3 billion from Treasury, which obligated them to collectively pay Treasury dividends of approximately $19 billion per year, plus commitment fees.  *See Fisher* ¶ 98; *Fairholme* ¶ 101; *Rafter* ¶ 56; *Owl Creek* ¶ 95.  In its August 8, 2012 SEC filing, Fannie Mae reported that its annual dividend payment "exceeds our reported annual net income for every year since our inception."  *See* Fannie Mae 10-Q at 4 (Aug. 8, 2012); *see also* Freddie Mac 10-Q at 8 (Aug. 7, 2012) ("our annual cash dividend obligation to Treasury on the senior preferred stock . . . exceeded our annual historical earnings in all but one period").  Both Enterprises reported that they did not expect to "generate net income or comprehensive income in excess of [their] annual dividend . . . to Treasury over the long term"

---

[6]  The Court may take judicial notice of information contained in SEC filings on a motion to dismiss.  *See In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 354 n.5 (2d Cir. 2010); *see also Northstar Fin. Advisors, Inc. v. Schwab Invs.*, 779 F.3d 1036, 1043 (9th Cir. 2015).

and anticipated future draws would be necessary to pay those dividends.  *See* Fannie Mae 10-Q at 12-13 (Aug. 8, 2012); Freddie Mac 10-Q at 10 (Aug. 7, 2012).

On August 17, 2012, FHFA as the Enterprises' conservator and Treasury executed the Third Amendment to the stock purchase agreements, which (1) replaced the fixed, 10 percent dividend with a variable dividend equal to the net worth of the Enterprises (minus a capital reserve), and (2) suspended the periodic commitment fee for as long as the variable dividend remains in effect.  *See* Third Amendment to Senior Preferred Stock Purchase Agreements, *available at* https://go.usa.gov/xUyaM (Fannie Mae) and https://go.usa.gov/xUyae (Freddie Mac).  In other words, under the Third Amendment, "Fannie and Freddie pay whatever dividend they could afford—however little, however much . . . . If Fannie and Freddie made profits, Treasury would reap the rewards; if they suffered losses, Treasury would have to forgo payment entirely."  *Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 612 (D.C. Cir. 2017), *cert. denied*, 138 S. Ct. 978 (2018) (*Perry Capital II*).  Plaintiffs refer to the Third Amendment's variable dividend structure as the "Net Worth Sweep."  *See*, *e.g.*, *Fairholme* ¶¶ 1, 11; *Cacciapalle* ¶ 8; *Fisher* ¶ 9; *Rafter* ¶ 7.

IV.     Procedural History Of The Third Amendment Cases

A.      The Court Of Federal Claims Actions

In 2013 and 2014, Fannie Mae and Freddie Mac shareholders filed complaints in this Court alleging that the Third Amendment resulted in a taking of their property without payment of just compensation.  After the United States moved to dismiss the first four complaints, the *Fairholme* plaintiffs requested that the Court suspend briefing on the motions so they could pursue jurisdictional discovery.  The Court granted the motion, permitting plaintiffs to pursue discovery on several topics, including whether "FHFA was an agent and arm of the Treasury[.]"

*See* Order at 3-4, *Fairholme Funds, Inc. v. United States*, No. 13-465 (Fed. Cl. Feb. 26, 2014), ECF No. 32.  Because jurisdiction is a threshold inquiry, the Court explained that its rationale was to provide plaintiffs the opportunity to "meet their burden of presenting the proof necessary to establish this Court's jurisdiction."  *Id.* at 3.

Jurisdictional discovery continued until January 2018, when the Court instructed all plaintiffs to file amended complaints.  The amended complaints contain some additional detail, add claims for illegal exaction, breach of fiduciary duty, and breach of contract, and style various claims as both "direct" and "derivative."  Nonetheless, the core allegation remains the same:  the Third Amendment represented a Government "expropriation" of the Enterprises' net worth, which harmed plaintiffs' "economic interests" in their Fannie Mae and Freddie Mac stock.  In addition to the amended complaints, seven additional plaintiffs recently filed suits in this Court setting forth substantially similar claims.[7]

B.     The District Court Actions

In addition to the Third Amendment cases pending in this Court, Fannie Mae and Freddie Mac shareholders filed a series of complaints challenging the Third Amendment in United States District Courts throughout the country.  Several of the plaintiffs currently before this Court are parties in district court cases that challenge the Third Amendment.

---

[7]  The Court coordinated the *Owl Creek*, *Akanthos*, *Appaloosa*, *CSS*, and *Mason* cases for "discovery, motion practice, case management, case scheduling, and other pretrial proceedings as appropriate" and directed that the briefing schedule will follow the Court's February 21, 2018 scheduling order.  *See*, *e.g.*, Order, *Owl Creek Asia I, L.P. v. United States*, No. 18-281 (Fed. Cl. Apr. 24, 2018), ECF No. 9.  The remaining two cases have been stayed pending disposition of this motion.  *See* Order, *683 Cap. Partners v. United States*, No. 18-711 (Fed. Cl. July 16, 2018), ECF No. 10; Order, *Patt v. United States*, No. 18-712 (Fed. Cl. July 16, 2018), ECF No. 7.

1.      In *Perry Capital*, Courts In The District Of Columbia Circuit Rejected
Plaintiffs' Efforts To Unwind The Third Amendment

In 2013, Enterprise shareholders—including the *Fairholme*, *Cacciapalle*, and *Arrowood*
plaintiffs in this Court—filed actions in the District Court for the District of Columbia, alleging
that by agreeing to the Third Amendment, FHFA and Treasury violated the Administrative
Procedure Act, 5 U.S.C. § 701 *et seq*., breached fiduciary duties, breached express and implied
contractual obligations, and effected a regulatory taking.[8]  The district court dismissed the
complaints in full, holding, among other things, that:  (1) HERA bars plaintiffs' claims for
equitable relief, including all Administrative Procedures Act claims; (2) HERA bars plaintiffs'
derivative claims because FHFA as conservator succeeded to all shareholder derivative claims
and no conflict-of-interest exception exists; (3) plaintiffs' contract and implied covenant claims
with respect to liquidation preferences are unripe; (4) plaintiffs' contract and implied covenant
claims with respect to dividends fail to state a claim; and (5) plaintiffs failed to allege either a
cognizable property right, or the elements of a *Penn Central* regulatory taking.  *Perry Capital
LLC v. United States*, 70 F. Supp. 3d 208, 228-31, 233-34 (D.D.C. 2014) (*Perry Capital I*).

Plaintiffs appealed these rulings with the exception of the district court's ruling rejecting
the takings claim.  On appeal, the D.C. Circuit held that FHFA acted within its statutory
authority as the Enterprises' conservator when it agreed to and implemented the Third
Amendment.  *See Perry Capital II*, 864 F.3d at 606 ("FHFA's Actions Fall Within Its Statutory
Authority"); *see also id.* ("adoption of the Third Amendment falls within FHFA's statutory
conservatorship powers").  The D.C. Circuit thus affirmed the dismissal of plaintiffs' statutory
claims under the Administrative Procedure Act, which sought exclusively injunctive and

---

[8]  The district court coordinated these cases for disposition under the caption *Perry Capital
LLC v. Lew*, No. 13-1025 (D.D.C.) (Lamberth, J.).

declaratory relief, holding that those claims are "barred by [HERA's] strict limitation on judicial review."  *Id*. at 598; *see also id.* at 633 ("claims against the FHFA and Treasury alleging arbitrary and capricious conduct and conduct in excess of their statutory authority . . . are barred by 12 U.S.C. § 4617(f)").  Further, the D.C. Circuit affirmed the dismissal of all claims against Treasury, determining that HERA barred it from reviewing such claims.  *See id.* at 617-27.

The D.C. Circuit also affirmed dismissal of "most of the . . . common-law claims," determining that "some are barred because FHFA succeeded to all rights, powers, and privileges of the stockholders under [HERA] . . . [and] others fail to state a claim upon which relief can be granted."  *Id.* at 598-99.  And the D.C. Circuit rejected plaintiffs' argument that HERA contains an implied conflict-of-interest exception to the succession clause that would permit shareholders to pursue derivative claims on the Enterprises' behalf.  *Id.* at 624-25.

As for the state-law contract claims against the Enterprises and FHFA as conservator, the D.C. Circuit affirmed dismissal of the breach of contract claim related to dividends.  The court held that the relevant stock certificates "accord the Companies complete discretion to declare or withhold dividends."  *Id.* at 629.  However, the D.C. Circuit remanded the implied duty of good faith and fair dealing claim regarding dividends for the district court to "evaluate it under the correct legal standard, namely, whether the Third Amendment violated the reasonable expectations of the parties."  *Id.* at 631.  As to the contract claims related to liquidation preferences, the D.C. Circuit held they are constitutionally ripe because plaintiffs allege that the Third Amendment "immediately harmed them by diminishing the value of their shares."  *Id*. at 632.  The D.C. Circuit thus remanded the breach claims related to liquidation preferences to district court.  The court instructed the district court to determine "in the first instance" whether plaintiffs stated "claims for breach of contract and breach of the implied covenant[.]"  *Id.* at 633.

Plaintiffs filed petitions for writ of *certiorari* in the United States Supreme Court, which were denied.

The *Fairholme*, *Cacciapalle*, and *Arrowood* plaintiffs each filed amended complaints in district court.  The amended complaints assert the claims against FHFA and the Enterprises that the D.C. Circuit remanded:  breach of contract for liquidation preferences, and breach of implied covenant for liquidation preferences and dividends.  The amended complaints also present two new sets of claims:  (1) purportedly "direct" claims for breach of fiduciary duty; and (2) claims that the Third Amendment violates certain Delaware (Fannie Mae) and Virginia (Freddie Mac) corporate governance laws regarding dividends.[9]  FHFA's and the Enterprises' motions to dismiss those claims are pending before the district court.

### 2. Federal Courts Have Uniformly Dismissed Other Third Amendment Shareholder Challenges

In addition to the *Perry Capital* decisions, all courts that addressed shareholder challenges to the Third Amendment as *ultra vires* have dismissed those complaints:[10]

---

[9]  Plaintiffs breach of contract, breach of implied covenant, and breach of fiduciary duty claims in district court overlap with those corresponding claims in this Court; plaintiffs swap as defendants (1) FHFA and the Enterprises for (2) the United States.  *Compare*, *e.g.*, 2d Am. Consol. Class Action and Derivative Compl. at ¶ 157, *In re Fannie Mae/Freddie Mac Senior Preferred Stock Purchase Agreement Class Action Litig.*, No. 13-1288 (D.D.C. Feb. 1, 2018), ECF No. 71 ("By entering into the Third Amendment with the purpose of effectively depriving Plaintiffs and the other members of the Freddie Preferred Class of any possibility of receiving dividends or a liquidation preference, Freddie Mac, acting through FHFA, breached the implied covenant of good faith and fair dealing inherent in the Certificates for the Freddie Mac Preferred Stock."), *with Cacciapalle* ¶ 163 ("By entering into the Third Amendment with the purpose of depriving Plaintiffs of any possibility of receiving dividends or a liquidation preference without any opportunity to vote, the Government has breached the implied covenant of good faith and fair dealing inherent in the Certificates for the Preferred Stock.").

[10]  In two additional cases, plaintiffs seek to unravel the Third Amendment by alleging that FHFA's structure is unconstitutional.  In *Bhatti v. Federal Housing Finance Agency*, the district court recently dismissed plaintiffs' complaint.  *See Bhatti v. Fed. Hous. Fin. Agency*, No. 17-

- *Jacobs v. Fed. Hous. Fin. Agency*, No. 15-708-GMS, 2017 WL 5664769 (D. Del. Nov. 27, 2017);

- *Saxton v. Fed. Hous. Fin. Agency*, 245 F. Supp. 3d 1063 (N.D. Iowa 2017);

- *Roberts v. Fed. Hous. Fin. Agency*, 243 F. Supp. 3d 950 (N.D. Ill. 2017);

- *Robinson v. Fed. Hous. Fin. Agency*, 223 F. Supp. 3d 659 (E.D. Ky. 2016);

- *Cont'l W. Ins. Co. v. Fed. Hous. Fin. Agency*, 83 F. Supp. 3d 828 (S.D. Iowa 2015).

Two of those decisions have been affirmed on appeal by the Sixth Circuit and Seventh Circuit:

- *Robinson v. Fed. Hous. Fin. Agency*, 876 F.3d 220 (6th Cir. 2017);

- *Roberts v. Fed. Hous. Fin. Agency*, 889 F.3d 397 (7th Cir. 2018).

And, in *Collins v. Mnuchin*, the Fifth Circuit affirmed dismissal of plaintiffs' Administrative Procedures Act claim in a paragraph, concluding that HERA's bar on judicial review precluded shareholder challenges to the Third Amendment because "FHFA acted within its statutory authority by adopting the net worth sweep." *See Collins v. Mnuchin*, No. 17-20364, 2018 WL 3430826, at *6, *6 n.67 (5th Cir. July 16, 2018) (citing *Roberts*, 889 F.3d at 399; *Robinson*, 876 F.3d at 220; *Perry Capital II*, 864 F.3d at 598).[11]

---

2185, 2018 WL 3336782 (D. Minn. July 6, 2018).  A similar suit challenging FHFA's structure, *Rop v. Fed. Hous. Fin. Agency*, No. 17-497 (W.D. Mich.), is pending.

The United States District Courts for the District of New Jersey and District of Columbia dismissed Third Amendments suits brought by another shareholder because the plaintiff did not respond to the defendants' motions to dismiss.  *See Voacolo v. Fannie Mae*, 224 F. Supp. 3d 39 (D.D.C. 2016); *Voacolo v. Fannie Mae*, No. 17-5667, slip op. at 1 (D.N.J. May 4, 2018).

[11]  In *Collins*, the Fifth Circuit also determined that FHFA's structure violated the separation of powers doctrine because "Congress insulated the FHFA [as regulator] to the point where the Executive Branch cannot control the FHFA or hold it accountable."  2008 WL 3430826, at *18.  To remedy the constitutional defect, the Court excised from HERA the provision that permitted

Like the D.C. Circuit in *Perry Capital*, the Fifth Circuit, Sixth Circuit, and Seventh Circuit rejected shareholder arguments that the Third Amendment exceeded the scope of FHFA's and Treasury's authority under HERA. *See Robinson*, 876 F.3d at 229-35; *Roberts*, 889 F.3d at 403-08; *Collins*, 2018 WL 3430826, *6. In *Roberts*, the Seventh Circuit came to the same conclusion as the D.C. Circuit regarding plaintiffs' derivative claims, holding that HERA bars shareholder derivative suits and contains no conflict-of-interest exception. *See Roberts*, 889 F.3d at 409-10.

For many of the same reasons articulated by the district and appeals courts that have considered and rejected plaintiffs' arguments, and because plaintiffs fail to articulate claims for which this Court has jurisdiction, the complaints in this Court should be dismissed.

## ARGUMENT

I.   Standards Of Review

    A.   Rule 12(b)(1)

"Jurisdiction is a threshold issue and a court must satisfy itself that it has jurisdiction to hear and decide a case before proceeding to the merits." *Ultra-Precision Mfg., Ltd. v. Ford Motor Co.*, 338 F.3d 1353, 1356 (Fed. Cir. 2003) (quoting *PIN/NIP, Inc. v. Platte Chem. Co.*, 304 F.3d 1235, 1241 (Fed. Cir. 2002)); RCFC 12(b)(1). If the Court determines that "it lacks jurisdiction over the subject matter, it must dismiss the claim." *Matthews v. United States*, 72 Fed. Cl. 274, 278 (2006); RCFC 12(h)(3). To the extent that the United States or the Court questions the factual basis of jurisdiction, the plaintiff must bring forth relevant, adequate proof to establish jurisdiction by a preponderance of evidence. *See* Order at 2, *Fairholme Funds, Inc. v. United States*, No. 13-465 (Fed. Cl. Feb. 26, 2014), ECF No. 32 (citing *McNutt v. Gen. Motors*

only "for cause" removal of FHFA's Director; in doing so, the Fifth Circuit left "intact the remainder of HERA and the FHFA's past actions—including the Third Amendment." *Id.* at *26.

*Acceptance Corp. of Indiana*, 298 U.S. 178, 189 (1936); *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988)).

    B.    <u>Rule 12(b)(6)</u>

Rule 12(b)(6) requires dismissal when a complaint does not plausibly give rise to an entitlement to relief.  RCFC 12(b)(6).  To avoid dismissal for failure to state a claim under Rule 12(b)(6), "a complaint must allege facts 'plausibly suggesting (not merely consistent with)' a showing of entitlement to relief."  *Acceptance Ins. Cos. v. United States*, 583 F.3d 849, 853 (Fed. Cir. 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).  The Court should dismiss if the complaint fails to "state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).  A claim is facially implausible if it does not permit the Court "to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  Allegations "that are 'merely consistent with' a defendant's liability" and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*

When the complaint "indicate[s] the existence of an affirmative defense that will bar the award of any remedy," the complaint should be dismissed pursuant to Rule 12(b)(6).  *Corrigan v. United States*, 82 Fed. Cl. 301, 304 (2008) (internal quotations and citations omitted).  This Court has held that the United States properly raises a collateral estoppel defense on a Rule 12(b)(6) motion.  *See Copar Pumice Co. v. United States*, 112 Fed. Cl. 515, 527 (2013) (citing *Lewis v. United States*, 99 Fed. Cl. 772, 781 (2011)).

When deciding a Rule 12(b)(6) motion, in addition to the pleading and its exhibits, the Court "must consider . . . documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  *Bell/Heery v. United States*, 106 Fed. Cl. 300, 307

(2012) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)).

"Moreover, '[e]ven where a document is not incorporated by reference, the court may

nevertheless consider it where the complaint relies heavily upon its terms and effect, which

renders the document integral to the complaint.'" *Id.* (quoting *Mangiafico v. Blumenthal*, 471

F.3d 391, 398 (2d Cir. 2006)).

## II.     The Court Lacks Jurisdiction To Entertain The Complaints Because FHFA Is Not The United States For Tucker Act Purposes When Acting As The Enterprises' Conservator

The Tucker Act establishes—and thus limits—this Court's jurisdiction.  28 U.S.C.

§ 1491; *United States v. Mitchell*, 445 U.S. 535, 538 (1980).  Under the Tucker Act, the Court

may only "render judgment upon any claim against the United States."  28 U.S.C. § 1491(a)(1);

*see Brown v. United States*, 105 F.3d 621, 624 (Fed. Cir. 1997).  Plaintiffs bear the burden of

establishing the Court's jurisdiction and must establish that the party they are suing is, in fact, the

United States.  *See*, *e.g.*, *Tenerife Real Estate Holdings LLC v. United States*, 136 Fed. Cl. 156,

160 (2018).

Although plaintiffs style their claims as against the "Government," the gravamen of the

complaints is that FHFA as conservator transferred the Enterprises' net worth to the Treasury,

thereby frustrating private shareholders' "economic interests" (*i.e.*, dividends and liquidation

preferences) in their Fannie Mae and Freddie Mac stock.  *See*, *e.g.*, *Fairholme* ¶ 117; *Arrowood*

¶ 97.  Because plaintiffs must show that the "Government" is responsible for their injuries to

establish jurisdiction under the Tucker Act, plaintiffs must establish that FHFA acting as the

Enterprises' conservator is, in fact, the Government.  Indeed, if FHFA as conservator negotiated

the Third Amendment standing in the Enterprises' private shoes, then plaintiffs' allegations that

FHFA as conservator took the Enterprises net worth and transferred it to Treasury do not support

claims against the United States for purposes of the Tucker Act.  Treasury alone could not have

implemented the Third Amendment, and its role as a counterparty to a voluntary agreement with the Enterprises does not support plaintiffs' claims.  *See Norman v. United States*, 429 F.3d 1081, 1089 (Fed. Cir. 2005) (a voluntary agreement is "not a proper basis upon which to premise a takings claim"); *Sun Oil Co. v. United States*, 572 F.2d 786, 818 (Ct. Cl. 1978) (Takings Clause is inapplicable when the Government enters into contract with private party); *St. Christopher Assocs., LP v. United States*, 511 F.3d 1376, 1385 (Fed. Cir. 2008) (Government contract does not give rise to takings liability notwithstanding public objective served by contract).  Whatever plaintiffs may think about the propriety of the Enterprises entering into the Third Amendment, their disagreement with FHFA as conservator's decision does not create a takings claim against the Federal Government.  *See B&G Enters., Inc. v. United States*, 220 F.3d 1318, 1324 (Fed. Cir. 2000); *see also* Section III, below.

Thus, to invoke this Court's jurisdiction, plaintiffs seek to impute FHFA's conduct as the Enterprises' conservator to the United States by alleging that "FHFA was an agent and arm of the Treasury."  *See* Order at 3-4, *Fairholme Funds, Inc. v. United States*, No. 13-465 (Fed. Cl. Feb. 26, 2014), ECF No. 32.

Indeed, this is the precise point for which the Court ordered jurisdictional discovery, but plaintiffs' four-year odyssey to find documents and testimony to substantiate their theory was in vain.  If anything, the amended and newly filed complaints confirm that Treasury and FHFA as conservator negotiated the Third Amendment independently.  Because plaintiffs' Third Amendment claims are not against the United States, they should be dismissed for lack of jurisdiction.

A.     FHFA As Conservator Stands In The Enterprises' Shoes

Courts have routinely held that when, as in these cases, a Government regulatory agency stands in the shoes of a private enterprise as its conservator, the agency is not the United States for Tucker Act purposes.  *See O'Melveny & Myers v. Fed. Deposit Ins. Corp.*, 512 U.S. 79, 85 (1994) (FDIC "is not the United States" when exercising bank's rights in receivership); *Tenerife Real Estate Holdings,* 136 Fed. Cl. at 160 (same); *Ameristar Fin. Servicing Co. v. United States*, 75 Fed. Cl. 807, 812 (2007) (FDIC as conservator "was not acting as the United States").

Federal courts that have specifically addressed whether FHFA as the Enterprises' conservator is a Federal actor for purposes of constitutional claims have unanimously held that it is not a Federal actor.  This is because HERA provides that FHFA as conservator—by operation of law, upon the inception of conservatorship—succeeds to "all rights, titles, powers, and privileges of the regulated entity, and of any stockholder, officer, or director[.]"  12 U.S.C. § 4617(b)(2)(A)(i).  As the D.C. Circuit explained, HERA "evinces Congress's intention to have the FHFA step into Fannie Mae's private shoes" and for FHFA to "shed[] its government character," not vice versa.  *Herron v. Fannie Mae*, 861 F.3d 160, 169 (D.C. Cir. 2017) (alteration in original) (citation omitted); *see also Meridian Invs., Inc. v. Fed. Home Loan Mort. Corp.*, 855 F.3d 573, 579 (4th Cir. 2017) ("[T]hough FHFA is a federal agency, as conservator it steps into Freddie Mac's shoes, shedding its government character and also becoming a private party."); *United States ex rel. Adams v. Aurora Loan Servs., Inc.*, 813 F.3d 1259, 1261 (9th Cir. 2016) (explaining that FHFA as conservator stepped into Fannie Mae's shoes, and "not the other way around").  Thus, here, when FHFA as conservator executed the Third Amendment on the Enterprises' behalf, it did not act as the United States but rather stood in the Enterprises' private shoes.

22

In *Perry Capital*, the D.C. Circuit considered a jurisdictional question directly analogous to the one presented here—whether FHFA as conservator is subject to suit as the Government under the Federal Tort Claims Act—and determined that FHFA is not the Government.  *See Perry Capital II*, 864 F.3d at 622-23.  The D.C. Circuit explained that plaintiffs' breach of fiduciary duty claims against FHFA as conservator were not cognizable under the Federal Tort Claims Act because "the agency steps into the shoes of the Companies and acts on their behalf." *Id.* at 622-23.  And because the Enterprises, pre-conservatorship, were not subject to suit under the Federal Tort Claims Act, "neither is the FHFA when it is sued for an action taken on their behalf—in this case, the Third Amendment."  *Id.* at 623.

Accordingly, because this Court lacks jurisdiction to entertain claims against the Enterprises, which are admittedly not the United States, the Court lacks jurisdiction to entertain claims against FHFA acting as their conservator.

B.    Plaintiffs' Own Allegations Confirm That Treasury And FHFA Acted Independently When They Entered Into The Third Amendment

Notwithstanding the growing number of Federal district and appellate courts that have uniformly ruled that FHFA did not execute the Third Amendment at Treasury's behest, *see*, *e.g.*, *Roberts*, 889 F.3d at 406, *Perry Capital I*, 70 F. Supp. 3d at 226-27, plaintiffs nonetheless contend that when FHFA executed the Third Amendment, it was "act[ing] as a Government agent and was not simply 'standing in the shoes' of [the Enterprises]."  *Fisher* ¶ 207; *see also Rafter* ¶ 7; *Fairholme* ¶ 147; *Owl Creek* ¶ 75.  But plaintiffs' own complaints contravene this theory.

As alleged, the Third Amendment was the product of a series of negotiations between Treasury and FHFA that lasted for many months.  *Reid* ¶ 131, 133-135, 138-140, 142. According to plaintiffs, Treasury staff first discussed the "idea of a Net Worth Sweep with FHFA

Acting Director DeMarco and [FHFA Special Advisor] Ugoletti" in July 2011. *Id.* ¶ 131.

Plaintiffs then purport to summarize internal Treasury deliberations, *id.* ¶¶ 132, 134, 138, 142;

internal FHFA deliberations, *id.* ¶ 133; and several subsequent negotiations between Treasury

and FHFA about a potential amendment to the stock purchase agreements. *Id.* ¶¶ 133-135, 138-

140, 142; *see also Fairholme* ¶ 144.  According to plaintiffs, Treasury and FHFA "agreed,"

"met," "discussed," and "negotiat[ed]" that amendment.  *Reid* ¶¶ 131, 140-141; *see also Rafter*

¶ 77 (describing FHFA's conduct during "negotiations").

For instance, plaintiffs cite an alleged briefing memo in which Treasury staff advised

Secretary Geithner to "*ask for* [Acting Director DeMarco's] commitment to work toward" a

strategic plan for the conservatorships that involves "modify[ing] the dividend calculation for the

preferred stock[.]"  *Reid* ¶ 139 (emphasis added).  Plaintiffs also reference an alleged June 21,

2012 meeting where Acting Director DeMarco expressed his "view that the amendment was not

urgent," notwithstanding Treasury's purported interest in amending the stock purchase

agreements sooner.  *Id.* ¶ 142.  *See also id.* ¶ 143 ("[Treasury Undersecretary] Miller wrote that

DeMarco 'is on record to *work with us* on the PSPAs.'") (emphasis added).  Thus, plaintiffs'

description of the negotiations between Treasury and FHFA over the Third Amendment show

two sophisticated entities operating independently.

Since the Court ordered jurisdictional discovery into whether FHFA was an "agent and

arm" of Treasury, numerous courts have ruled that FHFA as the Enterprises' conservator acted

independently when it executed the Third Amendment.  In *Roberts*, the Seventh Circuit

determined that because FHFA always possessed the power to refuse the Third Amendment,

plaintiffs alleged insufficient facts in their amended complaint to show that FHFA executed it

under Treasury's direction and supervision.  *See Roberts*, 889 F.3d at 406.  "[S]o long as [FHFA]

remained free to reject the terms offered by Treasury and to exercise its independent judgment, nothing prevented [FHFA] from taking Treasury's advice or agreement to its terms.  Even if . . .Treasury officials made statements suggesting that Treasury was in the driver's seat and had to convince [FHFA] to come along for the ride, such behavior alone" would not demonstrate that FHFA was subject to Treasury's direction or supervision.  *Compare id.*, *with Fairholme* ¶ 147 ("Treasury was a driving force behind the [Third Amendment]"); *Arrowood* ¶ 127 (same).

In *Perry Capital*, the district court reached the same conclusion.  Although plaintiffs alleged that "Treasury 'invented' the net-worth sweep concept with no input from FHFA," the court held that such allegations "do not come close to a reasonable inference that 'FHFA considered itself bound to do whatever Treasury ordered.'"  *Perry Capital I*, 70 F. Supp. 3d at 226.  The district court identified "nothing in the pleadings or the administrative record provided by Treasury that hints at coercion[.]"  *Id.* at 227.  Moreover, that Treasury allegedly proposed the net worth sweep to FHFA is irrelevant given that "many negotiations arise from one party conjuring up an idea, and then bringing their proposal to the other party."  *Id.*  Accordingly, the court determined that it lacked jurisdiction over plaintiffs' allegations that FHFA acted at Treasury's behest.  *Id.*

The same reasoning should compel the Court to reject plaintiffs' conclusory assertion that FHFA acted under Treasury's direction and supervision or was otherwise a Government agent. *See Fairholme* ¶ 147; *Arrowood* ¶ 127; *Reid* ¶ 171.  Even assuming as true that Treasury was the alleged "driving force" behind the Third Amendment, plaintiffs fail to allege any facts that support the conclusion that FHFA had no choice in the matter.  *See Fisher* ¶ 175 (describing "FHFA's *decision* to enter the Third Amendment") (emphasis added); *see also Roberts*, 889 F.3d at 406.  Moreover, plaintiffs' allegations that the Third Amendment supported Treasury goals

does not support plaintiffs' conclusion that "FHFA agreed to the Net Worth Sweep only at the insistence and under the direction and supervision of Treasury." *Compare Fairholme* ¶¶ 119, 147, *with Perry Capital I*, 70 F. Supp. 3d at 226-27.  Indeed, the substantive allegations contained in the complaints demonstrate the opposite.  *See*, *e.g.*, *Reid* ¶¶ 131, 133-135, 138-140, 142 (describing how ongoing FHFA and Treasury "discuss[ions]" resulted in an "agree[ment]" to adopt the Third Amendment).

Because the complaints fail to allege facts sufficient to support plaintiffs' conclusory assertion that FHFA was merely an "agent and arm of the Treasury" when negotiating the Third Amendment, plaintiffs cannot establish jurisdiction and the complaints must be dismissed.

III.    **Under HERA's Succession Clause, Enterprise Shareholders Lack Standing To Bring Derivative Suits**

HERA's succession clause provides another, independent basis to dismiss the complaints because it divests private shareholders of standing to bring derivative suits.

HERA's succession clause states that FHFA "shall, as conservator or receiver, and by operation of law, immediately succeed to . . . all rights, titles, powers, and privileges of the regulated entity, and of any stockholder, officer, or director of such regulated entity with respect to the regulated entity and the assets of the regulated entity."  12 U.S.C. § 4617(b)(2)(A)(i).  This provision "plainly transfers" to FHFA as conservator "the shareholders' ability to bring derivative suits."  *Perry Capital II*, 864 F.3d at 623 (quoting *Kellmer v. Raines*, 674 F.3d 848, 850 (D.C. Cir. 2012)) (alteration in original).  Indeed, when Congress transferred shareholder derivative suit rights to FHFA as conservator, the legislature did so "without exception."  *Perry Capital II*, 864 F.3d at 624.

In *Kellmer*, plaintiffs—shareholders of Fannie Mae—asserted a variety of shareholder derivative claims, including breach of fiduciary duty; the district court substituted FHFA for the

plaintiffs and the D.C. Circuit affirmed.  In rejecting plaintiffs' argument that HERA's

succession clause does not bar their derivative claims, the D.C. Circuit stated:

> [T]o resolve this issue, we need only heed Professor Frankfurter's
> timeless advice:  "(1) Read the statute; (2) read the statute; (3) read
> the statute!"  *See* Henry J. Friendly, *Mr. Justice Frankfurter and
> the Reading of Statutes, in* Benchmarks 196, 202 (1967).  HERA
> provides that FHFA "shall, as conservator or receiver, and by
> operation of law, immediately succeed to . . . all rights, titles,
> powers, and privileges . . . of any stockholder."  12 U.S.C.
> § 4617(b)(2)(A).  This language plainly transfers shareholders'
> ability to bring derivative suits—a "right[ ], title[ ], power[ ], [or]
> privilege[ ]"—to FHFA.

*Kellmer*, 674 F.3d at 850.  As demonstrated below, the D.C. Circuit's reasoning also requires

dismissal of plaintiffs' derivative claims here.

A. All Of Plaintiffs' Claims Against The United States Are Derivative Because They
Arise From The Enterprises' Alleged Injuries

The Court should dismiss all of plaintiff's claims as derivative because they are

byproducts of the Enterprises' alleged injuries.  "A basic tenet of American corporate law is that

the corporation and its shareholders are distinct entities."  *Dole Food Co. v. Patrickson*, 538 U.S.

468, 474 (2003); *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 477 (2006) ("[I]t is

fundamental corporation and agency law—indeed, it can be said to be the whole purpose of

corporation and agency law—that the shareholder and contracting officer of a corporation has no

rights and is exposed to no liability under the corporation's contracts.").  Thus, legal harms

committed against a corporation give rise to claims belonging to the corporation itself, and

shareholder suits seeking to enforce those claims are derivative.  *See Starr Int'l Co. v. United*

*States*, 856 F.3d 953, 966 (Fed. Cir. 2017), *cert. denied*, 138 S. Ct. 1324 (2018).  In a derivative

suit, any recovery flows to the corporate treasury; in a direct suit, it flows to the individual shareholder.[12]  *See* 3 Bus. & Com. Litig. Fed. Cts. § 20:2 (4th ed.).

Although plaintiffs label their claims as both "direct" and "derivative," the claims' substance, not their labels, is controlling.  *See Starr Int'l Co.*, 856 F.3d at 966-72.  "The manner in which a plaintiff labels its claim and the form of words used in the complaint are not dispositive; rather, the court must look to the nature of the wrong alleged, taking into account all of the facts alleged in the complaint, and determine for itself whether a direct claim exists."  *Hartsel v. Vanguard Grp., Inc.*, No. 5394, 2011 WL 2421003, at *16 (Del. Ch. June 15, 2011), *aff'd*, 38 A.3d 1254 (Del. 2012).

Two questions control whether a claim is direct or derivative:  "(1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?"  *Starr Int'l Co.*, 856 F.3d at 966 (quoting *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004)); *see also Kauffman v. Dreyfus Fund, Inc.*, 434 F.2d 727, 732 (3d Cir. 1970).  Unless a stockholder can establish that "the duty breached was owed to the stockholder" and the stockholder "can prevail without showing an injury to the corporation," the stockholder's claim is derivative.  *See*, *e.g.*, *El Paso Pipeline GP Co. v.*

---

[12]  Federal law governs whether these claims are direct or derivative because plaintiffs assert claims under the U.S. Constitution.  *See*, *e.g.*, *Starr Int'l Co.*, 856 F.3d at 965.  Where standing turns on the "allocation of governing power within [a] corporation," however, Federal law often looks to state-law principles.  *Kamen v. Kemper Fin. Servs.*, 500 U.S. 90, 99 (1991).  In any event, the applicable law makes little difference here; the United States is unaware of any jurisdiction that would permit shareholders to directly assert claims for damage to stock value, as plaintiffs seek to do here.  *See*, *e.g.*, *Kramer v. W. Pac. Indus., Inc.*, 546 A.2d 348, 353 (Del. 1988) ("Delaware courts have long recognized that actions charging 'mismanagement which depress[ ] the value of stock [allege] a wrong to the corporation; *i.e.*, the stockholders collectively, to be enforced by a derivative action.'").

*Brinckerhoff*, 152 A.3d 1248, 1260 (Del. 2016) (quoting *Tooley*, 845 A.2d at 1039); *see also Agostino v. Hicks*, 845 A.2d 1110, 1122 (Del. Ch. 2004) ("[T]he inquiry should focus on whether an injury is suffered by the shareholder that is not dependent on a prior injury to the corporation.").  Here, because plaintiffs' claims are substantively derivative, they are barred by HERA.

Substantively derivative claims include claims that defendants caused the company to enter into a series of "unfair" transactions that have involved self-dealing and diverting assets. *Cowin v. Bresler*, 741 F.2d 410, 416 (D.C. Cir. 1984).  Thus, in *Pareto v. FDIC*, 139 F.3d 696, 699 (9th Cir. 1998), the Ninth Circuit explained, "Pareto's allegations—that the directors breached their duties of care and loyalty by failing to safeguard Barbary Coast's assets and equity, mismanaging its operations, [and] improperly placing it into voluntary receivership . . . describe a direct injury to the bank, not the individual stockholders."  Similarly, "actions charging waste or mismanagement which depress the value of stock may not be maintained directly, but must be brought derivatively on behalf of the corporation."  *Blasband v. Rales*, 971 F.2d 1034, 1045 (3d Cir. 1992).

Allegations about "depreciation or diminution in the value of a shareholder's corporate stock" are also derivative because they do not reflect "the type of direct, personal injury which is necessary to sustain a direct cause of action."  *Hometown Fin., Inc. v. United States*, 56 Fed. Cl. 477, 486 (2003) (quoting *Gaff v. Fed. Deposit Ins. Corp.*, 814 F.2d 311, 315 (6th Cir. 1987)), *aff'd*, 409 F.3d 1360 (Fed. Cir. 2005); *see also In re Ionosphere Clubs, Inc.*, 17 F.3d 600, 606-07 (2d Cir. 1994) (shareholder's claims that corporation's former officers and directors diverted corporate assets, which resulted in non-payment of shareholder dividends, were derivative and thus extinguished by bankruptcy trustee as part of settlement).  Indeed, this Court has

consistently held that "shareholders lack standing to sue in their individual capacities where their losses from the alleged injury to the corporation amount to nothing more than a diminution in the value of their stock or a loss of dividends."  *Holland v. United States*, 59 Fed. Cl. 735, 740 (2004) (citing *Hometown Fin.*, 56 Fed. Cl. at 486); *Statesman Sav. Holding Corp. v. United States*, 41 Fed. Cl. 1, 16 (1998).

As their allegations reveal, plaintiffs' claims are substantively derivative:

- Allegations that the Third Amendment depletes and prevents accumulation of Enterprise capital.  *See, e.g.*, *WF* ¶ 204; *Fairholme* ¶¶ 10, 170, 265-66; *Cacciapalle* ¶¶ 10, 97; *Fisher* ¶ 199; *Reid* ¶ 195; *Rafter* ¶ 8; *Owl Creek* ¶ 76; *Akanthos* ¶ 69; *Appaloosa* ¶ 72; *CSS* ¶ 69; *Mason* ¶ 133.

- Allegations that the Third Amendment constituted a "waste" of corporate assets.  *See, e.g.*, *WF* ¶ 145; *Fairholme* ¶¶ 11, 231; *Cacciapalle* ¶ 170; *Rafter* ¶ 72; *Arrowood* ¶ 158; *Owl Creek* ¶ 92; *Akanthos* ¶ 84; *Appaloosa* ¶ 87; *CSS* ¶ 84; *Mason* ¶ 112.

- Allegations that the Third Amendment was the product of "self-dealing."  *See, e.g.*, *Fairholme* ¶ 229; *Cacciapalle* ¶ 168; *Rafter* ¶ 92; *Arrowood* ¶ 156; *Owl Creek* ¶ 108; *Akanthos* ¶ 133; *Appaloosa* ¶ 135; *CSS* ¶ 133; *Mason* ¶ 134.

- Allegations that the Third Amendment results in overpayment of Enterprise dividends to Treasury.  *See, e.g.*, *WF* ¶ 12; *Fairholme* ¶ 15; *Cacciapalle* ¶ 70; *Rafter* ¶ 81; *Arrowood* ¶ 15; *Owl Creek* ¶ 93; *Akonthos* ¶ 86; *Appaloosa* ¶ 89; *CSS* ¶ 86.

- Allegations that the Third Amendment did not further valid Enterprise goals or reflect good faith business judgment.  *See, e.g.*, *Fairholme* ¶ 232; *Cacciapalle* ¶ 171; *Rafter* ¶ 91; *Arrowood* ¶ 159; *Owl Creek* ¶ 81; *Akonthos* ¶ 74; *Appaloosa* ¶ 77; *CSS* ¶ 74; *Mason* ¶ 119.

- Allegations that the Third Amendment resulted in loss of shareholder value.  *See, e.g.*, *WF* ¶ 205; *Fairholme* ¶ 117; *Arrowood* ¶ 97; *Cacciapalle* ¶ 85; *Fisher* ¶ 199; *Reid* ¶ 195; *Rafter* ¶ 119; *Owl Creek* ¶ 76; *Akanthos* ¶ 6; *Appaloosa* ¶ 72; *CSS* ¶ 69; *Mason* ¶ 98.

Comparing plaintiffs' claims labeled as direct with those labeled as derivative reveals that they are identical because they uniformly arise from Enterprise dividend payments to Treasury. Plaintiffs simply swap the identity of the injured party and the alleged "right" taken or breached.

*Compare*, *e.g.*, *Fairholme* counts 1, 4, 7, 10 (direct), *with id*., counts 2-3, 5-6, 8-9, and 11-12 (derivative).

For instance, the *Fairholme* plaintiffs allege derivative and direct takings claims based on the same facts.  In their **derivative** takings claims, plaintiffs contend that the Third Amendment "expropriated" each Enterprise's "property interest[] in [its own] net worth."  *Id.* ¶¶ 179-80, 188-89.  In their **direct** takings claim, the *Fairholme* plaintiffs repeat these allegations, arguing that the Third Amendment took a "claim on the Companies' equity that could be paid out in the form of dividends or a liquidation payment."  *Id.* ¶¶ 169-71.  In reality, the "direct" injuries regarding shareholder dividends and liquidation payments are substantively derivative because they only exist as consequences of the alleged "expropriation" of the Enterprises' net worth.  *Compare id.* ¶¶ 179-80, 188-90 (derivative), *with id.* ¶¶ 169-71 (direct); *see El Paso Pipeline*, 152 A.3d at 1260 (stockholder cannot bring direct claim unless it can prevail without showing injury to corporation).

The Court should thus conclude that all of plaintiff's claims are derivative—regardless of the labels (or contortions) adopted by the claimants—because all twelve complaints depend on "showing an injury to the [Enterprises]" and relief would accrue to the Enterprises directly, *see*, *e.g.*, *Tooley*, 845 A.2d at 1039; *Saxton*, 245 F. Supp. 3d at 1073, and the shareholders only indirectly.

Indeed, despite an aggressive campaign throughout the country, Enterprise shareholders have yet to find a court that did not deem their claims against the Government to be derivative.  In *Roberts*, the Seventh Circuit determined that indistinguishable allegations regarding the Third Amendment were derivative for two reasons:  (1) the Enterprises suffered the alleged harm; and (2) any alleged recovery belongs to the Enterprises.  *See Roberts*, 889 F.3d at 409.  First, "[t]he

harm that plaintiffs allege . . . is that the net-worth dividend illegally dissipated corporate assets by transferring them to Treasury.  They complain, in effect, of a combination of mismanagement and depletion of corporate assets through over payment, both of which are classic derivative claims."  *Id*.  Second, because plaintiffs challenged the Enterprises' dividend payments to Treasury, any potential recovery "would inure to the benefit of the [Enterprises] rather than individual stockholders."  *Id.*  In *Perry Capital,* the D.C. Circuit reached a similar conclusion with respect to the plaintiffs' breach of fiduciary duty claims because plaintiffs' requested relief would benefit "Fannie Mae directly and the shareholders only derivatively."  *See Perry Capital II*, 864 F.3d at 626-27.  Again, in *Saxton*, 245 F. Supp. 3d at 1072, the court explained that allegations that the Third Amendment "expropriated" shareholder value and Enterprise net worth, and "destroyed" Enterprise stock value, were derivative in nature.

The *Fisher* and *Reid* complaints in this Court contain the same allegations about the Third Amendment as the other litigants, but *Fisher* and *Reid* acknowledge that these matching allegations are derivative.  Because plaintiffs tether every alleged shareholder injury to an alleged Enterprise injury, all claims must be deemed derivative.  Once the plaintiffs' allegations have been properly categorized as derivative, HERA's statutory bar on shareholder derivative suits requires their dismissal.

B.    HERA Contains No Implicit "Conflict of Interest" Exception To The Succession Clause

Although plaintiffs assert that a "manifest conflict-of-interest" allows them to pursue derivative suits notwithstanding HERA's succession clause, *see*, *e.g.*, *Fairholme* ¶ 165, *Cacciapalle* ¶ 92, *Fisher* ¶ 217, courts have uniformly rejected this argument because (1) nothing in HERA supports a conflict-of-interest exception to the succession clause, and

(2) inviting shareholders to second guess FHFA's business decisions by filing derivative suits would frustrate Congress's intent to insulate FHFA as conservator from judicial scrutiny.  *See Perry Capital I*, 70 F. Supp. 3d at 232, *aff'd*, 864 F.3d at 623-25; *Roberts*, 889 F.3d at 409-10; *see also Saxton*, 245 F. Supp. 3d at 1079; *Continental W. Ins. Co.*, 83 F. Supp. 3d at 840 n.6.

No court has recognized an implicit conflict-of-interest exception to HERA's bar on derivative suits.  In *Perry Capital*, the D.C. Circuit held that the "Succession Clause does not permit shareholders to bring derivative suits on behalf of the Companies even where the FHFA will not bring a derivative suit due to a conflict of interest."  *Perry Capital II*, 864 F.3d at 625. The Seventh Circuit and several district courts also determined that HERA contains no conflict-of-interest exception.  *See Roberts*, 889 F.3d at 409 ("we do not see a conflict-of-interest exception implicit in" HERA); *see also Saxton*, 245 F. Supp. 3d at 1079; *Continental W. Ins. Co.*, 83 F. Supp. 3d at 840 n.6.

Although the Federal Circuit's decision in *First Hartford* and the Ninth Circuit's decision in *Delta Savings* imply a conflict-of-interest exception to the general bar on derivative suits, those cases have limited reach and should not be applied here.  *See First Hartford Corp. Pension Plan & Trust v. United States,* 194 F.3d 1279, 1295 (Fed. Cir. 1999); *Delta Sav. Bank v. United States*, 265 F.3d 1017, 1020 (9th Cir. 2001).

*First Hartford* concerned the FDIC's (as regulator) breach of a distinct contract that it entered into with a bank several years before receivership.  *See First Hartford Corp.*, 194 F.3d at 1283-84.  The Federal Circuit identified a potential conflict-of-interest between FDIC as regulator and FDIC as receiver, and permitted shareholders to bring a derivative suit on the bank's behalf to pursue the pre-receivership breach claim against FDIC as regulator.  The court in *First Hartford* recognized the uniqueness of the situation and limited the scope of its opinion;

the court explained "our holding is limited to the situation here" and "[w]e neither infer nor express an opinion on the standing of derivative plaintiffs in other circumstances." *Id.* at 1295. In *Roberts*, the Seventh Circuit reflected on these limits: "The Federal Circuit expressly limited its conflict-of-interest exception to situations 'in which a government contractor with a putative claim of breach by a federal agency is being operated by that very same federal agency.'" *Roberts*, 889 F.3d at 409 (quoting *First Hartford Corp.*, 194 F.3d at 1295). That situation does not exist here.

In *Delta Savings*, the "plaintiffs wished to sue the Office of Thrift Supervision for racial discrimination in placing the bank *into* receivership—not for operating the bank once in receivership." *Id.* at 410 (citing *Delta Sav.*, 265 F.3d at 1020) (emphasis in original). Although the Ninth Circuit recognized that the Office of Thrift Supervision and FDIC are separate agencies, the court determined that they were "closely related" because they shared a common genesis in FIRREA, jointly published regulations, and shared common management. *Delta Sav.*, 265 F.3d at 1023. Given that FDIC would be required to assert the pre-receivership discrimination claim against a closely-related sister agency, the Court implied a conflict-of-interest exception to the bar on derivative suits and allowed shareholders to pursue the bank's discrimination suit against the Office of Thrift Supervision. *Id.* at 1024.

The circumstances present in *First Hartford* and *Delta Savings* are absent here. First, *First Hartford* and *Delta Savings* created a conflict-of-interest exception only in the context of failed banking institutions in receivership, not conservatorship. As plaintiffs recognize, "[u]nder HERA, conservatorship is a status distinct from receivership, with very different purposes, responsibilities, and restrictions." *Arrowood* ¶ 42. HERA makes clear that, upon appointment of the receiver, shareholders gain the ability to assert claims based on their contingent rights

through the administrative and judicial claims process.  *See* 12 U.S.C. § 4617(b)(2)(K)(i).

Shareholders have no such rights during conservatorship.  *See id*. § 4617(b)(2)(A).

As the district court explained in *Perry Capital*, applying a conflict-of-interest exception "makes still less sense in the conservatorship context, where FHFA enjoys even greater power free from judicial intervention" than in receivership.  *Perry Capital I*, 70 F. Supp. 3d at 231 n.30. Although courts have a role under HERA with respect to "issues brought by outside stakeholders" in receivership (*i.e.*, they are involved in the process of adjudicating shareholder claims), Congress altogether eliminated shareholder involvement in conservatorship operations. *Id*. (citing 12 U.S.C. § 4617(b)(5), (6)).

Second, *First Hartford* and *Delta Savings* are distinguishable because they involved circumstances that predated the receivership, such as the pre-receivership breach claim in *First Hartford* or the pre-receivership discrimination claim in *Delta Savings*.  *See First Hartford*, 194 F.3d at 1283-84, 1295 (determining that FDIC as receiver should not control breach of contract claim where FDIC's regulatory rulemaking both triggered appointment of the receiver and breached a contract); *Delta Savings*, 265 F.3d at 1019-20 (concluding that FDIC as receiver should not control claims based on alleged pre-receivership discrimination by the Office of Thrift Supervision when the Office put the bank into receivership after the Office became the target of discrimination investigations).

Here, plaintiffs do not seek to vindicate claims that preceded the conservatorship; rather, plaintiffs challenge FHFA's "decisions as conservator [after] that conservatorship is underway." *Roberts*, 889 F.3d at 410.  Indeed, plaintiffs' claims concern FHFA's decision to enter the Third

35

Amendment nearly four years *after* the imposition of the conservatorship.[13]  And challenges to FHFA's business decisions as the Enterprises' conservator, such as the Third Amendment, are precisely the types of claims that Congress prohibited.  *See id.* at 410.  Thus, plaintiffs' claims have no support in the Federal Circuit's or Ninth Circuit's receivership decisions—their conflict-of-interest claims are, literally, unprecedented.

Indeed, FHFA's authority to enter into and amend the stock purchase agreements falls squarely within its power to "operate" the Enterprises, "reorganiz[e]" their affairs, and "take such action as may be . . . appropriate" to carry on Enterprise business.  *See Perry Capital II*, 864 F.3d at 606-07 (quoting 12 U.S.C. § 4617(b)(2)(B), (a)(2), (b)(2)(D)(ii)).  In turn, Congress granted Treasury authority to "purchase any obligations and other securities issued by" the Enterprises through December 31, 2009, but placed no expiration date on Treasury's authority to "exercise any rights received in connection with" those securities.  *Id.* at 600 (citing 12 U.S.C. §§ 1455(*l*)(1)(A), 1719).  The complaints, moreover, contain no allegation that the original stock purchase agreements or the first two amendments—which already obligated the Enterprises to pay Treasury dividends and prohibited private shareholder dividends without Treasury approval—represented a conflict of interest.

---

[13]  Plaintiffs allege no plausible pre-conservatorship contract between Treasury and the Enterprises, such that enforcement of that contract would require FHFA as conservator to sue a "closely-related" agency.  But even if plaintiffs alleged such a contract, their contention that Treasury and FHFA share an "incestuous" relationship because certain FHFA officials previously worked at Treasury, *Reid* ¶¶ 226-28, is insufficient to demonstrate a conflict.  Treasury and FHFA operate independently and share no "managerial and operational overlap." *Delta Savings*, 265 F.3d at 1022.  Nor do they share a common genesis:  Congress created FHFA as an "independent agency" in 2008, 12 U.S.C. § 4511(a); it established Treasury in the 1789 "[A]ct to [E]stablish the Treasury Department."  *See United States ex rel. Work v. Boutwell*, 3 MacArth. 172 (D.C. 1879).

Recognizing a conflict-of-interest exception to the succession clause would frustrate HERA's purposes given that, when Congress enacted HERA, Congress anticipated that the Enterprises would turn to Treasury for essential capital and authorized Treasury to invest in the Enterprises.  12 U.S.C. §§ 1455(*l*); 1719(g).  If Congress intended to permit shareholder challenges to FHFA as conservator's dealings with Treasury, it would have expressly granted shareholders that right.  Instead, Congress transferred "all rights, titles, powers, and privileges" of the Enterprises' shareholders to FHFA.  12 U.S.C. § 4617(b)(2)(A)(i).  Thus, plaintiffs' claims here do not implicate any of the unique considerations present in *First Hartford* and *Delta Savings*.

Given that Congress granted FHFA as the Enterprises' conservator "immense discretionary power" and "prohibit[ed] courts from interfering with the exercise of such power," allowing an "*implicit* end-run around FHFA's conservatorship authority by means of the shareholder derivative suits" would frustrate Congress's explicit statutory language barring the same.  *See Perry Capital I*, 70 F. Supp. 3d at 230-31 (emphasis in original).

C.      Issue Preclusion Compels Dismissal Of Shareholder Derivative Claims

Issue preclusion (collateral estoppel) bars Enterprise shareholders from pursuing derivative claims.  In related Third Amendment shareholder litigations, Enterprise shareholders litigated and lost the issues of (1) whether HERA bars derivative claims, and (2) whether plaintiffs may nonetheless pursue such claims under an implied conflict-of-interest exception.  *See Perry Capital I*, 70 F. Supp. 3d at 229-33, *aff'd*, *Perry Capital II*, 864 F.3d at 624-25.  Definitive rulings on those issues foreclose plaintiffs' claims.

Issue preclusion "bars 'successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment,' even if the issue

recurs in the context of a different claim." *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008) (quoting

*New Hampshire v. Maine*, 532 U.S. 742, 748 (2001)).  The underlying rationale is to ensure that

once a court has decided an issue, "it is 'forever settled as between the parties,' . . . thereby

'protect[ing]' against 'the expense and vexation attending multiple lawsuits, conserv[ing]

judicial resources, and foster[ing] reliance on judicial action by minimizing the possibility of

inconsistent verdicts.'" *B&B Hardware Inc. v. Hargis Indus., Inc.*, 135 S. Ct. 1293, 1302 (2015)

(quoting *Baldwin v. Iowa State Traveling Men's Ass'n*, 283 U.S. 522, 525 (1931), and *Montana*

*v. United States*, 440 U.S. 147, 153-54 (1979)).  Issue preclusion "applies equally to findings of

fact and conclusions of law." *Franklin Sav. Corp. v. United States*, 56 Fed. Cl. 720, 736 (2003)

(italics removed) (citing *Arizona v. California*, 530 U.S. 392, 414-15 (2000)).  Accordingly,

collateral estoppel applies to jurisdictional rulings and precludes a subsequent claim plagued by

the same jurisdictional defect as the first claim. *See John v. United States*, 77 Fed. Cl. 788, 819

(2007) ("[A] plaintiff is collaterally estopped from litigating the question of subject matter

jurisdiction . . . based on materially indistinguishable allegations in a complaint that a court in a

prior action had ruled to be insufficient to establish jurisdiction.").

Issue preclusion requires that:  (1) the precluded party's interests were fully represented

in the prior action; (2) the issue previously adjudicated is identical with that now presented; (3)

that issue was actually litigated in the prior case; and (4) the ruling on that issue was necessary to

the decision in the prior action. *See Kroeger v. U.S. Postal Serv.*, 865 F.2d 235, 238 (Fed. Cir.

1988) (citing *Thomas v. Gen. Serv. Admin.*, 794 F.2d 661, 664 (Fed. Cir. 1986)); *see also*

*Stephen Slesinger, Inc. v. Disney Enters., Inc.*, 702 F.3d 640, 644 (Fed. Cir. 2012); *Banner v.*

*United States*, 238 F.3d 1348, 1354 (Fed. Cir. 2001).  All four pre-conditions for issue preclusion

are satisfied here.

Because the corporation is the real party-in-interest in a shareholder derivative suit, a decision rendered in a derivative suit generally precludes subsequent litigation by both the corporation and its shareholders.  *See*, *e.g.*, *Cottrell v. Duke*, 737 F.3d 1238, 1242-43 (8th Cir. 2013); *Arduini v. Hart*, 774 F.3d 622, 634 (9th Cir. 2014) ("[S]hareholders bringing derivative suits are in privity for the purposes of issue preclusion."); *In re Sonus Networks, Inc. S'holder Derivative Litig.*, 499 F.3d 47, 64 (1st Cir. 2007) ("[I]f the shareholder can sue on the corporation's behalf, it follows that the corporation is bound by the results of the suit in subsequent litigation, even if different shareholders prosecute the suits."); *Nathan v. Rowan*, 651 F.2d 1223, 1226 (6th Cir. 1981) ("[I]n shareholder derivative actions arising under Fed. R. Civ. P. 23.1, parties and their privies include the corporation and all nonparty shareholders.").  *But see Saxton*, 245 F. Supp. 3d at 1074-75 (declining to give preclusive effect to resolution of derivative claims where plaintiffs failed to comply with notice requirements under Federal Rule of Civil Procedure 23.1).  Thus, whether or not Enterprise shareholders were named plaintiffs in prior derivative actions challenging the Third Amendment, all the Enterprise shareholders are in privity with each other in a derivative action because their claims uniformly derive from the Enterprise's alleged injury.

Further, the issues here and in *Perry Capital* are the same and were actually litigated. *Perry Capital* involved derivative claims brought as a part of a putative class action on behalf of Enterprise shareholders, and the court concluded that HERA (1) barred shareholder derivative claims concerning the Third Amendment, and (2) contains no "conflict of interest" exception that would otherwise allow derivative claims to proceed.  *See Perry Capital I*, 70 F. Supp. 3d at 229-31, *aff'd*, 864 F.3d at 624-25.  That the derivative claims that the courts addressed in *Perry*

*Capital* were not identical to the claims plaintiffs raise here is irrelevant because issue preclusion applies "even if the issue recurs in the context of a different claim."  *See Taylor*, 553 U.S. at 892.

Finally, the succession clause's bar on shareholder derivative suits and the inapplicability of an implied conflict-of-interest exception were all necessary to the district court's decision and the D.C. Circuit's affirmance.  *See Perry Capital I*, 70 F. Supp. 3d at 229-32, *aff'd*, 864 F.3d at 623-25.  In *Perry Capital*, shareholder plaintiffs expressly framed their claims as derivative. *Perry Capital I*, 70 F. Supp. 3d at 229.

Accordingly, collateral estoppel bars all plaintiffs from relitigating the derivative suit issues that the *Perry Capital* court resolved against Enterprise shareholders—namely, that HERA (1) bars derivative suits and (2) contains no implied conflict-of-interest exception.

IV.     This Court Does Not Possess Jurisdiction To Entertain Plaintiffs' Allegedly Direct
        Contract Claims Because No Plaintiff Is Party To A Contract With The United States

Even if the Court determines that FHFA is the United States and plaintiffs otherwise state direct (as opposed to derivative) claims, the Court nonetheless lacks jurisdiction to entertain plaintiffs' allegedly direct claims for breach of contract.  Because the Tucker Act limits this Court's jurisdiction to claims based "upon any express or implied contract with the United States[,]" 28 U.S.C. § 1491, a plaintiff must allege a contract "between the plaintiff and the government [that] entitle[s] the plaintiff to money damages in the event of the government's breach," *Ransom v. United States*, 900 F.2d 242, 244 (Fed. Cir. 1990).  Thus, "[a] finding of privity between [a] [p]laintiff and the Government 'is a jurisdictional prerequisite for a contract claim because the government consents to be sued only by those with whom it has privity of contract.'"  *O. Ahlborg & Sons, Inc. v. United States*, 74 Fed. Cl. 178, 188 (2006) (quoting *Globex Corp. v. United States*, 54 Fed. Cl. 343, 347 (2002)).  The Federal Circuit recognizes only "limited exceptions" to the privity requirement, such as when a party can demonstrate that it

40

was an intended third-party beneficiary under a contract with the United States. *See*, *e.g.*, *Pac. Gas & Elec. Co. v. United States*, 838 F.3d 1341, 1350-51 (Fed. Cir. 2016) (citation omitted).

In this case, the Court lacks jurisdiction to hear plaintiffs' contract claims because Fannie Mae and Freddie Mac shareholders (1) have no contractual privity with the United States, and (2) cannot demonstrate that they were intended beneficiaries of any contract with the United States.

A.    Plaintiffs Are Not In Contractual Privity With The United States

As alleged, plaintiffs are only parties to contracts with the Enterprises. *See*, *e.g.*, *Cacciapalle* ¶ 150 ("The Certificates for the Fannie Mae and Freddie Mac Preferred Stock constitute contracts between Plaintiffs, on the one hand, and Fannie Mae and Freddie Mac, on the other."); *see also Rafter* ¶ 141 (The "Fannie Mae Contract [is] a binding and enforceable contract among Fannie Mae, its directors, officers, and shareholders."). Plaintiffs, however, identify no contract between themselves and the United States.

Recognizing this chasm, plaintiffs argue that the United States breached the Enterprises' charters. *See Rafter* ¶¶ 156, 164. The charters, of course, are acts of Congress that appear in the U.S. Code, *see* 12 U.S.C. § 1716 *et seq.* (Fannie Mae); 12 U.S.C. § 1451 *et seq.* (Freddie Mac), and thus cannot support a breach claim. "Absent clear indication to the contrary, legislation and regulation cannot establish the government's intent to bind itself in a contract." *Moda Health Plan, Inc. v. United States*, 892 F.3d 1311, 1329 (Fed. Cir. 2018). Given that the Enterprise charters contain no indication that the United States intended to contract with every purchaser of Enterprise stock, the charters cannot support the shareholders' breach claims.

Finally, plaintiffs ask the Court to reform the Third Amendment "[i]f Treasury and FHFA acted beyond their HERA authority in entering into the Third Amendment and causing payment of the Net Worth Sweeps[.]" *Rafter* ¶ 135. Plaintiffs, to their credit, acknowledge that they are

not parties to the Third Amendment. *Id.* at Claim IV. Accordingly, the Court lacks jurisdiction to entertain their claim seeking reformation of that contract.

### B. Plaintiffs Are Not Third-Party Beneficiaries Of Any Contract With The United States

Notwithstanding the lack of contractual privity, plaintiffs allege that they are "intended beneficiaries" of an implied contract between the United States and the Enterprises. *See*, *e.g.*, *Owl Creek* ¶ 136 (alleging implied-in-fact contract whereby FHFA obtained the consent of the Enterprise boards to conservatorship on the grounds, in part, that the conservatorships would serve the interests of shareholders). This argument finds no support in the alleged facts.

"Third party beneficiary status is an 'exceptional privilege' and, to avail oneself of this exceptional privilege, a party must 'at least show that [the contract] was intended for his direct benefit.'" *Glass v. United States*, 258 F.3d 1349, 1353-54 (Fed. Cir. 2001) (quoting *German Alliance Ins. Co. v. Home Water Supply Co.*, 226 U.S. 220, 230 (1912)). Unless "the contract . . . express[es] the intent of the promisor to benefit the shareholder *personally, independently of his or her status as a shareholder*," the shareholder has no third-party beneficiary standing. *Castle v. United States*, 301 F.3d 1328, 1338 (Fed. Cir. 2002) (emphasis in original) (quoting *Glass*, 258 F.3d at 1353-54); *see also Robo Wash, Inc. v. United States*, 223 Ct. Cl. 693, 697 (1980) (dismissing shareholders' breach of contract suit when they alleged no basis upon which any benefit was owed to them individually aside from their status as shareholders).

Here, plaintiffs allege that they are "intended beneficiaries" of an implied contract between the United States and the Enterprises, *Owl Creek* ¶ 136, but plaintiffs identify no contractual provision intended to benefit them personally. Like the plaintiffs in *Glass* and *Castle*, plaintiffs merely allege that Enterprise "*shareholders* were intended beneficiaries" of an implied contract. *Owl Creek* ¶ 136 (emphasis added). Because shareholder status alone cannot

support a claim for third-party beneficiary status, plaintiffs' third-party beneficiary allegations fail. *See Glass*, 258 F.3d at 1354; *Castle*, 301 F.3d at 1338. In fact, the stock purchase agreements—the only express contracts between the Enterprises and the United States—expressly disclaimed third-party beneficiary status for individuals, such as private shareholders. *See* PSPA § 6.1.

Because plaintiffs have no contract with the United States and cannot demonstrate third-party beneficiary status, plaintiffs' breach of contract claims should be dismissed for lack of jurisdiction.

V.      The Court Lacks Jurisdiction To Entertain Claims That Sound In Tort

Because the Tucker Act cannot support claims sounding in tort, the Court lacks jurisdiction to consider (1) plaintiffs' breach of fiduciary duty claims, and (2) any remaining claims alleging an abuse of discretion or other malfeasance. 28 U.S.C. § 1491(a)(1).

A.      Plaintiffs' Breach Of Fiduciary Duty Claims Sound In Tort

"Breach of fiduciary duty is generally classified as a tort," *Newby v. United States*, 57 Fed. Cl. 283, 294 (2003) (citing *Regents of Univ. of New Mexico v. Knight*, 321 F.3d 1111, 1116 (Fed. Cir. 2003)), which situates it outside the Tucker Act's grant of jurisdiction. Jurisdiction for such a claim is only available when a plaintiff can root the fiduciary relationship in a money-mandating statute or a contractual provision between the United States and claimant. *See Spengler v. United States*, 127 Fed. Cl. 597, 600 (2016). Such claims typically arise in the context of Indian law where a "unique trust relationship [exists] between the United States and the Native Americans." *Franklin Sav. Corp. v. United States*, 56 Fed. Cl. 720, 749 (2003); *see also United States v. Mitchell*, 463 U.S. 206, 225 (1983).

The complaints fail to establish any fiduciary relationship between the United States and Enterprise shareholders that can support jurisdiction in this Court. Although plaintiffs cite

HERA as the statutory source for their fiduciary duty claim, *Fairholme* ¶ 224, *Owl Creek* ¶ 125, HERA imposes no such duty.  On the contrary, HERA only requires that FHFA act in the best interests of "FHFA and the [Enterprises]—and *not* those of the [Enterprises'] shareholders or creditors."  *Perry Capital*, 864 F.3d at 608 (emphasis in original); *see also* 12 U.S.C. § 4617(b)(2)(J).  Under HERA, Congress directed Treasury to "protect the taxpayer" when investing in the Enterprises, but included no mention of Enterprise shareholders.  *See*, *e.g.*, *id.* § 1719(g)(1)(b)(iii).  Because plaintiffs fail to identify a provision in HERA to substantiate their alleged fiduciary relationship, the statute cannot provide jurisdiction for plaintiffs' breach of fiduciary duty claims.

The complaints also allege that the stock purchase agreements established a fiduciary duty running from the United States to Enterprise shareholders.  *Mason* ¶¶ 119-123.  Putting aside the unfounded leaps of logic that this claim requires, the stock purchase agreements are between Treasury and the Enterprises, not Treasury and shareholders.  Although plaintiffs describe their claim as "in essence a contract action," *id.* ¶ 123, as demonstrated above, *see* Section IV, plaintiffs identify no contract that establishes any relationship, let alone a fiduciary relationship, between the United States and shareholders.  Indeed, the stock purchase agreements disclaim any intent to benefit shareholders.  *See* PSPA § 6.1 ("no . . . other Person is intended to be, or shall be, a third party beneficiary of any provision of this Agreement").  The Court should, thus, reject plaintiffs' legal contentions that their breach of fiduciary duty claims arise from the stock purchase agreement, and dismiss these claims for lack of jurisdiction.

> B.  Plaintiffs' Takings And Illegal Exaction Claims Sound In Tort

The Court also lacks jurisdiction to entertain plaintiffs' takings and illegal exaction claims because they rely on allegations sounding in tort.  28 U.S.C. § 1491(a)(1).  Given plaintiffs' allegations that the Government took or illegally exacted their economic interests

through self-dealing, abuses of discretion, and other malfeasance, their claims are substantively

tort claims and, therefore, outside the Court's jurisdiction. *Compare*, *e.g.*, *Fairholme* ¶ 231

(wasting corporate assets); *Cacciapalle* ¶ 168 (self-dealing); *Owl Creek* ¶ 93 (overpayment);

*Rafter* ¶ 91 (mismanagement), *with Golden Pac. Bancorp v. United States*, 25 Cl. Ct. 768, 769-

70, 770 n.2 (1992), *aff'd*, 15 F.3d 1066, 1069, 1071 (Fed. Cir. 1994); *Franklin Sav. Corp. v.*

*United States*, 46 Fed. Cl. 533, 535-37 (2000).

In *Golden Pacific*, this Court reached a similar conclusion when considering bank

investors' allegations that the Comptroller of the Currency's cease-and-desist order caused the

bank's insolvency and resulting receivership. *See Golden Pac.*, 25 Cl. Ct. at 769-70. The Court

clarified that, pursuant to the Tucker Act, plaintiffs could only challenge the result of the

Comptroller's actions, not their propriety, because allegations contesting the propriety of the

Comptroller's decision-making would sound in tort. *Id.* at 769-70, 770 n.2.

Similarly, in *Franklin Savings*, 46 Fed. Cl. at 535-37, this Court emphasized that

challenges to the judgment of Federal regulators are not only tortious in character—and thus

beyond the Court's jurisdiction—but also protected by the discretionary-function exception to

the Federal Tort Claims Act. *See* 28 U.S.C. § 2680(a). Thus, no matter how plaintiffs attempt to

characterize their claim, "'just compensation' for a taking is not an available remedy" if

plaintiffs challenge the propriety of actions taken by financial regulators that happen to affect

shareholder interests. *Franklin*, 46 Fed. Cl. at 537.

Here, plaintiffs make the same tort-like allegations that this Court rejected in *Franklin*

*Savings* and *Golden Pacific*. Plaintiffs' complaints allege various forms of misconduct by

FHFA, including: irresponsible accounting decisions, *Fairholme* ¶¶ 85-91; collusion, *Owl Creek*

¶ 85, and misrepresentation, *WF* ¶ 200. Such purported malfeasance allegedly culminated in the

Third Amendment—a contract reflecting alleged self-dealing "by two federal agencies—the FHFA and the U.S. Treasury—to advance the economic and political interests of the U.S. Government."  *Cacciapalle* ¶ 129; *see also Fairholme* ¶ 168.

Given these allegations, plaintiffs' takings and illegal exaction claims necessarily depend on allegations that FHFA committed some form of misconduct.  These tort claims fall outside this Court's jurisdiction.  *See Golden Pac.*, 25 Cl. Ct. at 770 n.2; *Adams v. United States*, 20 Cl. Ct. 132, 138-39 (1990); *see also Rick's Mushroom Serv., Inc. v. United States*, 521 F.3d 1338, 1343 (Fed. Cir. 2008) (no jurisdiction over professional negligence claim); *Brown*, 105 F.3d at 623 (no jurisdiction over fraud claim); *De-Tom Enters., Inc. v. United States*, 552 F.2d 337, 339 (Ct. Cl. 1977) (no jurisdiction to entertain wrongful coercion claim in a takings case). Accordingly, the Court should dismiss the takings and illegal exaction claims because they sound in tort.

VI.   Plaintiffs That Did Not Own Shares At The Time Of The Alleged Taking, Illegal Exaction, or Breach Lack Standing To Pursue Their Claims

To establish standing, plaintiffs must demonstrate, among other things, ownership of the property at issue at the time of the alleged taking, illegal exaction, or breach.  As this Court observed, "obviously, if you don't have an ownership interest," at the time of the alleged taking, "you can't bring a taking[s] claim."  Transcript at 13, *Fairholme Funds, Inc. v. United States*, No. 13-465 (Fed. Cl. Sept. 22, 2015), ECF No. 244; *see also Maniere v. United States*, 31 Fed. Cl. 410, 420 (1994) ("plaintiff must demonstrate ownership of the property at the time of the taking").  "It is well established that 'only persons with a valid property interest at the time of the taking are entitled to compensation.'"  *CRV Enters., Inc. v. United States*, 626 F.3d 1241, 1249 (Fed. Cir. 2010) (quoting *Wyatt v. United States*, 271 F.3d 1090, 1096 (Fed. Cir. 2001)); *see also United States v. Dow*, 357 U.S. 17, 20 (1958).  Conversely, "owners who acquired their property

interests subsequent to the time of the taking are not entitled to compensation from the government." *Banks v. United States*, 88 Fed. Cl. 665, 674 (2009).

Indeed, this Court held in *Maniere* that purchasers of stock after the date of the alleged taking lacked standing to bring a takings claim. *See Maniere*, 31 Fed. Cl. at 421; *see also Textainer Equip. Mgmt. Ltd. v. United States*, 115 Fed. Cl. 708, 715 (2014) ("[O]ne party cannot simply step into the shoes of another when seeking just compensation for property belonging to another on the date of the taking."). A similar rule applies to breach of contract claims: a plaintiff cannot bring a breach claim until he enters into a contract. *See, e.g., Scott Timber Co. v. United States*, 692 F.3d 1365, 1372 (Fed. Cir. 2012).

Plaintiffs' "economic interests" in Fannie Mae and Freddie Mac stock comprise the alleged property at issue here. *See, e.g., Fairholme* ¶ 171. Plaintiffs allege that these interests were taken, exacted, or breached on August 17, 2012, when FHFA as conservator and Treasury entered into the Third Amendment. *See, e.g., Fairholme* ¶ 10; *Cacciapalle* ¶ 1. Several plaintiffs, however, purchased shares after the Third Amendment was adopted. *See, e.g., Rafter* ¶ 20 ("During a period commencing October 7, 2013, each Fund purchased common stock of each of Fannie Mae and Freddie Mac."). Several *Fairholme* plaintiffs previously admitted in responses to a Government interrogatory that they did not own *any* shares in the Enterprises until May 2013—more than eight months after the Third Amendment was signed. *See* Def. Supp. Mot. to Dismiss, *Fairholme Funds, Inc. v. United States* (Fed. Cl. June 8, 2015), ECF No. 161-1 at 2-5.

The Government could not, through the Third Amendment, have taken, illegally exacted, or breached contracts concerning stock that plaintiffs did not own before the amendment was adopted on August 17, 2012. Thus, these plaintiffs, like the *Maniere* plaintiffs who purchased

stock after the date of the alleged taking of the stock, lack standing to sue, and the Court must dismiss their claims.

VII.   Under 28 U.S.C. § 1500, The Court Lacks Jurisdiction To Entertain The *Fairholme*, *Cacciapalle*, And *Arrowood* Complaints

28 U.S.C. § 1500 bars the kind of forum-shopping that plaintiffs engage in here.  The express terms of the statute provide that the Court of Federal Claims has no jurisdiction over claims that the plaintiffs have also brought in another jurisdiction.  Although we acknowledge that current Federal Circuit precedent, *Tecon Engineers, Inc. v. United States*, 343 F.2d 943 (Ct. Cl. 1965), recognized a judicially-created exception to 28 U.S.C. § 1500 that grants this Court jurisdiction where, as here, plaintiffs' claims are first-filed in the Court of Federal Claims, judges of this Court and the Federal Circuit have criticized *Tecon*'s order of filing as being contrary to the terms, purpose, and plain language of section 1500.  Properly applied, section 1500 would require dismissal of the *Fairholme*, *Cacciapalle*, and *Arrowood* complaints for lack of jurisdiction.

Section 1500 provides that this Court "shall not have jurisdiction of any claim for or in respect to which the plaintiff or his assignee has pending in any other court any suit or process against the United States or any person . . . acting or professing to act . . . under the authority of the United States."  28 U.S.C. § 1500.  Based on the statute's language and purpose, the *Fairholme*, *Cacciapalle*, and *Arrowood* complaints should fall squarely within this jurisdictional bar because each of these plaintiffs is pursuing Third Amendment claims both in this Court and the United States District Court for the District of Columbia.

The Supreme Court has explained that "[t]wo suits are for or in respect to the same claim, precluding jurisdiction in the CFC, if they are based on substantially the same operative facts, regardless of the relief sought in each suit."  *United States v. Tohono O'Odham Nation*, 563 U.S.

48

307, 317 (2011).  Shortly after filing their initial complaints here, plaintiffs filed suit against

Treasury and other defendants in the United States District Court for the District of Columbia.

Class Action Compl., *Cacciapalle v. Fed. Hous. Fin. Agency*, No. 13-1139, (D.D.C. July 29,

2013) (filed 19 days after Court of Federal Claims suit); Compl., *Fairholme Funds, Inc. v. Fed.

Hous. Fin. Agency*, No. 13-1053, (D.D.C. July 10, 2013) (filed one day after Court of Federal

Claims suit); Compl., *Arrowood Indemnity Co. v. Fed. Nat'l Mort. Ass'n*, No. 13-1439, (D.D.C.

Sept. 20, 2013) (filed two days after Court of Federal Claims suit).  The same operative facts

appear in the complaints filed in this Court and in district court.

Despite the plain language of section 1500 and the intent to prevent plaintiffs from

litigating similar cases against the Government in multiple fora, the *Tecon* order-of-filing

exception would appear to vest this Court with jurisdiction over plaintiffs' claims.  This is so

because the *Fairholme*, *Cacciapalle*, and *Arrowood* plaintiffs happened to file their district court

complaints days after, rather than days before, their complaints in this Court.  In *Tecon

Engineers*, the Court of Claims created an exception to section 1500, holding that the statute

applies "only when the suit shall have been commenced in the other court before the claim was

filed in this court."  *Tecon Engineers*, 343 F.2d at 949.

The judicially-created order-of-filing exception has been the subject of much criticism

and indeed would have been reversed by the *en banc* Federal Circuit but for some procedural

quirks.  The *en banc* Federal Circuit rejected *Tecon*'s order-of-filing rule in *UNR Indus., Inc. v.

United States*, 962 F.2d 1013 (Fed. Cir. 1992), describing *Tecon* as "an aberrational case which

stands astride the path to a proper interpretation of section 1500 as it pertains to a post Claims

Court filing in another court."  *Id*. at 1023; *accord id*. at 1022 ("Congress wanted not to dictate

the order in which a claimant files suits in the Claims Court and another court on the same claim,

but to discourage him from doing so altogether."). But the Supreme Court granted *certiorari* and affirmed the Federal Circuit's decision on other grounds, vacating the *UNR Industries* court's order-of-filing holding and expressly reserving the issue. *Keene Corp. v. United States*, 508 U.S. 200, 209 n.4 (1993).

Later, in *Tohono O'Odham Nation*, the Supreme Court cast serious doubt on the continuing validity of *Tecon's* order-of-filing rule, stating that "Circuit precedent [has] left the statute without meaningful force." *Tohono O'Odham Nation*, 563 U.S. at 314. The current Chief Judge of the Federal Circuit likewise has questioned its wisdom. *See*, *e.g.*, *Brandt v. United States*, 710 F.3d 1369, 1382 (Fed. Cir. 2013) (Prost, J., concurring) (applying *Tecon* as binding precedent but urging the court to "take this opportunity to overrule *Tecon* and finally dispense with the ill-conceived order-of filing rule"). Given the Federal Circuit's questioning of *Tecon*, its vitality is open to serious doubt. If properly interpreted, section 1500 deprives this Court of jurisdiction to entertain the *Fairholme*, *Cacciapalle*, and *Arrowood* complaints.

VIII.   Plaintiffs Fail To State A Plausible Takings Claim

Even if plaintiffs could survive the jurisdictional barriers to suit, the plaintiffs' takings claims fail as a matter of law. First, neither plaintiffs' alleged "economic interests" in Fannie Mae and Freddie Mac stock nor their alleged "right" to bring certain causes of action comprise legally cognizable property required to assert a takings claim. Second, allegations that the "Government" (*i.e.*, FHFA as conservator acting as an agent and arm of Treasury) frustrated performance of a contract between two private parties—such as plaintiffs' Enterprise stock certificates—are insufficient to state a cognizable claim under the Takings Clause. Third, plaintiffs do not allege a plausible regulatory takings claim. Fourth, no taking occurs when, as in this case, the Government acted in a proprietary, rather than sovereign, capacity. Finally, plaintiffs' allegations that the Third Amendment was unauthorized defeats their takings claim.

50

A.     Plaintiffs' Purported "Economic Interests" In Fannie Mae And Freddie Mac Stock
        Do Not Create A Legally Cognizable Property Right Under The Takings Clause

Plaintiffs' takings claims should be dismissed because plaintiffs fail to identify a legally

cognizable property right in their purported contractual rights to dividends and liquidation

preferences.  *See Perry Capital I*, 70 F. Supp. 3d at 240.

Property rights are, for takings purposes, limited by "existing rules" and "background

principles" derived from the statutory and regulatory framework in existence when the plaintiff

acquires the property.  *Id.*  This legal framework inheres in the property, invalidating any Fifth

Amendment takings claim arising from the Government's exercise of its powers within that

framework.  *See*, *e.g.*, *Acceptance Ins.*, 583 F.3d at 857-58.  Accordingly, shareholders lack any

property right, cognizable under the Takings Clause, when the corporations are in

conservatorship or receivership; the laws authorizing conservatorship and receivership inhere in,

and thus limit, plaintiffs' rights in those shares.  *See Branch v. United States*, 69 F.3d 1571, 1575

(Fed. Cir. 1995); *Golden Pac. Bancorp v. United States*, 15 F.3d 1066, 1073-74 (Fed. Cir. 1994);

*Cal. Hous. Sec., Inc. v. United States*, 959 F.2d 955, 957 (Fed. Cir. 1992); *see also Am. Cont'l*

*Corp. v. United States*, 22 Cl. Ct. 692, 701 (1991).

The rationale behind this rule is that shareholders of regulated entities do not possess the

"the fundamental right to exclude the government from [their] property."  *Golden Pacific*, 15

F.3d at 1073 (citing *Cal. Hous. Sec.*, 959 F.2d at 957)).  Because the shareholders "h[o]ld less

than the full bundle of property rights," they lack compensable property under the Takings

Clause.  *See Golden Pacific*, 15 F.3d at 1073-74 (internal quotation marks omitted); *see also*

*Perry Capital I*, 70 F. Supp. 3d at 241 (explaining that the "right to exclude is doubtless . . . one

of the most essential sticks in the bundle of rights that are commonly characterized as property"

and concluding that Enterprise shareholders lack cognizable property under the Takings Clause because they lack the right to exclude).

Given the regulatory framework in which the Enterprises operate, plaintiffs' takings claims fail because Fannie Mae and Freddie Mac shareholders have no compensable property right to dividends and liquidation preferences for purposes of the Takings Clause. *See Perry Capital I*, 70 F. Supp. 3d at 240-241. In *Perry Capital*, the district court dismissed the *Cacciapalle* plaintiffs' takings claim pursuant to Rule 12(b)(6) because the Enterprises' history of Federal oversight and regulation undermined plaintiffs' allegations of a compensable property right. *See id.* Since Congress enacted the 1992 Safety and Soundness Act, the Enterprises "have been subject to . . . the specter of conservatorship . . . under which the regulatory agency succeeds to 'all rights' of the [Enterprises] and shareholders." *Id.* at 240-41 (citing Federal Housing Enterprises Financial Safety and Soundness Act of 1992, Pub. L. No. 102-550, §§ 1301-1395; 12 U.S.C. § 4617(b)(2)(i)); *see* 12 U.S.C. § 4619(a) (granting the Director of OFHEO discretionary authority to appoint conservator), *repealed by* Pub. L. 110-289, 122 Stat. 2767 (2008). And for years before HERA, members of Congress introduced legislation to broaden regulatory oversight over the Enterprises, to include expanded conservatorship authority and receivership authority. *See*, *e.g.*, Housing Finance Regulatory Improvement Act, H.R. 3703, 106th Cong. § 135 (2000); Federal Housing Reform Act of 2005, H.R. 1461, 109th Cong. § 144 (2005).

HERA reflects many of these earlier proposals. Under HERA, Congress empowered the Director of FHFA to appoint the agency as conservator. 12 U.S.C. § 4617(a)(1), (2). Congress granted FHFA as conservator authority to take over Enterprise assets and conduct Enterprise business, with all the powers of Enterprise shareholders, directors, and officers. *Id.* § 4617(b)(2).

And not only did Congress grant FHFA as conservator authority to operate the Enterprises, HERA broadly authorized FHFA as conservator to take any action that it determines to be in the best interests of the Enterprises or FHFA.  *Id*. § 4617(b)(2)(J).  These statutes, as well as regulations promulgated pursuant to those statutes, comprise the "'existing rules,' 'understandings,' [and] 'background principles' derived from legislation enacted prior to the share purchase [that] inhere in plaintiffs' title to the stock certificates."  *Perry Capital I*, 70 F. Supp. 3d at 240 (quoting *Lucas v. S. Carolina Coastal Council*, 505 U.S. 1003, 1028-30 (1992)).  In other words, plaintiffs' property rights in their Enterprise stock were and are subject to FHFA's statutory authority (as regulator) to place the Enterprises in conservatorship, and FHFA's statutory authority (as conservator) to operate the Enterprises within the full scope of its powers, which include the authority to execute the Third Amendment.  *See Campbell v. United States*, 134 Fed. Cl. 764, 778 (2017) (when an alleged property right is contingent on favorable decision or action of a Federal agency, it is not a cognizable property right under the Takings Clause) (citing *Acceptance Ins.*, 583 F.3d at 858).

Given this regulatory framework, the *Perry Capital* court held that plaintiffs lacked a compensable property right sufficient to state a takings claim.  *See Perry Capital I*, 70 F. Supp. 3d at 241.  In reaching this decision, the district court relied on the Federal Circuit's decisions in *Golden Pacific* and *California Housing Securities*.  *Id*.  Like the regulators in *Golden Pacific* and *California Housing Securities*, FHFA possessed the statutory authority to place the Enterprises into conservatorships, and this right inhered in the plaintiffs' shares.  *Id.* at 241-42.  As shareholders in regulated financial institutions, plaintiffs lack the right to exclude others, and specifically lack the right to exclude Federal regulators.  *Id.* (citing *Golden Pacific*, 15 F.3d at 1073-74).  Moreover, like the plaintiffs in *Golden Pacific* and *California Housing Securities*, the

plaintiffs here chose to invest in highly-regulated entities and bought stock with those regulatory strings attached. *See Golden Pacific*, 15 F.3d at 1073 ("Golden Pacific voluntarily entered into the highly regulated banking industry by choosing to invest in the Bank.").

For these reasons, plaintiffs' purported property rights are non-cognizable and non-compensable under the Takings Clause.

B.    The *Cacciapalle* Plaintiffs Have No Compensable Property Rights In Either A Shareholder Derivative Suit Or A Declaratory/Injunctive Relief Claim

As the *Cacciapalle* plaintiffs concede, HERA bars their rights to (1) assert derivative suits on behalf of the Enterprises and (2) seek injunctive and declaratory relief. *See Cacciapalle* ¶¶ 136-37; *Perry Capital*, 864 F.3d at 615, 624. They erroneously argue, however, that their right to file "derivative lawsuits and claims seeking injunctive and declaratory relief . . . constitute property rights protected by the Fifth Amendment." *Cacciapalle* ¶¶ 134-35. Plaintiffs' claim fails because neither a shareholder derivative suit nor a claim for declaratory or injunctive relief constitutes a compensable property right under the Takings Clause.

To start, as the Third Circuit recognized in the context of a due process claim, "[t]he right to bring a stockholder's derivative suit is not a property right." *Beneficial Indus. Loan Corp. v. Smith*, 170 F.2d 44, 58 (3d Cir. 1948). Because any shareholder derivative suit seeks to vindicate a claim belonging to a corporation, any limit on that claim affects the corporation's rights, not the shareholder's.

Further, no plaintiff has a compensable property right in a cause of action for declaratory or injunctive relief because "[f]or purposes of the Takings Clause, 'no "vested" right [in a claim] attaches until there is a final, unreviewable judgment.'" *Two Shields v. United States*, 119 Fed. Cl. 762, 788 (2014) (internal quotation marks omitted); *see also Campbell v. United States*, 137 Fed. Cl. 54, 62-63 (2018) (plaintiffs had no cognizable property right in tort claims extinguished

in General Motors bankruptcy proceedings because those claims were "highly contingent");
*Bowers v. Whitman*, 671 F.3d 905, 913-914 (9th Cir. 2012) ("a party's property right in a cause of action does not vest until a final unreviewable judgment is obtained" because a cause of action, in and of itself, is "inchoate" and "speculative").  Here, plaintiffs have no property right in their alleged cause of action for injunctive and declaratory relief because they have failed to obtain a final, unreviewable judgment in their favor.

Thus, no plaintiff possessed a compensable property right in these purported "causes of action."

C.   Allegations That The Government Frustrated Performance Of A Private Contract Do Not State A Takings Claim

Even assuming that plaintiffs' "economic interests" in their Fannie Mae and Freddie Mac stock comprise compensable property rights—which they do not—the Government does not "take" property under the Takings Clause if it prohibits, invalidates, or frustrates a private contract.  A taking of contract rights occurs only if the Government appropriates a private contract for its own use by substituting itself for the private contractor.  *See*, *e.g.*, *Huntleigh USA Corp. v. United States*, 525 F.3d 1370, 1379, 1380 (Fed. Cir. 2008) (because Huntleigh "conceded that the government did not actually assume its contracts" it failed to state a claim "predicated upon a taking of the contracts").  This proposition, rooted in Supreme Court and Federal Circuit precedent, invalidates plaintiffs' claims that the United States took their shareholder rights under their stock certificates with the Enterprises.

The seminal case in this area is the Supreme Court's decision in *Omnia Commercial Co. v. United States*, 261 U.S. 502 (1923).  In *Omnia*, the plaintiff (Omnia) had a valuable contract to purchase steel from the Allegheny Steel Company (Allegheny) at a below-market price.  *Id*. at 507.  The United States requisitioned Allegheny's entire production of steel for the year "and

directed [Allegheny] not to comply with the terms of [Omnia's] contract, declaring that if an attempt was made to do so the entire plant of the steel company would be taken over and operated for the public use." *Id*. Omnia then sued the United States alleging a taking of its contract rights. The Supreme Court determined no taking occurred because Omnia's contract "was not appropriated, but ended" by the United States' actions. *Id*. at 511.

The Federal Circuit's recent decision in *Piszel v. United States*, 833 F.3d 1366 (Fed. Cir. 2016), *cert. denied*, 138 S. Ct. 85 (2017), also reflects this point. In *Piszel*, Freddie Mac's former Chief Financial Officer alleged that his contractual severance benefits were taken when FHFA, acting as regulator, instructed Freddie Mac not to make those payments during conservatorship. *See Piszel*, 833 F.3d at 1376-77. Although FHFA allegedly frustrated Mr. Piszel's expectations regarding his contractual severance benefits, the Court determined that the FHFA's direction "did not take anything from Mr. Piszel because, even after the government's action, Mr. Piszel was left with the right" to pursue a contract claim against Freddie Mac. *Id.* at 1377. The Court explained that the "'only duty a contract imposes is to perform or pay damages,'" so even if the Government impedes performance, no taking occurs unless the Government also "substantially take[s] away the right to damages in the event of a breach." *Id.*

*Piszel* follows Federal Circuit precedent holding that mere frustration of private contract expectations does not constitute a Fifth Amendment taking. *See*, *e.g*., *Palmyra Pac. Seafoods LLC v. United States*, 561 F.3d 1361, 1365 (Fed. Cir. 2009) ("[T]he [G]overnment does not 'take' contract rights pertaining to a contract between two private parties simply by engaging in lawful action that affects the value of one of the parties' contract rights."); *Air Pegasus of D.C., Inc. v. United States*, 424 F.3d 1206, 1216 (Fed. Cir. 2005) (Air Pegasus alleged "that the FAA, by regulating helicopters owned by third parties, frustrated its business expectations," but, "like

the appellant in *Omnia*, Air Pegasus, while no doubt injured by reason of the government's actions, has not alleged a taking."); *767 Third Ave. Assocs. v. United States*, 48 F.3d 1575, 1582 (Fed. Cir. 1995) ("no interest is taken when a contract expectation is merely frustrated by a regulation directed toward a third party").

Here, too, plaintiffs state no takings claim based on allegations that the Third Amendment frustrated their purported contractual expectations to dividends and a liquidation preference.  Substitute "profits or funds" for "severance payments" or "steel," and plaintiffs' allegations here mirror those in *Piszel* and *Omnia*.  *See*, *e.g.*, *Mason* ¶ 55 (alleging that the United States "appropriated to itself all future profits of the Companies"); *Fairholme* ¶ 117 ("The quarterly sweep of the Companies' net worth ensures that there never will be sufficient funds for the Companies to pay a dividend to private shareholders.  It also ensures that private shareholders will receive nothing in the event of liquidation.").  But frustration of contract performance alone does not state a takings claim when plaintiffs retain their ability to seek damages against the Enterprises.

In *Piszel*, the Federal Circuit explained that, under HERA, when the "conservator prohibits performance of a contract, an action for breach of contract remains."  *Piszel*, 833 F.3d at 1377; *see also Perry Capital*, 864 F.3d at 623 n.22 ("The Companies therefore remain subject to suit as private corporations for violations of state law just as they were before the FHFA was appointed conservator.").  In fact, plaintiffs have brought such claims, which are pending in the United States District Court for the District of Columbia.  These contract claims in district court include, among others, the following claims:

- *Fairholme Funds, Inc. v. Fed. Hous. Fin. Agency*, No. 13-1053 (D.D.C.) Am. Compl. ¶ 140 ("FHFA's agreement to the Net Worth Sweep breached or repudiated Fannie's and Freddie's contracts with Plaintiffs and other holders of the Companies' Preferred Stock"), ¶ 143 ("No provision of

Plaintiffs' contracts with Fannie and Freddie reserves the Companies any right to repudiate or nullify entirely the Companies' contractual obligations to Plaintiffs and other holders of the Companies' Preferred Stock by granting rights to another class of the Companies' stock.").

- *Arrowood Indemn. Co. v. Fed. Nat'l Mortg. Ass'n*, No. 13-1439 (D.D.C.) Am. Compl. ¶ 134 ("By entering the Net Worth Sweep, FHFA, as conservator for Fannie and Freddie, breached Fannie's and Freddie's obligations to Plaintiffs by nullifying entirely the contractual rights of holders of the Companies' Preferred Stock.").

- *In re Fannie Mae/Freddie Mac Senior Preferred Stock Purchase Agreement Class Action Litigations*, No. 13-1288 (D.D.C.) 2d Am. Compl. ¶ 150 ("By entering into the Third Amendment with the purpose of effectively depriving Plaintiffs and the other members of the Fannie Preferred Class of any possibility of receiving dividends or a liquidation preference, Fannie Mae, acting through FHFA, breached the implied covenant of good faith and fair dealing inherent in the Certificates for the Preferred Stock.").

Although these breach claims against FHFA and the Enterprises lack merit, plaintiffs' pursuit of these direct contract claims in district court demonstrates that the Government did not take plaintiffs' right to seek damages from their contractual counter-parties. *See Cacciapalle* ¶ 13 n.1; *see also Piszel*, 833 F.3d at 1377. Because plaintiffs fail to allege that the Government (1) appropriated for itself plaintiffs' contractual rights to dividends and liquidation preferences under plaintiffs' stock certificates; and (2) took plaintiffs' right to seek damages in the event of the Enterprises' alleged breach of plaintiffs' stock certificates, plaintiffs cannot show that the United States is liable for a taking of their alleged shareholder rights. *Id.*

D.    In Any Case, The Complaints Fail To Allege A Regulatory Taking

Even if FHFA's decision to enter the Third Amendment on the Enterprises' behalf could support jurisdiction in this Court, which it cannot, plaintiffs fail to plausibly explain how the Takings Clause entitles them to compensation. Plaintiffs have not alleged a physical taking of their property. *See Cal. Housing Sec.*, 959 F.2d at 958; *Golden Pacific*, 15 F.3d at 1073-74.

Thus, plaintiffs' claim can only be understood to assert that the Third Amendment caused a regulatory taking under either a *Lucas* "wipeout" theory or a *Penn Central* ad hoc balancing analysis. As demonstrated below, the complaints do not allege a regulatory taking under either framework.

> 1. Plaintiffs Cannot Plausibly Allege A Categorical Regulatory Taking Because They Cannot Show That The Third Amendment Impacted Their Existing Rights In Fannie Mae And Freddie Mac Stock

Under a categorical or "total wipeout" theory, a property owner may establish a taking by showing that a "regulation denies all economically beneficial or productive use of land." *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015 (1992). The Supreme Court, however, has explained that the categorical takings analysis introduced by *Lucas* applies only in the "relatively rare" and "extraordinary circumstance when *no* productive or economically beneficial use of land is permitted." *Id.* at 1017-18 (emphasis in original). In addition, to demonstrate a wipeout under *Lucas*, even if the property has no productive or economically beneficial use after Government action, the plaintiff must also demonstrate that the property actually had value in the first place. *See Love Terminal Partners L.P. v. United States*, 889 F.3d 1331, 1344 (Fed. Cir. 2018) (the plaintiff must establish that "the property had value in the regulatory environment that existed before the government action").

As an initial matter, whether plaintiffs' alleged "economic interests" in Fannie Mae and Freddie Mac stock constitute "property" under the categorical takings framework is unsettled. *See A&D Auto Sales, Inc. v. United States*, 748 F.3d 1142, 1151-52 (2014) ("We have not had occasion to address whether the categorical takings test applies to takings of intangible property such as contract rights."); *cf. Hawkeye Commodity Promotions, Inc. v. Vilsack*, 486 F.3d 430, 441 (8th Cir. 2007) ("*Lucas* protects real property only."). But even if *Lucas* extends to

intangible personal property, such as shareholder contract rights, plaintiffs allege no plausible scenario in which the Third Amendment wiped out these rights.  As alleged, (1) plaintiffs still own their shares; (2) the shares retain value as traded equities; and (3) the share prices have fluctuated since FHFA placed the Enterprises into conservatorships.[14]  *See*, *e.g.*, *Arrowood* ¶ 19. Indeed, for years after the Third Amendment plaintiffs continued to purchase, sell, trade, assign, transfer, or dispose of their shares.  *See*, *e.g.*, *Appaloosa* ¶¶ 13-16; *Fairholme* ¶ 16; *Rafter* ¶ 20; *Arrowood* ¶ 19.  Because the shares still retain beneficial use, plaintiffs' alleged "economic interests" in Fannie Mae and Freddie Mac stock has not been eliminated.  *See Perry Capital I*, 70 F. Supp. 3d at 243 ("[P]laintiffs cannot find relief under a 'total wipeout' theory [when they] maintain 'economically beneficial use' of their shares, since the stock very much remains a tradable equity.").

Moreover, plaintiffs cannot show that their "economic interests" in Enterprise stock were worth more in the regulatory environment that existed before the Third Amendment than they were after.  At the imposition of the conservatorship, FHFA announced that "common and preferred stock dividends will be eliminated."  *Fisher* ¶ 63.  And, as alleged, "from their inception through the adoption of the Net Worth Sweep, the PSPAs" prohibited the Enterprise

---

[14]  On a motion to dismiss, the Court may take judicial notice of publicized stock prices.  *See*, *e.g.*, *Greenhouse v. MCG Cap. Corp.*, 392 F.3d 640, 655 n.4 (4th Cir. 2004) (citing *Ganino v. Citizens Util. Co.*, 228 F.3d 154, 166 n.8 (2d Cir. 2000)).

Fannie Mae's and Freddie Mac's common stock prices have never reached zero—the point at which they would be valueless.  Instead, on average, the prices are higher after the Third Amendment than they were before.  For instance, on March 10, 2014, Fannie Mae's common stock closed at $5.82 per share and Freddie Mac's closed at $5.52; between the imposition of the conservatorship and execution of the Third Amendment, the highest closing prices for Fannie Mae and Freddie Mac common stock was on August 28, 2009 (Fannie Mae ($2.04) and Freddie Mac ($2.40)).  *See* https://quotes.wsj.com/FNMA and https://quotes.wsj.com/FMCC.

from, without Treasury's approval, declaring or paying dividends, or making any other distribution to junior shareholders.  *Arrowood* ¶ 62 (quoting PSPA § 5.1).

Under the fixed, 10 percent dividend structure contained in the initial stock purchase agreement, by June 2012, the Enterprises' combined annual dividend payment was nearly $19 billion per year reflecting a liquidation preference over $187 billion.  *See Fairholme* ¶ 101 (Fannie Mae ($11.6 billion), Freddie Mac ($7.2 billion)).  As the D.C. Circuit explained in *Perry Capital*, FHFA's ability as the Enterprises' conservator to give Treasury a "preferential right to dividends, to the exclusion of other stockholders, was already put in place by the unchallenged and thus presumptively proper Stock Agreements and Amendments that predated the Third Amendment."  *Perry Capital II*, 864 F.3d at 609.  "The Third Amendment just locked in an exclusive allocation of dividends to Treasury that was already made possible by—and had been in practice under—the previous agreements, in exchange for continuing the Companies' unprecedented access to guaranteed capital."  *Id.* at 610.  And plaintiffs cannot show that their liquidation preference had value but for the adoption of the Third Amendment.  Even if the 10 percent dividend remained in place, plaintiffs allege no scenario in which the Enterprises would rebuild sufficient capital to pay down Treasury's $187.5 billion liquidation preference at the termination of the commitment and leave any money remaining to distribute to the private shareholders.  *See generally Arrowood* ¶¶ 102-103; *see also* Senior Preferred Stock Certificate of Designation § 3(a).  Thus, plaintiffs cannot allege the necessary economic impact to support a *Lucas* claim because the Third Amendment—when adopted—did not negatively affect the plaintiffs' position.

2. Plaintiffs Cannot Allege The Elements Of A *Penn Central* Regulatory Taking

When the alleged regulatory taking is not a *Lucas*-type categorical taking, *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 124 (1978), supplies the framework for determining whether a taking has occurred.  *See Love Terminal Partners, L.P.*, 889 F.3d at 1340.  The *Penn Central* inquiry looks at three factors to determine whether a plaintiff has a regulatory takings claim:  (1) the regulation's economic impact; (2) the extent to which the regulation interferes with investment-backed expectations; and (3) the nature or character of the governmental action.  *Penn Central*, 438 U.S. at 124.  Here, because the complaints fail to allege that the Third Amendment satisfies any of the *Penn Central* factors, the Court should dismiss plaintiffs' takings claims.  *See Res. Invs., Inc. v. United States*, 85 Fed. Cl. 447, 511 (2009).

a. The Third Amendment Did Not Impose An Economic Impact On Plaintiffs Because Their "Economic Interests" In The Enterprises Were Worth The Same Before And After The Third Amendment

First, to demonstrate that the alleged regulation imposed an economic impact on plaintiffs, plaintiffs must plausibly allege a "but-for" world in which plaintiff's property would have been worth more without the regulation.  *A&D Auto Sales*, 748 F.3d at 1158.  "[A] showing that property is valueless *after* a government action only suggests that a taking has occurred if there is evidence showing that the property would have had value *absent* the government action." *Love Terminal Partners*, 889 F.3d at 1343 (emphases in original).

As we explained above, plaintiffs cannot show that the Third Amendment had an economic impact on the value of their rights because the regulatory regime in existence before the Third Amendment already gave Treasury "a preferential right to dividends, to the effective exclusion of other stockholders."  *Perry Capital II*, 864 F.3d at 609.  The Third Amendment simply "locked in an exclusive allocation of dividends to Treasury that was already made

62

possible by—and had been in practice under—the previous agreements[.]"  *Id.*  In any event, the

stock purchase agreements always restricted the Enterprises from declaring or paying any

dividend or distribution to other equity holders without Treasury's prior written consent.  PSPA

§ 5.1.  Moreover, plaintiffs fail to allege how their liquidation preference could have been more

valuable before the Third Amendment than it was after.  Although plaintiffs recognize that

Treasury's senior liquidation preference was worth nearly $200 billion before the Third

Amendment, *see Fairholme* ¶ 117, plaintiffs do not allege a but-for scenario in which the

Enterprises would have had a surplus to distribute to private shareholders after payment of

Treasury's senior liquidation preference.

> b.   Enterprise Shareholders Have No Reasonable Investment-Backed Expectation That The Enterprises Would Rebuild Capital

With respect to plaintiffs' alleged investment-backed expectations, the Federal Circuit

requires that the Court consider the "regulatory environment at the time of [plaintiff's]

acquisition of the property."  *Love Terminal Partners*, 889 F.3d at 1345 (quoting *Commonwealth

Edison Co. v. United States*, 271 F.3d 1327, 1350 n.22 (Fed. Cir. 2001) (en banc)); *see also

Perry Capital I*, 70 F. Supp. 3d at 244-45.

Meeting the investment-backed expectations prong of *Penn Central* is particularly

difficult when the alleged property right is an investment in a highly-regulated business where

the regulator can place the business into conservatorship or receivership.  *See Golden Pacific*, 15

F.3d at 1074; *Cal. Hous. Sec.*, 959 F.2d at 958-59; *see also Am. Cont'l Corp.*, 22 Cl. Ct. at 697.

In other words, an agency's exercise of its authority to place and operate a regulated institution

in conservatorship cannot be a "taking" when the regulatory regime in which the institution

operates specifically contemplates that scenario.  *See Golden Pacific*, 15 F.3d at 1074; *Cal.

Hous. Sec.*, 959 F.2d at 958-59.

The Federal Circuit explained:

> Put most simply, Golden Pacific could not have reasonably expected
> that the government "would fail to enforce the applicable statutes and
> regulations." Indeed, Golden Pacific's expectations could only have
> been that the FDIC would exert control over the Bank's assets if the
> Comptroller became satisfied that the Bank was insolvent and chose
> to place it in receivership.

*Golden Pacific*, 15 F.3d at 1074 (citations omitted).

Like the plaintiffs in *Golden Pacific*, *California Housing Securities*, and *American Continental*, Fannie Mae and Freddie Mac shareholders could not have had a reasonable investment-backed expectation that these highly-regulated Enterprises would not be placed into and operated in conservatorship. Congress had authorized placement of the Enterprises in conservatorship over 25 years ago when Congress enacted the 1992 Safety and Soundness Act. *See Perry Capital I*, 70 F. Supp. 3d at 240-41. As the court explained in *American Continental*, "[b]ecause of the highly regulated nature of federally insured banking and because the government did no more than exercise its authority under statutes that pre-existed plaintiffs' investment, the government's assuming control of [the savings and loan] could not possibly have interfered with plaintiffs' reasonable investment-backed expectations." *Am. Cont'l Corp.*, 22 Cl. Ct. at 697. Here, too, because plaintiffs invested in highly-regulated, Government-sponsored financial institutions, FHFA's actions as conservator, as a matter of law, could not interfere with plaintiffs' investment-backed expectations. *See Golden Pacific*, 15 F.3d at 1074.

To meet the investment-backed-expectation prong, plaintiffs rely upon statements in the Certificates of Designation that accompanied their preferred shares; specifically, plaintiffs allege that these statements support plaintiffs' investment-backed expectation that the Enterprises would rebuild sufficient capital to exit conservatorship and pay dividends. *See*, *e.g.*, *Mason*

¶¶ 91-92; *Fairholme* ¶ 172.[15]  But those expectations are unreasonable when the certificates advised shareholders that dividends are declared and paid at the "sole discretion" of the Boards of Directors and therefore, the conservator.  *See Cacciapalle* ¶ 107 (quoting Certificate of Designation ¶ 2(a) (Holders of preferred stock are entitled to receive a quarterly dividend "when, as and if declared by the Board of Directors of Fannie Mae . . . in its sole discretion out of funds legally available therefor[.]"))  The certificates contain no "guarantee that more senior shareholders will not exhaust the funds available for distribution as dividends." *Perry Capital II*, 864 F.3d at 630.  Moreover, HERA amended the Enterprise charters to allow Treasury to purchase Enterprises' securities subject to the Secretary's consideration of "[r]estrictions on the use of corporation resources, including limitations on the payment of dividends and executive compensation and any such other terms and conditions as appropriate for those purposes."  12 U.S.C. §§ 1455(*l*)(1)(C)(vi), 1719(g)(1)(C)(vi).  Given that the original stock purchase agreements restricted the Enterprises from declaring or paying any dividend or distribution to other equity holders without Treasury's prior written consent, PSPA § 5.1, shareholders knew that Treasury's investment limited dividend payments to private shareholders well before the adoption of the Third Amendment.

Plaintiffs also contend that they had an investment-backed expectation that the Enterprises would build sufficient capital to pay out a liquidation preference.  *See*, *e.g.*, *Mason* ¶¶ 91-92, *Fairholme* ¶ 172.  Here, too, plaintiffs' alleged expectation could not be reasonable because it conflicts with the Certificate of Designation, which specifies that more senior

---

[15]  An exemplar Fannie Mae Preferred Stock Certificate of Designation is available at https://tinyurl.com/y8xbmtcy.

shareholders will be paid in full before common or junior preferred shareholders receive anything in the event of liquidation. *See Cacciapalle* ¶ 107 (quoting Certificate of Designation ¶ 4(d) ("Holders of . . . Preferred Stock will not be entitled to be paid any amount in respect of a dissolution, liquidation or winding up of Fannie Mae until holders of any classes or series of stock of Fannie Mae ranking . . . [senior] to the Series Q Preferred Stock have been paid all amounts to which such classes or series are entitled.")).  The Third Amendment did not change plaintiffs' relative positions in the event of a liquidation.

And plaintiffs' purported expectation that FHFA would independently terminate the conservatorships at the first signs of recovery, *see Fairholme* ¶ 102, *Cacciapalle* ¶ 55, is unreasonable when HERA establishes no fixed expiration date or mandatory termination criteria. *See Roberts*, 889 F.3d at 405.  And unless FHFA places the Enterprises in receivership, the stock purchase agreements require Treasury's consent to terminate the conservatorships.  PSPA § 5.3.  FHFA "could not know for how long the Companies might remain profitable or to what extent"; and, in any event, the Enterprises' net worth has dipped below zero since adoption of the Third Amendment, requiring them to take draws from the Treasury commitment, *see Roberts*, 889 F.3d at 405 (identifying various reasons why the Third Amendment did not exceed FHFA's authority as conservator); *see also Perry Capital II*, 864 F.3d at 602.

Finally, to the extent that plaintiffs purchased their shares while the Enterprises were in conservatorship, the Enterprises' public filings dispel any expectation that the Enterprises would rebuild capital for the benefit of shareholders or be restored to their pre-conservatorship form. Both Enterprises' first annual SEC filings after conservatorship state that the Enterprises would "[n]o longer [be] managed with a strategy to maximize common shareholder returns." *See* Fannie Mae 10-K for the fiscal year ended December 31, 2008, at 24 (Feb. 26, 2009), *available*

*at* https://tinyurl.com/y7v9a4bb; Freddie Mac 10-K for the fiscal year ended December 31, 2008, at 27 (Mar. 11, 2009), *available at* https://tinyurl.com/yawnxkp5.

Given the facts alleged, plaintiffs cannot plausibly show a reasonable investment-backed expectation that they would receive dividends from the Enterprises while the Treasury commitment remained in place or that sufficient funds would be available to distribute liquidation preference payments to private shareholders.

        c.      Plaintiffs Do Not Bear A Financial Burden That Should Again Fall On The Public

The third *Penn Central* factor—character of the Government action—considers the allocation of the regulation's financial burden between the plaintiffs and the public. *See Rose Acre Farms, Inc. v. United States*, 559 F.3d 1260, 1278 (Fed. Cir. 2009). When evaluating where to allocate that burden, the Federal Circuit has recognized that "it is rational to attempt to impose the costs inherent in a certain type of business activity on 'those who have profited from the fruits' of the business in question." *Branch*, 69 F.3d at 1580 (quoting *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 18 (1976)).

Here, Fannie Mae and Freddie Mac shareholders benefitted for years from the Enterprises' unique relationship with the Government. *See Perry Capital I*, 70 F. Supp. 3d at 215. And taxpayers—not shareholders—intervened during the housing crisis and provided billions to the Enterprises. *See Perry Capital II*, 864 F.3d at 613 ("[The Government's] $200 billion plus lifeline is what saved the Companies—none of the institutional stockholders were willing to infuse that kind of capital during desperate economic times."). Although plaintiffs claim now that they are somehow entitled to profit from the Enterprises' taxpayer-supported recoveries, the Third Amendment does not force plaintiffs to bear a unique burden that should fall again on the public as a whole. Indeed, when a corporation is unable to pay its bills as they

come due, equity holders like the plaintiffs are often left with nothing because equity holders

bear the losses of the companies they invest in. *See generally In re Insilico Techs., Inc.*, 480

F.3d 212, 218 & n.10 (3d Cir. 2007); *In re Holiday Mart, Inc.*, 715 F.2d 430, 433-34 (9th Cir.

1983). Plaintiffs offer no basis why they should be able to shift these alleged losses onto the

taxpayers and enjoy a windfall.

Thus, under the facts alleged, the character of the Government's action does not force the

plaintiffs to bear a burden that should fall on the public.

E.     Plaintiffs' Allegations Of Unauthorized Conduct Defeat Their Takings Claims

Plaintiffs' allegations that the Third Amendment was unauthorized by HERA eviscerates

their takings claims. "To prevail on a takings claim under the Tucker Act, a plaintiff must

concede the legitimacy of the government action that effected the taking." *Parker v. United

States*, 131 Fed. Cl. 1, 23 (2017) (Sweeney, J.).

In claiming that FHFA as conservator agreed to the Third Amendment "under the

direction and supervision of Treasury," *Fairholme* ¶ 147, *Arrowood* ¶ 127, plaintiffs allege that

FHFA as conservator violated 12 U.S.C. § 4617(a)(7), which provides that FHFA "[w]hen acting

as conservator or receiver . . . shall not be subject to the direction or supervision of any other

agency of the United States[.]" 12 U.S.C. § 4617(a)(7). Indeed, several plaintiffs, including the

*Fairholme* and *Arrowood* plaintiffs, unsuccessfully made the identical section 4617(a)(7) claim

before the D.C. Circuit. *See Perry Capital II*, 864 F.3d at 610 n.9. This recurring allegation,

however, is irreconcilable with plaintiffs' takings claims because unlawful and unauthorized

Government action cannot effect a taking. *See Acadia Tech., Inc. v. United States*, 458 F.3d

1327, 1330-31 (Fed. Cir. 2006); *Rith Energy, Inc. v. United States*, 247 F.3d 1355, 1366 (Fed.

Cir. 2001) (plaintiffs are required to litigate a takings claim on the assumption that the "action

was both authorized and lawful"); *Del-Rio Drilling Programs Inc. v. United States*, 146 F.3d 1358, 1362 (Fed. Cir. 1998) (holding that *ultra vires* conduct of a Government official cannot effect a governmental taking).

Therefore, to plausibly allege a takings claim, plaintiffs must concede that Treasury did not control and direct the FHFA in agreeing to the Third Amendment.

IX.     Plaintiffs Fail To State A Plausible Illegal Exaction Claim

As an alternative to their takings theory, plaintiffs allege that the same challenged actions by FHFA and Treasury "illegally exacted Plaintiffs' economic interest in Fannie and Freddie without due process." *Fairholme* ¶ 202, *Arrowood* ¶ 149; *see also Cacciapalle* ¶¶ 93-101. Plaintiffs fail to state an illegal exaction claim because they identify neither illegal conduct nor any money exacted from them.

To assert a plausible illegal exaction claim, a plaintiff must show that the United States improperly collected or withheld plaintiff's money in contravention of a money-mandating statute or regulation. *See Norman*, 429 F.3d at 1095 (citing *Eastport S.S. Corp. v. United States*, 372 F.2d 1002, 1007 (Ct. Cl. 1967)). Further, the United States must, as a result of violation of a statute or regulation, receive a financial benefit in one of two ways: either (1) "directly" through the plaintiff's payment to the Government; or (2) "in effect" by requiring a plaintiff to incur a cost that the Government otherwise would have had to pay itself. *See Aerolineas Argentinas v. United States*, 77 F.3d 1564, 1572-73 (Fed. Cir. 1996) ("[A]n illegal exaction has occurred when 'the Government has the citizen's money in its pocket.'") (quoting *Clapp v. United States*, 127 Ct. Cl. 505, 512 (1954)); *see also Camellia Apartments, Inc. v. United States*, 334 F.2d 667, 669 (Ct. Cl. 1964) (illegal exaction stated where Federal Housing Administration (FHA) regulations required banks to collect charges and pay them over to the FHA). Because plaintiffs allege none of these elements, the Court should dismiss their illegal exaction claim.

69

A.      The Government Has None Of Plaintiffs' Monies Or Other Property "In Its Pocket"

Plaintiffs allege that the Third Amendment "illegally exacted" the same property that was allegedly taken:  namely, plaintiffs' purported "claim on the Companies' equity that could be paid out in the form of dividends or a liquidation payment."  *Fairholme* ¶ 195, *Cacciapalle* ¶ 141, *Arrowood* ¶ 141.  But the complaints identify neither (1) money that they paid directly to the United States, nor (2) costs incurred by shareholders that the United States otherwise would have had to pay itself.  Although plaintiffs contend that the *value* of their Fannie and Freddie stock is less than it would have been absent the Third Amendment, the market determines the value of the stock, not the United States.

B.      HERA Is Not A Money-Mandating Statute And, In Any Event, The Third Amendment Was Within The Scope Of FHFA's Authority Under HERA

An illegal exaction claimant must allege and demonstrate:  (1) that the "exaction" was directly caused by the misapplication of a statute; and (2) that the statute is money-mandating, that is, the statute provides that "the remedy for its violation entails a return of money unlawfully exacted."  *Norman*, 429 F.3d at 1095 (quoting *Cyprus Amax Coal Co. v. United States*, 205 F.2d 1369, 1373 (Fed. Cir. 2000)).  Therefore, plaintiffs must not only identify a statute or regulation that the Government violated in "exacting" monies, but also must demonstrate that the statute "itself provides, either expressly or by necessary implication, that the remedy for its violation entails a return of money unlawfully exacted."  *Id.*  (internal quotation marks omitted).

As an initial matter, plaintiffs' illegal exaction claim fails because HERA is not money-mandating.  HERA mandates no compensation, much less monetary compensation, to Enterprise shareholders.  *See* 12 U.S.C. § 1451 *et seq.*  Although plaintiffs allege that FHFA exceeded its conservator authority when it executed the Third Amendment, *see*, *e.g.*, *Fairholme* ¶ 197,

*Cacciapalle* ¶ 146, *Owl Creek* ¶ 118, in *Perry Capital*, the D.C. Circuit determined that

"FHFA's execution of the Third Amendment falls squarely within its statutory authority to

'[o]perate the [Companies],' 12 U.S.C. § 4617(b)(2)(B); to 'reorganiz[e]' their affairs, *id*.

§ 4617(a)(2); and to 'take such action as may be . . . appropriate to carry on the[ir] business,' *id*.

§ 4617(b)(2)(D)(ii)."  *Perry Capital II*, 864 F.3d at 607 (modifications in original).  The court

explained that "[r]enegotiating dividend agreements, managing heavy debt and other financial

obligations, and ensuring ongoing access to vital yet hard-to-come-by capital are quintessential

conservatorship tasks designed to keep the Companies operational."  *Id.*

      The district court in *Perry Capital* also rejected plaintiffs' allegation that Treasury

exceeded its statutory authority to purchase Enterprise securities.  *Compare Perry Capital I*, 70

F. Supp. 3d at 223-24, *with, e.g.*, *Fairholme* ¶ 197, *Cacciapalle* ¶ 146, *Owl Creek* ¶ 118.

Treasury's authority to purchase new Enterprise securities sunsetted on December 31, 2009.

12 U.S.C. §§ 1719(g)(4), 1455(*l*)(4).  But its authority to "exercise any rights received in

connection" with earlier purchases, and its authority to hold or sell securities did not.

*Id.* §§ 1719(g)(2)(A), (D); 1455(*l*)(1)(A), (D).  *See Roberts*, 889 F.3d at 407; *Perry Capital I*, 70

F. Supp. 3d at 216.

      The rulings in *Perry Capital* demonstrate that FHFA and Treasury acted within the scope

of their HERA authority.  Because HERA authorized the Third Amendment, by definition,

plaintiffs fail to properly allege anything "illegal" in support of their illegal exaction claims.

X.     <u>Plaintiffs Fail To State A Plausible Breach Of Fiduciary Duty Claim</u>

      As we demonstrated above, the Court has no jurisdiction to entertain plaintiffs' breach of

fiduciary duty claims because HERA bars these substantively derivative claims and, in any

event, the Tucker Act does not permit plaintiffs to bring actions that sound in tort.  *See* Section

V.A above.  But even if the Court were to exercise jurisdiction over plaintiffs' common-law

fiduciary claims, those claims fail as a matter of law because HERA preempts them.

A.      HERA Preempts Plaintiffs' Breach Of Fiduciary Duty Claims Against FHFA

Courts may not apply state law if "the application of state law would frustrate specific

objectives of federal legislation," *Boyle v. United Techs. Corp.*, 487 U.S. 500, 507 (1988)

(internal citations and quotation marks omitted), or if the application of state law "stands as an

obstacle to the accomplishment and execution of the full purposes and objectives of Congress."

*Hillman v. Maretta*, 569 U.S. 483, 490 (2013) (internal quotation marks omitted).  "What is a

sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a

whole and identifying its purpose and intended effects."  *Crosby v. Nat'l Foreign Trade

Council*, 530 U.S. 363, 373 (2000).

Plaintiffs' fiduciary claims operate under the incorrect assumption that HERA establishes

a duty running from FHFA to Enterprise shareholders, and that FHFA breached that duty

because it did not prioritize Enterprise shareholder interests over any Enterprise or FHFA

interests.  *See Fairholme* ¶¶ 224-28, *Owl Creek* ¶ 125.  For instance, the *Fairholme* plaintiffs

allege that the "term 'conservator' has long been understood to denote a position of fiduciary

responsibility."  *Fairholme* ¶ 226.  HERA, according to plaintiffs' theory, provides that FHFA

must "exercise its conservatorship authorities for the benefit of the Companies and their

shareholders, and that the overriding purpose of the conservatorship is 'rehabilitating' Fannie

and Freddie."  *Id.* ¶ 226; *see also id.* ¶¶ 227, 238 (citing Conservatorship and Receivership, 76

Fed. Reg. 35,724, 35,730 (June 20, 2011)).

HERA does not support these assertions about FHFA's duties as the Enterprises'

conservator.  "The plain language of HERA, instead, 'endows FHFA with extraordinarily broad

flexibility to carry out its role as conservator,' far beyond that contemplated in a traditional conservatorship arrangement." *Robinson*, 876 F.3d at 230 (quoting *Perry Capital II*, 864 F.3d at 606)). And, as the D.C. Circuit explained in *Perry Capital*, "[HERA] refers only to the best interests of FHFA and the [Enterprises]—and *not* those of the [Enterprises'] shareholders or creditors." *Perry Capital II*, 864 F.3d at 608 (emphasis in original).

Moreover, plaintiffs' assertion that the "overriding" purpose of the conservatorship is to resurrect the Enterprises to their pre-conservatorship condition conflicts with HERA's plain language, which specifies that FHFA may appoint a conservator "for the purpose of reorganizing, rehabilitating, *or* winding up the affairs" of the Enterprises. *Compare* 12 U.S.C. § 4617(a)(2) (emphasis added), *with Fairholme* ¶ 199. "FHFA's textual authority to reorganize and rehabilitate the Companies, in other words, forecloses any argument that [HERA] made the *status quo ante* a statutorily compelled end game." *Perry Capital II*, 864 F.3d at 609. Indeed, "nothing in [HERA] says that FHFA must [preserve and conserve assets] in a manner that returns [the Enterprises] to their prior, private, capital-accumulating, and dividend-paying condition for all stockholders." *Id.* Further, HERA "openly recognizes that sometimes conservatorship will involve managing the regulated entity in the lead up to the appointment of a liquidating receiver." *Id.* at 609-10 (citing 12 U.S.C. § 4617(a)(4)).

Thus, HERA preempts any purported fiduciary duty that would require FHFA to prioritize duties to shareholders over the "best interests of the [Enterprises] or [FHFA]," 12 U.S.C. § 4617(b)(2)(J)(ii), and for that reason, Rule 12(b)(6) requires dismissal of plaintiffs' breach of fiduciary duty claims.

B.      HERA Preempts Plaintiffs' Breach Of Fiduciary Duty Claims Against Treasury

Plaintiffs also allege that the stock purchase agreements "gave the United States (via Treasury) control over the Companies," such that the "United States assumed fiduciary duties to . . . non-controlling shareholders[.]"  *See Owl Creek* ¶¶ 125-26; *Mason* ¶¶ 119-20.  Plaintiffs allege that Treasury breached this alleged duty by entering into the Third Amendment because it "was not in the best interests of the Companies' shareholders."  *See Owl Creek* ¶ 126; *Mason* ¶ 126.

Putting aside that Treasury is not a controlling shareholder of the Enterprises because it does not own the majority of Enterprise stock, HERA nonetheless preempts plaintiffs' claim that Treasury owes any duty to Enterprise shareholders.  HERA specifies the considerations that Treasury must make when investing in the Enterprises:  whether the investment is necessary to "(i) provide stability in the financial market; (ii) prevent disruptions in the availability of mortgage finance; and (iii) protect the taxpayer."  12 U.S.C. §§ 1719(g)(1)(B), 1455(*l*)(1)(B).  With respect to the requirement that Treasury "protect the taxpayer" when purchasing Enterprise securities, Congress instructed Treasury to take six factors into consideration, including "[t]he need for preferences or priorities regarding payments to the Government" and "[r]estrictions on the use of Corporation resources, including limitations on the payment of dividends[.]"  *Id.* §§ 1719(g)(1)(C), 1455(*l*)(1)(C).  In any event, the Third Amendment was not a "purchase [of] any obligations and other securities" that would require Treasury to perform this exercise in the first place.  12 U.S.C. §§ 1719(g)(1)(C), 1455(*l*)(1)(C).

HERA makes no mention that Treasury should consider the interests of shareholders in its determination.  This is not surprising—in a typical bankruptcy, these equity holders would have been the first investors wiped out.  *See generally Matter of Lifschultz Fast Freight*, 132

F.3d 339, 343 (7th Cir. 1997) ("Equityholders come last in bankruptcy, which generally means they get nothing at liquidation.").  Protecting Enterprise shareholders was not, therefore, Congress's priority.  Thus, HERA preempts any purported common-law fiduciary duty that would require Treasury to prioritize duties to shareholders over its statutory duty to "protect the taxpayer."  12 U.S.C. §§ 1719(g)(1)(B)(iii), 1455(*l*)(1)(B)(iii).

## XI.   Plaintiffs Fail To State A Plausible Breach Of Contract Claim

As we demonstrate above, the Court lacks jurisdiction to entertain plaintiffs' breach of contract claims because they fail to identify a contract between plaintiffs and the United States.  *See* Section IV above.  And, because plaintiffs have no contract with the United States, they have no cause of action against the United States for breach.

To establish a breach of contract, plaintiffs must allege "(1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach."  *San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989).

Plaintiffs allege breach of a variety of written contracts, none of which are between Treasury and Enterprise shareholders:

- Common and Junior Preferred Stock Certificates between the Enterprises and shareholders.  *Cacciapalle* ¶¶ 149-64.

- Third Amendment between FHFA as conservator and Treasury.  *Rafter* ¶¶ 134-37.

-  "Fannie Mae Contract" (Fannie Mae's charter, by-laws, and Delaware General Corporations Law) between Fannie Mae and its directors, officers, and shareholders.  *Rafter* ¶¶ 138-53.

Because none of these alleged contracts is "a valid contract" between Treasury and Enterprise shareholders, *see San Carlos Irrigation & Drainage Dist.*, 857 F.2d at 959, plaintiffs cannot state a breach of contract claim.

The only purported contracts alleged to exist between plaintiffs and the United States are Fannie Mae's and Freddie Mac's statutory charters. *See Rafter* ¶¶ 140, 154-69. But the charters are acts of Congress contained in the U.S. Code, not contracts between the United States and Enterprise shareholders. "The Supreme Court has maintained that absent some clear indication that the legislature intends to bind itself contractually, the presumption is that a law is not intended to create private contractual or vested rights, but merely declares a policy to be pursued until the legislature shall ordain otherwise." *Brooks v. Dunlop Mfg*., 702 F.3d 624, 630 (Fed. Cir. 2012) (internal quotation marks omitted). "This well-established presumption is grounded in the elementary proposition that the principal function of the legislature is not to make contracts, but to make laws that establish the policy of the state." *National R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry*., 470 U.S. 451, 466 (1985). Accordingly, "the party asserting the creation of a contract must overcome this well-founded presumption and [courts should] proceed cautiously both in identifying a contract within the language of a regulatory statute and in defining the contours of any contractual obligation." *Atchison*, 470 U.S. at 466.

Plaintiffs fail to identify any provision in the statutory charters evincing an intent by the United States to contract with purchasers of Enterprise stock. Plaintiffs merely identify statutory provisions specifying that the Enterprises are "private shareholder-owned compan[ies]" and that the Enterprises shall have "common stock." *Rafter* ¶¶ 156, 164. Plaintiffs then infer from these provisions that "the Government has agreed that common shareholders of [Enterprise] stock would have common stock vested with a right to the residual value of [the Enterprises], including to share in [their] earnings." *Id.* ¶¶ 156, 164. But plaintiffs' inferences do not identify a contract in the statutory charters or define the contours of any contractual obligation. *See Brooks*, 702 F.3d at 630-31; *see also Moda Health Plan, Inc.*, 892 F.3d at 1329-30. Accordingly, plaintiffs

fail to establish that the Enterprises' statutory charters constitute valid contracts between the United States and plaintiffs.

Moreover, putting aside that plaintiffs concede they are not parties to the Third Amendment, *see Rafter*, Claim IV, plaintiffs' reformation claim fails because it relies on the erroneous premise that "Treasury and FHFA acted beyond their HERA authority." *Rafter* ¶ 135. But as every court to consider a Third Amendment challenge has determined and as we have explained above, *see* Background, Section IV.B.1, FHFA and Treasury acted within their HERA authority when they executed the Third Amendment. *See, e.g., Perry Capital II*, 864 F.3d at 607, *Roberts*, 889 F.3d at 404-08.

Finally, plaintiffs claim that FHFA entered into an implied-in-fact contract when it purportedly obtained consent to the conservatorships from the Enterprise boards by promising that the FHFA would operate the Enterprises in conservatorship for the benefit of shareholders. *Fairholme* ¶¶ 64, 259-87; *Arrowood* ¶¶ 161-70; *Owl Creek* ¶¶ 130-41; *CSS* ¶¶ 123-34; *Akanthos* ¶¶ 123-34; *Appaloosa* ¶¶ 124-35; *Mason* ¶¶ 124-35.[16]  Plaintiffs' implied-in-fact contract claim fails because they cannot sufficiently allege a critical element:  mutuality of intent to contract. *See D&N Bank v. United States*, 331 F.3d 1374, 1378-79 (Fed. Cir. 2003).  Plaintiffs' own allegations contravene that either FHFA or the Enterprise boards intended to contract.  First, plaintiffs fail to show that FHFA intended to enter into a contract when placing the Enterprises into conservatorship given that it possesses such power by statute.  *See D&N Bank*, 331 F.3d at 1378 ("An agency's performance of its regulatory or sovereign functions does not create contractual obligations.").

---

[16]  The *Rafter* plaintiffs first advanced this "implied-in-fact" contract theory in their initial complaint, but excised the claim from their amended complaint after jurisdictional discovery.

Second, the Court cannot infer the Government's intent to contract through allegations that the Government encouraged or convinced the Enterprise boards to consent to conservatorship. *Compare Fairholme* ¶ 56, *with Suess v. United States*, 535 F.3d 1348, 1359-60 (Fed. Cir. 2008) ("However the mere 'encouragement' of a merger does not amount to a government promise to guarantee continued use of purchase accounting or goodwill amortization, nor does it constitute negotiation between the government and the thrift regarding the terms of the merger.") (internal modifications omitted).

Third, plaintiffs' allegations concerning the Enterprise boards' "acquiescence" to the Government's allegedly threatened "seizure" of the Enterprises further undermine plaintiffs' assertion that the Government intended to bind itself in contract to the Enterprises and their former boards to obtain consent. *See Fairholme* ¶ 64. Plaintiffs allege that FHFA presented the Enterprises with a "Hobson's choice"; their placement into conservatorships or face "seizure" and "nasty lawsuits." *Id.* Plaintiffs' acknowledge that FHFA advised both boards during the September 6, 2008 meetings that it intended to place both Enterprises into immediate conservatorship—with or without consent. *Id.* Consent to conservatorship allowed the boards to avail themselves of certain statutory liability protections that would have been unavailable in an involuntary conservatorship. *Id.*; 12 U.S.C. § 4617(a)(6). Thus, the complaints fail to show any intent to contract by either the Government or the boards because (1) the Government did not need to bargain for the Enterprises' consent, and (2) according to the complaints, the Enterprise boards provided consent to avoid litigation and potential liability—not as a matter of contract. *See Fairholme* ¶ 64.

The lack of "a valid contract between the parties," compels dismissal of plaintiffs' breach of contract claims for failure to state a claim.

XII.   The *Washington Federal* Plaintiffs' Claims Stemming From FHFA's Appointment As
Conservator Are Untimely Under HERA

In addition to claims challenging the Third Amendment, the *Washington Federal*

plaintiffs allege that FHFA's imposition of the conservatorship in 2008 either took or illegally

exacted "shareholders' rights and the value of their equity in the Companies[.]"  *WF* ¶ 16.  As

demonstrated above, *see* Sections VIII.A, VIII.D.2.b, the *Golden Pacific* line of cases

undermines plaintiffs' takings and illegal exaction claims.  When plaintiffs invest in a highly-

regulated environment in which Congress grants an agency authority to place an institution into

conservatorship or receivership, plaintiffs cannot demonstrate a reasonable expectation that the

agency will refrain from exercising such power.  *See Golden Pacific*, 15 F.3d at 1074; *Cal. Hous.*

*Sec.*, 959 F.2d at 958-59.

In any event, the Court lacks jurisdiction to consider the *Washington Federal* plaintiffs'

challenge to the imposition of the conservatorship because it is untimely.  HERA provided a 30-

day window after the appointment of a conservator for the Enterprises to seek an order removing

FHFA as conservator.  12 U.S.C. § 4617(a)(5); *Perry Capital II*, 864 F.3d at 614 (explaining that

section 4617(a)(5) "permits judicial review *only* at the behest of a regulated entity itself and even

then *only* of the Director's decision to appoint FHFA as a conservator or receiver" and requires

that any Enterprise suit challenging the conservatorship or receivership "must be promptly filed

within thirty days of the appointment decision (a deadline that none of the plaintiffs here met)").

Further, under HERA, the United States District Court possesses exclusive jurisdiction to

entertain such a challenge.  12 U.S.C. § 4617(a)(5)(A).

Courts have held that similar statutory provisions are the exclusive mechanism for

objecting to the appointment of a conservator.  *See Gibson v. Resolution Trust Corp.*, 51 F.3d

1016, 1026-27 (11th Cir. 1995) (explaining that 12 U.S.C. § 1464(d)(2)(B) was "the exclusive

mechanism for challenging the appointment of a conservator," and dismissing a challenge as untimely); *see also Resolution Trust Corp. v. Commerce Partners*, 132 F.R.D. 443, 446 (W.D. La. 1990).  For example, courts have upheld similar language in FDIC's organizing statute, which provides that banks challenging the appointment of a conservator must commence an action within 30 days after appointment.  *See* 12 U.S.C. § 1464(d)(2)(B); *see also Gibson*, 51 F.3d at 1026.

The same result is required here.  Although the *Washington Federal* plaintiffs contend that the imposition of the conservatorships constituted a taking or illegal exaction, *see*, *e.g.*, *WF* ¶ 83, the window to challenge appointment of FHFA as conservator expired 30 days after the September 6, 2008 appointment—years before the *Washington Federal* plaintiffs filed their complaint.  12 U.S.C. § 4617(a)(5).  Thus, the *Washington Federal* claims challenging the conservatorships must be dismissed as untimely.

CONCLUSION

For these reasons, the Court should dismiss plaintiffs' claims, both for lack of subject matter jurisdiction and for failure to state claims upon which relief can be granted.

Respectfully submitted,

JOSEPEH H. HUNT
Assistant Attorney General

s/ Robert E. Kirschman, Jr.
ROBERT E. KIRSCHMAN, JR.
Director

s/ Kenneth M. Dintzer
KENNETH M. DINTZER
Deputy Director
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
Telephone: (202) 616-0385
Facsimile:  (202) 307-0973
Email:        Kenneth.Dintzer@usdoj.gov

Attorneys for Defendant

October 1, 2018

<u>LIST OF COMPLAINTS</u>

- First. Am. Compl., *Akanthos Opportunity Master Fund L.P. v. United States*, No. 18-369 (Fed. Cl. Aug. 16, 2018), ECF No. 14.

- Second Am. Compl., *Appaloosa Inv. Ltd. P'Ship I v. United States*, No. 18-370 (Fed. Cl. Aug. 16, 2018), ECF No. 17.

- Second Am. Compl., *Arrowood Indemn. Co. v. United States*, No. 13-698 (Fed. Cl. Sept. 17, 2018), ECF No. 44.

- Am. Consol. Class Action Compl., *Cacciapalle v. United States*, No. 13-466 (Fed. Cl. Mar. 8, 2018), ECF No. 67.

- First Am. Compl., *CSS, LLC v. United States*, No. 18-371 (Fed. Cl. Aug 16, 2018), ECF No. 14.

- Second Am. Compl., *Fairholme Funds, Inc. v. United States*, No. 13-465 (Fed. Cl. Aug. 3, 2018), ECF No. 413.

- Second Am. Derivative Compl., *Fisher v. United States*, No. 13-608 (Fed. Cl. Mar. 8, 2018), ECF No. 36.

- First Am. Compl., *Mason Cap. L.P. v. United States*, No. 18-529 (Fed. Cl. Aug. 16, 2018), ECF No. 14.

- First Am. Compl., *Owl Creek Asia I, L.P. v. United States*, No. 18-281 (Fed. Cl. Aug. 16, 2018), ECF No. 16.

- Second Am. Verified Compl., *Rafter v. United States*, No. 14-740 (Fed. Cl. Mar. 8, 2018), ECF No. 25.

- Am. Derivative Compl., *Reid v. United States*, No. 14-152 (Fed. Cl. Mar. 8, 2018), ECF No. 22.

- Am. Compl., *Washington Federal v. United States*, No. 13-385 (Fed. Cl. Mar. 8, 2018), ECF No. 57.