IN THE UNITED STATES COURT OF FEDERAL CLAIMS

|  |  |
|---|---|
| WASHINGTON FEDERAL, *et al.*, ) ) ) | |
| Plaintiffs, ) ) | No. 13-385C (Chief Judge Sweeney) |
| v. ) ) | |
| THE UNITED STATES, ) ) | |
| Defendant. ) ) | |
| FAIRHOLME FUNDS, INC., *et al.*, ) ) ) | |
| Plaintiffs, ) ) | No. 13-465C (Chief Judge Sweeney) |
| v. ) ) | |
| THE UNITED STATES, ) ) | |
| Defendant. ) ) | |

*Additional plaintiffs on following pages

DEFENDANT'S REPLY IN SUPPORT OF ITS OMNIBUS MOTION TO DISMISS

JOSEPH H. HUNT
Assistant Attorney General

ROBERT E. KIRSCHMAN, JR.
Director

OF COUNSEL:

ELIZABETH M. HOSFORD
FRANKLIN E. WHITE, JR.
Assistant Directors

MARIANA T. ACEVEDO
RETA E. BEZAK
ERIC E. LAUFGRABEN
Trial Attorneys

KENNETH M. DINTZER
Deputy Director
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
Telephone: (202) 616-0385
Facsimile:  (202) 307-0973
Email:      Kenneth.Dintzer@usdoj.gov

May 6, 2019

Attorneys for Defendant

| | |
|---|---|
| JOSEPH CACCIAPALLE, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) No. 13-466C |
| | ) (Chief Judge Sweeney) |
| v. | ) |
| | ) |
| THE UNITED STATES, | ) |
| | ) |
| Defendant. | ) |
| | ) |

| | |
|---|---|
| BRYNDON FISHER, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) No. 13-608C |
| | ) (Chief Judge Sweeney) |
| v. | ) |
| | ) |
| THE UNITED STATES, | ) |
| | ) |
| Defendant. | ) |
| | ) |

| | |
|---|---|
| ARROWOOD INDEMNITY COMPANY, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) No. 13-698C |
| | ) (Chief Judge Sweeney) |
| v. | ) |
| | ) |
| THE UNITED STATES, | ) |
| | ) |
| Defendant. | ) |
| | ) |

| | |
|---|---|
| BRUCE REID, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) No. 14-152C |
| | ) (Chief Judge Sweeney) |
| v. | ) |
| | ) |
| THE UNITED STATES, | ) |
| | ) |
| Defendant. | ) |

| | | |
|---|---|---|
| LOUISE RAFTER, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | No. 14-740C |
| | ) | (Chief Judge Sweeney) |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

| | | |
|---|---|---|
| OWL CREEK ASIA I, L.P., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | No. 18-281C |
| | ) | (Chief Judge Sweeney) |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

| | | |
|---|---|---|
| AKANTHOS OPPORTUNITY MASTER FUND, L.P., | ) | |
| | ) | |
| Plaintiff, | ) | No. 18-369C |
| | ) | (Chief Judge Sweeney) |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

| | | |
|---|---|---|
| APPALOOSA INVESTMENT LIMITED PARTNERSHIP I, *et al.*, | ) | |
| | ) | |
| Plaintiff, | ) | No. 18-370C |
| | ) | (Chief Judge Sweeney) |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

| | | |
|---|---|---|
| CSS, LLC, | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | No. 18-371C |
| | ) | (Chief Judge Sweeney) |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| MASON CAPITAL L.P., *et al.*, | ) | |
| | ) | |
| Plaintiff, | ) | No. 18-529C |
| | ) | (Chief Judge Sweeney) |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

TABLE OF CONTENTS

GLOSSARY ............................................................................................................. xix

INTRODUCTION ........................................................................................................1

ARGUMENT ................................................................................................................4

     I.      The Court Lacks Jurisdiction Because Plaintiffs' Third Amendment Claims
           Are Not Claims Against The United States ............................................................4

           A.     Conservatorship Did Not Transform Plaintiffs' Private-Shareholder
                  Claims Against The Enterprises Into Claims Against The United States....5

           B.     The Complaints Fail To Show That FHFA Entered Into The Third
                  Amendment At Treasury's Behest Such That The Court May Attribute
                  FHFA's Execution Of The Third Amendment To The United States ........8

                 1.     Plaintiffs Fail To Show That Treasury Coerced FHFA As
                         Conservator Into Executing The Third Amendment ......................9

                 2.     Plaintiffs Fail To Show That FHFA As Conservator Acted As
                           Treasury's Agent When It Executed The Third Amendment........12

                 3.     Plaintiffs Fail To Show That FHFA As Conservator Acted As
                           An Agent For FHFA As Regulator .................................................14

             C.     Treasury's Contractual Rights Set Forth In The PSPAs Do Not
                    Demonstrate That Treasury Controls The Enterprises.............................15

             D.     FHFA's Exercise Of Its Statutory Conservatorship Powers Does Not
                    Transform Plaintiffs' Private-Shareholder Contract Claims Against The
                    Enterprises Into Claims Against The United States...................................16

             E.     The Conservatorships Did Not Transform The Enterprises Themselves
                    Into Government Actors Such That Plaintiffs May Assert Their Private-
                    Shareholder Claims Against The United States.........................................18

     II.     HERA's Succession Clause Bars Plaintiffs' Derivative Claims Against The
           United States ......................................................................................................21

           A.     Plaintiffs' Claims Are Derivative Because They Uniformly Arise Out
                    Of Alleged Injuries To The Enterprises...................................................22

                   1.     Plaintiffs Allege No Injury Unique To Them ...............................22

2.  Any Recovery Would Belong To The Enterprises ........................25

B.  No Basis Exists To Disregard The Succession Clause's Plain Language .25

1.  HERA Contains No Conflict-Of-Interest Exception To Its Bar On Derivative Suits........................................................................25

2.  Collateral Estoppel Precludes Shareholders From Re-Litigating Whether HERA's Bar On Derivative Suits Contains A Conflict-Of-Interest Exception ...................................29

3.  The D.C. Circuit Held That Shareholders May Pursue Direct Contract Claims Against The Enterprises And FHFA As Conservator ....................................................................................34

C.  Plaintiffs Identify No Other Exception That Would Provide Them With Standing To Assert Alleged Derivative Claims................................36

1.  Plaintiffs Do Not Allege "Dual-Natured" Claims ........................36

2.  Plaintiffs' "Targeting" Theory Fails ..............................................40

3.  Third-Party Standing Principles Do Not Permit Plaintiffs To Sue Directly For Alleged Enterprise Injuries................................40

III.  The Court Does Not Possess Jurisdiction To Entertain Plaintiffs' Alleged Direct Contract Claims Because There Is No Contract Between Plaintiffs And The United States ............................................................................................42

A.  Plaintiffs Are Not Parties To Government Contracts ...............................42

1.  The United States Is Not A Party To An Alleged "Fannie Mae Contract"........................................................................................43

2.  The Enterprises' Congressional Charters Do Not Establish A Contractual Relationship Between The United States And Enterprise Shareholders ................................................................43

3.  The United States Is Not A Party To The *Cacciapalle* Plaintiffs' Stock Certificates ........................................................44

B.  The *Owl Creek* Plaintiffs Were Not Third-Party Beneficiaries Of Any Purported Implied-In-Fact Contract Between The Government And The Enterprises .................................................................................45

C.  The Court Lacks Jurisdiction To "Reform" The PSPAs ...........................46

IV.    The Tucker Act Does Not Permit Plaintiffs To Pursue Claims That Sound In Tort ...................................................................................................47

      A.    The Court Lacks Jurisdiction To Entertain Plaintiffs' Breach Of Fiduciary Duty Claims ...............................................................47

      B.    Plaintiffs' Cannot Invoke The Court's Jurisdiction By Disguising A Tortious-Interference-With-Contract Claim As A Takings Claim ........48

V.    Shareholders Who Purchased Enterprise Stock After The Third Amendment Lack Standing To Pursue Their Takings Claims ....................................................49

VI.    Under 28 U.S.C. § 1500, The Court Lacks Jurisdiction To Entertain The *Fairholme*, *Cacciapalle*, and *Arrowood* Complaints .............................................52

VII.    Plaintiffs Fail To State A Plausible Takings Claim .................................................52

      A.    Plaintiffs Cannot State A Claim For A Taking Of Their Contract Rights When They Retain Their Right To Seek Money Damages From The Enterprises ...................................................................53

      B.    Plaintiffs Fail To Allege A Cognizable Property Right Under The Takings Clause ......................................................................58

            1.    Because Plaintiffs Cannot Exclude The Government From The Enterprises Or Their Assets, Plaintiffs Do Not Allege A Compensable Property Right ..........................................................58

            The *Cacciapalle* Plaintiffs Have No Protected Property Interest Either In Standing To Bring Derivative Suits Or In Equitable Relief ............................................................................63

      C.    The *Owl Creek* Plaintiffs Fail To State A Plausible Physical Takings Claim .......................................................................65

      D.    Plaintiffs Fail To State A Categorical Regulatory Takings Claim ............65

            1.    The *Lucas* Wipe-Out Framework Is Inapplicable To Plaintiffs' Takings Claims ...........................................................66

            2.    Plaintiffs Fail To State A *Lucas* Wipe-Out Claim Because Their Stock Is Still Traded ...........................................................68

      E.    Plaintiffs Fail To Allege A Plausible *Penn Central* Regulatory Taking ...69

| | | | |
|---|---|---|---|
| | 1. | Plaintiffs Fail To Identify A Plausible Economic Impact | 70 |
| | 2. | Plaintiffs' Alleged Investment-Backed Expectations Are Inconsistent With The Statutory Scheme In Which The Enterprises Operate | 71 |
| | 3. | The Character Of The Alleged Government Action Does Not Support A Regulatory Taking | 74 |
| VIII. | | Plaintiffs Fail To State A Plausible Illegal Exaction Claim | 76 |
| | A. | The Government Has Not Directly Or "In Effect" Exacted Plaintiffs' Money | 76 |
| | B. | Plaintiffs Fail To Allege That A Government Violation Of A Money-Mandating Statute Resulted In A Direct Or "In Effect" Exaction Of Their Money | 78 |
| | | 1. Plaintiffs' Allegations That FHFA Exceeded Its Statutory Powers Under HERA When It Executed The Third Amendment Do Not Support An Illegal Exaction Claim | 79 |
| | | 2. Plaintiffs' Allegations That FHFA Violated An Alleged Requirement To "Preserve And Conserve" Enterprise Assets Do Not Support An Illegal Exaction Claim | 81 |
| | | 3. Plaintiffs' Allegations That FHFA Violated HERA's "Best Interests" Provision Do Not Support An Illegal Exaction Claim | 81 |
| | | 4. Plaintiffs' Allegations That HERA Itself Violates The "Non-Delegation Doctrine" Do Not Support An Illegal Exaction Claim | 82 |
| | | 5. Plaintiffs' Allegations That The Third Amendment Violated FHFA Regulations Do Not Support An Illegal Exaction Claim | 83 |
| | | 6. Plaintiffs' Allegations That The Third Amendment Constituted A Purchase Of New Securities Do Not Support An Illegal Exaction Claim | 84 |
| | | 7. Plaintiffs' Remaining Characterizations Of Treasury's Conduct Do Not Support An Illegal Exaction Claim | 85 |
| | | 8. The *Washington Federal* Plaintiffs' Allegations About The Enterprises' Placement Into Conservatorships Do Not Support An Illegal Exaction Claim | 85 |

IX.   Plaintiffs Fail To State A Plausible Claim For Breach Of Fiduciary Duty ...........87

    A.   HERA Imposes No Fiduciary Duty Running From FHFA To Enterprise Shareholders.................................................................................88

        1.   HERA Preempts Any Common-Law Limitations On Conservator Authority ...................................................88

        2.   HERA Does Not Establish A Trust Relationship Between FHFA And Enterprise Shareholders ...............................................89

    B.   Treasury Owes No Fiduciary Duty To Enterprise Shareholders ..............91

        1.   HERA Imposes No Fiduciary Duty Running From Treasury To Enterprise Shareholders.............................................92

        2.   The PSPAs Impose No Fiduciary Duty Running From Treasury To Enterprise Shareholders...............................................93

X.   Plaintiffs Fail To State A Plausible Breach Of Contract Claim............................94

    A.   The *Rafter* And *Cacciapalle* Plaintiffs Fail To State A Claim For Breach Of Contract .....................................................................................94

    B.   Plaintiffs Fail To State A Claim For Breach Of An Implied-In-Fact Contract That FHFA Would Operate The Enterprises As A Common-Law Conservator .....................................................................................96

XI.   The *Washington Federal* Plaintiffs Cannot Challenge The Appointment Of A Conservator Under The Guise Of A Takings Or Illegal Exaction Claim ..........98

CONCLUSION....................................................................................................................100

TABLE OF AUTHORITIES

Cases

*120 Delaware Ave. LLC v. United States*,
    95 Fed. Cl. 627 (2010) .......................................................................................................... 48

*A & D Auto Sales, Inc. v. United States*,
    748 F.3d 1142 (Fed. Cir. 2014)................................................................................... passim

*ACP Master, Ltd. v. Sprint Corp.*,
    No. 8508-VCL, 2017 WL 3421142 (Del. Ch. Aug. 8, 2017) ................................................. 37

*Aerolineas Argentinas v. United States*,
    77 F.3d 1564 (Fed. Cir. 1996)................................................................................. 76, 77, 79

*All Winstar-Related Cases at Court v. United States*,
    44 Fed. Cl. 3 (1999) ............................................................................................................. 14

*Am. Cap. Corp. v. FDIC*,
    472 F.3d 859 (Fed. Cir. 2006).............................................................................................. 5

*Ameristar Fin. Servicing Co. v. United States*,
    75 Fed. Cl. 807 (2007) .......................................................................................................... 5

*Arduini v. Hart*,
    774 F.3d 622 (9th Cir. 2014) ............................................................................................... 34

*Ark. Game & Fish Comm'n v. United States*,
    568 U.S. 23 (2012)............................................................................................................... 66

*B & B Hardware v. Hargis Indus., Inc.*,
    135 S. Ct. 1293 (2015)......................................................................................................... 34

*B & G Enters., Ltd. v. United States*,
    220 F.3d 1318 (Fed. Cir. 2000)............................................................................................. 9

*Bailey v. United States*,
    78 Fed. Cl. 239 (2007) ........................................................................................................ 51

*Bank of U.S. v. Planters' Bank of Ga.*,
    22 U.S. 904 (1824).............................................................................................................. 15

*In re Beach First Nat'l Bancshares, Inc.*,
    702 F.3d 772 (4th Cir. 2012) ............................................................................................... 29

*Bell/Heery v. United States,*
     739 F.3d 1324 (Fed. Cir. 2014)................................................................ 95

*Beneficial Loan Indus. Corp. v. Smith,*
     170 F.2d 44 (3d Cir. 1948)................................................................ 63, 64

*Bhatti v. FHFA,*
     332 F. Supp. 3d 1206 (D. Minn. 2018)............................. 3, 6, 80, 82, 83

*Bixler v. Foster,*
     596 F.3d 751 (10th Cir. 2010) ................................................................ 25

*Branch v. United States,*
     69 F.3d 1571 (Fed. Cir. 1995)................................................ 63, 65, 71, 72

*Broad v. Sealaska Corp.,*
     85 F.3d 422 (9th Cir. 1996) ................................................................ 61

*Brooks-Scanlon Corp. v. United States,*
     265 U.S. 106 (1924)................................................................ 57

*Brown v. Legal Foundation of Washington,*
     538 U.S. 216 (2003)................................................................ 61

*Burich v. United States,*
     366 F.2d 985 (Ct. Cl. 1966) ................................................................ 50

*Cal. Hous. Sec., Inc. v. United States,*
     959 F.2d 955 (Fed. Cir. 1992)................................................ 59, 71, 72

*Camellia Apartments, Inc. v. United States,*
     167 Ct. Cl. 224 (1964) ................................................................ 77

*Caroline Hunt Tr. Estate v. United States,*
     470 F.3d 1044 (Fed. Cir. 2006)................................................................ 15

*Casa de Cambio Comdiv S.A. de C.V. v. United States,*
     291 F.3d 1356 (Fed. Cir. 2002)................................................................ 86

*Caspian Select Credit Master Fund Ltd. v. Gohl,*
     No. 10244-VCN, 2015 WL 5718592 (Del. Ch. Sept. 28, 2015) ............ 37

*Castle v. United States,*
     301 F.3d 1328 (Fed. Cir. 2002)................................................ 45, 46, 54

*Christy, Inc. v. United States*,
   141 Fed. Cl. 641 (2019) .................................................................... 79

*Cienega Gardens v. United States*,
   331 F.3d 1319 (Fed. Cir. 2003) ....................................................... 49

*Citigroup Inc. v. AHW Inv. P'ship*,
   140 A.3d 1125 (Del. 2016) ............................................................... 28

*Collins v. Mnuchin*,
   896 F.3d 640 (5th Cir. 2018) ........................................................... 80

*Collins v. Mnuchin*,
   908 F.3d 151 (5th Cir. 2018) ........................................................... 80

*Consol. Edison of N.Y. v. Bodman*,
   449 F.3d 1254 (D.C. Cir. 2006) ....................................................... 32

*County of Sonoma v. FHFA*,
   710 F.3d 987 (9th Cir. 2013) ........................................................... 15

*Cyprus Amax Coal Co. v. United States*,
   205 F.3d 1369 (Fed. Cir. 2000) ................................................... 78, 79

*D & N Bank v. United States*,
   331 F.3d 1374 (Fed. Cir. 2003) ....................................................... 96

*Deephaven Risk Arb Trading Ltd. v. UnitedGlobalCom, Inc.*,
   No. 379-N, 2005 WL 1713067 (Del. Ch. July 13, 2005) ...................... 39

*Del-Rio Drilling Programs v. United States*,
   146 F.3d 1358 (Fed. Cir. 1998) ................................................... 53, 86

*DiMare Fresh, Inc. v. United States*,
   808 F.3d 1301 (Fed. Cir. 2015) ....................................................... 69

*DuPont v. FDIC*,
   32 F.3d 592 (D.C. Cir. 1995) ........................................................... 87

*Duran v. City of Corpus Christi*,
   240 F. App'x 639 (5th Cir. 2007) ..................................................... 28

*Eastport S.S. Corp. v. United States*,
   372 F.2d 1002 (Ct. Cl. 1967) ........................................................... 76

*Edwards v. Deloitte & Touche, LLP*,
  No. 16-21221-CIV, 2017  WL 1291994 (S.D. Fla. Jan. 18, 2017)............................. 26, 37, 38

*El Paso Pipeline GP Co. LLC v. Brinckerhoff*,
  152 A.3d 1248 (Del. 2016) ...................................................................... 37, 38

*Energy Sec. of Am. Corp. v. United States*,
  86 Fed. Cl. 554 (2009), *aff'd*, 356 F. App'x 414 (Fed. Cir. 2009) .......................................... 67

*Fairholme Funds, Inc. v. FHFA*,
  No. 13-1439, 2018 WL 4680197 (D.D.C. Sept. 28, 2018)................................................. passim

*Fairholme Funds, Inc. v. United States*,
  114 Fed. Cl. 718 (2014) ........................................................................... 8, 13

*FDIC v. Morley*,
  867 F.2d 1381 (11th Cir. 1989) ...................................................................... 15

*Feldman v. Cutaia*,
  951 A.2d 727 (Del. 2008) ............................................................................ 39

*Fireman v. United States*,
  44 Fed. Cl. 528 (1999) .......................................................................... 76, 79

*First Hartford Corp. Pension Plan & Trust v. United States*,
  194 F.3d 1279 (Fed. Cir. 1999)........................................................... 26, 27, 31, 62

*Franklin Sav. Corp. v. United States*,
  56 Fed. Cl. 720 (2003) .............................................................................. 48

*FTC v. Think Achievement Corp.*,
  312 F.3d 259 (7th Cir. 2002) ........................................................................ 54

*Gail C. Sweeney Estate Marital Tr. v. U.S. Treasury Dep't*,
  68 F. Supp. 3d 116 (D.D.C. 2014) .................................................................... 31

*Gatz v. Ponsoldt*,
  925 A.2d 1265 (Del. 2007) ........................................................................... 39

*Gatz v. Ponsoldt*,
  No. 174-N, 2004 WL 3029868 (Del. Ch. Nov. 5, 2004) ................................................. 39

*Gentile v. Rosette*,
  906 A.2d 91 (Del. 2006) ......................................................................... 36, 38

*Gibbons v. Mahon,*
    136 U.S. 549 (1890) ............................................................................................ 61

*Gibson v. Resolution Tr. Corp.,*
    51 F.3d 1016 (11th Cir. 1995) ........................................................................... 98

*Glass v. United States,*
    258 F.3d 1349 (Fed. Cir. 2001) ......................................................................... 46

*Golden Pac. Bancorp v. FDIC,*
    375 F.3d 196 (2d Cir. 2004) .............................................................................. 87

*Golden Pac. Bancorp v. United States,*
    15 F.3d 1066 (Fed. Cir. 1994) ..................................................................... passim

*Grady v. United States,*
    No. 13-15, 2013 WL 4957344 (Fed. Cl. July 31, 2013) ..................................... 91

*Hatter v. United States,*
    203 F.3d 795 (Fed. Cir. 2000) ........................................................................... 50

*Hendler v. United States,*
    952 F.2d 1364 (Fed. Cir. 1991) ................................................................... 13, 14

*Herron v. Fannie Mae,*
    857 F. Supp. 2d 87 (D.D.C. 2012) ................................................................... 1, 5

*Herron v. Fannie Mae,*
    861 F.3d 160 (D.C. Cir. 2017) .............................................. 6, 15, 19, 20, 21

*Holland v. United States,*
    59 Fed. Cl. 735 (2004) ...................................................................................... 24

*Holland v. United States,*
    75 Fed. Cl. 483 (2007) ...................................................................................... 15

*Hollingsworth v. Perry,*
    570 U.S. 693 (2013) .......................................................................................... 12

*Hopi Tribe v. United States,*
    782 F.3d 662 (Fed. Cir. 2015) ........................................................................... 91

*Horne v. Dep't of Agric.,*
    135 S. Ct. 2419 (2015) ...................................................................................... 67

*Huntleigh USA Corp. v. United States,*
 525 F.3d 1370 (Fed. Cir. 2008)..................................................................... 53, 57, 58

*Indep. Ink, Inc. v. Ill. Tool Works, Inc.,*
 396 F.3d 1342 (Fed. Cir. 2005)............................................................................... 6

*Jacobs v. FHFA,*
 908 F.3d 884 (3d Cir. 2018).......................................................................... passim

*Kalos v. United States,*
 87 Fed. Cl. 230 (2009) ........................................................................................ 79

*Kellmer v. Raines,*
 674 F.3d 848 (D.C. Cir. 2012) ............................................................................ 22

*Kerpen v. Metro. Wash. Airports Auth.,*
 907 F.3d 152 (4th Cir. 2018) .............................................................................. 20

*Kirby Forest Indus., Inc. v. United States,*
 467 U.S. 1 (1984)................................................................................................ 69

*Kowalski v. Tesmer,*
 543 U.S. 125 (2004)............................................................................................ 41

*Langenegger v. United States,*
 756 F.2d 1565 (Fed. Cir. 1985)............................................................................. 9

*Lebron v. Nat'l R.R. Passenger Corp.,*
 513 U.S. 374 (1995)...................................................................................... 18, 19

*Levin v. Miller,*
 763 F.3d 667 (7th Cir. 2014) .............................................................................. 29

*Lingle v. Chevron U.S.A., Inc.,*
 544 U.S. 528 (2005)...................................................................................... 66, 70

*Loretto v. Teleprompter Manhattan CATV Corp,*
 458 U.S. 419 (1982)............................................................................................ 66

*Love Terminal Partners L.P. v. United States,*
 889 F.3d 1331 (Fed. Cir. 2018)........................................................................... 68

*Lucas v. S.C. Coastal Council,*
 505 U.S.1003 (1992)...................................................................................... 65, 66

*Maiz v. Virani*,
   253 F.3d 641 (11th Cir. 2001) ............................................... 39

*Maniere v. United States*,
   31 Fed. Cl. 410 (1994) ............................................... 49, 50

*Maritrans, Inc. v. United States*,
   342 F.3d 1344 (Fed. Cir. 2003) ............................................... 67

*Matter of Bouchard Trans. Co.*,
   No. 14 Civ. 1262, 2019 WL 1383067 (S.D.N.Y. Mar. 27, 2019) ........................................... 32

*McFadden v. United States*,
   135 S. Ct. 2298 (2015) ............................................... 35

*McIlvaine v. City Nat'l Bank & Trust of Chicago*,
   42 N.E.2d 93 (Ill. App. 1942) ............................................... 63, 64

*Meridian Invs., Inc. v. Freddie Mac*,
   855 F.3d 573 (4th Cir. 2017) ............................................... 6, 15, 18, 20

*Meyer Grp., Ltd. v. United States*,
   115 Fed. Cl. 645 (2014) ............................................... 87

*Moda Health Plan, Inc. v. United States*,
   892 F.3d 1311 (Fed. Cir. 2018) ............................................... 43

*Montana v. United States*,
   440 U.S. 147 (1979) ............................................... 31

*In re Newmont Mining Corp. Shareholders Litig.*,
   535 A.2d 1334 (Del. 1987) ............................................... 37

*Norman v. United States*,
   429 F.3d 1081 (Fed. Cir. 2005) ............................................... 76, 78, 79

*In re Nuijten*,
   500 F.3d 1346 (Fed. Cir. 2007) ............................................... 6

*Ohio State Life Ins. Co. v. Clark*,
   274 F.2d 771 (6th Cir. 1960) ............................................... 44

*Omnia Com. Co. v. United States*,
   261 U.S. 502 (1923) ............................................... 54, 57, 58

*O'Melveny & Myers v. FDIC*,
   512 U.S. 79 (1994)................................................................................................ 5

*Pagan v. Calderon*,
   448 F.3d 16 (1st Cir. 2006)................................................................ 27, 28, 40, 41

*Pagliara v. Fed. Home Loan Mort. Co.*,
   203 F. Supp. 3d 678 (E.D. Va. 2016) ................................................................ 35

*Palazzolo v. Rhode Island*,
   533 U.S. 606 (2001)............................................................................................ 51

*Palmyra Pac. Seafoods, L.L.C. v. United States*,
   561 F.3d 1361 (Fed. Cir. 2009) ................................................................... 54, 57

*Pareto v. FDIC*,
   139 F.3d 696 (9th Cir. 1998) ............................................................................. 29

*Paul v. Judicial Watch, Inc.*,
   543 F. Supp. 2d 1 (D.D.C. 2008)....................................................................... 87

*Pegram v. Herdrich*,
   530 U.S. 211 (2000)............................................................................................ 17

*Penn Cent. Transp. Co. v. City of New York*,
   438 U.S. 104 (1978).................................................................... 66,  69, 70

*Perry Capital LLC v. Lew*,
   70 F. Supp. 3d 208 (D.D.C. 2014) ............................................................. passim

*Perry Capital LLC v. Mnuchin*,
   138 S. Ct. 978 (2018)................................................................................... 33, 80

*Perry Capital LLC v. Mnuchin*,
   864 F.3d 591 (D.C. Cir. 2017)..................................................................... passim

*Philip Morris, Inc. v. Reilly*,
   312 F.3d 24 (1st Cir. 2002)................................................................................ 66

*Piszel v. United States*,
   833 F.3d 1366 (Fed. Cir. 2016)............................................................... 3, 54, 58

*Preseault v. United States*,
   100 F.3d 1525 (Fed. Cir. 1996)............................................................... 13, 14

*Protas v. Cavanagh,*
   No. Civ. A. 6555-VCG, 2012 WL 1580969 (Del. Ch. May 4, 2012).......................................... 24

*Quadrant Structured Prods. Corp. v. Vertin,*
   102 A.3d 155 (Del. Ch. 2014) ...................................................................................................... 64

*Ransom v. United States,*
   900 F.2d 242 (Fed. Cir. 1990) ...................................................................................................... 94

*Resolution Tr. Corp. v. Commerce Partners,*
   132 F.R.D. 443 (W.D. La. 1990) ................................................................................................... 98

*Rith Energy, Inc. v. United* States,
   247 F.3d 1355 (Fed. Cir. 2001) ............................................................................................... 53, 86

*RK Ventures, Inc. v. City of Seattle,*
   307 F.3d 1045 (9th Cir. 2002) ...................................................................................................... 39

*Roberts v. FHFA,*
   243 F. Supp. 3d 950 (N.D. Ill. 2017) ........................................................................................... 93

*Roberts v. FHFA,*
   889 F.3d 397 (7th Cir. 2018) ................................................................................................. passim

*Robinson v. FHFA,*
   876 F.3d 220 (6th Cir. 2017) ................................................................................................. passim

*Robinson v, FHFA,*
   223 F. Supp. 3d 659 (E.D. Ky. 2016) ..........................................................................................93

*Rose Acre Farms, Inc. v. United States,*
   373 F.3d 1177 (Fed. Cir. 2004) .................................................................................................... 67

*Rose Acre Farms, Inc. v. United States,*
   559 F.3d 1260 (Fed. Cir. 2009) .................................................................................................... 74

*Ruckelshaus v. Monsanto Co.,*
   467 U.S. 986 (1984) ................................................................................................................ 67, 71

*Rumsfeld v. FAIR,*
   547 U.S. 47 (2006) ................................................................................................................... 51, 52

*Saxton v. FHFA,*
   245 F. Supp. 3d 1063 (N.D. Iowa, 2017) ........................................................................ 26, 30, 33, 38

*Saxton v. FHFA,*
   901 F.3d 954 (8th Cir. 2018) ............................................................ passim

*Seuss v. FDIC,*
   770 F. Supp. 2d 32 (D.D.C. 2011) ............................................................ 87

*Sinclair v. Hawke,*
   314 F.3d 934 (8th Cir. 2003) ................................................................ 28

*Sisti v. FHFA,*
   324 F. Supp. 3d 273 (D.R.I. 2018) ............................................................ 20

*Slattery v. United States,*
   583 F.3d 800 (Fed. Cir. 2009) ............................................................ 6, 7

*Smith v. United States,*
   58 Fed. Cl. 374 (2003) ...................................................................... 63

*In re Sonus Networks, Inc. S'holder Deriv. Litig.,*
   499 F.3d 47 (1st Cir. 2007) ................................................................ 34

*Spengler v. United States,*
   127 Fed. Cl. 597 (2016) .................................................................... 47

*Starr Int'l Co. v. Fed. Reserve Bank,*
   906 F. Supp. 2d 202 (S.D.N.Y. 2012), *aff'd,* 742 F.3d 37 (2d Cir. 2014) ......... 37, 92

*Starr Int'l Co. v. United States,*
   856 F.3d 953 (Fed. Cir. 2017) ........................................................ passim

*Superior Vision Servs., Inc. v. ReliaStar Life Ins. Co.,*
   No. 1668-N, 2006 WL 25214265 (Del. Ch. Aug. 25, 2006) .............................. 37

*Surgical Co. v. Waggoner,*
   588 A.2d 1130 (Del. 1991) .................................................................. 44

*Taylor v. United States,*
   No. 18-1082, _ Fed. Cl. _, 2019 WL 1497132 (Fed. Cl. Apr. 5, 2019) ............ passim

*Tex. State Bank v. United States,*
   423 F.3d 1370 (Fed. Cir. 2005) ............................................................. 9

*Tooley v. Donaldson, Lufkin & Jenrette, Inc.,*
   845 A.2d 1031 (Del. 2004) .............................................................. 22, 25

*United States ex rel. Adams v. Aurora Loan Servs, Inc.*,
   813 F.3d 1259 (9th Cir. 2016) ............................................................. 6, 20

*United States v. Beszborn*,
   21 F.3d 62 (5th Cir. 1994) ......................................................................... 15

*United States v. Mitchell*,
   463 U.S. 206 (1983) ..................................................................... 48, 90, 91

*United States v. Navajo Nation*,
   556 U.S. 287 (2009) ................................................................................... 91

*United States v. Wade*,
   152 F.3d 969 (D.C. Cir. 1998) ................................................................. 18

*United States v. White Mountain Apache Tribe*,
   537 U.S. 465 (2003) ............................................................................ 90, 91

*Waterview Mgmt. Co. v. FDIC*,
   105 F.3d 696 (D.C. Cir. 1997) ................................................................. 17

*Wiggins v. JP Morgan Chase Bank*,
   No. 14-cv-11103, 2015 WL 868933 (S.D. W. Va. Feb. 27, 2015)............. 15

*Yamaha Corp. of Am. v. United States*,
   745 F. Supp. 734 (D.D.C. 1990), *aff'd*, 961 F.2d 245 (D.C. Cir. 1992)................. 32

<u>Statutes</u>

12 U.S.C. § 1455(*l*)(1)(B) ............................................................... passim

12 U.S.C. § 1455(*l*)(2)(A) ...................................................................... 60

12 U.S.C. § 1455(*l*)(2)(D) ...................................................................... 84

12 U.S.C. § 1455(*l*)(4) ............................................................................ 84

12 U.S.C. § 1719(g)(1)(A) ........................................................................ 84

12 U.S.C. § 1719(g)(1)(B) .................................................................. passim

12 U.S.C. § 1719(g)(1)(C) ................................................................... 92, 93

12 U.S.C. § 1719(g)(2)(A) ........................................................................ 60

12 U.S.C. § 1719(g)(2)(D) ........................................................................................... 84

12 U.S.C. § 1719(g)(4) ................................................................................................ 84

12 U.S.C. § 1821(d)(2)(A)(i) ....................................................................................... 31

12 U.S.C. § 1821(d)(2)(J)(ii) ....................................................................................... 89

12 U.S.C. § 1821(j) ...................................................................................................... 47

12 U.S.C. § 4617(a)(2) ............................................................................ 21, 73, 83, 86

12 U.S.C. § 4617(a)(5) ........................................................................................ passim

12 U.S.C. § 4617(a)(7) ........................................................................................ passim

12 U.S.C. § 4617(b)(2) ................................................................................................ 80

12 U.S.C. § 4617(b)(2)(A) ................................................................................... passim

12 U.S.C. § 4617(b)(2)(J) .................................................................................... passim

12 U.S.C. § 4617(c) .............................................................................................. 62, 74

12 U.S.C. § 4617(d)(1) ................................................................................................ 55

12 U.S.C. § 4617(f) ............................................................................................... 26, 47

12 U.S.C. § 4620 .......................................................................................................... 59

28 U.S.C. § 1500 .......................................................................................................... 52

Pub. L. 110-289 ..................................................................................................... 59, 97

Pub. L. 102-550 ........................................................................................................... 72

## Regulations

12 C.F.R. § 1237.12 .............................................................................................. 83, 84

Conservatorship & Receivership,
    75 Fed. Reg. 39,462 (July 9, 2010)........................................................................ 83

Other Authorities

44B Am. Jur. 2d *Interference* § 54 (2017)..................................................................... 10

7A Fletcher Cyc. Corp. § 3634 (perm. ed., rev. vol. 2014) ........................................... 44

Fed. Hous. Fin. Reform Act of 2005, H.R. 1461, 109th Cong. (2005) ......................... 72

Hous. Fin. Regulatory Improvement Act, H.R. 3703, 106th Cong. (2000) .................. 72

<u>GLOSSARY</u>

<u>Key Terms</u>

| | |
|---|---|
| Enterprises or Companies | Federal National Mortgage Association and Federal Home Loan Mortgage Corporation |
| Fannie Mae or Fannie | Federal National Mortgage Association |
| FDIC | Federal Deposit Insurance Corporation |
| FHFA | Federal Housing Finance Agency |
| Freddie Mac or Freddie | Federal Home Loan Mortgage Corporation |
| OFHEO | Office of Federal Housing Enterprise Oversight |
| *Perry Capital I* | *Perry Capital LLC v. Lew*, 70 F. Supp. 3d 208 (D.D.C. 2014) |
| *Perry Capital II* | *Perry Capital LLC v. Mnuchin*, 864 F.3d 591 (D.C. Cir. 2017), *cert. denied*, 138 S. Ct. 978 (2018) |
| Stock Purchase Agreements or PSPAs | Senior Preferred Stock Purchase Agreements between Treasury and FHFA as Conservator for Fannie Mae and Freddie Mac |
| Third Amendment | Third Amendment to the Senior Preferred Stock Purchase Agreements |

<u>Complaints</u>

| | |
|---|---|
| *Akanthos* | First Am. Compl., *Akanthos Opportunity Master Fund L.P. v. United States*, No. 18-369 (Fed. Cl. Aug. 16, 2018), ECF No. 14. |
| *Appaloosa* | Second Am. Compl., *Appaloosa Inv. Ltd. P'Ship I v. United States*, No. 18-370 (Fed. Cl. Aug. 16, 2018), ECF No. 17. |
| *Arrowood* | Second Am. Compl., *Arrowood Indemn. Co. v. United States*, No. 13-698 (Fed. Cl. Sept. 17, 2018), ECF No. 44. |
| *Cacciapalle* | Am. Consol. Class Action Compl., *Cacciapalle v. United States*, No. 13-466 (Fed. Cl. Mar. 8, 2018), ECF No. 67. |
| *CSS* | First Am. Compl., *CSS, LLC v. United States*, No. 18-371 (Fed. Cl. Aug. 16, 2018), ECF No. 14. |
| *Fairholme* | Second Am. Compl., *Fairholme Funds, Inc. v. United States*, No. 13-465 (Fed. Cl. Aug. 3, 2018), ECF No. 413. |

| | |
|---|---|
| *Fisher* | Second Am. Derivative Compl., *Fisher v. United States*, No. 13-608 (Fed. Cl. Mar. 8, 2018), ECF No. 36. |
| *Mason* | First Am. Compl., *Mason Cap. L.P. v. United States*, No. 18-529 (Fed. Cl. Aug. 16, 2018), ECF No. 14. |
| *Owl Creek* | First. Am. Compl., *Owl Creek Asia I, L.P. v. United States*, No. 18-281 (Fed. Cl. Aug. 16, 2018), ECF No. 16. |
| *Rafter* | Second Am. Verified Compl., *Rafter v. United States*, No. 14-740 (Fed. Cl. Mar. 8, 2018), ECF No. 25. |
| *Reid* | Am. Derivative Compl., *Reid v. United States*, No. 14-152 (Fed. Cl. Mar. 8, 2018), ECF No. 22. |
| *WF* | Am. Compl., *Washington Federal v. United States*, No. 13-385 (Fed. Cl. Mar. 8, 2018), ECF No. 57. |

Response Briefs

| | |
|---|---|
| Arrowood Br. | Supplemental Brief of Arrowood Indemnity Co., Arrowood Surplus Lines Insurance Co., and Financial Structures Ltd. in Opposition to Defendant's Omnibus Motion to Dismiss, *Arrowood Indem. Co. v. United States*, No. 13-698 (Fed. Cl. Nov. 2, 2018), ECF No. 25. |
| Cacciapalle Br. | Class Plaintiffs' Supplemental Opposition to Defendant's Motion to Dismiss, *Cacciapalle v. United States*, No. 13-466 (Fed. Cl. Nov. 2, 2018), ECF No. 81. |
| Fisher Br. | Plaintiffs Bryndon Fischer, Bruce Reid, and Erick Shipmon's Supplemental Memorandum in Opposition to Defendant's Omnibus Motion to Dismiss, *Fisher v. United States*, No. 13-608, *Reid v. United States*, No. 14-152 (Fed. Cl. Nov. 2, 2018), ECF No. 33. |
| Omnibus Br. | Plaintiffs' Omnibus Response to Defendant's Motion to Dismiss, *Fairholme Funds, Inc. v. United States*, No. 13-465, *Cacciapalle v. United States*, No. 13-466, *Fisher v. United States*, No. 13-608, *Arrowood Indem. Co. v. United States*, 13-698, *Reid v. United States*, No. 14-152, *Rafter v. United States*, No. 14-740 (Fed. Cl. Nov. 2, 2018), ECF No. 428. |
| Owl Creek Br. | Combined Opposition to Defendant's Omnibus Motion to Dismiss, *Owl Creek Asia I, L.P. v. United States*, No. 18-281, *Akanthos Opportunity Master Fund L.P. v. United States*, No. 18-369, *Appaloosa Inv. Ltd. P'Ship I v. United States*, No. 18-370, *CSS, LLC v. United States*, No. 18-371, *Mason Cap. L.P.* |

*v. United States*, No. 18-529 (Fed. Cl. Nov. 2, 2018), ECF No. 25.

Rafter Br.  Plaintiffs' Supplemental Brief In Opposition to Defendant's Amended Motion to Dismiss, *Rafter v. United States*, No. 14-740 (Fed. Cl. Nov. 2, 2018), ECF No. 42.

Reid Br.  Plaintiffs Bryndon Fischer, Bruce Reid, and Erick Shipmon's Supplemental Memorandum in Opposition to Defendant's Omnibus Motion to Dismiss, *Fisher v. United States*, No. 13-608, *Reid v. United States*, No. 14-152 (Fed. Cl. Nov. 2, 2018), ECF No. 33.

Wash. Fed. Br.  Plaintiffs' Brief in Opposition to Defendant's Motion to Dismiss, *Washington Federal v. United States*, No. 13-385 (Fed. Cl. Nov. 2, 2018), ECF No. 69.

INTRODUCTION

As we demonstrated in our omnibus motion to dismiss (U.S. Mot.), the Court should dismiss the plaintiffs' complaints pursuant to Rules 12(b)(1) and 12(b)(6); the Court does not possess jurisdiction to entertain these complaints and plaintiffs' substantive claims fail as a matter of law.  Plaintiffs' arguments in response are unavailing.

First, this Court lacks jurisdiction to entertain plaintiffs' claims.  Importantly, plaintiffs' responses confirm that their claims rely on the erroneous assumption that their alleged rights arising from stock contracts with Fannie Mae and Freddie Mac (Enterprises) somehow transformed into constitutional, statutory, and contractual claims against the United States because the Enterprises operate in conservatorship.  This transformation did not occur.  Because the Federal Housing Finance Agency (FHFA) as the Enterprises' conservator stands in the Enterprises' private shoes in regard to the Tucker Act, plaintiffs cannot attribute to the United States their quarrels with decisions made by FHFA as the Enterprises' conservator.  Accordingly, they cannot bring these quarrels here under the Tucker Act.  Labels and conclusions aside (*e.g.*, "coercion," "collusion," "agent"), the substantive allegations in plaintiffs' complaints demonstrate that Treasury and FHFA as conservator independently renegotiated the dividend arrangement resulting in the Third Amendment.  Thus, to the extent that plaintiffs contend that the Third Amendment breached plaintiffs' Enterprise stock contracts, plaintiffs allege a contract claim against the Enterprises and FHFA as their conservator—not constitutional, statutory, and contractual claims against the United States.  Indeed, Enterprise shareholders, including the *Fairholme* and *Arrowood* plaintiffs, as well as the *Cacciapalle* plaintiffs on behalf of a putative class, are pursuing such contract claims against the Enterprises and FHFA as conservator in the United States District Court for the District of Columbia.  *See Fairholme Funds, Inc. v. FHFA*,

No. 13-1439, 2018 WL 4680197, at *4 (D.D.C. Sept. 28, 2018) (*Fairholme DDC*).  So

shareholders will have (or have had) their day in court—just not this Court.

Moreover, even if the Court determines that plaintiffs' claims against FHFA constitute

claims against the United States, plaintiffs lack standing to bring them.  Pursuant to a provision

in the Housing and Economic Recovery Act of 2008 (HERA), any pre-conservatorship

shareholder rights to bring derivative claims automatically transferred to FHFA upon its

appointment as conservator.  Accordingly, plaintiffs lack standing to assert derivative claims.

Although several plaintiffs acknowledge that their claims are derivative, while others insist that

those same claims are direct, the labels and conclusions plaintiffs apply are irrelevant.

Substantively, plaintiffs' claims are derivative because plaintiffs' alleged injuries exist solely as

a result of the Enterprises' alleged injuries: first, from the Enterprises' placement in

conservatorship; and second, from the Enterprises' payment of dividends pursuant to the Third

Amendment.  Because plaintiffs cannot identify an injury unique to themselves, separate from

any alleged Enterprise injury, HERA bars all of plaintiffs' claims.

In addition, stripped of legal conclusions, the factual allegations contained in the

complaints reflect nothing more than a claim that the Third Amendment tortiously interfered

with plaintiffs' Enterprise stock contracts.  Thus, they are outside the Court's Tucker Act

jurisdiction.

And for the numerous plaintiffs that purchased Enterprise stock *after* the execution of the

Third Amendment, settled case law demonstrates that they lack standing to assert constitutional

claims against the United States.

Second, even if the Court were to determine that the complaints survive each of these

independent, dispositive jurisdictional thresholds, the complaints nonetheless should be

dismissed pursuant to Rule 12(b)(6) because they fail to state claims upon which relief may be granted.  Most importantly, plaintiffs cannot state a plausible claim for a taking of their contract rights based on allegations that either the imposition of the conservatorships themselves or the Third Amendment frustrated the Enterprises' performance under plaintiffs' stock contracts.  The Federal Circuit does not recognize frustration of contract performance as a taking when, as in this case, plaintiffs retain their right to seek contract damages.  *See Piszel v. United States*, 833 F.3d 1366 (Fed. Cir. 2016), *cert. denied*, 138 S. Ct. 85 (2017).

Plaintiffs' illegal exaction claims, based on the same conduct, fail because plaintiffs identify neither money exacted from them nor illegal Government conduct.  Indeed, since we filed our motion to dismiss, the Third Circuit and the Eighth Circuit have joined the D.C. Circuit, the Sixth Circuit, and the Seventh Circuit in determining that the Third Amendment was within FHFA's statutory conservatorship powers.  *See Jacobs v. FHFA*, 908 F.3d 884 (3d Cir. 2018); *Saxton v. FHFA*, 901 F.3d 954 (8th Cir. 2018); *see also Bhatti v. FHFA*, 332 F. Supp. 3d 1206 (D. Minn. 2018), *appeal docketed*, No. 18-2506 (8th Cir. July 16, 2018).

Finally, because plaintiffs fail to identify any contractual or statutory relationship setting forth a fiduciary duty running from the United States to the Enterprises' private shareholders, plaintiffs cannot state a plausible breach of fiduciary duty claim.  Moreover, the absence of any contractual relationship between Enterprise shareholders and the United States defeats plaintiffs' contract claims.

Simply put, plaintiffs' acquisition of Enterprise stock provided them with alleged contract rights against the Enterprises, not an additional panoply of rights against the United States.  The Court should reject plaintiffs' attempt to transform a private-shareholder, corporate dispute arising from their investments in Enterprise stock into constitutional claims against the United

3

States.  Because the Court lacks jurisdiction to entertain plaintiffs' complaints and no plaintiff

states a viable claim, all of the complaints should be dismissed.

<u>ARGUMENT</u>

I.    The Court Lacks Jurisdiction Because Plaintiffs' Third Amendment Claims Are Not
      Claims Against The United States

      In the complaints challenging the Third Amendment, plaintiffs have dressed up breach of

contract claims against the Enterprises as constitutional, statutory, and contract claims against the

United States.  But plaintiffs' investments in Enterprise stock do not provide them with claims

against the United States merely because the Enterprises are in conservatorship.  Accordingly,

the complaints should be dismissed for lack of jurisdiction.

      The Enterprises are congressionally-chartered, publicly-traded, private companies that

guarantee and securitize home mortgages—a business long regulated by the Federal

Government.  *See Perry Capital LLC v. Lew*, 70 F. Supp. 3d 208, 244, 244 n.56 (D.D.C. 2014)

(*Perry Capital I*).  Plaintiffs acquired junior preferred and common stock in these private entities

on private markets, and the terms of plaintiffs' stock contracts govern plaintiffs' rights with

respect to the Enterprises.  Similarly, after the Enterprises' placement in conservatorship, the

Department of the Treasury acquired senior preferred stock in these private entities in exchange

for funding commitments worth hundreds of billions of dollars.  The Senior Preferred Stock

Purchase Agreements (PSPAs) reflecting that investment govern Treasury's rights with respect

to the Enterprises.[1]  Although Treasury is an investor and FHFA, exercising its statutory powers,

operates the Enterprises in conservatorship, the Enterprises remain private companies, and

plaintiffs' private-shareholder rights remain governed by their stock contracts.

---

      [1]  Copies of the PSPAs are available at https://go.usa.gov/xmDBc (Fannie Mae) and
https://go.usa.gov/xmDBC (Freddie Mac).

4

A.     Conservatorship Did Not Transform Plaintiffs' Private-Shareholder Claims
       Against The Enterprises Into Claims Against The United States

As we demonstrated in our moving brief, when appointed as conservator or receiver of a

failed entity, a Government agency steps into the private entity's shoes for claims such as these.

*See O'Melveny & Myers v. FDIC*, 512 U.S. 79, 86 (1994); U.S. Mot. 22-23.  The rationale

behind this rule is that when a conservator or receiver steps into the shoes of a private entity, it

succeeds to the entity's pre-conservatorship or pre-receivership rights and liabilities.  *See*

*O'Melveny*, 512 U.S. at 86; *Am. Cap. Corp. v. FDIC*, 472 F.3d 859, 870 (Fed. Cir. 2006)

(affirming dismissal of breach claim brought by FDIC as receiver for failed thrift because the

thrift itself could not have sued for breach of contract).  However, the entity's operation in

conservatorship or receivership does not transform a claim against a private entity into a claim

against the United States.[2]

The same principle applies when FHFA steps into the Enterprises' shoes as their

conservator, as it did here when it executed the PSPAs and all amendments on the Enterprises'

behalf.  FHFA as conservator takes on the Enterprises' private status without regard to the nature

of a plaintiff's underlying claims—whether pled under a statute, a contract, or the Constitution.

*See Herron v. Fannie Mae*, 857 F. Supp. 2d 87, 95 (D.D.C. 2012) (dismissing plaintiff's 14th

Amendment *Bivens* claim because "FHFA as conservator for Fannie Mae is not a government

---

[2]  The *Owl Creek* plaintiffs argue that the *O'Melveny* rule is inapplicable to conservators, but the HERA provision pursuant to which a conservator or receiver succeeds to the Enterprises' rights makes no distinction between conservators and receivers.  12 U.S.C. § 4617(b)(2)(A)(i). Indeed, this Court has applied *O'Melveny*'s rationale when an agency steps into an institution's shoes as conservator.  *See Ameristar Fin. Servicing Co. v. United States*, 75 Fed. Cl. 807 (2007). Although the *Owl Creek* plaintiffs also attempt to distinguish *O'Melveny* because a receiver owes a fiduciary duty to creditors, while a common-law conservator allegedly owes fiduciary duties to a corporation, Owl Creek Br. 19-20, they fail to explain why that distinction has any legal significance here.  In any event, Congress vested FHFA as conservator with substantially broader powers than a common-law conservator.

actor"), *aff'd*, 861 F.3d 160 (D.C. Cir. 2017); *Meridian Invs., Inc. v. Freddie Mac*, 855 F.3d 573,

579 (4th Cir. 2017) (applying five-year statute of limitations under Virginia law to plaintiff's

claim, rather than six-year statute of limitations under Federal law, because "though FHFA is a

federal agency, as conservator it steps into Freddie Mac's shoes, shedding its government

character and also becoming a private party"); *United States ex rel. Adams v. Aurora Loan Servs,*

*Inc.*, 813 F.3d 1259, 1260-61 (9th Cir. 2016) (although Enterprises were under Federal

conservatorship, *qui tam* relator could not pursue False Claims Act case based on submission of

fraudulent claims to the Enterprises because conservatorship "places FHFA in the shoes of

Fannie Mae and Freddie Mac, and gives FHFA *their* rights and duties, not the other way

around") (emphasis in original).

  Despite these principles, plaintiffs argue that their Enterprise stock contracts provide

them with both contract claims against the Enterprises, and constitutional, statutory, and contract

claims against the United States because the Enterprises currently operate in conservatorship.

*See* Omnibus Br. 10-13.  Specifically, plaintiffs rely on a statement in *Slattery v. United States*,

583 F.3d 800, 827 (Fed. Cir. 2009), in which the Federal Circuit stated that "whether the FDIC

as receiver is 'the government' depends on the context of the claim."  Omnibus Br. 11; Owl

Creek Br. 20.[3]  In *Slattery*, the Federal Circuit emphasized that the challenged FDIC action—its

retention of a monetary surplus it obtained from a bank liquidation—did not fall within "the

standard receivership situation in which the receiver is enforcing the rights or defending claims

---

   [3] Indeed, plaintiffs suggest that the Court should adopt their interpretation of *Slattery*
even if it conflicts with *O'Melveny*, purportedly because "*Slattery* . . . was decided after
*O'Melveny*."  Omnibus Br. 12 n.5.  This Court cannot adopt an interpretation of a Federal Circuit
decision that would place it in conflict with Supreme Court precedent.  *See, e.g.*, *In re Nuijten*,
500 F.3d 1346, 1356 n.5 (Fed. Cir. 2007) ("It is the duty of a court of appeals to follow the
precedents of the Supreme Court until the Court itself chooses to expressly overrule them."
(*quoting Indep. Ink, Inc. v. Ill. Tool Works, Inc.*, 396 F.3d 1342, 1351 (Fed. Cir. 2005))).

and paying the bills of the seized bank." *Slattery*, 583 F.3d at 827-28; *see also* Omnibus Br. 11 (citing *Citizens Cent. Bancorp, Inc. v. United States*, No. 15-1539, slip op. at 10 (Fed. Cl. Sept. 7, 2017)).[4]

But the underlying reasoning behind *Slattery*—that in retaining the failed bank's monetary surplus for itself, the FDIC was not acting as receiver—is inapplicable here given that FHFA's negotiation of, and agreement to, the Third Amendment were "quintessential conservatorship tasks." *Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 607 (D.C. Cir. 2017) (*Perry Capital II*).  Although plaintiffs repeatedly mischaracterize the Third Amendment as an *ultra vires* "expropriation" of Enterprise property, FHFA's conduct examined "in context" demonstrates that its renegotiation of the PSPA dividend provision reflected in the Third Amendment was consistent with its statutory conservator authority and purpose.

In *Perry Capital II*, the D.C. Circuit explained that "[r]enegotiating dividend agreements, managing heavy debt and other financial obligations, and ensuring ongoing access to vital yet hard-to-come-by capital . . . sit[] at the core of FHFA's conservatorship function." *Compare id.* at 605, 607, *with* Omnibus Br. 10-11.  Similarly, in *Jacobs*, the Third Circuit described the Third Amendment as "in essence a renegotiation of an existing lending agreement (albeit with equity rather than debt)[, which] is a traditional power of corporate officers or directors." *Jacobs*, 908 F.3d at 890.  And in *Saxton*, the Eighth Circuit rejected plaintiffs' mischaracterization of the Third Amendment as *ultra vires*, explaining that the Court could not "see how [FHFA's conservatorship] could exclude the power to renegotiate an existing lending agreement, which is

---

[4] In *Citizens*, the Court determined that the plaintiff-bank's allegations that FDIC as receiver misallocated litigation recoveries to benefit itself were sufficient to show jurisdiction, but dismissed the complaint because the plaintiff lacked a property right sufficient to state a takings claim and failed to identify a violation of a money-mandating statute to show an illegal exaction.  *See Citizens*, slip op. at 15-17, 21.

in essence what the [Third Amendment] did. Fannie and Freddie owed money; the [Third Amendment] changed the payment schedule and terms. This sort of action is within the heartland of powers vested in the officers or board of directors of any corporation." *Saxton*, 901 F.3d at 960-61 (Stras, C.J. concurring); *see also Roberts v. FHFA*, 889 F.3d 397, 404-06 (7th Cir. 2018); *Robinson v. FHFA*, 876 F.3d 220, 229-30 (6th Cir. 2017). So, unlike the FDIC in *Slattery*, which allegedly retained for itself a liquidation surplus rather than distributing it, allegedly in violation of FIRREA's statutory receivership priority scheme, FHFA's execution of the Third Amendment in its capacity as conservator reflected a proper exercise of its statutory powers.

> B.    The Complaints Fail To Show That FHFA Entered Into The Third Amendment At Treasury's Behest Such That The Court May Attribute FHFA's Execution Of The Third Amendment To The United States

As we demonstrated in our motion to dismiss, plaintiffs fail to plausibly allege that FHFA as conservator acted at the behest of Treasury such that the Court may impute conservator decisions to the United States. U.S. Mot. 23-26. Although the *Owl Creek* plaintiffs argue that Treasury's conduct alone may establish jurisdiction over the United States in this Court, *see* Owl Creek Br. 10-12, jurisdiction over Treasury alone is meaningless in these cases because the premise of plaintiffs' complaints is that FHFA "worked with" Treasury to transfer Enterprise profits to the Government via the Third Amendment. *See id.* at 2; U.S. Mot. 20-21; *see also, e.g.*, *Fairholme* ¶ 10; *Owl Creek* ¶ 2. Indeed, jurisdictional discovery would have been pointless if plaintiffs could get through the door simply by making allegations against Treasury alone. *See Fairholme Funds, Inc. v. United States*, 114 Fed. Cl. 718, 721 (2014).

Rather, to hold the United States liable for an alleged taking when the challenged conduct involves the Government and a third party, the plaintiff must demonstrate either (1) that the third

party acted as the Federal Government's agent or (2) the Federal Government's "influence over

the third party was coercive rather than merely persuasive." *A & D Auto Sales, Inc. v. United

States*, 748 F.3d 1142, 1154 (Fed. Cir. 2014) (citing *Tex. State Bank v. United States*, 423 F.3d

1370, 1376-77 (Fed. Cir. 2005)); *see also B & G Enters., Ltd. v. United States*, 220 F.3d 1318,

1325 (Fed. Cir. 2000) (rejecting takings claim where Congress conditioned Federal funding to

States on their prohibitions of cigarette sales to minors because the States had the power to

accept or reject the funding).

Although plaintiffs stamp their complaints with the terms "agent" and "coercion,"

plaintiffs fail to show that FHFA as conservator and Treasury did not independently negotiate the

Third Amendment, and numerous courts have confirmed the same. *Compare* Omnibus Br. 13-19

and Owl Creek Br. 22-26, *with Roberts*, 889 F.3d at 405-06 and *Perry Capital I*, 70 F. Supp. 3d

at 226-27. Despite their being afforded years of jurisdictional discovery to find evidence

substantiating their coercion or agent allegations, plaintiffs have been unable to do so.

1.     Plaintiffs Fail To Show That Treasury Coerced FHFA As Conservator Into
       Executing The Third Amendment

To demonstrate that Treasury coerced FHFA as conservator into executing the Third

Amendment, plaintiffs must show that the Government's influence over FHFA as conservator

was "coercive rather than merely persuasive." *A & D Auto Sales*, 748 F.3d at 1154.

Voluntariness informs the line between coercion and persuasion, so when a party has a choice to

accept or reject an offer—"however difficult refusal may be as a practical matter" for the party—

the presence of that choice defeats a coercion showing. *Id.* at 1155 (quoting *Langenegger v.

United States*, 756 F.2d 1565, 1572 (Fed. Cir. 1985)).[5]

_____

[5] This Court does not recognize "coercion" as a theory to hold the United States
responsible for a party's alleged breach of a private contract; it treats such claims against the

In this case, because plaintiffs' substantive allegations fail to show that FHFA as conservator executed the Third Amendment involuntarily, the complaints do not demonstrate "coercion."  Plaintiffs do not—and cannot—show that FHFA as conservator had no choice, so they instead point to allegations that Treasury was the impetus behind the Third Amendment. For instance, plaintiffs allege that the Third Amendment was a "Treasury-driven process;" that FHFA did not propose an alternative; and that Treasury informed the Enterprises about the Third Amendment.  *See* Omnibus Br. 18.  Yet, absent from the complaints is any allegation that Treasury (or the White House) *required* FHFA as conservator to enter into the Third Amendment against its will.  Indeed, the Owl Creek plaintiffs acknowledge in the first sentence of their brief that FHFA as conservator "worked with" Treasury to modify the PSPAs' dividend structure. Owl Creek Br. 1; *see also Reid* ¶¶ 135, 139-41 (alleging that Treasury and FHFA "agreed," "met," "discussed," and "negotiat[ed]" the Third Amendment); *Rafter* ¶ 77 (describing FHFA's conduct during "negotiations").  Thus, the complaints reflect actions of contractual counter-parties; none suggests or is even consistent with coercion.  *See* U.S. Mot. 23-26 (discussing plaintiffs' allegations that Treasury and FHFA acted independently when executing the Third Amendment and refuting argument that FHFA was Treasury's agent).

Numerous courts have already rejected the allegations plaintiffs cite in support of their coercion theory as insufficient to show that FHFA acted at Treasury's "direction or supervision" in violation of Section 4617(a)(7) of HERA.[6]  In *Perry Capital I*, the district court concluded that

---

Government as tort claims outside the Court's jurisdiction.  *See generally Taylor v. United States*, No. 18-1082, _ Fed. Cl. _, 2019 WL 1497132, at *3-4 (Fed. Cl. Apr. 5, 2019); *see also* 44B Am. Jur. 2d *Interference* § 54 (2017) ("Where a third party influences a contracting party to breach his or her contract, the innocent contracting party has a right in breach of contract against the other contracting party and a right in tort against the third party.").

[6]  Section 4617(a)(7) of HERA provides that "[w]hen acting as conservator or receiver, [FHFA] shall not be subject to the direction or supervision of any other agency of the United

plaintiffs' allegations that "Treasury 'invented the net-worth sweep concept with no input from

FHFA'" "do not come close to a reasonable inference that 'FHFA considered itself bound to do

whatever Treasury ordered.'"  *Perry Capital I*, 70 F. Supp. 3d at 226 (internal quotation

omitted).  And as the Seventh Circuit explained in *Roberts*, "[e]ven if . . . Treasury officials

made statements suggesting that Treasury was in the driver's seat and had to convince [FHFA] to

come along for the ride, such behavior alone" would not demonstrate that FHFA was under

Treasury's thumb.  *See Roberts*, 889 F.3d at 406.  In *Saxton*, the Eighth Circuit agreed,

concluding that plaintiffs' allegations that "Treasury officials *wanted* FHFA to agree to the net

worth sweep" failed to demonstrate that "Treasury *directed or commandeered* FHFA's exercise

of its conservatorship powers."  *See Saxton*, 901 F.3d at 959 n.6 (emphasis added).  Moreover,

plaintiffs' allegations here that FHFA did not "propose[] alternatives" to the Third Amendment

or "attempt[] to calculate the effect that the change would have on the dividends paid to

Treasury" does not show that FHFA acted involuntarily when the alternative was to continue

with the terms of the Second Amendment—namely, maintenance of the fixed, 10 percent

dividend plus payment of a fee for Treasury's outstanding commitment.  *Compare* Omnibus Br.

18 and *Fairholme* ¶ 139, *with Roberts*, 889 F.3d at 406.  Moreover, plaintiffs' assertion that

Treasury informed the Enterprises about the Third Amendment after Treasury and FHFA as

conservator executed it has no bearing on whether FHFA as conservator voluntarily accepted it.

*See* Omnibus Br. 18.

Although the *Roberts*, *Saxton*, and *Perry Capital I* courts determined that the plaintiffs

failed to show that FHFA acted at Treasury's behest when executing the Third Amendment,

---

States or any State in the exercise of the rights, powers, and privileges of [FHFA]."  12 U.S.C.
§ 4617(a)(7).

plaintiffs seek to minimize the reach of these decisions by characterizing them as Administrative Procedure Act (APA) cases in which the courts only determined that plaintiffs failed to show that FHFA had operated under Treasury's "direction or supervision" in violation of 12 U.S.C. § 4617(a)(7).  *See* Omnibus Br. 18-19.  In this case, plaintiffs replace "direction or supervision" with "coercion," but both theories rely on the same allegations.  And just as those allegations were insufficient to show that FHFA acted at Treasury's "direction and supervision" in several district and appeals courts, those allegations are insufficient in this Court to show that FHFA was "coerced" by Treasury.

> 2.    Plaintiffs Fail To Show That FHFA As Conservator Acted As Treasury's Agent When It Executed The Third Amendment

The complaints do not show an agency relationship between FHFA as conservator and either Treasury or the White House such that the Court could attribute FHFA's decision to enter the Third Amendment to the United States.  *See* Owl Creek Br. 1.  As the Third Circuit explained in *Jacobs*, the Third Amendment reflected a two-party "renegotiation of an existing lending agreement (albeit with equity rather than debt)"—not an agency relationship.  *See Jacobs*, 908 F.3d at 890.

"'An essential element of agency is the principal's right to control the agent's actions.'" *Hollingsworth v. Perry*, 570 U.S. 693, 713 (2013) (quoting Restatement (Third) of Agency § 1.01, cmt. f (2005)).  Indeed, the "mere authorization to assert a particular interest" alone is insufficient to establish an agency relationship.  *Id.*

In this case, because plaintiffs do not allege any Treasury *right* to control FHFA, plaintiffs cannot attribute FHFA's conservator decisions to the United States under an agency theory.  *See* Owl Creek Br. 22-26.  Plaintiffs' allegation that FHFA as conservator shared

12

"common goals" with Treasury can prove nothing; two parties may share common goals, but that suggests nothing about their ability to control each other, or even to act in concert.

As an initial matter, HERA itself denies Treasury any right to control FHFA.  *See* 12 U.S.C. § 4617(a)(7) (providing that FHFA shall not be subject to the "direction and supervision" of any other Federal agency or any State).  Indeed, the Court granted plaintiffs years of jurisdictional discovery to substantiate their claim that FHFA acted as an "agent or arm" of Treasury, yet the fruits of that endeavor revealed, at most, that FHFA and Treasury allegedly shared "common goals."  *Compare Fairholme Funds, Inc.*, 114 Fed. Cl. at 721, *with* Omnibus Br. 14; Owl Creek Br. 2, 22, 25.  Because plaintiffs fail to bring forward "relevant, adequate proof" that Treasury *controlled* FHFA, plaintiffs fail to demonstrate that their claims are against the United States.  *See Fairholme Funds, Inc.*, 114 Fed. Cl. at 720, 721.

The authorities on which plaintiffs rely—*Hendler* and *Preseault*—only underscore the point that Treasury had no right to control FHFA as its agent.  *See* Omnibus Br. 13 (citing *Hendler v. United States*, 952 F.2d 1364, 1379 (Fed. Cir. 1991); *Preseault v. United States*, 100 F.3d 1525, 1550 (Fed. Cir. 1996) (en banc)).  In *Hendler* and *Preseault*, the Federal Circuit held that the Federal Government was subject to takings liability for state conduct because the Federal Government ordered the states' alleged takings of real property.  But *Hendler* and *Preseault* are inapposite because they bear no resemblance to the legal or factual scenarios presented here.

In *Hendler*, the Environmental Protection Agency (EPA) exercised its authority under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) to direct the State of California to dig wells on the plaintiffs' property.  *See Hendler*, 952 F.2d at 1367, 1374.  Because EPA had the right under CERCLA to order California to dig the wells, the Court held that, just as the EPA's activities would subject the United States to takings liability,

California's "activities within the scope of the Order are attributable to the Federal Government for purposes of takings law[.]" *Id.* at 1378-79. Similarly, in *Preseault*, property owners bought land previously subject to a railroad easement. *See Preseault*, 100 F.3d at 1537. Because the railroad effectively abandoned its easement, the State of Vermont converted the land to a public bicycle and pedestrian trail pursuant to an Interstate Commerce Commission (ICC) order. *Id.* at 1549. The Court attributed Vermont's actions to the United States because Vermont acted solely pursuant to the ICC's statutory order authorizing Vermont to convert the easement into a public trail over plaintiffs' objections. *Id.* at 1550-51.

Unlike the plaintiffs in *Hendler* and *Preseault*, plaintiffs here do not allege—and cannot reasonably allege—that FHFA acted under a directive or order from Treasury authorizing it to enter into the Third Amendment. No Federal statute would authorize Treasury to give FHFA such a directive; indeed, HERA specifies that FHFA as conservator "shall not be subject to the direction or supervision" of any other Federal agency. 12 U.S.C. § 4617(a)(7); *see also Roberts*, 889 F.3d at 406. Thus, because plaintiffs' allegations fail to demonstrate that Treasury or the White House controlled FHFA, plaintiffs cannot attribute FHFA's decisions as conservator to the United States under an agency theory.

### 3. Plaintiffs Fail To Show That FHFA As Conservator Acted As An Agent For FHFA As Regulator

As the Enterprises' conservator, FHFA did not act as an agent for FHFA as regulator, or for any other part of the Government, when it agreed to the Third Amendment. Nonetheless, plaintiffs contend that FHFA as conservator was an agent of FHFA as regulator because FHFA did not establish a "wall" separating both of its capacities. Omnibus Br. 15-17 (citing *All Winstar-Related Cases at Court v. United States*, 44 Fed. Cl. 3 (1999)).

14

But courts have long recognized the distinction between an agency acting as conservator or receiver, and an agency acting as regulator.  *See United States v. Beszborn*, 21 F.3d 62, 68 (5th Cir. 1994); *see also Herron*, 861 F.3d at 169; *County of Sonoma v. FHFA*, 710 F.3d 987, 993-94 (9th Cir. 2013).  HERA itself outlines the wall between FHFA's two capacities by detailing the authority and duty of each.  Nothing more is required.

C.      Treasury's Contractual Rights Set Forth In The PSPAs Do Not Demonstrate That Treasury Controls The Enterprises

"The Supreme Court has long held that, when the government acquires an ownership interest in a corporation, it acts—and is treated—as any other shareholder."  *Meridian*, 855 F.3d at 579 (citing *Bank of U.S. v. Planters' Bank of Ga.*, 22 U.S. 904, 907 (1824)).  In financial crises, the Government has purchased equity in, and provided substantial financial support to, troubled institutions, often under detailed contracts to support the broader financial system.  *See, e.g.*, *Starr Int'l Co. v. United States*, 856 F.3d 953, 958-60 (Fed. Cir. 2017); *see also Caroline Hunt Tr. Estate v. United States*, 470 F.3d 1044, 1046-48 (Fed. Cir. 2006); *Holland v. United States*, 75 Fed. Cl. 483, 485 (2007); *FDIC v. Morley*, 867 F.2d 1381, 1383 (11th Cir. 1989).

Treasury's investments in the Enterprises, reflected in the PSPAs and their amendments, are no different, and its financial support does not convert the Enterprises (as private corporations) into Government actors.  *See, e.g.*, *Wiggins v. JP Morgan Chase Bank*, No. 14-cv-11103, 2015 WL 868933 (S.D. W. Va. Feb. 27, 2015) (recipient of Troubled Asset Relief Program funds not a Government actor).[7]  Plaintiffs identify no case—because there is none—in

---

[7] Similar to Treasury's financial support of the Enterprises' conservatorships, "Treasury used the TARP authority to make investments, loans and asset guarantees and purchases in or from a range of financial institutions.  In exchange for this assistance, Treasury, on behalf of the taxpayer, received financial instruments including equity securities (preferred stock, common stock and warrants)[.]"  U.S. Dep't of the Treasury, *Where Did The Money Go?* (Aug. 8, 2018, 4:12 PM), *available at* https://go.usa.gov/xEzqh.

which a private financial institution has been deemed a Government actor by virtue of entering

into a financial support agreement while in conservatorship or receivership.

Finally, that one party cedes certain rights to a contracting counter-party does not render

either party the other's agent.  Indeed, under plaintiffs' reasoning, virtually every homeowner

with a mortgage would operate as the bank's agent because any mortgage agreement requires a

homeowner to subordinate her rights in the property to the bank's rights in exchange for the

bank's loan.  Thus, that FHFA as the Enterprises' conservator, as a condition of receiving

Treasury's capital commitments, granted Treasury certain senior preferred shareholder rights that

would otherwise belong to FHFA as conservator—such as the right to approve dividend

payments to other shareholders—does not transform FHFA as conservator into Treasury's agent.

> D.     FHFA's Exercise Of Its Statutory Conservatorship Powers Does Not Transform
>        Plaintiffs' Private-Shareholder Contract Claims Against The Enterprises Into
>        Claims Against The United States

Plaintiffs also argue that, because FHFA's statutory conservatorship authority is broader

than a common-law conservator's authority, FHFA's exercise of such statutory authority

converted plaintiffs' private-shareholder contract claims against the Enterprises into claims

against the United States.  *See* Owl Creek Br. 18.  Although Congress vested FHFA with

statutory conservator powers that are broader than a common-law conservator's powers, those

broader statutory powers do not transform the conservator into a Government actor.  For

example, plaintiffs in another Third Amendment case recently "argue[d] that the Third

Amendment was . . . an exercise of governmental power because, according to plaintiffs, no

private conservator or corporate officer could have entered into it without violating fiduciary and

other duties normally imposed under state law."  *Bhatti*, 332 F. Supp. 3d at 1226.  The district

court disagreed, holding that "[i]t may well be true that FHFA's actions would not be allowed

under traditional principles of corporate or conservatorship law, but it does not follow that those actions are therefore governmental." *Id*. Thus, "[l]egislatures can expand conservatorship and similar powers without transforming conservators into agents of the government." *Id.* (citing *Pegram v. Herdrich*, 530 U.S. 211, 225-26 (2000)). The same reasoning demonstrates that FHFA's execution of the Third Amendment on the Enterprises' behalf does not reflect an exercise of governmental power.

In response, plaintiffs cite to the D.C. Circuit's decision in *Waterview Management Co. v. FDIC*, to argue that this Court should treat FHFA as conservator as a Government actor given FHFA's broad statutory powers. Owl Creek Br. 16 (citing *Waterview Mgmt. Co. v. FDIC*, 105 F.3d 696, 699-702 (D.C. Cir. 1997)). But *Waterview Management* does not support this argument. *Waterview Management* was a statutory-construction case addressing the narrow question of whether the existence of a receivership preempted a pre-receivership bank contract. 105 F.3d at 699-702. The D.C. Circuit held that the receivership itself did not preempt a pre-receivership contract, such that if the receiver sought to repudiate the contract, the receiver must pay damages on behalf of the bank in receivership.

Although plaintiffs emphasize that the *Waterview Management* court expressed that it "avoid[ed] a possible" takings issue by not reading FIRREA as preempting a party from pursuing a pre-receivership contract remedy, that "possible" takings issue is not present here because we do not take the position that conservatorship preempts pre-conservatorship Enterprise contracts (or contract claims) out of existence. *Compare* Owl Creek Br. 16, *with Waterview Mgmt.*, 105 F.3d at 701. In any event, the *Waterview Management* court did not decide the merits of the "possible" takings claim, which would have required the court to decide whether the Resolution Trust Corporation (RTC) as receiver was the United States. And because the parties in

17

*Waterview Management* did not brief whether RTC was a private actor or the United States, the issue was not before the court, so its reference to the takings claim has limited utility here. *See generally United States v. Wade*, 152 F.3d 969, 973 (D.C. Cir. 1998). Given that shareholders are pursuing a claim against the Enterprises alleging that the Third Amendment breached the implied covenant of good faith and fair dealing in their stock contracts, *Waterview Management* lends no support to plaintiffs' argument that their private-shareholder contract claims against the Enterprises have evolved into constitutional, statutory, and contract claims against the United States.

E.      The Conservatorships Did Not Transform The Enterprises Themselves Into Government Actors Such That Plaintiffs May Assert Their Private-Shareholder Claims Against The United States

Plaintiffs also argue that the Court possesses jurisdiction to treat their private-shareholder claims against the Enterprises as claims against the United States because the existence of the conservatorships somehow converted the Enterprises into Government actors. Citing the Supreme Court's decision in *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374 (1995), plaintiffs erroneously argue that, even if FHFA as conservator stands in the Enterprises' shoes, those shoes are public, so plaintiffs may repackage their claims against the Enterprises as claims against the United States. *See* Omnibus Br. 19-20; Owl Creek Br. 13-15.[8]

---

[8] Plaintiffs also contend that FHFA as conservator itself is a Government actor under *Lebron*. Owl Creek Br. 13-14. To the extent *Lebron* applies to a Federal statutory conservator, the same analysis that shows that the Enterprises are not the United States also shows that FHFA as conservator, standing the Enterprises' shoes, is not the United States. Indeed, in *Meridian*, the Fourth Circuit "[a]ppl[ied] the reasoning of *Lebron*" and held that "though FHFA is a federal agency, as conservator it steps into Freddie Mac's shoes, shedding its government character and also becoming a private party." *Meridian*, 855 F.3d at 579; *see also* Appendix (A) 5 (citing cases in which courts have determined that FHFA as conservator is not a Government actor under *Lebron*).

In *Lebron*, the Supreme Court established a three-part test to determine whether a court may treat a private entity as the Government for constitutional purposes: the Government must (1) create the corporation by special law, (2) in furtherance of governmental objectives, and (3) retain for itself permanent authority to appoint a majority of the corporation's directors.  *See Lebron*, 513 U.S. at 399.  Because the test is conjunctive, failure to satisfy any element defeats a plaintiff's attempt to treat a private corporation as the Government.  *See, e.g.*, *Herron*, 861 F.3d at 168.

The Supreme Court applied this three-part test to conclude that Amtrak was part of the Government.  In reaching this determination, the Supreme Court emphasized that "Amtrak is not merely in the *temporary* control of the Government (as a private corporation whose stock comes into federal ownership might be)" but rather was under *permanent* government control because "the Government . . . retain[ed] for itself *permanent* authority to appoint a majority of the directors."  *Lebron*, 513 U.S. at 398, 400 (emphasis added).  Thus, *Lebron* equates permanent Government control with the presence of structural elements that not only give the Government ongoing, practical control over the corporation's affairs, but that also cannot be altered except by act of Congress.

Accordingly, temporary control—even for an extended period—is insufficient to satisfy *Lebron*'s requirement that the Government retain permanent control over an entity's board of directors.  Indeed, the Fourth Circuit recently identified conservatorship as a quintessential example of *temporary* control that does *not* convert a private corporation into a Government actor: "In *Lebron*, the Supreme Court explained that entities that are both created and controlled by the federal government may be considered federal entities that are subject to the limitations of the Constitution. . . . Temporary control—*as when the federal government steps in as a*

19

*conservator*—is not sufficient." *Kerpen v. Metro. Wash. Airports Auth.*, 907 F.3d 152, 158-59 (4th Cir. 2018) (emphasis added).

Applied to the Enterprises, dozens of Federal courts (including four Circuits) have concluded that, under *Lebron*, the Enterprises maintain their private identities while in conservatorship. *See* Appendix (A) 1-5 (citing cases); *Meridian*, 855 F.3d at 579; *Adams*, 813 F.3d at 1260-61. *But see Sisti v. FHFA*, 324 F. Supp. 3d 273, 279-81 (D.R.I. 2018). For example, the D.C. Circuit explained that "[w]hile the conservatorship authorized the government to exercise substantial control over Fannie Mae, that control is temporary, as a private corporation whose stock comes into federal ownership might be. Thus, the government's indefinite but temporary control does not transform Fannie Mae into a government actor." *Herron*, 861 F.3d at 169 (internal quotation marks and citations omitted).

The only contrary decision—*Sisti*—reflects that court's misunderstanding of the substantive role and operation of financial-institution conservatorships. The *Sisti* court incorrectly concluded that FHFA's control over the Enterprises' conservatorships is permanent for purposes of *LeBron*'s governmental-actor analysis because the conservatorship does not have a specific expiration date. *See Sisti*, 324 F. Supp. 3d at 280-81. Every other Federal court to have considered this argument has rejected it as immaterial. *See* A1-5; *see also Sisti*, 324 F. Supp. 3d at 277 ("This court is aware that this holding is contrary to every other court to reach the issue."). Under *Sisti*'s logic, the Enterprises are Government actors because the conservatorship has lasted too long; yet, *Sisti* identifies neither a particular time when the Enterprises underwent their private-to-public conversion nor any principles from which a court could make a similar determination.

In any event, plaintiffs fail to show that the Enterprises are Government actors under *Lebron* because they identify no law in which Congress retained for the Government permanent control over the Enterprises' directors.  Even though FHFA as conservator temporarily controls the Enterprises' boards during the conservatorships, a conservatorship itself necessarily does not satisfy *Lebron*'s requirement for permanent control.

Unlike the Amtrak charter provisions discussed in *Lebron*, HERA does not grant FHFA permanent, structural control over the Enterprises.  On the contrary, HERA's statutory framework makes clear that conservatorship could end without further legislation.  Indeed, in HERA, Congress empowered FHFA to act as the Enterprises' conservator for purposes of "reorganizing, rehabilitating, or winding up [the Enterprises'] affairs," but Congress did not grant FHFA permanent control.  12 U.S.C. § 4617(a)(2).  "Although there is no specific termination date, the purpose of the conservatorship is to restore [the Enterprises] to a stable condition."  *Herron*, 861 F.3d at 169.  Because FHFA as conservator's control over the Enterprises' boards is temporary, though continuing, neither *Lebron* nor *Sisti* supports plaintiffs' efforts to attribute the Enterprises' actions to the United States.  *Id*.

## II.   HERA's Succession Clause Bars Plaintiffs' Derivative Claims Against The United States

As we demonstrated in our moving brief, even if the Court were to determine that plaintiffs' private-shareholder contract claims against the Enterprises and FHFA as conservator constitute claims against the United States, those claims are barred because all rights to file and prosecute derivative claims transferred to FHFA as a matter of law.  Pursuant to HERA's succession clause, FHFA "shall, as conservator or receiver, and by operation of law, immediately succeed to . . . all rights, titles, powers, and privileges of the regulated entity, and of any stockholder, officer, or director of such regulated entity with respect to the regulated entity and

the assets of the regulated entity[.]"  12 U.S.C. § 4617(b)(2)(A)(i).  This provision "plainly

transfers [to the FHFA the] shareholders' ability to bring derivative suits[.]"  *Perry Capital II*,

864 F.3d at 623 (alteration in original) (quoting *Kellmer v. Raines*, 674 F.3d 848, 850 (D.C. Cir.

2012)).  Here, because all of the shareholder complaints assert, in substance, derivative claims

arising from alleged injuries to the Enterprises, HERA's succession clause divests plaintiffs of

standing to bring them.

A.      Plaintiffs' Claims Are Derivative Because They Uniformly Arise Out Of Alleged
        Injuries To The Enterprises

Distinguishing direct and derivative claims requires courts to answer two questions: "(1)

who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2)

who would receive the benefit of any recovery or other remedy (the corporation or the

stockholders, individually)?"  *Starr Int'l Co.*, 856 F.3d at 966 (quoting *Tooley v. Donaldson,

Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004)).  As we demonstrated in our moving

brief, the complaints allege only derivative claims because plaintiffs allege that (1) the

Enterprises suffered the alleged harm—either through their placement in conservatorship or

through their dividend payments under the Third Amendment—and (2) the Enterprises would

receive the direct benefit of any recovery.  *See* U.S. Mot. 27-32.

1.      Plaintiffs Allege No Injury Unique To Them

Plaintiffs differ among themselves whether their substantively identical claims are direct

or derivative.  *Compare* Fisher Br. 4-6, *with* Owl Creek Br. 36.  They all are derivative.  As we

explained in our moving brief, the complaints challenging the Third Amendment uniformly

allege that the amendment reflected corporate waste, self-dealing, overpayments,

mismanagement, and poor business judgment, all of which rendered plaintiffs' stock less

valuable.  *See* U.S. Mot. 30 (citing complaints).  Thus, whatever labels plaintiffs use, all such

claims reflect alleged harms to the Enterprises directly, and plaintiffs only indirectly.  *See* U.S. Mot. 30-32.  Indeed, the *Fisher* and *Reid* plaintiffs acknowledge that "the transactions at issue are between the Companies and the Government; no money or other property has been taken directly from the shareholders that is distinct from the property and money that the Companies have paid and will pay to the Government."  Fisher Br. 2.  Thus, as alleged, "the Third Amendment no doubt adversely affected Fannie and Freddie's shareholders, but such effects were the 'unavoidable result' of the reduction in value to the Companies that occurred as a result of the Government taking the Companies' assets. . . . Because the shareholders' injuries are dependent upon the prior injury to the Companies, the claims are derivative."  *Id.* at 5.

The "transactions at issue" and the alleged "effects" are the same in all complaints challenging the Third Amendment.  Plaintiffs challenging the Third Amendment uniformly argue that the variable dividend payments deprive the *Enterprises* of funds from which plaintiffs could realize "economic interests" reflected in Enterprise stock—such as through dividend payments to shareholders.  *See, e.g.*, Omnibus Br. 44, 53; Owl Creek Br. 54-55.  In fact, plaintiffs' response briefs repeatedly confirm that their alleged injuries exist only as a result of the *Enterprises'* contractual dividend payments to Treasury.  For instance, plaintiffs explain that their property interests comprise "the *Companies'* residual value, whether realized through dividends, liquidations, or accretion."  Omnibus Br. 45 (emphasis added).  However, those interests allegedly no longer have value because, through the Third Amendment, the "Government has seized over $120 billion from Fannie and Freddie that otherwise would have been retained or paid out for the benefit of all shareholders, not just Treasury."  Omnibus Br. 2.  Thus, the fundamental premise of their case is that, as a result of the Third Amendment, Treasury "alone enjoyed the right to participate in the *Companies'* financial success, [which] 'eliminate[d] any

possible investment return'" for common and junior preferred stockholders.  Owl Creek Br. 51

(citing *Owl Creek* ¶ 104 (emphasis added)).[9]  The *Washington Federal* plaintiffs' response

underscores this point in that they allege that the Enterprises' placement in conservatorship

harmed shareholders because it reduced the value of their stock.[10]  *See* Wash. Fed. Br. 23, 31.

But an alleged "deplet[ion of] corporate assets that might otherwise [have] be[en] used to

benefit the stockholders, such as through a dividend," "harms the stockholders only derivatively

so far as their stock loses value."  *Protas v. Cavanagh*, No. Civ. A. 6555-VCG, 2012 WL

1580969, at *6 (Del. Ch. May 4, 2012) (alterations added); *see also Perry Capital I*, 70 F. Supp.

3d at 229 n.24, 235 n.39 (claims alleging "damage to the price of [Enterprise] shares, as valued

---

[9]  Thus, when the *Rafter* plaintiffs cite *Perry Capital II* for the assertion that "contract-based claims are obviously direct," they tellingly omit that the *Perry Capital* plaintiffs asserted those claims against the Enterprises as their contract counter-parties (and FHFA as conservator)—*not* the United States.  *See* Rafter Br. 14; *Perry Capital II*, 864 F.3d at 628.  And even though the *Rafter* plaintiffs contend that a shareholder may pursue "damages from an injury 'separate and distinct' from the corporation's," the *Rafter* plaintiffs identify no personal injury separate and distinct from any Enterprise injury.  *See* Rafter Br. 15 (quoting *Holland v. United States*, 59 Fed. Cl. 735, 737, 741 (2004)).  As alleged, the *Rafter* plaintiffs' purported contract injuries arise from Fannie Mae "giving the Government Fannie Mae's entire net worth[.]"  *Rafter* ¶ 151; *see also id.* ¶ 159 (alleging injury from "Fannie Mae . . . sending Treasury all of Fannie Mae's profits and net worth"); *id.* ¶ 167 (same as to Freddie Mac).

Similarly, the *Washington Federal* plaintiffs assert that their purported constitutional claims are "directly analogous" to the shareholders' contract claim in district court, *see* Wash. Fed. Br. 20; however, the *Washington Federal* plaintiffs fail to acknowledge that the shareholders' claim in district court is against the Enterprises and FHFA as conservator—not the United States.

[10]  Although the *Washington Federal* plaintiffs argue that our moving brief did not "address the bulk of the allegations" in their complaint, the point of the omnibus briefing was to address common factual and legal arguments present in all complaints.  *See* Wash. Fed. Br. 3.  So, even if we did not specifically identify the *Washington Federal* plaintiffs by name throughout the brief and addressed a specific argument unique to the *Washington Federal* plaintiffs that is inapplicable to the plaintiffs challenging the Third Amendment, our remaining arguments apply equally to their claim that the impositions of the conservatorships effected a taking or illegal exaction.  Contrary to the *Washington Federal* plaintiffs' assertion, we have not waived any arguments demonstrating why their complaint should be dismissed.  *See id.*

by the market . . . are considered derivative under Delaware law"). And allegations that "minority shareholders suffered a diminution in value of their corporate shares without receiving the same monetary compensation the majority shareholders received . . . is not [a] direct and personal [injury] . . . but is, rather, an injury to the corporation." *Bixler v. Foster*, 596 F.3d 751, 757 (10th Cir. 2010).

### 2.   Any Recovery Would Belong To The Enterprises

With respect to the second question identified in *Starr*—which asks "who would receive the benefit of any recovery or other remedy," *Starr Int'l Co.*, 856 F.3d at 966—some (but not all) plaintiffs assert that they are seeking money damages payable directly to themselves, and argue that a remedy to the Enterprises would be improper. *See* Omnibus Br. 24; Wash. Fed. Br. 20-22. The Court, however, evaluates "the nature of the wrong and to whom the relief *should* go." *Tooley*, 845 A.2d at 1039 (emphasis added). Here, as the *Fisher* and *Reid* plaintiffs concede, "the recovery [sought] here would flow to the Companies, as the Companies are the entities required to pay the net worth sweep to the Government . . . . That shareholders may indirectly benefit . . . cannot, through alchemy, transform a derivative claim into a direct claim." Fisher Br. 5. Thus, because any potential recovery here would "inure to the benefit of the corporations, rather than individual stockholders," plaintiffs' claims are derivative. *Roberts*, 889 F.3d at 409.

### B.   No Basis Exists To Disregard The Succession Clause's Plain Language

The Court should conclude that HERA's succession clause precludes plaintiffs' efforts to pursue derivative suits in this Court.

### 1.   HERA Contains No Conflict-Of-Interest Exception To Its Bar On Derivative Suits

As we demonstrated in our motion to dismiss, HERA contains no conflict-of-interest exception to the succession clause that would permit plaintiffs to assert derivative claims while

the conservatorship is underway.  *See* U.S. Mot. 33-37; *see also Roberts*, 889 F.3d at 410.

Indeed, the very concept would frustrate Congress's prohibition on judicial "action to restrain or

affect" FHFA's powers as conservator.  12 U.S.C. § 4617(f).  As the Seventh Circuit explained,

HERA unequivocally bars shareholder derivative suits challenging FHFA's business decisions as

the Enterprises' conservator.  *See Roberts*, 889 F.3d at 409-10; *see also Perry Capital II*, 864

F.3d at 624-25.  In addition to conflicting with the succession clause's plain language, permitting

derivative suits during the pendency of the conservatorship would frustrate Congress's intent to

insulate the conservator from shareholder interference by permitting "shareholders [to] challenge

nearly any business judgment of [FHFA as conservator] using a derivative suit, by invoking a

conflict-of-interest exception."  *Roberts*, 889 F.3d at 410.  That is why *no* court has accepted

plaintiffs' arguments that HERA contains a conflict-of-interest exception to the bar on derivative

suits.  *See id.*; *Perry Capital II*, 864 F.3d at 625; *Saxton v. FHFA*, 245 F. Supp. 3d 1063, 1079

(N.D. Iowa 2017); *see also Edwards v. Deloitte & Touche LLP*, No. 16-21221, 2017 WL

1291994, at *7 (S.D. Fla. Jan. 18, 2017) (citing cases).

　　　Citing the Federal Circuit's decision in *First Hartford Corp. Pension Plan & Trust,*

plaintiffs have tried and failed to convince Federal appeals and district courts that HERA

contains an implied conflict-of-interest exception that permits shareholder derivative claims to

challenge conservator decisions.  Omnibus Br. 26-28 (citing *First Hartford Corp. Pension Plan

& Trust v. United States*, 194 F.3d 1279, 1282-84 (Fed. Cir. 1999)).  No court has adopted or

even encouraged plaintiffs' argument because it conflicts with HERA.  For instance, in *Saxton*,

the district court explained that the succession clause contains no ambiguity that would allow the

court to read into it an unstated conflict-of-interest exception that would permit derivative

claims.  *See Saxton*, 245 F. Supp. 3d at 1079.

In *Roberts*, the Seventh Circuit explained the differences in the factual scenarios here and in *First Hartford* that render *First Hartford* inapplicable: In *First Hartford*, the Federal Circuit considered "FDIC's breach of a distinct contract entered into *before* the bank entered FDIC receivership." *Roberts*, 889 F.3d at 409 (emphasis in original) (citing *First Hartford*, 194 F.3d at 1283-84). Thus, in *First Hartford*, the "Federal Circuit expressly limited its conflict-of-interest exception to situations 'in which a government contractor with a putative claim of breach by a federal agency is being operated by that very same federal agency.'" *Id.* at 409-410 (quoting *First Hartford*, 194 F.3d at 1295). "*First Hartford* thus stands for the proposition that the accident of receivership should not serve to extinguish an asset (whether seen as a contractual right or chose in action) of the bank." *Id.* at 410. Thus, the unique scenario presented in *First Hartford*—where the FDIC as receiver must enforce a bank's pre-receivership breach claim against the agency as regulator—bears no resemblance to the scenario here where plaintiffs seek to challenge FHFA's decision-making process as the Enterprises' conservator while the Enterprises are in conservatorship.

Plaintiffs' attempt to distinguish the derivative claims in *Perry Capital*, *Roberts*, and *Saxton* (alleged as APA, breach of fiduciary duty, and breach of contract claims), from the derivative claims in this case (alleged as takings, illegal exaction, breach of fiduciary duty, and breach of contract claims), is unavailing because the succession clause that precludes derivative claims makes no distinction based on the underlying claims themselves. Indeed, courts have uniformly rejected the contention that shareholder standing depends on the nature of the claim asserted. *See Pagan v. Calderon*, 448 F.3d 16, 28-30 (1st Cir. 2006) (shareholders lacked standing to pursue due process and equal protection claims because they failed to allege that they "sustained a particularized nonderivative injury" separate from any injury to the corporation);

*Duran v. City of Corpus Christi*, 240 F. App'x 639, 642-43 (5th Cir. 2007) (per curiam)

(concluding that "only the corporation [had] standing to seek redress" for an alleged First

Amendment violation) (citing *Pagan*, 448 F.3d at 30); *Sinclair v. Hawke*, 314 F.3d 934, 939 (8th

Cir. 2003) (shareholder lacked standing to pursue First and Fifth Amendment claims, as well as

Federal statutory civil rights claims).

And as we demonstrated in our moving brief, whether a claim is direct or derivative turns

on the nature of the injury and the relief sought—not, as plaintiffs contend, on whether the

source of the claimed injury was allegedly constitutional.  *See* Omnibus Br. 21-22.  In the

complaints, plaintiffs allege no direct injury as the result of a violation of any personal

constitutional right; in other words, they assert no claims belonging to plaintiffs, as shareholders,

rather than the Enterprises themselves.  *Id.* at 28 (acknowledging that bar on derivative claims

concerns only an alleged taking or exaction of "the Companies' property").  And although

plaintiffs have alleged no genuinely direct claims in this Court, the D.C. Circuit has determined

that Enterprise shareholders retain their right to pursue a direct claim for any injury unique to

them.  *See Perry Capital II*, 864 F.3d at 628 (the succession clause does not bar a plaintiff's

assertion of a direct claim "based on the plaintiff's own right") (quoting *Citigroup Inc. v. AHW

Inv. P'ship*, 140 A.3d 1125, 1139-40 (Del. 2016)); *see also Fairholme DDC*, 2018 WL 4680197,

at *13-14 (denying motion to dismiss plaintiffs' direct breach of the implied covenant of good

faith and fair dealing claim against the Enterprises and FHFA as conservator).

In a footnote, plaintiffs argue that the Court should not "disregard[]" *First Hartford*

because, when enacting HERA, Congress "merely copied" the succession clause in FIRREA.

Omnibus Br. 27 n.8.  This statutory copying, according to plaintiffs, suggests that Congress

intended courts to read an implied conflict-of-interest exception into HERA, notwithstanding the

unambiguous text. *Id*. But plaintiffs' argument demonstrates the opposite; indeed, in the FIRREA context, *First Hartford* was an outlier and limited to its unique facts. *See Perry Capital II*, 864 F.3d at 624-25; *see also, e.g.*, *Levin v. Miller*, 763 F.3d 667, 670-71 (7th Cir. 2014); *In re Beach First Nat'l Bancshares, Inc.*, 702 F.3d 772, 777 (4th Cir. 2012); *Pareto v. FDIC*, 139 F.3d 696, 700-01 (9th Cir. 1998). Indeed, the D.C. Circuit expressly rejected plaintiffs' argument, concluding that Congress did not "intend[] *sub silentio* to incorporate" a conflict-of-interest exception into HERA. *Perry Capital II*, 864 F.3d at 625.

Further, plaintiffs cite a general, common-law policy that derivative suits help vindicate alleged harms to a corporation. In *Perry Capital II*, however, the D.C. Circuit concluded that any such policy must yield to HERA's plain language transferring derivative suit rights to FHFA as conservator. The circuit court explained that "it makes little sense to base an exception to the rule against derivative suits in the Succession Clause 'on the purpose of the "derivative suit mechanism," rather than the plain statutory text to the contrary.'" *Perry Capital II*, 864 F.3d at 625 (quoting *Perry Capital I*, 70 F. Supp. 3d at 230-31)).

Ultimately, plaintiffs' arguments about a common-law policy behind derivative suits provide scant support to carve out an implied conflict-of-interest exception from the succession clause's unambiguous language. Congress expressly and deliberately chose to transfer shareholder derivative-suit rights to FHFA as the Enterprises' conservator—a barrier to plaintiffs' claims that no common-law policy argument can breach.

    2.    Collateral Estoppel Precludes Shareholders From Re-Litigating Whether HERA's Bar On Derivative Suits Contains A Conflict-Of-Interest Exception

In *Perry Capital*, Enterprise shareholders litigated and lost the issue of whether HERA's bar on derivative suits contains an implied conflict-of-interest exception; accordingly, collateral

estoppel precludes plaintiffs, as Enterprise shareholders, from relitigating that issue here.  U.S. Mot. 37-40 (citing *Perry Capital I*, 70 F. Supp. 3d at 229-32, *aff'd*, 864 F.3d at 624-25).  Indeed, Enterprise shareholders have repeatedly litigated and lost this issue.  *See, e.g.*, *Perry Capital II*, 864 F.3d at 624-25; *Roberts*, 889 F.3d at 409-10; *Saxton*, 245 F. Supp. 3d at 1079.

Although plaintiffs acknowledge that issue preclusion applies in derivative suits, Omnibus Br. 34, plaintiffs argue that the rulings in *Perry Capital* are inapplicable because the court determined that shareholders "lacked the capacity" under HERA to pursue derivative claims on the Enterprises' behalf.  *Id.*  But that is the precise ruling that precludes shareholders from pursuing derivative claims here regardless of the nature of the underlying claim.  Indeed, we do not contend that the *Perry Capital* rulings about derivative suits bar the *merits* of any particular claim; however, a legal issue presented in this case—whether HERA's bar on derivative suits contains an implied conflict-of-interest exception—has been fully and finally resolved against shareholders in prior derivative actions.  *See, e.g.*, *Perry Capital II*, 864 F.3d at 624-25; *Roberts*, 889 F.3d at 409-10; *Saxton*, 245 F. Supp. 3d at 1079.  Therefore, plaintiffs cannot raise it again through this derivative action.

Plaintiffs' efforts to avoid the binding effects of issue preclusion sort themselves into two categories: (1) misapprehensions of the issues resolved in *Perry Capital*, and (2) misstatements of the plaintiffs' claims.  First, plaintiffs argue that issue preclusion is inapplicable because the issues in this suit and in *Perry Capital* are not "identical."  Omnibus Br. 32.  Like the *Perry Capital* plaintiffs, however, the plaintiffs here contend that HERA's succession clause contains a conflict-of-interest exception that permits shareholders to pursue derivative claims any time they disagree with FHFA as the Enterprises' conservator.  *Compare Perry Capital I*, 70 F. Supp. 3d at 229-32, *with* Omnibus Br. 25-28.  Whether the underlying claims themselves are identical is

irrelevant for collateral estoppel purposes because the legal issue is the same.  *See Montana v. United States*, 440 U.S. 147, 158-62 (1979).

In any event, applying issue preclusion would not "extinguish[] all judicial remedies for constitutional violations," as plaintiffs contend, because the ruling only precludes shareholders from pursuing *derivative* claims on the Enterprises' behalf.  Omnibus Br. 32.  As the D.C. Circuit determined, shareholders retain claims that they "may lodge directly" against the Enterprises during conservatorship.  *See Perry Capital II*, 864 F.3d at 628; *Fairholme DDC*, 2018 WL 4680197, at *13-14.

Plaintiffs also argue that the Court "cannot give preclusive effect" to the ruling in *Perry Capital I* because the D.C. Circuit was not bound by *First Hartford*.  Omnibus Br. 33. Unsurprisingly, plaintiffs cite no authority for their novel assertion that the Court "cannot give preclusive effect" to a prior ruling simply because the Federal Circuit construed a similar, but not identical, provision in a different statute in a different factual context.  *Compare id.*, *with, e.g.*, *Gail C. Sweeney Estate Marital Tr. v. U.S. Treasury Dep't*, 68 F. Supp. 3d 116, 122-23 (D.D.C. 2014) (stating that even if *First Hartford* were binding, it is not a HERA case).

In this regard, plaintiffs misapprehend the precise issues resolved in *Perry Capital*, as well as the reach of *First Hartford*.  In *First Hartford*, the Federal Circuit determined that (1) a FIRREA provision (12 U.S.C. § 1821(d)(2)(A)(i)) contained an implied exception, that (2) permitted shareholders to bring a derivative suit to enforce a bank's pre-receivership contract claims against the FDIC as regulator when the bank is operated by the FDIC as receiver.  *See First Hartford*, 194 F.3d at 1295.  In *Perry Capital*, the court (1) construed a similar, but different provision, 12 U.S.C. § 4617(b)(2)(A)(i), under HERA—a different statute—and (2) held that the provision unambiguously transferred to FHFA as conservator all shareholder rights

31

to pursue derivative claims.  *See Perry Capital I*, 70 F. Supp. 3d at 231; *Perry Capital II*, 864 F.3d at 624-25.

Moreover, although *First Hartford* is not precedential in the D.C. Circuit, both the district court and the D.C. Circuit considered the reasoning behind *First Hartford* when they ruled that HERA contains no analogous conflict-of-interest exception.  In *Perry Capital I*, the district court considered Congress's grant of immense discretionary power to FHFA along with HERA's prohibition on judicial interference with the exercise of such power.  The court concluded that HERA does not "house an *implicit* end-run around FHFA's conservatorship authority by means of the shareholder derivative suits that the statute explicitly bars."  *Id*. at 230-31 (emphasis in original); *see also Perry Capital II*, 864 F.3d at 625.  Thus, *First Hartford* does not permit plaintiffs to re-litigate here the identical statutory construction question resolved in *Perry Capital*—namely, that HERA contains no implied conflict-of-interest exception to its bar on derivative suits.[11]

---

[11]  Moreover, even if plaintiffs believe that, under Federal Circuit law, this Court would recognize an implied conflict-of-interest exception in HERA, the possibility of a different outcome in the second court is no obstacle to application of issue preclusion because the second court does not review the merits of the first court's rulings.  *See Consol. Edison of N.Y. v. Bodman*, 449 F.3d 1254, 1257 (D.C. Cir. 2006).  So long as the precluded party had a full and fair opportunity to litigate an issue in the first court, collateral estoppel prevents the party from relitigating the issue in the second court even if precedent in the second court would warrant a different result.  *See Yamaha Corp. of Am. v. United States*, 745 F. Supp. 734, 738 (D.D.C. 1990) ("party may not "take advantage of a split in the circuits if it loses in the first jurisdiction in which [it] makes its arguments"), *aff'd* 961 F.2d 245 (D.C. Cir. 1992); *see also Matter of Bouchard Trans. Co.*, No. 14 Civ. 1262, 2019 WL 1383067, at *9-10 (S.D.N.Y. Mar. 27, 2019) ("[C]ourts have applied collateral estoppel to bar re-litigation even in instances where the prior litigation was brought in a circuit with different controlling law.").  Thus, in this case, applying collateral estoppel would not require the Court to determine whether HERA contains an implied conflict-of-interest exception, only that plaintiffs had a full and fair opportunity to litigate the issue in *Perry Capital*, which they did, such that they may not relitigate the issue here.

Plaintiffs then argue that the Court should not apply issue preclusion where "superseding authority calls into question the prior decision." Omnibus Br. 33. But no such authority exists. Indeed, the D.C. Circuit affirmed the district court's ruling that HERA contains no conflict-of-interest exception to its bar on derivative suits. *See Perry Capital II*, 864 F.3d at 624-25. All other courts to have considered whether HERA contains an implied conflict-of-interest exception have ruled that it does not. *See Saxton*, 245 F. Supp. 3d at 1079, *aff'd*, 901 F.3d 954 (8th Cir. 2018); *Roberts*, 889 F.3d at 409-10. Quite simply, shareholders, including several plaintiffs here, chose to litigate in these other fora and they must now be bound by the rulings that they have obtained.

Indeed, plaintiffs misstate the law when they argue that courts "decline" to apply issue preclusion when the prior ruling is from a coordinate court, the issue is of "general interest," and "has not been resolved by the United States Supreme Court." Omnibus Br. 33. If plaintiffs are correct, then a narrow exception would swallow the rule because few cases reach the Supreme Court even if they concern issues of "general interest." But resolution of an issue by the highest court is no requirement for application of issue preclusion. In any event, the Supreme Court denied plaintiffs' petition for a writ of certiorari in *Perry Capital*. *See Perry Capital LLC v. Mnuchin*, 138 S. Ct. 978 (2018).

Finally, plaintiffs' argument that the shareholder-plaintiffs in *Perry Capital* lack privity with the shareholder-plaintiffs here is in direct conflict with two federal appellate court decisions. *See* Omnibus Br. 34. As plaintiffs acknowledge, *id.* at 34 n.11-12, the First Circuit has held that subsequent shareholders pursuing derivative claims were in privity with earlier shareholders who had pursued derivative claims in state court, notwithstanding that the state court claims were dismissed because the shareholders could not show that they could bring suit

on behalf of the corporation.  *In re Sonus Networks, Inc. S'holder Deriv. Litig.*, 499 F.3d 47, 64 (1st Cir. 2007).  The Ninth Circuit has similarly rejected a subsequent shareholder's attempt to avoid preclusion by arguing that "he was not in privity with the [earlier shareholder] plaintiffs because they failed to establish derivative standing," concluding that preclusion applied because the earlier shareholders "fully litigated the case through its dismissal . . . [and on] appeal" on behalf of all shareholders.  *Arduini v. Hart*, 774 F.3d 622, 633, 636 (9th Cir. 2014).  Plaintiffs cite no contrary authority and strain to provide any meaningful explanation why the reasoning outlined in *Sonus* and *Arduini* is inapplicable here.  *See* Omnibus Br. 34 n.11-12.  Indeed, given the number of shares the Enterprises had outstanding, plaintiffs' privity argument would essentially allow the plaintiffs to endlessly relitigate the same issues—an outcome directly opposed by the judicial-economy policies behind issue preclusion.  *See, e.g.*, *B & B Hardware v. Hargis Indus., Inc.*, 135 S. Ct. 1293, 1302-03 (2015).

Because shareholders have repeatedly litigated and lost the argument that HERA contains a conflict-of-interest exception, the Court should preclude plaintiffs from relitigating that argument in this case.

3.     The D.C. Circuit Held That Shareholders May Pursue Direct Contract Claims Against The Enterprises And FHFA As Conservator

Although plaintiffs acknowledge that the plain language of HERA's succession clause transfers shareholder rights to derivatively pursue Enterprise claims to FHFA as conservator, plaintiffs allege that that the Court should disregard the statutory text because it would not permit plaintiffs to "vindicate . . . constitutional and statutory policies" on the *Enterprises'* behalf. Omnibus Br. 22.  In making this argument, plaintiffs improperly conflate (1) their private-shareholder contract claims against the Enterprises with (2) the Enterprises' alleged claims against the Government.  Indeed, as we explained above, Enterprise shareholders, including the

34

*Fairholme* and *Arrowood* plaintiffs, as well as the *Cacciapalle* plaintiffs on behalf of a putative

class, are pursuing direct claims in district court where they have alleged breaches of the implied

covenant of good faith and fair dealing.  *See Fairholme DDC*, 2018 WL 4680197, at *7-14.

Thus, enforcing HERA's bar on derivative suits frustrates no constitutional or statutory policies

because plaintiffs retain their ability to assert those breach claims directly.

      Indeed, the policy that the Court must give effect to is the policy behind the succession

clause itself—by transferring to FHFA as conservator authority to vindicate any Enterprise

rights, Congress established a Federal policy that FHFA as conservator is the only entity that

may do so.

      Plaintiffs also invoke the statutory-construction canon of "constitutional avoidance,"

suggesting that the Court should "interpret" HERA to contain an implied conflict-of-interest

exception to avoid "serious constitutional concerns."  Omnibus Br. 29.  Although the canon of

constitutional avoidance "is a tool for choosing between competing plausible interpretations of a

provision," it has "no application" when, as in this case, the statute itself is unambiguous.

*McFadden v. United States*, 135 S. Ct. 2298, 2307 (2015).  Indeed, in a shareholder suit to

inspect Freddie Mac's records during conservatorship, the Eastern District of Virginia rejected a

shareholder's argument that enforcing the succession clause "poses a serious risk of implicating

the Fifth Amendment's Takings Clause."  *Pagliara v. Fed. Home Loan Mort. Co.*, 203 F. Supp.

3d 678, 688-89 (E.D. Va. 2016).  Because the Court identified no ambiguity in HERA, it had no

basis to resort to the canon of constitutional avoidance and, in any event, determined that

enforcement of the succession clause raised no constitutional concerns.  *Id.* at 688, 689 n.16.

Here, too, because the succession clause's transfer of shareholder power to bring derivative suits

to FHFA as conservator is unambiguous, the Court has no need to rely on the canon of constitutional avoidance.

Finally, plaintiffs argue that applying the succession clause to bar derivative suits would frustrate a separate Federal policy under HERA charging FHFA as conservator with an alleged common-law fiduciary duty to "the Companies and their shareholders."  Omnibus Br. 22. Plaintiffs cite no authority in support of this alleged policy because no such policy exists. Indeed, HERA's express terms could not be clearer to the contrary.  HERA authorizes FHFA to act in the best interests of the Enterprises or FHFA.  12 U.S.C. § 4617(b)(2)(J).  At no point does it require FHFA to act in the best interests of shareholders.

C.    Plaintiffs Identify No Other Exception That Would Provide Them With Standing To Assert Alleged Derivative Claims

The alleged conflict-of-interest exception discussed above is not, however, the only such exception that plaintiffs try to inject into HERA's succession clause.  In their search for permission to pursue derivative claims, plaintiffs assert that their derivative claims should proceed because: (1) they are simultaneously direct and derivative (dual-natured claims); (2) plaintiffs possess a "close relationship" with the Enterprises; and (3) the Third Amendment "targeted" plaintiffs.  None of these theories applies here.

1.    Plaintiffs Do Not Allege "Dual-Natured" Claims

In *Starr*, the Federal Circuit rejected the AIG shareholders' argument that their derivative claims fell into a narrow exception under Delaware law that permits a court to treat a derivative claim as both "derivative and direct in character."  *Starr Int'l Co.*, 856 F.3d at 968 (quoting *Gentile v. Rosette*, 906 A.2d 91, 99 (Del. 2006)).  The exception applies only when two criteria are met: (1) a controlling shareholder causes the corporation to issue "excessive" shares of its stock in exchange for assets of the controlling shareholder that have a lesser value; and (2) the

issuance of excessive shares dilutes the minority shareholders' voting power.  *See id.*; *see also El Paso Pipeline GP Co. LLC v. Brinckerhoff*, 152 A.3d 1248, 1264 (Del. 2016) (clarifying that the dual-natured exception does not apply in any other scenario).  Neither criterion is present here.

First, Treasury is not and never has been a controlling shareholder in the Enterprises.[12] But even if Treasury were a controlling shareholder, "the Third Amendment . . . did not involve the issuance of any new shares let alone 'excessive' shares."  *Edwards*, 2017 WL 1291994, at *7; *see also ACP Master, Ltd. v. Sprint Corp.*, No. 8508-VCL, 2017 WL 3421142, at *26 n.206 (Del. Ch. Aug. 8, 2017) (declining to apply *Gentile* exception because "no additional shares were issued"); *Caspian Select Credit Master Fund Ltd. v. Gohl*, No. 10244-VCN, 2015 WL 5718592, at *4 (Del. Ch. Sept. 28, 2015) (plaintiffs stated no dual-natured claim under *Gentile* because "[p]laintiffs do not challenge any stock issuance by [the company]").  Instead, plaintiffs challenge an amendment to the terms of Treasury's existing shares, not an issuance of new shares.  *See Robinson*, 876 F.3d at 234 ("The Third Amendment does not effectuate a new

---

[12]  A controlling stockholder either owns a majority of the corporation's voting shares, or it exercises "actual control" over the corporation's affairs.  *Starr Int'l Co. v. Fed. Reserve Bank*, 906 F. Supp. 2d 202, 219-25 (S.D.N.Y. 2012), *aff'd*, 742 F.3d 37 (2d Cir. 2014); *see also In re Newmont Mining Corp. Shareholders Litig.*, 535 A.2d 1334, 1344 (Del. 1987).  However, even "a significant shareholder, who exercises a duly-obtained contractual right that somehow limits or restricts the actions that a corporation otherwise would take, does not become, without more, a 'controlling shareholder' for that particular purpose."  *Superior Vision Servs., Inc. v. ReliaStar Life Ins. Co.*, No. 1668-N, 2006 WL 2521426, at *5 (Del. Ch. Aug. 25, 2006); *see also Starr Int'l Co.*, 906 F. Supp. 2d at 219-25.

Treasury is not and has never been a controlling stockholder in the Enterprises.  Its rights as a senior preferred stockholder are governed by the PSPAs, which provide no voting rights to Treasury.  Moreover, HERA's requirements that Treasury act to "protect the taxpayer," and consider the "need for preferences or priorities regarding payments to the Government," negates any suggestion that Treasury owed common-law fiduciary duties to Enterprises stockholders.  12 U.S.C. §§ 1455(*l*)(1)(B)(iii), (*l*)(1)(C)(i); 1719(g)(1)(B)(iii), (g)(1)(C)(i).

'purchase' of the Companies' securities"); *Perry Capital I*, 70 F. Supp. 3d at 224 ("Treasury did not purchase new securities under the Third Amendment").

Second, the Third Amendment did not involve the reallocation of voting power between stockholders, which is another essential element of dual-natured claims. *See Gentile*, 906 A.2d at 99-100; *El Paso Pipeline*, 152 A.3d at 1264-65 (holding that claims alleging an "expropriation of economic value to a controller" that was "not coupled with any voting rights dilution" to be "exclusively derivative")*.* Here, because Treasury had no shareholder voting rights in the first place, "the Third Amendment in no way affected the Treasury's or the Plaintiffs' [stockholders'] voting power"; thus, the dual-natured claims exception does not apply. *See Edwards*, 2017 WL 1291994, at *7 (declining to apply *Gentile* exception to lawsuit challenging Third Amendment); *see also Saxton*, 245 F. Supp. 3d at 1072-73 (dismissing derivative claims challenging the Third Amendment based on the "absen[ce] [of] additional allegations that [plaintiffs'] voting rights have been diluted").

Nonetheless, plaintiffs argue that the dual-nature exception applies because the Third Amendment allegedly "rearrang[ed]" the Enterprises' "capital structure to shift part of the corporation's ongoing value from one shareholder to another." Omnibus Br. 23. But the Enterprises' capital structures before and after the Third Amendment are identical. In any event, "the extraction of solely economic value from the minority [stockholders] by a controlling stockholder" alone would not constitute a dual-nature claim given that the complaints do not show voting-rights dilution resulting from the Third Amendment. *El Paso Pipeline*, 152 A.3d at 1264.

Moreover, the cases on which plaintiffs rely to support their "dual-nature" claim are outdated and inapplicable. *See* Omnibus Br. 23-24. Most significantly, all of them preceded

*Gentile* (decided in 2006), and *El Paso Pipeline* (decided in 2016), in which the Delaware

Supreme Court expressly refused to extend the *Gentile* exception to other fact patterns.  For

example, plaintiffs cite an unpublished Chancery Court decision, issued in 2005, to argue that

claims based on "misallocation of shares among competing stockholders" can be direct and not

exclusively derivative.  Omnibus Br. 23 (quoting *Deephaven Risk Arb Trading Ltd. v.*

*UnitedGlobalCom, Inc.*, No. 379-N, 2005 WL 1713067, at *8 n.4 (Del. Ch. July 13, 2005)).  But

that decision expressly relied upon *Gatz v. Ponsoldt,* No. 174-N, 2004 WL 3029868, at *8 (Del.

Ch. Nov. 5, 2004), a Delaware chancery court decision that was appealed and resulted in another

Delaware Supreme Court decision re-affirming that a dual-nature claim requires an improper

transfer of *both* economic value and voting power from the minority shareholders to the

controlling shareholder.  *See Gatz v. Ponsoldt,* 925 A.2d 1265, 1278 (Del. 2007); *see also*

*Feldman v. Cutaia*, 951 A.2d 727, 732 n.26 (Del. 2008) (describing *Gentile* and *Gatz* as cases

involving both a transfer of economic value and voting rights to a controlling stockholder).[13]

Plaintiffs also cite *RK Ventures*, a Ninth Circuit decision pre-dating not only *Gentile* but also

*Tooley*, the foundational case on distinguishing derivative and direct claims.  *See* Omnibus Br.

24 (citing *RK Ventures, Inc. v. City of Seattle*, 307 F.3d 1045, 1057 (9th Cir. 2002)).  Plaintiffs

cite no post-*Gentile* case law because none supports their position.

---

[13]   In support of this argument, plaintiffs cite *Maiz v. Virani*, 253 F.3d 641, 655-56 (11th
Cir. 2001), but in that case, the circuit court determined that, in the RICO context, the plaintiffs
had standing to allege direct injuries because the plaintiffs showed injuries unique to them
personally that arose before they formed any closely-held corporations.  The *Deephaven* decision
is also inapplicable, as it addressed whether to allow a plaintiff-stockholder to inspect the
company's books and records under Section 220 of the Delaware Code; in that context, the court
also addressed whether the plaintiff could have viable direct claims to assert in another case in
the future.  *See Deephaven*, 2005 WL 1713067, at *8.  Such unique circumstances are not
present here.

2.      Plaintiffs' "Targeting" Theory Fails

Plaintiffs also argue that even if their claims are derivative, plaintiffs may still pursue

those claims as direct because the Third Amendment allegedly "targeted shareholders directly."

Omnibus Br. 24.  Plaintiffs cite no case that supports a targeting theory and the Federal Circuit

expressly rejected AIG shareholders' similar theory in *Starr* as "untethered to reality."  *Starr*

*Int'l Co.*, 856 F.3d at 972 (citation omitted).  Importantly, the court observed that the plaintiff

failed to "explain why the Government's subjective motivations are relevant to the inquiry into

direct standing."  *Id*. at 973.

In *Pagan*, the First Circuit similarly rejected a corporate consultant's argument that he

possessed standing to assert a corporation's constitutional claim directly against Puerto Rico's

former Governor under the theory that the Governor harmed the bank by targeting the consultant

personally.  *See Pagan*, 448 F.3d at 30.  The court held that "the standing inquiry turns on the

plaintiff's injury, not the defendant's motive.  Thus, when a government actor discriminates

against a corporation based on a protected trait of a corporate agent, it is the corporation—and

only the corporation—that has standing to seek redress."  *Id.*  Plaintiffs provide no explanation as

to why their allegations about either Treasury's or FHFA's motivations to enter into the Third

Amendment should yield a different result here.

3.      Third-Party Standing Principles Do Not Permit Plaintiffs To Sue Directly
        For Alleged Enterprise Injuries

Plaintiffs also allege, under a third-party standing theory, that they are "the appropriate

parties to assert" the Enterprises' purported claims.  Omnibus Br. 23.  Although a plaintiff

typically has standing only to assert her own legal rights and interest, the Supreme Court has

recognized that a third party may have standing to assert the rights of another when: (1) "the

party asserting the right has a 'close' relationship with the person who possesses the right"; and

(2) "there is a 'hindrance' to the possessor's ability to protect his own interests." *Kowalski v. Tesmer*, 543 U.S. 125, 129-130 (2004). In *Kowalski*, the Supreme Court considered whether defense attorneys have a sufficiently close relationship with unidentified, indigent defendants to challenge a state statute denying appointment of appellate counsel to indigents who plead guilty. *Id.* at 127. Although the Court determined that an existing attorney-client relationship might provide an attorney with third-party standing to enforce the rights of her client, the *Kowalski* Court determined that such attorneys lacked third-party standing to challenge the statute because (1) they had no existing relationship with any affected indigents, and (2) sufficient avenues existed for indigents to challenge the statute on their own. *Id.* at 130-132; *see also Pagan*, 448 F.3d at 27-30 (rejecting shareholders' efforts to sue in their own name to vindicate a corporation's claims for alleged constitutional violations).

The *Kowalski* analysis simply does not track here because, by statute, FHFA as conservator is the appropriate party to assert any Enterprise claims. 12 U.S.C. § 4617(b)(2)(A). Plaintiffs' relationship with the Enterprises bears no resemblance to an attorney-client relationship and, in any event, plaintiffs' allegedly close relationship with the Enterprises is inconsistent with Congress's intent to transfer all Enterprise rights to FHFA as conservator. And plaintiffs fail to show that the conservatorships hinder the Enterprises from vindicating their rights. Indeed, FHFA has brought numerous suits to vindicate such rights. *See generally* https://go.usa.gov/xmNYB (describing recoveries obtained from private label securities actions initiated by FHFA on the Enterprises' behalf); *see also Fairholme* ¶ 101.

Although plaintiffs cite *Pagan* for the proposition that "the rule that a shareholder cannot sue in his own name for an injury sustained by the corporation is not ironclad," plaintiffs cite no basis for departing from that rule here. *See* Omnibus Br. 23; *Pagan*, 448 F.3d at 29 (rejecting

shareholder efforts to assert derivative claims as direct).  So, ironclad or not, the rule controls here.

III.  The Court Does Not Possess Jurisdiction To Entertain Plaintiffs' Alleged Direct Contract Claims Because There Is No Contract Between Plaintiffs And The United States

The Tucker Act limits this Court's contract jurisdiction to "claim[s] against the United States founded . . . upon any express or implied contract with the United States."  28 U.S.C. § 1491(a)(1).  The only relevant contracts to which the United States is a party are the PSPAs, signed by Treasury and FHFA on the Enterprises' behalf.  Plaintiffs are not parties to the PSPAs and those agreements expressly disclaim any intent to confer third-party beneficiary standing. *See* PSPA § 6.1.

A.  Plaintiffs Are Not Parties To Government Contracts

The omnibus response does not address our argument that the contract claims must be dismissed because, as the *Owl Creek* plaintiffs concede, no contract exists between plaintiffs and the United States.  *See* Owl Creek Br. 12.  Nonetheless, the *Rafter* plaintiffs continue to argue that the United States is a party to two separate contracts with plaintiffs that vest plaintiffs with rights to pursue breach claims in this Court: (1) a "Fannie Mae Contract" that comprises the stock certificate, Fannie Mae bylaws, charter, and Delaware corporate law; and (2) the Enterprises' statutory charters themselves.  Rafter Br. 7-10; *Rafter* ¶¶ 139-53.  More simply, the *Cacciapalle* plaintiffs argue that the Government breached their stock certificates.  Cacciapalle Br. 6-7; *Cacciapalle* ¶¶ 149-64.

Neither the purported Fannie Mae Contract nor the Enterprises' congressional charters, however, establish contractual privity between the *Rafter* plaintiffs and the United States.  And the *Cacciapalle* plaintiffs' stock certificates are only agreements between those plaintiffs and the

42

Enterprises—not the United States.  Thus, the Court lacks jurisdiction to entertain plaintiffs'

contract claims.

      1.    <u>The United States Is Not A Party To An Alleged "Fannie Mae Contract"</u>

The *Rafter* plaintiffs allege that Fannie Mae's "[c]harter, By-laws, and [Delaware

corporate law] . . . form an enforceable contract among Fannie, its directors, officers and

shareholders under Delaware law, which is applicable to Fannie under its By-laws."  Rafter Br.

8-9 (citing *Rafter* ¶ 141 (describing a purported Fannie Mae Contract)).  As the *Rafter* plaintiffs

acknowledge, the United States itself is not a party to the purported Fannie Mae Contract.  *Id.*

Although the *Rafter* plaintiffs argue that the Government succeeded to the purported Fannie Mae

Contract through the conservatorship, HERA states that only FHFA "as conservator" succeeds to

Enterprise contract rights.  12 U.S.C. § 4617(b)(2)(A).

      2.    The Enterprises' Congressional Charters Do Not Establish A Contractual
             <u>Relationship Between The United States And Enterprise Shareholders</u>

Plaintiffs' contention that the Enterprises' congressional charters establish a contractual

relationship between the United States and Enterprise shareholders is incorrect for at least two

reasons.  First, as we demonstrated in our moving brief, absent clear intent to the contrary, an act

of Congress—here, chartering the Enterprises—does not bind the United States in contract with

private parties.  U.S. Mot. 41 (quoting *Moda Health Plan, Inc. v. United States*, 892 F.3d 1311,

1329 (Fed. Cir. 2018)).  Plaintiffs identify no provision in the Enterprises' congressional charters

that reflects any intent by Congress to establish a contractual relationship between the United

States and the Enterprises' private stockholders.  *See generally* Fannie Mae Charter, *available at*

https://go.usa.gov/xm3p5; Freddie Mac Charter, *available at* https://go.usa.gov/xmNKh.

Second, "as a general principle of corporate law . . . a corporate charter is both a contract

between the corporation and the state and a contract between the corporation and its

stockholders." *See, e.g.*, *Ohio State Life Ins. Co. v. Clark*, 274 F.2d 771, 776 (6th Cir. 1960);

*STARR Surgical Co. v. Waggoner*, 588 A.2d 1130, 1136 (Del. 1991) ("[A] corporate charter is

both a contract between the State and the corporation, and the corporation and its shareholders");

*see also* 7A Fletcher Cyc. of the Law of Corp. § 3634 (perm. ed., rev. vol. 2014) (Nature and

Components of Charter).  Thus, a charter may reflect two separate contractual relationships

(corporation/government and corporation/stockholder), but they do not create a third contractual

relationship between the government and the stockholder.  Accordingly, the *Rafter* plaintiffs'

reliance on a statement in a 1977 Office of Legal Counsel opinion that Fannie Mae's charter

provides its shareholders with contractual rights with respect to the United States is misplaced.

*See* Rafter Br. 8-9 (citing 1 Op. Off. Legal Counsel 126, 129 (June 3, 1977)).  Although

plaintiffs' stock contracts incorporate the Enterprise charters, the charters themselves impose no

contractual obligations running from the United States to shareholders.  *See also Fairholme

DDC*, 2018 WL 4680197, at *8 (explaining that the evolving contract between the Enterprises

and their shareholders incorporates stock certificates, bylaws, certificates of designation, stock

certificates, and the statutory charter).  If the *Rafter* plaintiffs are correct that a corporate charter

constitutes a binding contract between the corporation's shareholders and the chartering

government, then every state government would be bound in contract to any stockholder in a

corporation chartered in that state.  The *Rafter* plaintiffs cite no authority for such a sweeping

assertion and offer no basis why these fundamental charter principles should be changed now.

      3.      The United States Is Not A Party To The *Cacciapalle* Plaintiffs' Stock
             Certificates

The *Cacciapalle* plaintiffs' stock certificates are contracts between them and the

Enterprises, not the United States.  *See* Cacciapalle Br. 6-8.  Indeed, the *Cacciapalle* plaintiffs

are pursuing a putative class action in district court against the Enterprises and FHFA as

conservator for alleged breaches of their Enterprise stock contracts.  *See* Second Am. Compl.
¶¶ 124-65, *In re Fannie Mae/Freddie Mac Senior Preferred Stock Purchase Agreement Class
Action Litig.*, No. 13-1288 (D.D.C. Feb. 1, 2018), ECF No. 71.

Although FHFA as conservator succeeded to the Enterprises' rights under the stock
certificates, as we demonstrated in our moving brief and above, FHFA as conservator stands in
the Enterprises' private shoes; the private stock certificates remain private while the Enterprises
are in conservatorship.  *See* U.S. Mot. 22-23; Section I, above.  The *Cacciapalle* plaintiffs cite no
authority for the proposition that FHFA's appointment as the Enterprises' conservator transforms
private stock certificates into Government contracts.  *See* Cacciapalle Br. 7.

Given the absence of contractual privity between the *Cacciapalle* plaintiffs and the
Government, the Court lacks jurisdiction to entertain breach claims against the United States that
are virtually identical to the breach claims the *Cacciapalle* plaintiffs asserted against the
Enterprises and FHFA as conservator in district court.  *Compare Cacciapalle* ¶¶ 149-64, *with*
Second Am. Compl. ¶¶ 124-65, *In re Fannie Mae/Freddie Mac Senior Preferred Stock Purchase
Agreement Class Action Litig.*, No. 13-1288 (D.D.C. Feb. 1, 2018), ECF No. 71.

B.    The *Owl Creek* Plaintiffs Were Not Third-Party Beneficiaries Of Any Purported
      Implied-In-Fact Contract Between The Government And The Enterprises

The Court should reject the *Owl Creek* plaintiffs' efforts to frame themselves as third-
party beneficiaries to a Government contract when, as here, no such contract provides them with
third-party beneficiary status.

In our moving brief, we demonstrated that shareholder status cannot confer third-party
beneficiary standing to enforce a contract between the Government and a contractor.  U.S. Mot.
42-43 (citing *Castle v. United States*, 301 F.3d 1328, 1338 (Fed. Cir. 2002)).  Indeed, the PSPAs,
which are the only contracts between the Enterprises and the Government, disclaim third-party

beneficiary status for individuals, such as shareholders.  *See* PSPA § 6.1.  More generally, corporate shareholders lack third-party beneficiary standing to enforce a contract between the Government and the corporation unless the "'contract . . . express[es] the intent of the promissor to benefit the shareholder, *personally, independent of his or her status as a shareholder.*'" *Castle*, 301 F.3d at 1338 (emphasis in original) (quoting *Glass v. United States*, 258 F.3d 1349, 1353-54 (Fed. Cir. 2001)).

Here, although the *Owl Creek* plaintiffs allege that they "are third-party beneficiaries" of an alleged implied-in-fact contract between the Government and the Enterprises to operate the conservatorships for shareholder benefit, Owl Creek Br. 34, absent from their complaints is any allegation reflecting a mutual intent to benefit the *Owl Creek* plaintiffs "personally."  *See Castle*, 301 F.3d at 1338.  Nor could they make such an allegation when none of the *Owl Creek* plaintiffs owned Enterprise stock at the time of the alleged implied-in-fact contract's formation.  *See* Owl Creek Br. 9 (alleging that the *Owl Creek* plaintiffs purchased Enterprise stock "after [FHFA] imposed the conservatorships but before it joined with Treasury to impose the Sweep Amendment").

Absent an allegation that the Government and the Enterprises' boards intended to benefit the *Owl Creek* plaintiffs personally—as opposed to shareholders in general—the *Owl Creek* plaintiffs cannot demonstrate third-party beneficiary standing to enforce a purported implied pre-conservatorship contract between the Enterprises and the Government.

C.     The Court Lacks Jurisdiction To "Reform" The PSPAs

The *Rafter* plaintiffs assert a derivative breach of contract claim requesting that the Court rewrite the PSPAs to the *Rafter* plaintiffs' satisfaction.  *Rafter* at Count IV.  Specifically, the *Rafter* plaintiffs allege that "[b]ecause the Third Amendment was unlawful, it is void" and thus

"[a]ll money paid . . . pursuant to the Third Amendment . . . should be returned to the Companies." *Id*. ¶ 136.  The *Rafter* plaintiffs thus seek "reformation of the PSPAs to excise the Third Amendment and restitution of funds paid to the United States under the Third Amendment." *Id*. ¶ 137.  Under HERA, the Court lacks jurisdiction to grant the requested equitable relief.

Section 4617(f) of HERA provides that "no court may take any action to restrain or affect the exercise of powers or functions of [FHFA] as a conservator."  12 U.S.C. § 4617(f).  This "plain statutory text draws a sharp line in the sand against litigative interference—through judicial injunctions, declaratory judgments, or other equitable relief—with FHFA's statutorily permitted actions as conservator."  *Perry Capital II*, 864 F.3d at 606.  Courts have consistently held that Section 4617(f) (and its materially-identical FDIC analog, 12 U.S.C. 1821(j)) bar *at the very least* claims for equitable and declaratory relief.  *See Saxton*, 901 F.3d at 957 (holding that Section 4617(f) bars all forms of equitable relief); *Perry Capital II*, 864 F.3d at 605 (same); *cf. Jacobs*, 908 F.3d at 895-96 (holding that Section 4617(f) also bars certain claims for money damages).  Because the *Rafter* plaintiffs' efforts to undo the Third Amendment by reforming the PSPAs "would restrain [FHFA's] powers," Section 4617(f) precludes the Court from granting such relief.  *Jacobs*, 908 F.3d at 894.

IV.     The Tucker Act Does Not Permit Plaintiffs To Pursue Claims That Sound In Tort

      A.     The Court Lacks Jurisdiction To Entertain Plaintiffs' Breach Of Fiduciary Duty Claims

As we demonstrated in our moving brief, unless a plaintiff can demonstrate a fiduciary duty arising from a money-mandating statute or contract, an alleged breach of fiduciary duty is a tort claim beyond this Court's jurisdiction.  U.S. Mot. 43 (citing *Spengler v. United States*, 127 Fed. Cl. 597, 600 (2016)).  This Court has typically entertained such claims only in the context

of Indian law where a "unique trust relationship [exists] between the United States and Native Americans." *Franklin Sav. Corp. v. United States*, 56 Fed. Cl. 720, 749 (2003); *see also United States v. Mitchell*, 463 U.S. 206, 225 (1983).

Plaintiffs contend that corporate stockholders share a unique trust relationship with the United States, similar to the trust relationship that Native Americans share with the United States, but they identify neither a contract provision nor a money-mandating law actually reflecting a fiduciary relationship. *See* Section IX.A, below; U.S. Mot. 43-44. Accordingly, the Court lacks jurisdiction over plaintiffs' breach of fiduciary duty claims.

B.     Plaintiffs Cannot Invoke The Court's Jurisdiction By Disguising A Tortious-Interference-With-Contract Claim As A Takings Claim

Pursuant to the Tucker Act, the Court lacks jurisdiction to decide tort claims. A plaintiff's characterization of its claim as a "taking" is irrelevant because "the Court must 'look to the true nature of the action' to determine whether jurisdiction exists." *See Taylor v. United States*, No. 18-1082, _ Fed. Cl. _, 2019 WL 1497132, at *3 (Fed. Cl. Apr. 5, 2019) (quoting *120 Delaware Ave. LLC v. United States*, 95 Fed. Cl. 627, 630 (2010)); *see also Golden Pac. Bancorp v. United States*, 15 F.3d 1066, 1069 n.8 (Fed. Cir. 1994). When, as in this case, a plaintiff alleges a factual scenario in which the Government intentionally interfered with performance of a private contract, the Court lacks jurisdiction because the claim sounds in tort. *See Taylor*, 2019 WL 1497132, at *4.

Although plaintiffs style their allegations as a takings claim, the underlying factual allegations reflect a claim for tortious interference with contract. *See Rafter* ¶ 151 (alleging that the Third Amendment "violat[ed] common shareholders' contractual rights"). In essence, plaintiffs allege that through various forms of misconduct—*e.g.*, collusion, coercion, self-dealing—FHFA and Treasury tortiously induced the Enterprises to breach plaintiffs' stock

contracts by preventing the Enterprises from accumulating capital for shareholder benefit. *Cacciapalle* ¶ 13; *Owl Creek* ¶ 115; *see also* Cacciapalle Br. 7-8.  The complaints contain no allegation that the Government took plaintiffs' stock contracts themselves; rather, they contend that FHFA as conservator interfered with the Enterprises' performance of those stock contracts. *Fairholme* ¶¶ 117, 120; *see Taylor*, 2019 WL 1497132, at *4 (quoting *Cienega Gardens v. United States*, 331 F.3d 1319, 1365-66 (Fed. Cir. 2003)).  Because such allegations reflect that plaintiffs' claims are for tortious interference with contract, not takings of property redressable through the Takings Clause, the claims lay beyond the Court's jurisdiction.

## V.     Shareholders Who Purchased Enterprise Stock After The Third Amendment Lack Standing To Pursue Their Takings Claims

The Court should conclude that plaintiffs who did not own Enterprise stock at the time of the Third Amendment lack standing to assert claims that the Third Amendment somehow defeated expectations in their yet-to-be acquired stock.  U.S. Mot. 46-48 (citing *Maniere v. United States*, 31 Fed. Cl. 410, 420-21 (1994)).[14]

In *Maniere*, the Court considered whether a bank shareholder who purchased his stock after Congress enacted FIRREA had standing to pursue a claim that FIRREA's prohibition on goodwill amortization, which resulted in the bank's insolvency, constituted a taking of his stock. *See Maniere*, 31 Fed. Cl. at 412.  The Court determined that, to show standing, a plaintiff must own the relevant property at the time of the alleged taking.  *See id.* at 420 (citations omitted). Because the alleged taking—implementing FIRREA—occurred before the plaintiff acquired his stock, the *Maniere* court determined that the plaintiff had no standing to pursue the takings claim.  *Id.* at 421.

---

[14]   The *Arrowood* plaintiffs agree that only pre-Third Amendment stockholders who owned stock as of August 17, 2012, have standing to bring direct claims.  Arrowood Br. 4-7.

*Maniere* applies here.  Either plaintiffs owned Enterprise stock at the time of the Third Amendment, or they did not.  Those plaintiffs that purchased Enterprise stock after the Third Amendment made those purchases fully aware that the Third Amendment prevented the Enterprises from accumulating capital for shareholder benefit.  Accordingly, those plaintiffs have no standing to allege that the Government took their property.  Moreover, plaintiffs' characterization of each dividend payment as a separate taking does not provide them standing to pursue a takings claim because the dividend arrangement pursuant to which the Enterprises make those payments was in place as of August 17, 2012.  *See Maniere*, 31 Fed. Cl. at 421.[15]

Given that plaintiffs can identify no case in which a Court permitted a plaintiff to pursue a claim that Government action took intangible property that the plaintiff acquired *after* the Government action occurred, plaintiffs here cite general propositions that the Takings Clause applies to intangible property and that takings claims typically require a fact-specific analysis.  *See* Omnibus Br. 35-40.  Those propositions are beside the point and fail to demonstrate that plaintiffs who purchased Enterprise stock after August 17, 2012 have standing to pursue a takings claim.[16]

---

[15]  Plaintiffs cite the Federal Circuit's decisions in *Hatter* and *Burich* for the proposition that "each payment under the Net Worth Sweep constitutes another taking," Omnibus Br. 38 n.14, but neither case involved a takings claim.  Both cases considered the applicability of the "continuing claims" doctrine for statute-of-limitations purposes.  *See Hatter v. United States*, 203 F.3d 795, 799-800 (Fed. Cir. 2000); *Burich v. United States*, 366 F.2d 985, 986-88 (Ct. Cl. 1966).

[16]  Although the *Rafter* plaintiffs argue that rights and liabilities associated with stock transfer to successive holders under Delaware law, that principle applies to breach of contract claims, not takings claims.  *Compare Fairholme DDC*, 2018 WL 4680197, at *8 (post-breach stock purchaser may pursue breach of contract claim), *with Maniere*, 31 Fed. Cl. at 421 (post-regulation stock purchaser lacks standing to allege that regulation constituted a taking).

As plaintiffs acknowledge, reliance on cases involving real property or physical seizures have limited utility in connection with claims, such as those here, involving alleged regulatory takings of intangible property.  *See* Omnibus Br. 36-37.  At the same time, the only cases plaintiffs have identified in which the Court has even entertained a post-regulation purchaser's standing to pursue a takings claim involved real property.  *See id.* at 35-36 (citing, among others, *Bailey v. United States*, 78 Fed. Cl. 239, 272-75 (2007); *Palazzolo v. Rhode Island*, 533 U.S. 606, 630 (2001)).  Although plaintiffs quote *Bailey* for the proposition that "any owner" of real, personal, or intangible property "should be compensated for the interest taken" "while the restriction continues," plaintiffs themselves acknowledge that the "*Bailey* court limited its holding to regulatory takings involving real property."  *Id.* at 37-38 (quoting *Bailey*, 78 Fed. Cl. at 273); *id.* at 38 n.13.  Plaintiffs identify no authority extending *Bailey*'s reach to intangible property.

Moreover, *Palazzolo*, on which *Bailey* relies, involved a scenario in which the property owner before and after the alleged taking was effectively the same—title simply transferred from a closely-held corporation to its sole corporate shareholder after the state revoked the corporation's charter.  *See Palazzolo*, 533 U.S. at 626-28.  *Palazzolo* cannot be read to set up a market for takings claims, where buyers and sellers of property can transfer standing to pursue alleged constitutional rights as some of the plaintiffs seek to do here.  Indeed, such transfers raise enormous concerns regarding the possibility of double recoveries between the former and present property holders.

Plaintiffs also argue that the Court need not dismiss a plaintiff who lacks standing so long as another plaintiff has it.  *See* Omnibus Br. 35 (citing *Rumsfeld v. FAIR*, 547 U.S. 47 (2006)).  But plaintiffs cite no case in which a court has permitted a plaintiff who lacked standing to seek

money damages for herself simply because another plaintiff in the case had standing to seek damages for her own injury. In *FAIR*, the Supreme Court simply acknowledged, in a footnote, that, for purposes of analyzing a suit to enjoin a statute of universal application, it could reach the merits because one of the plaintiffs had standing. *See FAIR*, 547 U.S. at 52 n.2. Here, plaintiffs seek individual awards of money damages. The Court should not waste its own resources or the parties' resources by permitting a plaintiff to pursue a takings claim when the plaintiff will never be able to establish an entitlement to money damages.

VI.   Under 28 U.S.C. § 1500, The Court Lacks Jurisdiction To Entertain The *Fairholme*, *Cacciapalle*, and *Arrowood* Complaints

As we acknowledged in our motion to dismiss, pursuant to the Federal Circuit's current interpretation of 28 U.S.C. § 1500, the statute does not divest this Court of jurisdiction over the *Fairholme*, *Cacciapalle*, and *Arrowood* complaints because they were filed in this Court before those same plaintiffs filed suits challenging the Third Amendment in district court. *See* U.S. Mot. 48-50. However, because the order-of-filing rule is inconsistent with the language and spirit of Section 1500, and the Supreme Court has not affirmed the Federal Circuit's interpretation, we preserve this argument for appeal.

VII.   Plaintiffs Fail To State A Plausible Takings Claim

As we explained in our moving brief, to state a plausible takings claim, a plaintiff must acknowledge the legality of the government action. *See* U.S. Mot. 68-69. Although plaintiffs contend that they may plead in the alternative both a legal taking and an illegal exaction, *see* Omnibus Br. 43, the problem goes much deeper because plaintiffs contend that FHFA as conservator acted at Treasury's behest such that the Court may attribute FHFA's decisions to the United States. However, if Treasury truly controlled FHFA, then Treasury's conduct was *ultra vires* because HERA provides that FHFA "[w]hen acting as conservator . . . shall not be subject

to the direction or supervision of any other agency of the United States[.]"  12 U.S.C.

§ 4617(a)(7).  Plaintiffs may not state a takings claim based on *ultra vires* conduct.  *See Rith*

*Energy, Inc. v. United* States, 247 F.3d 1355, 1366 (Fed. Cir. 2001); *cf. Del-Rio Drilling*

*Programs Inc. v. United* States, 146 F.3d 1358, 1362 (Fed. Cir. 1998) (holding that *ultra vires*

conduct by a government official cannot support a takings claim).  Thus, if the Court agrees with

plaintiffs that FHFA acted at Treasury's behest in violation of 12 U.S.C. § 4617(a)(7), then

plaintiffs state no plausible takings claim because the Third Amendment was *ultra vires*.  On the

other hand, if the Court determines that FHFA executed the Third Amendment independently in

its conservator capacity, then plaintiffs cannot attribute FHFA's actions to the United States.

Either scenario requires dismissal of plaintiffs' takings claims.

A.     Plaintiffs Cannot State A Claim For A Taking Of Their Contract Rights When
       They Retain Their Right To Seek Money Damages From The Enterprises

As plaintiffs concede, their alleged property rights are entirely contractual.  Omnibus Br.

44.  Thus, however plaintiffs characterize these rights—as "economic interests" in dividends,

liquidation preferences, or rights to "participate in the [Enterprises'] income stream and residual

value"—those alleged rights arise solely from plaintiffs' acquisition of Enterprise stock.

Omnibus Br. 44; *see also* Owl Creek Br. 42-43.

As we demonstrated in our motion to dismiss, a plaintiff has no claim for a taking of

contract rights when, as in this case, the Government allegedly frustrates a contract through

lawful regulatory action, but does not actually assume the contract itself.  U.S. Mot. 55-58 (citing

cases); *see also Huntleigh USA Corp. v. United States*, 525 F.3d 1370, 1379 (Fed. Cir. 2008)

(holding that a plaintiff failed to establish a taking where it "conceded that the government did

not actually assume its contracts"); *Taylor*, 2019 WL 1497132, at *6 (to state a claim for a taking

of a contract, the plaintiff must plausibly allege that the Government assumed the contract for

itself).  The underlying rationale behind this rule is that a contract provides a party with either a

right to performance *or* a right to seek damages.  *See Piszel*, 833 F.3d at 1377 (quoting *FTC v.*

*Think Achievement Corp.*, 312 F.3d 259, 261 (7th Cir. 2002)); *see also Castle*, 301 F.3d at 1342.

So long as a plaintiff retains its right to seek contract damages, the United States is not liable

under the Takings Clause even if Government action frustrates that contract's performance.

This long-standing rule arises from the Supreme Court's decision in *Omnia Commercial*

*Co. v. United States*, 261 U.S. 502 (1923).  In *Omnia*, the Government requisitioned the

Allegheny Steel Company's (Allegheny) entire production of steel plate for a year and

specifically directed Allegheny to breach its contract with a steel purchaser (Omnia).  Although

the Government's actions left Omnia without a steel supply, the Supreme Court held that Omnia

had no takings claim against the United States because Omnia's contract with Allegheny "was

not appropriated, but ended."  *Id.* at 438.  Thus, even though "the government's action was

specifically directed at Omnia, the . . . destruction of [Omnia's] contract did not constitute a

compensable taking."  *Palmyra Pac. Seafoods, L.L.C. v. United States*, 561 F.3d 1361, 1369

(Fed. Cir. 2009).

In *Piszel*, the Federal Circuit recently reached a similar conclusion when it determined

that the plaintiff failed to state a takings claim based on allegations that FHFA as regulator

frustrated contract performance because the plaintiff retained his right to sue for contract

damages.  *See Piszel*, 833 F.3d at 1377.  The plaintiff in *Piszel* was Freddie Mac's former Chief

Financial Officer (Mr. Piszel).  When Freddie Mac hired Mr. Piszel in November 2006, he

signed an employment contract in which Freddie Mac promised specified severance benefits if it

terminated Mr. Piszel without cause.  Indeed, FHFA's predecessor agency approved the

severance terms in Mr. Piszel's contract.  In September 2008, however, after Freddie Mac's

placement into conservatorship, FHFA directed Freddie Mac to terminate Mr. Piszel without payment of his contractual severance benefits. *Id.* at 1370-72. Several years later, Mr. Piszel sued the United States in this Court alleging that FHFA's instruction that Freddie Mac disavow Mr. Piszel's employment contract constituted a taking of his contractual severance benefits. This Court dismissed Mr. Piszel's suit and the Federal Circuit affirmed.

The Federal Circuit concluded that even if HERA authorized FHFA to direct Freddie Mac to refuse payment of Mr. Piszel's severance benefits, HERA also expressly preserved Mr. Piszel's right (and any Enterprise contractor's right) to pursue a breach of contract claim against the Enterprises. *See id.* at 1370 (citing 12 U.S.C. § 4617(d)(1) (specifying that FHFA may "disaffirm or repudiate" an Enterprise contract, after which the contractor may seek "actual direct compensatory damages")). Thus, because Mr. Piszel possessed his contractual right to pursue a state-law breach claim against Freddie Mac, FHFA's instruction to Freddie Mac "did not take anything from Mr. Piszel because, even after the government's action, Mr. Piszel was left with the right to enforce his contract against Freddie Mac in a breach of contract action." *Id.* at 1377.

The Federal Circuit's reasoning in *Piszel* compels dismissal of plaintiffs' takings claims in this case. Like Mr. Piszel, plaintiffs allege that, through FHFA's statutory authority, the Government took rights that plaintiffs acquired in contracts with the Enterprises. And like Mr. Piszel, plaintiffs allege that Government conduct targeted them and frustrated their contract rights. But just as Congress preserved Mr. Piszel's right to seek "actual direct compensatory damages" from Freddie Mac, Congress preserved shareholders' rights to seek contract damages against the Enterprises, too. *See* 12 U.S.C. § 4617(d)(1). Thus, like Mr. Piszel, because plaintiffs retain their right to pursue contract damages against the Enterprises (and FHFA as

conservator), plaintiffs cannot state a takings claim against the United States for allegedly frustrating plaintiffs' right to performance under their stock contracts.

Indeed, that several plaintiffs in this Court, including a class of Enterprise shareholders, are pursuing claims for contract damages against the Enterprises and FHFA as their conservator in the United States District Court for the District of Columbia exemplifies this point. In *Perry Capital II*, the D.C. Circuit ruled that plaintiffs' claims "that the Companies breached contractual duties owed to the class plaintiffs by virtue of their stock certificates" were direct claims. *See Perry Capital II*, 864 F.3d at 628. And on remand, the district court determined that plaintiffs stated a claim for breach of the implied covenant of good faith and fair dealing based on plaintiffs' allegations that they "could not reasonably expect that the [Enterprises] themselves— through the FHFA—would give away all of Plaintiffs' residual rights to dividends and liquidation surplus[.]" *See Fairholme DDC*, 2018 WL 4680197, at *12. Discovery is continuing in district court. And although we believe that the plaintiffs' district court claims lack merit, that litigation offers shareholders their day in court to prove up those claims.[17]

We devoted several pages of our moving brief to *Omnia*, *Piszel*, and other cases in which courts dismissed takings claims alleging that the United States had frustrated performance of private contracts, yet plaintiffs offer no meaningful response. Instead, they incorrectly assert that

---

[17] Plaintiffs concede the "close relationship" between their contract claims in district court and the alleged takings claim in this Court. To that end, plaintiffs' warning that the Government could expose it to double liability—in contract to stock buyers and then as a taking to stock sellers—illustrates *Piszel's* underlying point as to why plaintiffs' takings claims are invalid. *See* Omnibus Br. 41. When a plaintiff maintains its ability to vindicate its private, contractual rights in a breach of contract suit against its contracting counter-party, that same plaintiff cannot simultaneously state a takings claim against the United States to vindicate those same contractual rights. Thus, neither the stock seller nor the purchaser have a takings claim against the United States. The seller sold its contractual right to pursue a contract remedy against the Enterprises when it sold the stock; the buyer purchased that right.

*Piszel* is inapposite because Mr. Piszel "alleged a taking resulting from a statute and regulation that barred payment of his 'golden parachute' compensation upon termination," not that the Government "divert[ed] the unpaid compensation payments to itself." Omnibus Br. 49 n.20. But any factual distinction in the *mechanisms* by which the Government allegedly frustrated performance is without a legal difference. *See, e.g.*, *Omnia Com. Co.*, 261 U.S. at 507 (specific instruction to steel producer not to comply with private contract); *Huntleigh USA Corp.*, 525 F.3d at 1378-79 (enactment of statute transferring airport screening functions to the Government frustrated private contractor's performance of screening functions); *Taylor*, 2019 WL 1497132, at *2 (plaintiff alleged that developer cancelled contract to construct wind energy farm after Government provided developer with an "informal indication" that it would not provide regulatory approval).

Plaintiffs also argue that *Omnia* and similar cases are inapposite because the Third Amendment's impact on plaintiffs' rights was not "unintended or collateral" and, in any event, the "Government did appropriate Plaintiffs' contractual rights for itself, satisfying the rule of *Omnia* even if it did apply." Omnibus Br. 49-50 (citing *A & D Auto Sales*, 748 F.3d at 1153-57); Owl Creek Br. 49. Here, plaintiffs misconstrue the "unintended or collateral" language they cite from *A & D Auto Sales*. In *Palmyra Pacific Seafood*, the Federal Circuit clarified the distinction between an alleged taking of the contract itself (direct), and an alleged taking of the "subject matter of a contract" (collateral); although the former may support a takings claim, the latter does not. *Compare Palmyra Pac. Seafoods*, 561 F.3d at 1365-66 (citing *Brooks-Scanlon Corp. v. United States*, 265 U.S. 106, 120 (1924)), *with* Owl Creek Br. 49. Thus, in *A & D Auto Sales*, the Federal Circuit explained that, in *Omnia*, the Government's requisition of Allegheny's steel imposed only unintended or collateral effects on Omnia, even though the Government

specifically instructed Allegheny *not* to comply with Omnia's contract.  *See A & D Auto Sales*,
748 F.3d at 1153 (quoting *Omnia Com. Co.*, 261 U.S. at 507); *see also Piszel*, 833 F.3d at 1371
(FHFA specifically instructed Freddie Mac to terminate Mr. Piszel and deny his severance
benefits).  The actions that plaintiffs challenge here—either the imposition of the
conservatorships or the renegotiation of the PSPA dividend provision reflected in the Third
Amendment—were no less "indirect" than the actions in *Omnia* or *Piszel* where the Government
specifically instructed an entity not to honor its contract with the plaintiff.

Here, plaintiffs allege that the Government took portions of the subject matter of
plaintiffs' stock contracts—"the value of increases in equity, to dividends reasonably paid, and to
any liquidation surplus"—but not the contracts themselves.  Omnibus Br. 45.  Because plaintiffs
retain their rights to seek contract damages against the Enterprises, plaintiffs cannot state a
plausible takings claim against the United States.

B.    <u>Plaintiffs Fail To Allege A Cognizable Property Right Under The Takings Clause</u>

Putting aside that *Omnia* and *Piszel* defeat the fundamental legal theory underlying
plaintiffs' takings claims, as we demonstrated in our motion to dismiss and above, those claims
also fail under any regulatory takings analysis because plaintiffs do not plausibly allege the
essential liability elements: (1) a property right; and (2) Government action that amounted to a
compensable taking.  *See* U.S. Mot. 51-55, 59-68; *see also Huntleigh USA Corp.*, 525 F.3d at
1377-78.

1.    Because Plaintiffs Cannot Exclude The Government From The
Enterprises Or Their Assets, Plaintiffs Do Not Allege A Compensable
<u>Property Right</u>

Plaintiffs' expectations that they would receive Enterprise dividends or payment upon the
Enterprises' liquidation are not cognizable property rights under the Takings Clause.  As

Enterprise shareholders, plaintiffs acquired and held their stock with the knowledge that FHFA

(or its predecessor, OFHEO) had the authority to place the Enterprises into conservatorship and,

as conservator, take over and manage Enterprise assets.  12 U.S.C. § 4617(b)(2)(A)(i),

(b)(2)(B)(i), (b)(2)(J); *see also* 12 U.S.C. § 4620, *repealed by* HERA, Pub. L. 110-289, Div. A,

tit. 1, § 1145 (2008).  Under HERA, Congress permitted Treasury to invest in Enterprise

securities to "protect the taxpayer," and instructed it to consider the need for "preferences or

payments to the Government."  12 U.S.C. §§ 1455(*l*)(1)(B)(iii), (*l*)(1)(C)(i); 1719(g)(1)(B)(iii),

(g)(1)(C)(i).  The existence of these powers necessarily limited plaintiffs' rights as shareholders,

and prevents them from asserting a legally cognizable property interest in the Enterprises' profits

in conservatorship.  *See Perry Capital I*, 70 F. Supp. 3d at 241 n. 50 ("the shareholders lose their

cognizable property interest [when the GSEs are] in conservatorship") (citation omitted).

 As we demonstrated in our moving brief, shareholders in highly-regulated entities, such

as the Enterprises, lack any property interest cognizable under the Takings Clause in shares of

entities that are in conservatorship or receivership, because the laws authorizing conservatorship

and receivership actions inhere in the entities' stock.  *See* U.S. Mot. 51-52 (citing *Golden Pac.*

*Bancorp*, 15 F.3d at 1073-74; *Cal. Hous. Sec., Inc. v. United States*, 959 F.2d 955, 957 (Fed. Cir.

1992)).  The rationale behind this rule is that regulated entities lack "the fundamental right to

exclude the government from [their] property;" therefore, shareholders in those entities "held

less than the full bundle of property rights."  *See Golden Pac. Bancorp*, 15 F.3d at 1073-74

(internal quotation omitted).

 Thus, as an initial matter, FHFA's power to place the Enterprises into conservatorship

necessarily demonstrates that the *Washington Federal* plaintiffs have no compensable property

right sufficient to state a takings claim based on the imposition of the conservatorships

themselves.  *See* Wash. Fed. Br. 25-28.  Like the regulators in *Golden Pacific* and *California Housing Securities*, FHFA possessed and exercised the statutory power to place the Enterprises into conservatorship.  Moreover, HERA granted the Enterprises a statutory right to challenge the imposition of the conservatorship—*i.e.*, to exclude the Government—within 30 days after conservator appointment if the statutory conditions were unsatisfied.  *See* 12 U.S.C. § 4617(a)(5).  The Enterprises did not avail themselves of that remedy.  *See* Section XI, below.

With respect to plaintiffs' Third Amendment claims, plaintiffs' alleged property rights stemming from the Enterprises' retention of capital conflict with the statutory scheme in which the Enterprises operate.  Seeking to distinguish *Golden Pacific* and *California Housing Securities*, plaintiffs argue that the underlying statutory scheme in those cases is only like HERA in that it granted regulators authority to place the banks into conservatorship; plaintiffs, however, read HERA too narrowly.  *See* Omnibus Br. 47; Owl Creek Br. 46.  In HERA, Congress not only granted FHFA the right to place the Enterprises into conservatorship, it vested FHFA as conservator with authority to take over the Enterprises' assets, and manage those assets in the best interests of the Enterprises or FHFA.  12 U.S.C. § 4617(b)(2)(A)(i), (b)(2)(B), (b)(2)(J).  Further, Congress amended the Enterprises' charters to grant Treasury authority to purchase Enterprise securities, and then exercise any rights it obtained through those purchases, which include the right to renegotiate the dividend terms.  12 U.S.C. §§ 1455(*l*)(2)(A); 1719(g)(2)(A); PSPA § 6.3.  Thus, plaintiffs' assertion that "nothing in the regulatory background" placed plaintiffs on notice that FHFA as conservator and Treasury could renegotiate the dividend terms in the PSPAs is contradicted by HERA itself.  *See* Omnibus Br. 48.

Although plaintiffs would have preferred that FHFA as conservator permitted the Enterprises to accumulate capital for shareholder benefit rather than renegotiate the terms of

Treasury's $450 billion commitment, Congress vested FHFA as conservator with authority to make such business decisions.  Accordingly, plaintiffs allege no cognizable property right in the Enterprises' assets when neither plaintiffs nor the Enterprises themselves possessed the right to exclude FHFA from controlling those assets during conservatorship.

Moreover, plaintiffs have no cognizable property right to Enterprise dividend payments. A corporation's profits belong to the corporation; they do not pass to shareholders unless the board declares a dividend.  *See, e.g.*, *Gibbons v. Mahon,* 136 U.S. 549, 557 (1890); *Perry Capital II*, 864 F.3d at 629 (shareholders "have no enforceable right to dividends because the certificates accord the Companies complete discretion to declare or withhold dividends"); *Broad v. Sealaska Corp.*, 85 F.3d 422, 430 (9th Cir. 1996) (shareholders have no compensable property interest in dividends unless declared by board).  This principle demonstrates the inapplicability of cases in which courts have recognized takings of a trust-account holder's interest because, unlike corporate profits, the interest belongs to the account holder.  For instance, plaintiffs analogize this case to *Brown v. Legal Foundation of Washington*, 538 U.S. 216 (2003), which they describe as holding that a state-imposed rule "requiring interest on [certain] trust accounts to be paid to the Government and not to the private owners of the underlying funds" effected a *per se* taking. Omnibus Br. 48; *see also* Owl Creek Br. 47-48.  But plaintiffs' analogy ignores a dispositive distinction: the *Brown* plaintiffs were the "owners of the underlying funds," while in this case, plaintiffs are mere shareholders.  As shareholders, plaintiffs have no ownership interest in funds invested in (or earned by) the Enterprises, or in the Enterprises' equity.  Thus, *Brown* lends no support to plaintiffs' argument that their "economic interests" in the Enterprises' residual value is a cognizable property right under the Takings Clause.

Similarly, while the Enterprises are in conservatorship, plaintiffs have no property right to a distribution of a liquidation surplus. Any surplus that could be distributed upon liquidation belongs to the corporation, not the shareholder, at least until the imposition of a receivership— which has not happened here. Plaintiffs argue that a "shareholder's direct interest in a liquidation surplus is a cognizable property interest the taking of which by the federal government gives rise to standing to sue." *See* Omnibus Br. 45 (citing *First Hartford*, 194 F.3d at 1283); *see also* Owl Creek Br. 46. But *First Hartford* involved an actual receivership, which was a prerequisite to the legal recognition of shareholders' statutory distribution rights. Indeed, in *First Hartford*, the shareholder's "direct interest in a liquidation surplus" was only cognizable "provided that a liquidation was underway that could create a surplus thereby triggering a shareholder distribution[.]" *First Hartford*, 194 F.3d at 1288. The statutory receivership priority scheme at issue in *First Hartford* has no analogue in the conservatorship context. *See* 12 U.S.C. § 4617(c)(1) (describing priority of unsecured claims "proven to the satisfaction of the receiver").

Finally, plaintiffs reach the slippery slope, arguing that if their claims are not allowed, the Government could "take the rights" of "all shareholders in any and all of the Nation's banks and other financial institutions." Omnibus Br. 45. But Congress defines the scope of the Government's powers to place an entity into statutory conservatorship and receivership, and defines the scope of the conservator's and receiver's powers. Accordingly, in *Perry Capital I*, the district court rejected the same "alarmist assertion" as unfounded. *See Perry Capital I*, 70 F. Supp. 3d at 242 n.51.

2.     The *Cacciapalle* Plaintiffs Have No Protected Property Interest Either In Standing To Bring Derivative Suits Or In Equitable Relief

In addition, the *Cacciapalle* plaintiffs' alleged equitable "rights" in standing to bring a derivative suit or an action seeking equitable relief do not comprise compensable property interests under the Takings Clause because no person has a vested interest in any rule of law. *See Branch v. United States*, 69 F.3d 1571, 1577-78 (Fed. Cir. 1995) ("As a general matter, a legislature is free to make statutory changes in the common law rules of liability without running afoul of the Fifth or Fourteenth Amendment protections of property.").

The *Cacciapalle* plaintiffs argue that a "cause of action constitutes a property right protected by the Takings Clause," Cacciapalle Br. 2-5, but neither a derivative suit nor a suit seeking equitable relief *on its own* constitutes a cause of action.  A derivative suit merely provides a shareholder with *standing* to enforce a corporation's right when the corporation will not do so for itself.  *See Smith v. United States*, 58 Fed. Cl. 374, 388 (2003).  Similarly, equitable relief is an "effect," not an underlying right.  *See Jacobs*, 908 F.3d at 895.  Thus, the erroneous premise underlying the *Cacciapalle* plaintiffs' argument is that they possess a constitutionally-protected property interest in a particular procedure to enforce a claim.  The Takings Clause does not extend so far.

As we demonstrated in our moving brief, the Constitution does not treat a shareholder's power to bring a derivative suit as a property interest, primarily because the underlying claim belongs to the corporation, not the shareholder.  *See* U.S. Mot. 54 (citing *Beneficial Loan Indus. Corp. v. Smith*, 170 F.2d 44, 58 (3d Cir. 1948)); *see also McIlvaine v. City Nat'l Bank & Trust of Chicago*, 42 N.E.2d 93, 102 (Ill. App. 1942).  Indeed, in *McIlvaine*, the court rejected a shareholder's claim that the statutory transfer of a bank's claim to a receiver deprived him of an alleged constitutional right to bring a derivative suit.  *See McIlvaine*, 42 N.E.2d at 102.  Because

the shareholder "never had title to the [bank's] alleged cause of action" in the first place, the court held that he had "no vested right in any remedial procedure to enforce the cause of action[.]"  *Id.*

In response, the *Cacciapalle* plaintiffs cite a Delaware case, *Quadrant Structured Products Corp. v. Vertin*, for the proposition that the "right to bring a claim for breach of fiduciary duty, *including derivatively*, is a property right associated with a share of stock and freely assignable."  Cacciapalle Br. 3 (italics in original) (quoting *Quadrant Structured Prods. Corp. v. Vertin*, 102 A.3d 155, 179 (Del. Ch. 2014)).  They reason that, if property rights are informed by state law, then the Court must recognize standing to bring derivative suits as a constitutionally-protected right.  But state law also recognizes that state governments may impose limitations on shareholder standing to bring derivative suits.  Indeed, in *Quadrant*, the Delaware Chancery Court enforced a statutory limitation on a stockholder's right to assert a derivative claim that arose before he acquired the corporation's stock.  *See Quadrant Structured Prods. Corp.*, 102 A.3d at 180.  In *Beneficial* and *McIlvaine*, the courts determined that such limitations implicated no constitutional right.  *See Beneficial Loan*, 170 F.2d at 58; *McIlvaine*, 42 N.E.2d at 102

Moreover, the *Cacciapalle* plaintiffs have no property right in equitable relief against either the Enterprises or FHFA as conservator.  As we explained in our moving brief, the dominant view among appellate courts is that a plaintiff lacks a compensable property right in a claim absent a final judgment.  *See* U.S. Mot. 54-55 (citing cases).  Although the Federal Circuit has treated claims for money damages as property rights for analytical purposes, plaintiffs cite no Federal Circuit case in which the Court determined that the Government was actually liable for taking a claim unsecured by a final judgment.  Thus, just as the *Cacciapalle* plaintiffs have no

constitutionally-protected property right in a derivative suit, they have no such property right in equitable relief either.  *See Branch*, 69 F.3d at 1578.

 C. The *Owl Creek* Plaintiffs Fail To State A Plausible Physical Takings Claim

 Although the omnibus plaintiffs appear to acknowledge that their takings claim under any theory is a regulatory takings claim, the *Owl Creek* plaintiffs incorrectly argue that the Third Amendment resulted in a physical seizure of their property.  Owl Creek Br. 48-49.  But because their allegations reveal that they plead such a claim in only a figurative sense, their physical seizure claim fails as a matter of law.  *See Starr Int'l Co.*, 856 F.3d at 967.

 In *Starr*, AIG shareholders argued that AIG's issuance of new equity to the Government—which diluted plaintiffs' own AIG equity—resulted in a physical seizure of their stock.  However, the Court determined that plaintiffs' physical seizure allegations were implausible given that plaintiffs' stock did not physically transfer to the Government.  *See id*.  Like the plaintiffs in *Starr*, the *Owl Creek* plaintiffs do not allege an actual physical seizure of their stock.  In fact, the *Owl Creek* plaintiffs describe their Enterprise stock "holdings" in detail and merely allege that the Third Amendment "effectively" appropriated their stock.  *See, e.g.*, *Owl Creek* ¶¶ 13-20; *id.* at p. 21.  Because a metaphorical seizure is not an actual seizure, the *Owl Creek* plaintiffs fail to allege a physical takings claim.

 D. Plaintiffs Fail To State A Categorical Regulatory Takings Claim

 In our moving brief, we demonstrated that plaintiffs failed to allege a plausible regulatory takings claim under a *Lucas* "wipe-out" theory.  *See* U.S. Mot. 59-61; *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015-19 (1992).  Although plaintiffs try to contort the allegations set forth in their complaints into *Lucas*'s narrow framework, their responses confirm that they state no plausible *Lucas* wipe-out claim.

1.   The *Lucas* Wipe-Out Framework Is Inapplicable To Plaintiffs' Takings Claims

As an initial matter, the principal mechanism for evaluating regulatory takings remains the multi-part test in *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 124 (1978). Courts employ the *Penn Central* ad hoc analysis to regulatory takings claims to consider (1) the economic impact on the property holder, (2) the character of the Government's actions, and (3) the property holder's investment-backed expectations. *Id.* This test—in this form—has endured for 40 years. Indeed, the Supreme Court has explained that the *Penn Central* test is the default method for analyzing *all* takings claims (except those involving physical appropriation or invasion), regardless of whether they involve an actual regulation. *See Ark. Game & Fish Comm'n v. United States*, 568 U.S. 23, 31-32 (2012) (citing *Penn Central*, 438 U.S. at 124).

The categorical wipe-out theory articulated in *Lucas* exists only as a narrow exception to the *Penn Central* analysis.[18] *See Philip Morris, Inc. v. Reilly*, 312 F.3d 24, 33 (1st Cir. 2002) (en banc) (citing *Lucas*, 505 U.S. at 1015). Although the Supreme Court has had reason to consider *Lucas* on multiple occasions, it has never applied the rule to any type of property rights other than real property. Thus, in 2012, the Supreme Court clarified that the exceptions to *Penn Central* are narrow ones requiring either a "permanent physical occupation" or a "regulation that permanently requires a property owner to sacrifice all economically beneficial uses of his or her land." *Ark. Game*, 568 U.S. at 31-32 (emphasis added) (citing *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 426 (1982); *Lucas*, 505 U.S. at 1019). Even more recently, in *Horne v. Department of Agriculture*, the Supreme Court reaffirmed its limits on

---

[18]   Although the omnibus response presents the Third Amendment as both a "per se" taking and a "categorical regulatory taking," Omnibus Br. 48-52, the Supreme Court recognizes no such distinction. *See Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 538 (2005).

*Lucas*. *See Horne v. Dep't of Agric.*, 135 S. Ct. 2419, 2427-28 (2015); *see also Energy Sec. of Am. Corp. v. United States*, 86 Fed. Cl. 554, 564 (2009) ("[I]t is probably the case that *Lucas* can be viewed as limited, at least heretofore, to the context of real property.  Outside the context of real property, if there is any shred of plausible incident of ownership interest remaining, the Court has been reluctant to find a taking"), *aff'd*, 356 F. App'x 414 (Fed. Cir. 2009).

Indeed, the cases on which plaintiffs rely in their discussion of *Lucas* involved either a physical transfer of real or personal property (*e.g.*, occupation of a leased warehouse, transfer of interest in bank account) or regulations involving real property.  *See* Omnibus Br. 50; Owl Creek Br. 47-48 (citing cases).  Although plaintiffs cite *Rose Acre Farms* and *Maritrans* for the proposition that the Federal Circuit applies the *Lucas* test to personal property, in *Rose Acre Farms*, the Federal Circuit reversed the trial court's application of *Lucas* and instructed it to evaluate plaintiffs' claims under the *Penn Central* framework.  *See Rose Acre Farms, Inc. v. United States*, 373 F.3d 1177, 1197-98 (Fed. Cir. 2004).  In *Maritrans*, the Federal Circuit did not address the question, but determined that plaintiff failed to show a regulatory taking under either framework.  *See Maritrans, Inc. v. United States*, 342 F.3d 1344, 1354-59 (Fed. Cir. 2003).  In any event, neither case involved *Lucas*'s application to intangible property, such as the "economic interests" alleged in these cases.  Indeed, when considering an alleged taking of intangible property rights, even when Government action allegedly wiped out their value, the Supreme Court applied *Penn Central*, rather than *Lucas*.  *See Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 991-1000, 1005 (1984) (applying *Penn Central* when plaintiffs alleged that the Government destroyed its trade secrets by publishing them).

The analogies contained in plaintiffs' responses demonstrate that the *Lucas* framework is particularly ill-suited to analyze plaintiffs' takings claims.  For instance, plaintiffs analogize the

Enterprises' dividend payments to Treasury (and plaintiffs' derivative interest in those payments) to a physical diversion of water.  Omnibus Br. 49.  But a corporation's retention of capital bears no resemblance to a landowner's riparian rights.  The figurative money river described in the omnibus brief does not exist, and highlights the inapplicability of takings cases involving either physical seizures or regulations involving real property to this case.

Likewise, the Court should reject the *Owl Creek* plaintiffs' argument that Treasury's receipt of contractual dividend payments is analogous to (1) a police officer violating the terms of a warrant by seizing anything from a home, or (2) a tax collector disregarding the value of a lien by garnishing and emptying a bank account.  Owl Creek Br. 47.  The *Owl Creek* plaintiffs' analogies are misplaced because, unlike the contractual dividend payments at issue here, they involve *ultra vires* conduct such that the Takings Clause would not apply in the first place.

Finally, the unique scenarios alleged in the complaints—either the imposition of the conservatorships or the renegotiation of the PSPA dividend arrangement reflected in the Third Amendment—did not involve the enactment of a statute or regulation.  Consequently, *Lucas* is especially ill-suited as an analytical framework for evaluating plaintiffs' takings claims because, unlike *Penn Central*, it does not permit the Court to evaluate the plaintiffs' expectations and the character of the government action.

      2.        Plaintiffs Fail To State A *Lucas* Wipe-Out Claim Because Their Stock Is Still Traded

Even if *Lucas* applied to intangible property, plaintiffs must still show the economic impact of the regulation rendered their property valueless.  *See Love Terminal Partners L.P. v. United States*, 889 F.3d 1331, 1343-44 (Fed. Cir. 2018).  Thus, to evaluate economic impact, courts must consider not only what was allegedly taken, but what the property owner retains after the alleged taking.  Absent an allegation that the Government "interfer[ed] with an owner's legal

right to dispose of his [property], even a substantial reduction of the attractiveness of the

property to potential purchasers does not entitle the owner to compensation under the Fifth

Amendment."  *See DiMare Fresh, Inc. v. United States*, 808 F.3d 1301, 1310 (Fed. Cir. 2015)

(quoting *Kirby Forest Indus., Inc. v. United States*, 467 U.S. 1, 15 (1984)).

 In this case, accepting as true plaintiffs' allegations that the Government wiped out their

contingent rights to dividends and liquidation preferences, plaintiffs still fail to show a plausible

categorical taking when they continue to hold, purchase, and sell Enterprise stock.  *See* Owl

Creek ¶¶ 13-20, 23-24.  Although plaintiffs allege that their stock is worthless as a result of the

Third Amendment, Omnibus Br. 51, their stock continues to trade at prices set by the market.

*See generally* https://quotes.wsj.com/FNMA; https://quotes.wsj.com/FMCC.  As the district

court explained, because "plaintiffs maintain 'economically beneficial use' of their shares,"

which are "traded daily on public over-the-counter (OTC) exchanges," plaintiffs could not show

that the Third Amendment resulted in a *Lucas* wipe-out.  *Perry Capital I*, 70 F. Supp. 3d at 243.

 And, although plaintiffs argue that the Enterprises' junior preferred and common stock

values "depend[] on the [Third Amendment] being invalidated by the courts or Congress—or

from a court awarding damages or just compensation for the [Third Amendment]," the *reason*

behind the stock's value is irrelevant.  *See* Omnibus Br. 51.  The point is that a market exists for

Enterprise stock.  Thus, plaintiffs' allegation that "there was value in the private shares" before

the Third Amendment, but those shares are now "worthless" is implausible (and demonstrably

false).  *See id.*

 E. Plaintiffs Fail To Allege A Plausible *Penn Central* Regulatory Taking

 As we demonstrated in our motion to dismiss, plaintiffs fail to allege a plausible

regulatory taking under *Penn Central*'s multi-factor, ad hoc framework.  *Penn Central*, 438 U.S.

at 124.  Although plaintiffs suggest that the *Penn Central* analysis is appropriate only where

"Government regulation decreases the value of property or prevents the owner from making

some use of it," Omnibus Br. 52-53, *Penn Central*'s broader purpose is to "identify regulatory

actions that are functionally equivalent to the classic taking in which government directly

appropriates private property or ousts the owner from his domain."  *See Lingle v. Chevron

U.S.A., Inc.*, 544 U.S. 528, 529 (2005).  Because the Third Amendment is not the "functional

equivalent" of a classic appropriation of private property, and because plaintiffs cannot plausibly

allege any of the three *Penn Central* factors, the Court should dismiss plaintiffs' takings claims.

1.   <u>Plaintiffs Fail To Identify A Plausible Economic Impact</u>

Plaintiffs have not alleged a "but-for" world in which plaintiffs' stock was worth more

without the Third Amendment.  *See A & D Auto Sales*, 748 F.3d at 1158.  Thus, in their

responses, plaintiffs focus on the alleged economic impact to the Enterprises, not to themselves.

Omnibus Br. 53; Owl Creek Br. 54-55.  But plaintiffs cannot state a direct takings claim based

on the economic impact to the Enterprises and, as we explained in our motion and above,

plaintiffs cannot show that the Third Amendment had an economic impact on the value of their

rights because the PSPAs already gave Treasury "a preferential right to dividends, to the

effective exclusion of other stockholders."  *Perry Capital II*, 864 F.3d at 609.

Moreover, as the district court explained in *Perry Capital I*, plaintiffs fail to allege that

the Third Amendment had any economic impact on plaintiffs themselves because the PSPAs

already granted Treasury discretion to deny any dividends to junior shareholders and the Third

Amendment made no change to that provision.  *See Perry Capital I*, 70 F. Supp. 3d at 244.

Similarly, the Third Amendment made no change to Treasury's right to exercise its warrants to

purchase 79.9 percent of the Enterprises' common stock.  *See* Omnibus Br. 52; Owl Creek Br.

56.  And, in *Perry Capital I*, the district court explained that plaintiffs' "liquidation preference rights only ripen during liquidation," so "any impact on such rights is, at best, theoretical while the [Enterprises] remain in conservatorship."  *See Perry Capital I*, 70 F. Supp. 3d at 244.

Plaintiffs' hypothetical scenario in which the Enterprises use their retained earnings above the 10 percent dividend amount to pay down Treasury's liquidation preference is inconsistent with the terms of Treasury's stock, which only permit the Enterprises to pay down the liquidation preference after termination of Treasury's commitment or with Treasury's consent, and, in any case, disregards that the original PSPAs required payment of a commitment fee.  *See* Omnibus Br. 52; *see also* PSPA §§ 3.2, 5.2; Stock Certificate § 3(a), *available at* https://go.usa.gov/xm9dr (Fannie Mae); https://go.usa.gov/xm9db (Freddie Mac).  Thus, with or without the Third Amendment, the Enterprises could not pay down the liquidation preference.

2.  Plaintiffs' Alleged Investment-Backed Expectations Are Inconsistent With The Statutory Scheme In Which The Enterprises Operate

"A 'reasonable investment-backed expectation' must be more than a 'unilateral expectation or an abstract need.'"  *Ruckelshaus v. Monsanto*, 467 U.S. 986, 1005 (1984).  In evaluating a plaintiff's investment-backed expectations, a court considers the regulatory environment in which the plaintiff invested.  *See Branch*, 69 F.3d at 1581.  When, as in this case, plaintiffs invest in a highly-regulated field, their "investment backed expectations are greatly reduced."  *Id.*  Moreover, investors in highly-regulated entities must also expect that the details of the regulatory framework may change after they acquire their stock.  *See Cal. Hous. Sec.*, 959 F.2d at 959 (holding that changes in the law did not create an expectation of compensation because financial institutions are "on notice that [they] might be subjected to different regulatory burdens over time").

Here, the investment-backed expectations that plaintiffs describe are unilateral expectations inconsistent with the regulatory environment in which the Enterprises operate, which has long contemplated the possibility of placing and managing the Enterprises in conservatorship. Since 1992, the Enterprises have been subject to the possibility of a conservatorship in which the conservator succeeds to all rights of the Enterprises and their shareholders. *See* U.S. Mot. 52 (citing Fed. Hous. Enterprises Fin. Safety & Soundness Act of 1992, Pub. L. 102-550, §§ 1301-1395 (1992)); *Perry Capital I*, 70 F. Supp. 3d at 240. Indeed, for many years before Congress enacted HERA, Congress considered legislative proposals that would (1) expand Government oversight over the Enterprises and its power to place the Enterprises into conservatorship, and (2) provide the Enterprises' regulator with the option to place the Enterprises into receivership. *See, e.g.*, Hous. Fin. Regulatory Improvement Act, H.R. 3703, §§ 1311, 1369E, 106th Cong. (2000) (proposing the creation of an independent agency to regulate the Enterprises, including authority to place the Enterprises in receivership); Fed. Hous. Fin. Reform Act of 2005, H.R. 1461, §§ 1311, 1367, 109th Cong. (2005) (similar). In HERA, Congress built on these proposals by expanding the Government's existing statutory powers to place and operate the Enterprises in conservatorship, and providing for appointment of a receiver.

Thus, the long line of precedent holding that no taking occurs when the Government exercises its statutory authority to place an entity into conservatorship or receivership defeats the *Washington Federal* plaintiffs' argument that they possessed a reasonable investment-backed expectation that the Enterprises would indefinitely operate outside of conservatorship. *See Branch*, 69 F.3d at 1575 (citing *Golden Pac. Bancorp*, 15 F.3d at 1037-74; *Cal. Hous. Sec.*, 959 F.2d at 959).

Further, the regulatory framework in which the Enterprises operate demonstrates that plaintiffs challenging the Third Amendment have no reasonable investment-backed expectation that the Enterprises would accumulate capital for shareholder benefit during conservatorship. Indeed, plaintiffs concede that they have no takings claim when the "Government acting pursuant to a regulatory framework, engages in conduct that is entirely consistent with that framework." Wash. Fed. Br. 27; *see also Golden Pac. Bancorp*, 15 F.3d at 1074. Plaintiffs' allegations confirm that their expectations rely on a misapprehension of FHFA's authority under HERA. For instance, plaintiffs argue that they expected FHFA as conservator to have "embrac[ed] a true conservator's role," in that it would operate the Enterprises in the best interests of Enterprise shareholders. *See* Owl Creek Br. 53. But FHFA's powers as conservator are established by HERA, not common law, and HERA authorizes the conservator to act in the Enterprises' or FHFA's best interests. 12 U.S.C. § 4617(b)(2)(J); *see also Jacobs*, 908 F.3d at 893. Similarly, plaintiffs' expectation that, in conservatorship, FHFA as conservator would ensure that the Enterprises would accumulate capital and restore the Enterprises to their pre-conservatorship form ignores that FHFA's Director may appoint a conservator for the purpose of "reorganizing, rehabilitating, *or* winding up the affairs" of the Enterprises. *Id.* § 4617(a)(2) (emphasis added); *see also Perry Capital II*, 864 F.3d at 609. Indeed, as the D.C. Circuit explained, although HERA provides that FHFA may "preserve and conserve assets, nothing in [HERA] says that FHFA must do that in a manner that returns [the Enterprises] to their prior private, capital-accumulating, and dividend-paying condition for all stockholders." *Perry Capital II*, 864 F.3d at 609.

Further, plaintiffs' unilateral expectation that the PSPAs would remain static is implausible when FHFA and Treasury had already amended them twice in accordance with a

contractual provision granting them the right to do so.  *Fairholme* ¶ 84; PSPA § 6.3.  And plaintiffs' unilateral expectation that Treasury would act in the junior preferred and common shareholders' best interests is inconsistent with Congress's instruction that, in making any investment, Treasury must determine that the investment is necessary to "protect the taxpayer." 12 U.S.C. §§ 1455(*l*)(1)(B)(iii); 1719(g)(1)(B)(iii).  Finally, plaintiffs' purported expectations about "positive value . . . inur[ing] to shareholders, not the Government," not only ignores that Treasury is the Enterprises' senior preferred shareholder, it misrepresents HERA as containing a "priority scheme" that applies to conservatorships; however, that scheme applies solely in a receivership.  *Compare* Omnibus Br. 54, *with* 12 U.S.C. § 4617(c).  Thus, plaintiffs' expectations about the distribution of Enterprise assets in receivership are irrelevant to their purported investment-backed expectations that the Enterprises would accumulate capital for shareholder benefit during conservatorship.

        3.      The Character Of The Alleged Government Action Does Not Support A Regulatory Taking

Plaintiffs also fail to show that the third *Penn Central* factor—the "character of the government action"—supports a holding that either the conservatorships themselves or the Third Amendment effected a regulatory taking.  When considering the character of alleged Government action, courts evaluate the actual burden imposed on property rights, how that burden is allocated, and whether the plaintiff has been unfairly forced to bear a burden that should be borne by the public.  *See Rose Acre Farms, Inc. v. United States*, 559 F.3d 1260, 1276-79 (Fed. Cir. 2009).  In this case, given that the taxpayers assumed maximum risk in connection with the Government's taxpayer-funded rescue of the Enterprises, plaintiffs cite no reason why the rescue should not also allocate to the taxpayers maximum reward for their investment.

Plaintiffs' characterization of the Third Amendment as a "pure money grab" is hyperbole. Omnibus Br. 55.  No money transferred from plaintiffs to the Government.  Rather, under the PSPAs, the United States transfers money *to* the Enterprises when necessary to restore a positive net worth; and the Enterprises transfer money *to* Treasury in the form of dividend payments in exchange for the Government's unprecedented capital commitment.  And this arrangement is possible only through Congress's enactment of HERA—a statutory program that adjusts the benefits and burdens of economic life to promote the common good.

Moreover, Enterprise shareholders benefitted for years from the Enterprises' unique relationship with the Government through "preferential tax treatment, far lower capital requirements, and a widely perceived government guarantee."  *See Perry Capital I*, 70 F. Supp. 3d at 215, 244 n.56 (quotation omitted).  And taxpayers—not shareholders—intervened during the housing crisis and provided hundreds of billions to the Enterprises.  *See Perry Capital II*, 864 F.3d at 613.

Finally, although plaintiffs may disagree, courts have recognized the Third Amendment's benefit to the Enterprises themselves.  *See, e.g.*, *Perry Capital II*, 864 F.3d at 611.  The 10 percent dividend "sometimes cost Fannie and Freddie more than their positive net worth and forced them to borrow even more."  *Jacobs*, 908 F.3d at 894.  "The Third Amendment thus insured Fannie and Freddie against downturns and 'death spirals,' preventing unpayable dividends from ratcheting up their debt loads to unsustainable levels.'"  *Id.* (quoting *Saxton*, 901 F.3d at 962 (Stras, J., concurring)).  Thus, the character of the Government action does not support plaintiffs' takings claims.

VIII.   <u>Plaintiffs Fail To State A Plausible Illegal Exaction Claim</u>

As we explained in our motion to dismiss, U.S. Mot. 70-71, plaintiffs' illegal exaction

claims fail because they cannot establish any of the essential liability elements: (1) that plaintiffs

paid money directly or "in effect" to the Government as a result of (2) the Government's

violation of a statute or provision that either "expressly or by 'necessary implication' . . . entails

a return of money unlawfully exacted." *Aerolineas Argentinas v. United States*, 77 F.3d 1564,

1572-73 (Fed. Cir. 1996); *Norman v. United States*, 429 F.3d 1081, 1095 (Fed. Cir. 2005).

Plaintiffs' responses confirm that their illegal exaction claims fail because (1) plaintiffs paid no

money directly or "in effect" to the Government, and (2) they cannot identify a statutory or

regulatory violation that would require the Government to pay damages to plaintiffs.

A.   <u>The Government Has Not Directly Or "In Effect" Exacted Plaintiffs' Money</u>

Plaintiffs' illegal exaction claim fails because plaintiffs do not plausibly allege that they

have "paid money over to the Government, directly or in effect[.]" *Aerolineas Argentinas*, 77

F.3d at 1572 (quoting *Eastport S.S. Corp. v. United States*, 372 F.2d 1002, 1007 (Ct. Cl. 1967)).

An "in effect" exaction generally arises in one of two scenarios.  In the first scenario, the

plaintiff paid money to another "at the direction of the government to meet a governmental

obligation." *Id.* at 1573.  For instance, in *Aerolinas Argentinas*, at the Government's direction,

an airline paid for aliens' housing and expenses that, by regulation, the Government was required

to pay. *See id.* at 1571-72.  In the second scenario, the Government retained money that, by

regulation, should have been returned to the plaintiff. *See Fireman v. United States*, 44 Fed. Cl.

528, 532 n.4, 534-35 (1999). *Fireman* illustrates the second scenario.  In *Fireman*, the plaintiffs

made illegal campaign contributions that, by regulation, the campaigns were required to refund

to the contributors.  Notwithstanding the regulation, the campaigns transmitted those illegal

contributions to the Government, which the Court determined could reflect a payment "in effect" to the Government.  *See id.*[19]

In this case, no plaintiff identifies any direct or "in effect" payment to the Government. Indeed, the *Washington Federal* plaintiffs concede that no money was exacted either directly or "in effect" as a result of the conservatorships.  Wash. Fed. Br. 39 (alleging that the conservatorships exacted "shareholders' power to control the direction of the Companies").  For this reason alone, the *Washington Federal* plaintiffs cannot state an illegal exaction claim.

The plaintiffs challenging the Third Amendment apparently concede that the Government has not directly "exacted" any money from them; rather plaintiffs allege only a direct exaction of the *Enterprises'* money.  Omnibus Br. 56; *see also* Fisher Br. 6 ("the shareholders have not paid any money in any relevant sense, either directly or in effect").  For the reasons explained in Section II, above, and in our moving brief, U.S. Mot. 26-32, HERA's succession clause bars plaintiffs from asserting such derivative claims.

Instead, plaintiffs allege that they "paid" money to the Government "in effect" and seek "'return of all or part of that sum' that 'was improperly paid, exacted, or taken from [them] in contravention of the Constitution, a statute, or regulation.'"  Omnibus Br. 57 (quoting *Aerolineas Argentinas*, 77 F.3d at 1572-73).  But the alleged payments "in effect" bear no resemblance to the two exaction scenarios identified by either the Federal Circuit or this Court given that

---

[19]  Plaintiffs also cite to *Camellia Apartments* for the proposition that "'in effect' exactions also occur when the Government unlawfully requires a plaintiff to pay money to a third party that then transmits that money to the Government"; however, in *Camellia Apartments*, the Court rejected plaintiffs' illegal exaction claim.  Omnibus Br. 58 (citing *Camellia Apartments, Inc. v. United States*, 167 Ct. Cl. 224 (1964)).  In any event, unlike the plaintiffs in *Camellia Apartments*, plaintiffs here identify no money that they paid to a third party, which the third party transmitted to the Government.  The Enterprises' profits arose from their operations supported by the Treasury commitment, not from funding by the plaintiffs.

plaintiffs identify no payments they made to anyone.  For instance, plaintiffs neither allege that they paid money to a third party on the Government's behalf, nor do they allege that they made payments to a third party that the Government retained for itself.

Because plaintiffs cannot identify any genuine payment they made as a result of either the conservatorships or the Third Amendment, they rely on exaggerated analogies that bear no resemblance to the factual scenario alleged in this case.  *See, e.g.*, Owl Creek Br. 57 (alleging that the Enterprises' contractual dividend payments to Treasury are "no different in principle than if the government had ordered a bank to hand over all of the funds it held").  But a hypothetical scenario is no substitute for a substantive allegation identifying a specific sum of money that plaintiffs paid directly to the Government, to a third party on the Government's behalf, or to a third party that the Government has retained for itself.  And absent such an allegation, plaintiffs cannot state a plausible illegal exactions claim.

B.    Plaintiffs Fail To Allege That A Government Violation Of A Money-Mandating Statute Resulted In A Direct Or "In Effect" Exaction Of Their Money

To invoke the Court's jurisdiction to entertain an illegal exaction claim, plaintiffs must first show that the "statute or provision causing the exaction itself provides, either expressly or by 'necessary implication,' that 'the remedy for its violation entails a return of money unlawfully exacted.'"  *Norman*, 429 F.3d at 1095 (quoting *Cyprus Amax Coal Co. v. United States*, 205 F.3d 1369, 1373 (Fed. Cir. 2000)).[20]  For instance, the statute allegedly violated in *Aerolineas*

---

[20]  Although plaintiffs argue that a party need not identify a money-mandating statute to state an illegal exaction claim, the Federal Circuit has treated the requirement as jurisdictional. *Compare* Omnibus Br. 66, *with Norman*, 429 F.3d at 1095.  The Federal Circuit explained that because an illegal exaction claim "involves a deprivation of property without due process of law," and the Court "ordinarily lacks jurisdiction over due process claims," a plaintiff must identify a separate, money-mandating source of law that requires payment of money damages for its violation.  *Norman*, 429 F.3d at 1095.  Thus, "[t]o invoke Tucker Act jurisdiction over an illegal exaction claim, a claimant must demonstrate that the statute or provision causing the

*Argentinas* provided that the Treasury "shall refund" expenses incurred for "providing detention

and deportation services for excludable aliens arriving on commercial aircraft and vessels."

*Aerolineas Argentinas*, 77 F.3d at 1571 (internal citations and quotation marks omitted).

Similarly, in *Fireman*, when a campaign delivered an illegal donation to the Government, the

action allegedly violated a regulation specifying that a campaign "shall refund" an illegal

donation to the campaign's contributor.  *See Fireman*, 44 Fed. Cl. at 532 n.4.  The absence of

such language in the allegedly violated regulation precludes an illegal exaction claim.  *See*

*Norman*, 429 F.3d at 1095.   In this case, plaintiffs identify no money-mandating language in any

of the laws allegedly violated.  Moreover, plaintiffs' illegal exaction claims fail because

plaintiffs do not plausibly allege that any statutory violation resulted in an exaction of their

money.

> 1.      Plaintiffs' Allegations That FHFA Exceeded Its Statutory Powers Under
>         HERA When It Executed The Third Amendment Do Not Support An
>         Illegal Exaction Claim

Plaintiffs do not plausibly allege that FHFA acted beyond the scope of its statutory

powers.  Plaintiffs tellingly attempt to brush off the D.C. Circuit's decision in *Perry Capital II*,

864 F.3d at 607, by characterizing it as just the opinion of "two judges."  Omnibus Br. 60.  But

five circuit courts of appeal—the Third, Sixth, Seventh, Eighth, and D.C. Circuits—and still

more district courts have held that FHFA acted within its HERA authority when it executed the

---

exaction itself provides, either expressly or by 'necessary implication' that 'the remedy for its
violation entails a return of money unlawfully exacted.'"  *Id.* (quoting *Cyprus Amax Coal*, 205
F.3d at 1373); *see also Christy, Inc. v. United States*, 141 Fed. Cl. 641, 667 (2019) (Sweeney, J.)
(citing *Norman* standard for illegal exaction claim); *Kalos v. United States*, 87 Fed. Cl. 230, 239-
40 (2009) (Sweeney, J.) (dismissing illegal exaction claim where plaintiff failed to identify a
money-mandating statute).

Third Amendment.[21]  In *Perry Capital*, the Supreme Court denied plaintiffs' petition for a writ of certiorari to review this precise determination by the D.C. Circuit.  *See Perry Capital LLC v. Mnuchin*, 138 S. Ct. 978 (2018).

In all cases, the courts uniformly concluded that FHFA's execution of the Third Amendment fell squarely within FHFA's broad statutory powers and functions, including to "take over the assets of and operate the [Enterprises]," "carry on [their] business," "perform all functions" of the Enterprises, "contract" on their behalf, and "conduct all business of the [Enterprises]"—all in the manner the Conservator "determines is in the best interests of the [Enterprises] or the Agency."  12 U.S.C. § 4617(b)(2).

As the Third Circuit recently explained in *Jacobs*, the "Third Amendment is in essence a renegotiation of an existing lending agreement"—the PSPAs—that provides the Enterprises with a capital backstop of hundreds of billions of dollars.  *Jacobs*, 908 F.3d at 890; *see also Saxton*, 901 F.3d at 960 (Stras, C.J. concurring) ("I cannot see how [FHFA]'s exceptionally broad operational authority [under HERA] could exclude the power to renegotiate an existing lending agreement, which is in essence what the [Third Amendment] did."); *Perry Capital II*, 864 F.3d at 607 ("Renegotiating dividend agreements, managing heavy debt and other financial obligations, and ensuring ongoing access to vital yet hard-to-come-by capital are quintessential

---

[21]  *See, e.g.*, *Perry Capital v. Mnuchin*, 864 F.3d 591, 607 (D.C. Cir. 2017); *Robinson v. FHFA*, 876 F.3d 220, 231 (6th Cir. 2017); *Roberts v. FHFA*, 889 F.3d 397, 404-05 (7th Cir. 2018); *Saxton v. FHFA*, 901 F.3d 954, 958-59 (8th Cir. 2018); *Jacobs v. FHFA*, 908 F.3d 884, 889-90 (3d Cir. 2018); *Bhatti v. FHFA*, 332 F. Supp. 3d 1206, 1225-27 (D. Minn. 2018).

A Fifth Circuit panel also held, among other things, that FHFA acted within its statutory authority under HERA, *see Collins v. Mnuchin*, 896 F.3d 640, 652-53 (5th Cir. 2018), but that decision was vacated after the Court granted both parties' petitions for rehearing *en banc*.  *See Collins v. Mnuchin*, 908 F.3d 151 (5th Cir. 2018).  The full Fifth Circuit heard oral argument on January 23, 2019.

conservatorship tasks designed to keep the [Enterprises] operational.").  Accordingly, "HERA does not bar FHFA's decision as conservator to restructure the [Enterprises'] dividend payments to Treasury" via the Third Amendment.  *Robinson*, 876 F.3d at 231.  The Third Amendment was a lawful exercise of FHFA's statutory conservator power.

> 2.   Plaintiffs' Allegations That FHFA Violated An Alleged Requirement To
>      "Preserve And Conserve" Enterprise Assets Do Not Support An Illegal
>      Exaction Claim

Plaintiffs also assert that FHFA as conservator violated obligations that it "preserve and conserve" the Enterprises' assets.  Omnibus Br. 61.  But every court to consider that issue has held that "the most natural reading of [HERA] is that it permits FHFA, but does not compel it in any judicially enforceable sense, to preserve and conserve Fannie's and Freddie's assets[.]"  *Perry Capital II*, 864 F.3d at 607; *accord Saxton*, 901 F.3d at 958 ("Reading § 4617(b) as a whole, it is clear that Congress intended the permissive 'may' to grant FHFA broad discretion in its management and operation of Fannie and Freddie."); *Roberts*, 889 F.3d at 403 ("HERA does not impose such mandatory duties on conservators[.]"); *Robinson*, 876 F.3d at 230 (HERA's "preserve and conserve" "language is permissive and . . . details *powers* that FHFA holds rather than *duties* that FHFA must perform." (emphasis in original)).  Plaintiffs' reliance on HERA's permissive "preserve and conserve" language does not demonstrate a violation of a money-mandating statute.

> 3.   Plaintiffs' Allegations That FHFA Violated HERA's "Best Interests"
>      Provision Do Not Support An Illegal Exaction Claim

The "best interests" provision specifies that in taking "any action authorized by" HERA—which includes a host of powers, such as operating the Enterprises' ongoing business—FHFA may do so in a manner it determines to be in the Enterprises' or its *own* best interests.  12 U.S.C. § 4617(b)(2)(J)(ii).  In *Perry Capital II*, the D.C. Circuit explained that the "best

interests" provision "refers only to the best interests of FHFA and the [Enterprises]—and *not* those of the [Enterprises'] shareholders and creditors." *See Perry Capital II*, 864 F.3d at 608 (emphasis in original).

In response, plaintiffs accuse the D.C. Circuit of "badly misread[ing]" HERA's "best interests" provision, which plaintiffs characterize as "*restrict[ing]* the authorities otherwise granted to FHFA as conservator." Omnibus Br. 61-62 (emphasis in original). No court has accepted plaintiffs' misinterpretation of the "best interests" provision as somehow requiring FHFA to act in the best interests of Enterprise shareholders because it is inconsistent with the unambiguous text. *See Jacobs*, 908 F.3d at 893; *see also Robinson*, 876 F.3d at 230 (similar). Moreover, although plaintiffs argue that the "best interests" provision requires "FHFA to make a best-interests determination before taking action authorized elsewhere in HERA," Omnibus Br. 62, plaintiffs identify nothing in HERA or any FHFA regulation reflecting such a requirement.

Accordingly, plaintiffs cannot plausibly allege a direct or "in effect" exaction as a result of an alleged violation of HERA's "best interests" provision sufficient to show a plausible illegal exaction claim.

4.      Plaintiffs' Allegations That HERA Itself Violates The "Non-Delegation Doctrine" Do Not Support An Illegal Exaction Claim

Plaintiffs next allege that HERA itself "violates the non-delegation doctrine." Omnibus Br. 61. The non-delegation doctrine "limits the government's ability to delegate regulatory and other governmental authority to private parties." *Bhatti*, 332 F. Supp. 3d at 1227.

In *Bhatti*, the court explained that "the non-delegation doctrine is not implicated in this case, because FHFA was not exercising governmental power when it agreed to the Third Amendment. . . . The Third Amendment is simply a contractual arrangement that FHFA entered into on behalf of two private entities—Fannie and Freddie—in its capacity as their conservator."

*Id.* at 1225-26.  In any event, the *Bhatti* court rejected plaintiffs' non-delegation argument because "HERA provides the requisite 'intelligible principle'" to satisfy a non-delegation analysis.  *Id.* at 1227-28.  The court explained that Congress's identification of FHFA's purpose as conservator, its authorization of FHFA to carry on the Enterprises' business, and its specification of conservator powers were "more than sufficient to meet the 'intelligible principle' standard."  *Id.* at 1228; *see also* 12 U.S.C. § 4617(a)(2), (b)(2)(B), (b)(2)(D)(ii).

Thus, plaintiffs fail to show that HERA itself violates the non-delegation doctrine, that such a violation resulted in an exaction of plaintiffs' money, or that the non-delegation doctrine itself mandates payment of money damages for its alleged violation.

5.      Plaintiffs' Allegations That The Third Amendment Violated FHFA
Regulations Do Not Support An Illegal Exaction Claim

Plaintiffs next argue that the Third Amendment is illegal because it allegedly violates a regulation, promulgated by FHFA in 2011, specifying that the Enterprises "shall make no capital distribution while in conservatorship," and defining "capital distribution" to include dividends.  Omnibus Br. 65 (citing 12 C.F.R. § 1237.12(a)).  But that regulation expressly allows FHFA's Director to authorize the payment of dividends in conservatorship for a variety of reasons, including if the Director determines that it would "contribute to the long-term financial safety and soundness" of the Enterprises, or be "in the interest of the [Enterprises]" or "otherwise in the public interest."  12 C.F.R. § 1237.12(b).  And that is exactly what the Director did.

As FHFA explained in the notice of proposed rulemaking for this regulation: "the Director has approved payment of contractually required dividends on the Senior Preferred Stock held by Treasury . . . because these extraordinary funding arrangements with Treasury are critical to the long-term financial safety and soundness of the Enterprises."  Conservatorship & Receivership, 75 Fed. Reg. 39,462, 39,468 n.8 (July 9, 2010).  Plaintiffs' disagreement with the

merits of the Director's decisions, *see* Omnibus Br. 65-66, does not render those decisions

illegal.  As the regulation requires, FHFA's Director approved dividend payments to Treasury

under the PSPAs, making them permissible under 12 C.F.R. § 1237.12

      Thus, plaintiffs identify no regulatory violation that resulted in an exaction of their

money sufficient to support their illegal exaction claim.

      6.      Plaintiffs' Allegations That The Third Amendment Constituted A
              Purchase Of New Securities Do Not Support An Illegal Exaction Claim

      Plaintiffs' assertion that the Third Amendment constituted an unlawful exercise of

Treasury's authority to "purchase any obligations or other securities," 12 U.S.C.

§§ 1455(*l*)(1)(A); 1719(g)(1)(A), is mistaken.  *See* Owl Creek Br. 59.  Treasury's authority to

purchase new Enterprise securities expired on December 31, 2009.  12 U.S.C. §§ 1455(*l*)(4);

1719(g)(4).  However, its authority to "exercise any rights received in connection" with earlier

purchases, and its authority to hold or sell securities, never expires.  *See id.* §§ 1455(*l*)(2)(D);

1719(g)(2)(D).  Treasury's and FHFA's right to amend the PSPAs is set forth in the PSPAs.  *See*

PSPA § 6.3.

      When entering into the Third Amendment, Treasury neither made a purchase nor

received obligations and other securities, under any meaning of those terms.  Importantly, the

Third Amendment did not result in the issuance of any stock to Treasury, or the commitment of

any additional taxpayer funds by Treasury.  *See Robinson*, 876 F.3d at 234.  Rather, the Third

Amendment merely modified the dividend structure of the securities Treasury already owned and

eliminated the periodic commitment fee.  *See Perry Capital I*, 70 F. Supp. 3d at 224.  Although

plaintiffs acknowledge the import of the district court's decision, they argue that it rested on an

erroneous factual premise that the Enterprises were in a "downward spiral" at the time of the

Third Amendment.  Omnibus Br. 64.  But the district court construed a contract amendment—a

legal question—and its decision does not remotely suggest that the alleged factual context in which the parties executed the Third Amendment could inform whether the Third Amendment constituted a new security or an amendment to an existing security.

Fatal to plaintiffs' illegal exaction claim is their failure to identify any provision in HERA limiting either Treasury's or FHFA's ability as the Enterprises' conservator to renegotiate the PSPA's fixed, 10 percent dividend to a variable dividend, or to waive the periodic commitment fee, that would undermine Treasury's statutory and contractual right to renegotiate the terms of its existing securities.  Thus, plaintiffs fail to show a Treasury purchase of new securities in violation of HERA that resulted in an exaction of plaintiffs' money.

> 7.  Plaintiffs' Remaining Characterizations Of Treasury's Conduct Do Not Support An Illegal Exaction Claim

Plaintiffs' remaining characterizations of Treasury's conduct are inconsistent with their own complaints.  The complaints do not show that Treasury "unilaterally" "require[d] FHFA to agree" to the Third Amendment.  Omnibus Br. 63.  At most, plaintiffs allege that Treasury and FHFA as conservator executed the Third Amendment because they possessed common "policy objectives"—not that Treasury somehow implemented the Third Amendment by itself.  *Compare id.*, *with Fairholme* ¶¶ 116, 119.  And, in any event, plaintiffs identify no regulatory violation that resulted in an exaction of plaintiffs' money and would require payment of money damages.

> 8.  The *Washington Federal* Plaintiffs' Allegations About The Enterprises' Placement Into Conservatorships Do Not Support An Illegal Exaction Claim

As an initial matter, the *Washington Federal* plaintiffs' concession that they "have not alleged that the FHFA 'exceeded its statutory authority' in the sense that . . . any Government employees here acted *ultra vires*" requires dismissal of their illegal exaction claim.  Wash. Fed. Br. 43.  If the challenged action was authorized, by definition there can be no "illegal exaction."

*See Casa de Cambio Comdiv S.A. de C.V. v. United States*, 291 F.3d 1356, 1363 (Fed. Cir.

2002).  Although the *Washington Federal* plaintiffs argue that authorized, but unlawful, conduct

may support a takings claim, they cite no authority for the proposition that the same allegedly

authorized, but unlawful, Government conduct may simultaneously support an illegal exaction

claim.  *See* Wash. Fed. Br. 43 (citing *Del-Rio Drilling*, 146 F.3d at 1363).[22]

In any event, even if the Court considered the *Washington Federal* plaintiffs' allegations

that the conservatorships themselves were unlawful, such allegations cannot support an illegal

exaction claim because they would require the Court to review the merits of FHFA's underlying

decision to place the Enterprises into conservatorship.  As we demonstrated in our moving brief

and in Section XI below, U.S. Mot. 79-80, Congress granted FHFA the authority, with or

without the consent of the Enterprises or their shareholders, to appoint a conservator "for the

purpose of reorganizing, rehabilitating, or winding up the affairs of a regulated entity." 12 U.S.C.

§ 4617(a)(2).  Congress specifically provided only one avenue for court review of a

conservatorship decision—namely, the Enterprises could bring a suit in district court challenging

the appointment of a conservator within 30 days after the appointment.  12 U.S.C. § 4617(a)(5).

Because Section 4617(a)(5) is the exclusive mechanism to challenge the merits of the

---

[22]  Putting aside that *Del-Rio Drilling* said nothing about an illegal exaction claim, the
*Washington Federal* plaintiffs misstate *Del-Rio Drilling*'s application to takings claims.  In *Rith
Energy*, the Federal Circuit clarified that *Del-Rio Drilling* merely noted that "if a plaintiff claims
its property was taken *regardless of* whether the agency acted consistently with its statutory and
regulatory mandate," the plaintiff need not first obtain a ruling about the legality of the agency's
conduct in another forum.  *Rith Energy, Inc.*, 247 F.3d at 1365-66 (emphasis in original).
However, when, as in this case, the plaintiff "claims it is entitled to prevail *because* the agency
acted in violation of statute or regulation, *Del-Rio* does not give the plaintiff a right to litigate
that issue in a takings action" rather than the forum designated by Congress.  *Id.* at 1366
(emphasis in original).   Thus, if the plaintiff does not challenge the legality of agency action in
another forum, it must litigate its takings claim "on the assumption that the administrative action
was both authorized and lawful."  *Id.*

conservatorship decision and the Enterprises did not bring such a challenge, the *Washington Federal* plaintiffs cannot ask this Court to review the merits of that decision now in the context of an illegal exaction claim.

IX.   Plaintiffs Fail To State A Plausible Claim For Breach Of Fiduciary Duty

Plaintiffs' claims for breach of fiduciary duty further reflect their efforts to transform private-shareholder contract claims against the Enterprises into claims against the United States. As we demonstrated in our moving brief, breach of fiduciary duty is generally a tort claim and, as in this case, absent a contract with the United States or a money-mandating statute establishing such a duty, the Court lacks jurisdiction to consider a breach of fiduciary duty claim. *See* U.S. Mot. 43-44.  Assuming the Court possesses jurisdiction over the claim, "a plaintiff must allege facts sufficient to establish the following: (1) defendant owed plaintiff a fiduciary duty; (2) defendant breached that duty; and (3) to the extent plaintiff seeks compensatory damages—the breach proximately caused an injury."  *Meyer Grp., Ltd. v. United States*, 115 Fed. Cl. 645, 650 (2014) (quoting *Paul v. Judicial Watch, Inc.*, 543 F. Supp. 2d 1, 5-6 (D.D.C. 2008)).  Because plaintiffs cannot plausibly allege that either FHFA or Treasury owed a fiduciary duty to Enterprise shareholders, plaintiffs fail to state a breach of fiduciary duty claim.[23]

---

[23]   Although plaintiffs cite to cases in which FDIC as receiver acknowledged a fiduciary duty to the bank and its creditors, in those cases, FDIC did not dispute the existence of such a duty *in receivership*, so the issue was not before the courts.  *See* Omnibus Br. 30, 72 (citing *Golden Pac. Bancorp v. FDIC*, 375 F.3d 196, 201 (2d Cir. 2004); *Seuss v. FDIC*, 770 F. Supp. 2d 32, 38 (D.D.C. 2011)); *see also DuPont v. FDIC*, 32 F.3d 592, 595 (D.C. Cir. 1995).  Moreover, the statutory receivership priority scheme at issue in the cases cited by plaintiffs has no analogue in the conservatorship context.

A.   HERA Imposes No Fiduciary Duty Running From FHFA To Enterprise
Shareholders

Plaintiffs' fiduciary-duty theory relies on two basic misunderstandings.  First, plaintiffs

contend that Congress imported common-law conservatorship concepts when it enacted HERA.

According to plaintiffs, Congress intended that FHFA would exercise its conservator authority in

accordance with general, common-law understandings about a conservator's power, rather than

in accordance with the express statutory powers granted by Congress.  Owl Creek Br. 28-32.

Second, plaintiffs contend that the Court should construe HERA to recognize an implied trust

relationship in which FHFA as conservator manages Enterprise assets for shareholder benefit—

similar to certain trust relationships recognized in Indian law.  Omnibus Br. 70-71.  Both theories

fail because they conflict with the conservator's actual powers set forth in HERA.

1.   HERA Preempts Any Common-Law Limitations On Conservator
Authority

As we demonstrated in our motion to dismiss, HERA—not state common law—defines

FHFA's powers as the Enterprises' conservator.  U.S. Mot. 72-75.  Although plaintiffs argue that

Congress merely intended that FHFA operate as a conservator as that term is understood as a

"common-law term[] of art," Owl Creek Br. 31-32, Congress expressly defined FHFA's powers

as conservator and provided FHFA with authority to take measures much broader than a "private

common-law conservator would be able to undertake."  *Perry Capital II*, 864 F.3d at 613.

Congress did not authorize FHFA to act in the best interests of Enterprise shareholders; on the

contrary, Congress authorized FHFA to act in the best interests of the Enterprises or FHFA.  12

U.S.C. § 4617(b)(2)(J).  Thus, HERA preempts any alleged common-law fiduciary duty running

from FHFA as conservator to Enterprise shareholders.  *See Fairholme DDC*, 2018 WL 4680197,

at *15-16.

Had Congress intended to impose upon FHFA as conservator a fiduciary duty to act in the interests of shareholders, it could have done so.  Indeed, FIRREA's "best interests" provision permits FDIC as conservator to act in the interests of FDIC, the bank, *and* the bank's depositors. *See* 12 U.S.C. § 1821(d)(2)(J)(ii).  In *Jacobs*, the Third Circuit observed that HERA's "best interests" provision refers only "to the best interests of Fannie, Freddie, and the Agency." *Jacobs*, 908 F.3d at 893.  And because "Congress modeled [HERA] on FIRREA, [HERA's] omission of shareholders' interests is telling" that Congress did not intend that FHFA would act in the best interests of Enterprise shareholders.  *Id.*  In *Fairholme DDC*, the class plaintiffs advanced a somewhat softer position—that FHFA could act in the best interests of the Enterprises or FHFA, but as a matter of state law, should consider "in good faith, the interests of private shareholders." *Fairholme DDC*, 2018 WL 4680197, at *16.  The court rejected that argument as preempted because it would impose duties on FHFA inconsistent with Congress's "deliberate choice" to limit the best interests provision to the Enterprises and FHFA.  *Id.*

> 2.    HERA Does Not Establish A Trust Relationship Between FHFA And Enterprise Shareholders

As we demonstrated in our motion, no trust relationship exists in which the Government holds Enterprise assets in trust for the benefit of private shareholders.  U.S. Mot. 42.  In response, plaintiffs rely on Indian law cases for the proposition that, in enacting HERA, Congress intended to establish such a relationship.  Omnibus Br. 71.  But the statutory schemes described in those cases bear no resemblance to HERA.  And the Government shares no historical, trust relationship with corporate stockholders, as it does with Native Americans. These distinctions highlight the inapplicability of those Indian law cases to the Enterprise shareholders' claims.

In *Mitchell*, the Supreme Court identified a fiduciary duty from a statute that mandated the sale of timber from Indian trust lands "based upon the Secretary's consideration of 'the needs and best interests of the Indian owner and his heirs,'" and specified "that proceeds from such sales be paid to owners 'or disposed of for their benefit.'"  *Mitchell*, 463 U.S. at 224 (quoting 25 U.S.C. § 406(a) (Sale of timber on lands held under trust)).  The Government did not deny the existence of a fiduciary duty, but argued that the statute was not money-mandating.  The Supreme Court disagreed.  Recognizing an "undisputed existence of a general trust relationship between the United States and the Indian people" along with a "'distinctive obligation of trust incumbent upon the Government in its dealings with these dependent and sometimes exploited people,'" the Supreme Court held that the Government could be liable for money damages in the event it failed to act—pursuant to statute—in the "best interests of the Indian owner and his heirs." *Id.* at 224-25.  Similarly, in *White Mountain Apache*, the Supreme Court determined that the Government could be liable for money damages under a statutory mandate that "Fort Apache be 'held by the United States in trust for the White Mountain Apache Tribe.'"  *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 474-75 (2003) (quoting 74 Stat. 8).

None of the factors on which the Supreme Court relied in *Mitchell* or *White Mountain Apache* are present in this case.  First, unlike in *Mitchell*, where Congress instructed the Government to consider the "needs and best interests of the Indian owner and his heirs" in connection with timber sales, HERA only instructs FHFA as conservator to act in the best interests of the Enterprises or FHFA—not Enterprise shareholders.  *Compare Mitchell*, 463 U.S. at 222, *with* 12 U.S.C. § 4617(b)(2)(J).

Second, unlike the Government's long-standing fiduciary duty to Indians, the Government has no long-standing fiduciary duty to hedge funds, speculators, and other investors

in publicly-traded companies, such as plaintiffs. *Cf. Mitchell*, 463 U.S. at 225. Plaintiffs'

contention to the contrary is misplaced. Indeed, as demonstrated by the cases cited by plaintiffs,

this Court has routinely rejected plaintiffs' attempts to impose fiduciary duties on the

Government outside the context of Indian law. *See* Omnibus Br. 69-70 (citing *Grady v. United

States*, No. 13-15, 2013 WL 4957344, at *3 (Fed. Cl. July 31, 2013) (rejecting proposition that

the Securities and Exchange Commission assumed a fiduciary duty to individual investors under

the 1934 Act)).

Third, unlike the statute in *White Mountain Apache*, HERA contains no language

specifying that FHFA as conservator holds Enterprise property in trust to benefit Enterprise

shareholders. *See White Mountain Apache Tribe*, 537 U.S. at 474-75.

Fourth, even the recognition of a "trust relationship" alone is insufficient to show a

fiduciary duty in the absence of a statute or regulation that "impose[s] a specific obligation on

the United States and 'bear[s] the hallmarks of a conventional fiduciary relationship.'" *Hopi

Tribe v. United States*, 782 F.3d 662, 667 (Fed. Cir. 2015) (quoting *United States v. Navajo

Nation*, 556 U.S. 287, 301 (2009)).

Because plaintiffs identify nothing in HERA that bears any resemblance to the statutes

discussed in *Mitchell* or *White Mountain Apache*, plaintiffs fail to show a fiduciary relationship

sufficient to support a breach of fiduciary duty claim.

     B.     <u>Treasury Owes No Fiduciary Duty To Enterprise Shareholders</u>

The Court should conclude—quite simply—that Treasury owes no duty to the

Enterprises' shareholders.

1.      HERA Imposes No Fiduciary Duty Running From Treasury To Enterprise
        Shareholders

As we demonstrated in our motion to dismiss, HERA preempts plaintiffs' allegation that

Treasury owes fiduciary duties to plaintiffs.  *See* U.S. Mot. 74-75.  Indeed, HERA requires

Treasury to "protect the taxpayer" when investing in the Enterprises—not to protect the

shareholders.  As plaintiffs recognize, HERA provides six considerations to guide Treasury's

decision to invest in the Enterprises, which include the "need to maintain [an Enterprise's] status

as a private shareholder-owned company," and an Enterprise's "plan for the orderly resumption

of private market funding or capital market access."  Omnibus Br. 74 (citing 12 U.S.C.

§§ 1455(*l*)(1)(C); 1719(g)(1)(C)).  These considerations inform the three fundamental reasons for

a Treasury investment: to (1) provide stability to financial markets; (2) prevent disruptions in the

availability of mortgage finance; and (3) protect the taxpayer.  12 U.S.C. §§ 1455(*l*)(1)(B);

1719(g)(1)(B).

From these provisions instructing Treasury to determine whether an Enterprise

investment is necessary to "protect the *taxpayer*," *id.* (emphasis added), plaintiffs make the

erroneous leap of logic that those provisions create a fiduciary duty to Enterprise *shareholders*.

Omnibus Br. 74.  Whatever arguments plaintiffs have about whether Treasury fulfilled its

statutory mandate to "protect the taxpayer," nowhere in HERA is there any mandate that

Treasury assume a fiduciary duty to Enterprise shareholders, let alone even consider shareholder

interests, when investing taxpayer funds in the Enterprises or exercising any of its rights in

connection with those investments.

Moreover, even if state law could supply the basis for a breach of fiduciary duty claim

against the United States, a fiduciary relationship would not arise because Treasury is not a

"controlling shareholder" within the meaning of state law given that it is neither a majority

shareholder nor exercises actual control over the Enterprises.  *See Starr Int'l Co.*, 906 F. Supp.

2d at 215-30.  Although plaintiffs allege that Treasury is a controlling shareholder, pleading

"labels and conclusions" is insufficient to state a claim, and the existence of a controlling

shareholder relationship is a question of law.  *See id.* at 217.

In any event, even if the Court treated Treasury as a controlling shareholder, plaintiffs

cite "no evidence of Congressional intent to graft state fiduciary duties onto the Treasury's

responsibilities under HERA."  *Robinson v. FHFA*, 223 F. Supp. 3d 659, 666 n.3 (E.D. Ky.

2016); *see also Roberts v. FHFA*, 243 F. Supp. 3d 950, 963 (N.D. Ill. 2017) ("There is zero hint

in [HERA], or anywhere else, that Congress intended for state-law-type fiduciary duties to apply

to Treasury in the exercise of its [HERA] purchase authority"), *aff'd*, 889 F.3d 397 (7th Cir.

2018).  Indeed, that "Congress explicitly permitted Treasury to consider the 'need for

preferences or priorities regarding payments to the Government,' [which would be] an interest

clearly at odds with traditional notions of dominant shareholder's fiduciary duties to minority

shareholders," demonstrates that HERA preempts any state-law duty ascribed to allegedly

dominant shareholders.  *Robinson*, 223 F. Supp. 3d at 666 n.3 (citing 12 U.S.C.

§ 1719(g)(1)(C)(i)).

### 2.     The PSPAs Impose No Fiduciary Duty Running From Treasury To Enterprise Shareholders

Although plaintiffs attempt to use the PSPAs to impose a fiduciary duty running from

Treasury (as the holder of senior preferred stock) to plaintiffs (as holders of common and junior

preferred stock), *see* Owl Creek Br. 29, no such duty arises from the PSPAs.  *See Perry Capital*

*II*, 864 F.3d at 619 (describing plaintiffs' breach of fiduciary duty claims as non-contractual).

Plaintiffs are not parties to the PSPAs, which disclaim any third-party beneficiary status.  *See*

PSPA § 6.1.  Moreover, that Treasury, like plaintiffs, is an investor in the Enterprises establishes

no fiduciary duty either.  *See Starr Int'l Co.*, 856 F.3d at 969 (explaining that the Government

assumed no fiduciary duty to AIG shareholders by virtue of its $85 billion investment).

Thus, unable to cite any contract or statute from which any genuine fiduciary duty

running from Treasury to Enterprise shareholders could arise, plaintiffs suggest that the alleged

duty somehow arises from unspecified propositions about "general corporate law."  Owl Creek

Br. 29.  Given that the Court does not entertain breach of fiduciary duty claims absent a contract

or money-mandating statute, "general corporate law" is an insufficient source from which

plaintiffs could state a breach of fiduciary duty claim.  In any event, plaintiffs' expectations

about purported duties to corporate shareholders arising from "general corporate law" are

preempted because HERA provides only that Treasury "protect the taxpayer"—not Enterprise

shareholders.  *See* 12 U.S.C. §§ 1455(*l*)(1)(B); 1719(g)(1)(B).

X.     Plaintiffs Fail To State A Plausible Breach Of Contract Claim

The Court should conclude that the plaintiffs have failed to assert a plausible breach

claim.

A.     The *Rafter* And *Cacciapalle* Plaintiffs Fail To State A Claim For Breach Of
       Contract

As an initial matter, a plaintiff cannot state a claim against the United States for breach of

contract without identifying a contract with the United States.  *See, e.g.*, *Ransom v. United

States*, 900 F.2d 242, 244 (Fed. Cir. 1990).  As we demonstrated in our moving brief and in

Section III.A above, the *Rafter* and *Cacciapalle* plaintiffs' breach of contract claims fail because

they do not meet this basic requirement.  *See* U.S. Mot. 40-41, 75-76.

First, the alleged "Fannie Mae Contract" referenced in the *Rafter* complaint describes a

contract between Fannie Mae shareholders and the Enterprises.  *See Rafter* ¶ 139.  As we

explained in our moving brief and in Section I above, FHFA as conservator stands in the

Enterprises' private shoes; the existence of the conservatorship does not transform plaintiffs' private "Fannie Mae Contract" into a Government contract.  Although the *Rafter* plaintiffs incorrectly argue that we do not "challenge [their] allegations that [the Government] breached the Fannie Contract," we demonstrated that they stated no contract claim because Government was not party to that purported contract in the first place.  *Compare* Rafter Br. 10, *with* U.S. Mot. 41, 75-76.

Second, the Enterprises' charters are not contracts between the United States and the *Rafter* plaintiffs.  *See* U.S. Mot. 76; *see also* Section III above.  But even if they were, the *Rafter* plaintiffs fail to plausibly allege that the Government breached an alleged duty of good faith and fair dealing set forth in the charter.  *Rafter* ¶¶ 156, 164.  Although the charters specify that the Enterprises "shall have common stock," the charters make no representations about what rights come with such stock.  In contrast, the charters are specific with respect to Treasury's rights as an investor.  Indeed, the charters expressly grant Treasury the right to make investments in the Enterprises to "protect the taxpayer" and for Treasury to exercise all rights obtained in connection with its investments.  *See* 12 U.S.C. §§ 1455(*l*)(1)(B)(iii), (*l*)(2)(A); 1719(g)(1)(B)(iii), (g)(2)(A).  Thus, even if the charter were a contract, the *Rafter* plaintiffs' claim fails because Government conduct consistent with the express terms of a contract defeats any claim that such conduct breached an implied duty.  *See Bell/Heery v. United States*, 739 F.3d 1324, 1334-35 (Fed. Cir. 2014).

Third, the *Rafter* plaintiffs' claim seeking to reform the PSPAs fails because it relies on allegations that the Third Amendment was *ultra vires*.  Rafter Br. 7.  As we demonstrated in our moving brief and above, every court to consider the validity of the Third Amendment held that renegotiating the PSPAs was within Treasury's and FHFA as conservator's statutory authority.

95

*See* U.S. Mot. 16-18 (citing cases); *see also, e.g.*, *Perry Capital II*, 864 F.3d at 607; *Jacobs*, 908 F.3d at 890-94; *Saxton*, 901 F.3d at 958-59.

Finally, the *Cacciapalle* plaintiffs' contract claim fares no better.  Cacciapalle Br. 7.  Indeed, that the *Cacciapalle* plaintiffs are pursuing in district court a putative shareholder class action against the Enterprises and FHFA as conservator based on the same contract claims that they allege in this case demonstrates that their contract claims arise under their private stock contracts—not Government contracts.  As the district court explained in the *Cacciapalle* plaintiffs' suit against the Enterprises and FHFA as conservator, the breach claims concern alleged conduct attributable to the Enterprises, not the United States.  *See Fairholme DDC*, 2018 WL 4680197, at *12.

B.     Plaintiffs Fail To State A Claim For Breach Of An Implied-In-Fact Contract That FHFA Would Operate The Enterprises As A Common-Law Conservator

Plaintiffs allege that FHFA entered into implied contracts with the Enterprises' boards to operate the Enterprises as a common-law conservator for shareholder benefit.  Beyond the claim's implausibility, as we demonstrated in our moving brief and in Section III.B above, any such breach claim belongs to the Enterprises and plaintiffs lack third-party beneficiary standing to pursue such a claim.  U.S. Mot. 42-43; *see also id.* at 77-78.  Accordingly, plaintiffs' breach of an implied-in-fact contract claim should be dismissed on those bases alone.

In any case, plaintiffs fail to state a claim for an implied-in-fact contract.  An implied-in-fact contract requires "something more than a cloud of evidence that could be consistent with a contract."  *D & N Bank v. United States*, 331 F.3d 1374, 1377 (Fed. Cir. 2003).  Specifically, it requires "(1) mutuality of intent to contract; (2) consideration; (3) lack of ambiguity in offer and acceptance; . . . and (4) actual authority" to enter a binding contract.  *Id.* at 1378.  Plaintiffs do

not meet these requirements.  Indeed, plaintiffs point to no alleged facts to show that FHFA

agreed to constrain its statutory conservatorship powers or otherwise depart from HERA.

Plaintiffs contend that FHFA and the boards of directors of the Enterprises agreed to an

implied-in-fact contract in which the directors consented to conservatorship and, in return, FHFA

supposedly agreed to operate as a "common law" conservator and forgo the full scope of its own

statutory powers.  Owl Creek Resp. at 33.  But FHFA's Director appointed FHFA as conservator

pursuant to his HERA authority.  *See, e.g.*, *Owl Creek* ¶ 46 (citing Questions & Answers on

Conservatorship (Sept. 7, 2008) ("In this instance, [FHFA] has been appointed by its Director to

be the Conservator of the Company in accordance with the Federal Housing Finance Regulatory

Reform Act of 2008 (Public Law 110-289) and the Federal Housing Enterprises Financial Safety

and Soundness Act of 1992[.]")).[24]  Moreover, the Director explained that the conservatorship

was a "statutory process."  *See Owl Creek* ¶ 45 (citing Statement of FHFA Director James B.

Lockhart at News Conference Announcing Conservatorship of Fannie Mae and Freddie Mac

(Sept. 7, 2008)).[25]  The complaints do not reference any FHFA or Enterprise statement reflecting

the existence of a contract.  Indeed, attached to the *Owl Creek* plaintiffs' response is Fannie

Mae's board resolution consenting to conservatorship.  Conspicuously absent from the board

resolution is any mention of an agreement whereby FHFA would withhold its statutory

conservatorship powers in exchange for the board's consent.  *See* Owl Creek Br., A79-83.

Moreover, if FHFA had taken the highly unusual step of relinquishing its own statutory

powers in a contractually binding manner, presumably *someone* would have publicly mentioned

this at some point in the decade before plaintiffs introduced the theory in this litigation.  Plainly,

---

[24] *Available at* https://go.usa.gov/xm4Nh.

[25] *Available at* https://go.usa.gov/xm4Rq.

whatever plaintiffs now claim to have believed, plaintiffs fail to plausibly allege a meeting of the

minds in which FHFA and the Enterprise boards agreed that FHFA as conservator would have

anything less than the full authority that Congress provided.

XI.    The *Washington Federal* Plaintiffs Cannot Challenge The Appointment Of A
       Conservator Under The Guise Of A Takings Or Illegal Exaction Claim

As we demonstrated in our moving brief, HERA contains the exclusive statutory

mechanism to challenge the appointment of a conservator.  Under Section 4617(a)(5), the

Enterprises may, within 30 days of appointment of a conservator, seek an order in district court

requiring the removal of the conservator.  *See* U.S. Mot. 79-80; 12 U.S.C. § 4617(a)(5).  Because

the Enterprises did not avail themselves of that right, the *Washington Federal* plaintiffs cannot

step in years later to challenge the appointment under the guise of a takings or illegal exaction

claim.

When a statutory scheme contemplating the appointment of a conservator or receiver

provides an exclusive mechanism for judicial review of the appointment decision, courts lack

jurisdiction to consider the merits of that decision in a separate litigation.  *See Resolution Tr.*

*Corp. v. Commerce Partners*, 132 F.R.D. 443, 445-46 (W.D. La. 1990) (rejecting defendant's

challenge to RTC as conservator's standing to sue on bank's behalf when statute permits only the

bank to challenge the appointment of a conservator within 30 days of its appointment).  In

*Gibson v. Resolution Trust Corp.*, 51 F.3d 1016, 1026-27 (11th Cir. 1995), two former bank

directors challenged RTC's repudiation of a contract that set aside money for payment of

directors' future legal fees.  In addition to their claim for declaratory relief with respect to the

contract, the directors contended that RTC's appointment as conservator violated the

Appointments Clause.  *Id.* at 1026.  The Eleventh Circuit rejected the directors' constitutional

challenge to the appointment because FIRREA provided only 30 days for challenges to

conservator appointment, and this was the "exclusive mechanism" for bringing such challenges. *Id.* at 1026-27.  Similarly, Section 4617(a)(5) of HERA is the exclusive mechanism for challenging the imposition of a conservatorship.  12 U.S.C. § 4617(a)(5).

Although the *Washington Federal* plaintiffs appear to acknowledge that a shareholder in a troubled financial institution does not have a property right in the institution's continued operation outside of a conservatorship or receivership, they argue that a shareholder in a healthy financial institution has a property right in the institution's continued operation without "governmental interference."  Wash. Fed. Br. 27-28.  HERA sets forth twelve grounds for the discretionary appointment of a conservator (*e.g.*, insolvency, undercapitalization, Enterprise consent, etc.); the *Washington Federal* plaintiffs argue that those grounds were not met.  *Id.* at 12.[26]  As a result, by placing the Enterprises into conservatorship when FHFA allegedly had no basis to do so, the Government allegedly interfered in plaintiffs' property right in the Enterprises operating outside of a conservatorship.  *Id.* at 28.

A fatal flaw in the *Washington Federal* plaintiffs' claim is that it requires the Court to evaluate the merits of the initial conservatorship decision.  *See id.* at 12, 27-28.  In HERA, however, Congress provided the exclusive statutory mechanism to review that decision— namely, the Enterprises could seek an order in district court directing FHFA to remove itself as conservator within 30 days of its appointment.  12 U.S.C. § 4617(a)(5).  Although the *Washington Federal* plaintiffs argue that the relief they seek here (damages) is different from the

---

[26] Although the *Washington Federal* plaintiffs acknowledge that the Enterprises' boards consented to the conservatorships, they allege that such consent was coerced because the Enterprises "faced a Hobson's choice: take the horse offered or none at all."  *See* Wash. Fed. Br. 9-10.  However, as we demonstrated in our moving brief and in Section I.B above, a choice between two difficult alternatives does not render "coerced" the choice itself.  *See A & D Auto Sales*, 748 F.3d at 1155.

relief available under HERA (conservator removal), litigating the merits of their claims would require the Court to evaluate the merits of the underlying conservatorship decision. *See* Wash. Fed. Br. 12.  The right to challenge that decision expired long before the *Washington Federal* plaintiffs filed suit and they cannot resurrect that challenge now under the guise of a takings or illegal exaction claim.  Moreover, any injuries the *Washington Federal* plaintiffs assert are the direct result of the Enterprises' decisions not to challenge the appointment of a conservator within 30 days, and thus could not be remedied by any action in this Court.

CONCLUSION

For these reasons and the reasons stated in our omnibus moving brief, plaintiffs' complaints should be dismissed.

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General


s/Robert E. Kirschman, Jr.
ROBERT E. KIRSCHMAN, JR.
Director

OF COUNSEL:

ELIZABETH M. HOSFORD
FRANKLIN E. WHITE, JR.
Assistant Directors

MARIANA T. ACEVEDO
RETA E. BEZAK
ERIC E. LAUFGRABEN
Trial Attorneys

s/Kenneth M. Dintzer
KENNETH M. DINTZER
Deputy Director
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
Telephone: (202) 616-0385
Facsimile:  (202) 307-0973
Email:      Kenneth.Dintzer@usdoj.gov

May 6, 2019

Attorneys for Defendant

<u>APPENDIX</u>

I.   Decisions Holding That The Enterprises Are Not Government Actors Subject To
Constitutional Claims

Appellate Court Decisions

1.   *Herron v. Fannie Mae*, 861 F.3d 160, 169 (D.C. Cir. 2017) ("[T]he government's
indefinite but temporary control does not transform Fannie Mae into a government
actor.")

2.   *Mik v. Freddie Mac*, 743 F.3d 149, 168 (6th Cir. 2014) ("Under the *Lebron* framework,
Freddie Mac is not a government actor who can be held liable for violations of the Fifth
Amendment's Due Process Clause.")

3.   *Rubin v. Fannie Mae*, 587 F. App'x 273, 275 (6th Cir. 2014) ("Under Supreme Court
precedent, a necessary condition precedent for a conclusion that a once-private entity is a
state actor is that the government's control over the entity is permanent.")

4.   *Bernard v. Fannie Mae*, 587 F. App'x 266, 271 (6th Cir. 2014) (citing *Lebron* and
holding that "following FHFA's conservatorship, Fannie Mae is not a state actor")

5.   *Heibel v. Fannie Mae*, 581 F. App'x 543, 544 (6th Cir. 2014) (following Sixth Circuit
precedent)

6.   *Freddie Mac v. Gaines*, 589 F. App'x 314, 316 (6th Cir. 2014) (following Sixth Circuit
precedent)

District Court Decisions

1.   *Herron v. Fannie Mae*, 857 F. Supp. 2d 87, 92 (D.D.C. 2012) (Fannie Mae is not subject
to *Bivens* claims because "the imposition of conservatorship . . . did not transform Fannie
Mae into a government actor.")

2.   *Haney v. Fannie Mae*, No. 16-cv-01296, 2017 WL 1404103, at *5 (D. Colo. Mar. 9,
2017) ("It is well-settled that Fannie Mae is not a state actor for purposes of establishing
the necessary state action" under § 1983) (citing *Herron*, 857 F. Supp. 2d at 92)

3.   *Beliz v. Loan Simple, Inc.*, No. 15-cv-01284, 2016 WL 424807, at *8 (D. Colo. Jan. 14,
2016), *report and recommendation adopted*, 2016 WL 409408 (D. Colo. Feb. 3, 2016)
("[T]he court agrees with those courts that have considered and rejected the argument
that Freddie Mac and its companion, Fannie Mae, are government actors by virtue of the
FHFA conservatorship. . . .  [T]he court concludes that the FHFA conservatorship does
not create the type of permanent control required under *Lebron*.")

4.     *Caldwell v. Citimortgage, Inc.*, No. 15-cv-1784, 2015 WL 6445467, at *4 (N.D. Ill. Oct. 23, 2015) (agreeing with "[a]ll of the federal courts to address the issue [and that] have held that Freddie Mac is not a government actor and, therefore, cannot be held liable for violating a plaintiff's constitutional rights")

5.     *Fisher v. JP Morgan Chase Bank, NA*, No. 14-cv-12734, 2015 WL 871066, at *4 (E.D. Mich. Feb. 27, 2015) ("The Courts have already determined that Fannie Mae is not a government actor" for constitutional purposes)

6.     *Hurst v. Fannie Mae*, No. 14-cv-10942, 2015 WL 300275, at *4 n.4 (E.D. Mich. Jan. 22, 2015), *aff'd*, 642 F. App'x 533 (6th Cir. 2016) (concluding even if plaintiff had standing, her claims would fail because "[f]ederal courts . . . across the country [have] found that neither Fannie Mae nor Freddie Mac are governmental actors post-conservatorship pursuant to the Supreme Court's decision in *Lebron*")

7.     *Freddie Mac. v. Kama*, No. 14-cv-00137, 2014 WL 4980967, at *16 (D. Haw. Oct. 3, 2014) (citing *Lebron* and agreeing with the "numerous district courts [that] have held that Freddie Mac, and similar entity [Fannie Mae] did not become federal governmental actors post-conservatorship")

8.     *Wright v. Fannie Mae*, No. 1:13-cv-04294, 2014 WL 12042555, at *3 (N.D. Ga. Sept. 22, 2014) ("Since government control of Defendant Fannie Mae is temporary, courts have consistently held that Defendant Fannie Mae is not a government actor, even though it is in a conservatorship.")

9.     *Rush v. Freddie Mac*, No. 13-cv-11302, 2014 WL 1030842, at *4 (E.D. Mich. Mar. 17, 2014) ("Thus, under the *Lebron* test, Freddie Mac is not a governmental entity.")

10.     *Narra v. Fannie Mae*, No. 2:13-cv-12282, 2014 WL 505571, at *4 (E.D. Mich. Feb. 7, 2014) ("[N]either Fannie Mae nor Freddie Mac are governmental actors post-conservatorship pursuant to the Supreme Court's decision in *Lebron*.")

11.     *In re Kapla*, No. ADV 12-4000, 2014 WL 346019, at *3 (E.D. Mich. Jan. 30, 2014) (citing *Lebro*n and agreeing "a conservatorship is by nature temporary and therefore the third prong required to find that [Fannie Mae] is a federal actor for the purpose of a constitutional claim is not satisfied")

12.     *Dias v. Fannie Mae*, 990 F. Supp. 2d 1042, 1062 (D. Haw. 2013) ("FHFA's conservatorship does not create the type of permanent control required under *Lebron*.")

13.     *Parra v. Fannie Mae*, No. 13-cv-4031, 2013 WL 5638824, at *3 (C.D. Cal. Oct. 16, 2013) (agreeing that "Fannie Mae and its conservator, [FHFA], are not government actors for purposes of the Fifth Amendment's Due Process Clause")

14.     *Williams v. Fannie Mae*, No. 1:13-cv-1899, 2013 WL 5361211, at *2 n.3 (N.D. Ga. Sept. 25, 2013) ("[C]ourts have consistently found that Fannie Mae is not a government actor for purposes of a constitutional claim.")

15.     *Johnson v. Fannie Mae*, No. 2:12-cv-00452, 2013 WL 3819365, at *2 (W.D. Mich. July 23, 2013) ("Fannie Mae is not a governmental entity capable of violating [plaintiff's] federal constitutional rights.")

16.     *In re Hermiz*, No. BR 12-52399, 2013 WL 3353928, at *2 (E.D. Mich. July 3, 2013) (citing *Lebron* and holding that "Freddie Mac is not a federal instrumentality for constitutional purposes")

17.     *May v. Wells Fargo Bank, N.A.*, No. 4:11-cv-3516, 2013 WL 3207511, at *5 (S.D. Tex. June 24, 2013) ("This Court agrees and holds that, despite FHFA's conservatorship, Freddie Mac is not a government actor under *Lebron.*")

18.     *Colbert v. Fannie Mae*, No. 12-cv-13844, 2013 WL 1629305, at *13 (E.D. Mich. Apr. 16, 2013) ("This Court agrees with the reasoning of other courts in this District concluding that Fannie Mae is not a state actor.")

19.     *Bernard v. Fannie Mae*, No. 12-cv-14680, 2013 WL 1282016, at *5 (E.D. Mich. Mar. 27, 2013), *aff'd*, 587 F. App'x 266 (6th Cir. 2014) ("FHFA's conservatorship does not create the type of permanent control required under *Lebron.*  Accordingly, the Court holds that Fannie Mae is not a government actor that can be held liable for an alleged Fifth Amendment due process violation.")

20.     *Fannie Mae v. Mandry*, No. 12-cv-13236, 2013 WL 687056, at *5 (E.D. Mich. Feb. 26, 2013) ("FHFA's conservatorship does not create the type of permanent control required under *Lebron.*  Accordingly, this Court holds that Fannie Mae and FHFA are not government actors that can be held liable for the Fifth Amendment due process violation.")

21.     *Freddie Mac v. Matthews-Gaines*, No. 12-cv-12131, 2013 WL 423777, at *3 (E.D. Mich. Feb. 4, 2013), *aff'd*, 589 F. App'x 314 (6th Cir. 2014) (Freddie Mac is not a government actor because "*Lebron* requires that the government maintain permanent control over the entity.")

22.     *Lopez v. Bank of Am., N.A.*, 920 F. Supp. 2d 798, 801 (W.D. Mich. 2013) ("Because Fannie Mae is not under permanent governmental control, it is not a governmental actor for purposes of constitutional challenges.")

23.     *Fannie Mae v. Lemaire*, No. 12-cv-11479, 2012 WL 12930829, at *2 (E.D. Mich. Dec. 20, 2012) (citing *Lebron* and holding "Defendants' due process argument must fail because Fannie Mae is a private corporation and not a government actor for constitutional purposes")

24.     *In re Kapla*, 485 B.R. 136, 152 (Bankr. E.D. Mich. 2012), *aff'd*, 2014 WL 346019 (E.D. Mich. Jan. 30, 2014) ("Fannie Mae is not a government actor under *Lebron* for purposes of constitutional claims.")

25.     *Rubin v. Fannie Mae*, No. 12-cv-12832, 2012 WL 6000572, at *3 (E.D. Mich. Nov. 30, 2012) (citing *Lebron* and holding "that Fannie Mae is not a federal actor [for the purpose of] constitutional claims")

26.     *Ljekocevic v. CitiMortgage*, No. 11-cv-14403, 2012 WL 5379571, at *4 (E.D. Mich. Sept. 25, 2012), *report and recommendation adopted*, 2012 WL 5379370 (E.D. Mich. Oct. 31, 2012) ("Freddie Mac is a private corporation—not a government actor—for constitutional purposes.")

27.     *Syriani v. Freddie Mac Multiclass Certificates, Series 3365*, No. 12-cv-3035, 2012 WL 6200251, at *4 (C.D. Cal. July 10, 2012) (applying *Lebron* and holding "Freddie Mac does not become a governmental actor for Fifth Amendment purposes merely because it is placed into conservatorship.  [FHFA]'s 'control' is merely the same control that Freddie Mac had before the conservatorship.")

28.     *Garcia v. Fannie Mae*, No. 1:13-cv-1259, 2014 WL 2210784, at *3 (W.D. Mich. Apr. 30, 2014), *aff'd*, 782 F.3d 736 (6th Cir. 2015) (citing *Herron* and holding that "Fannie Mae is not a governmental actor" for the plaintiff's § 1983 claim)

29.     *Freddie Mac v. Shamoon*, 922 F. Supp. 2d 641, 644 (E.D. Mich. 2013) (applying *Lebron* and holding that "Freddie Mac, and similar entity Fannie Mae, [are] not governmental actors post-conservatorship, and dismissing claims alleging a constitutional violation as a matter of law")

30.     *Oliver v. Bank of Am., N.A.*, No. 1:14-cv-00012, 2014 WL 11532239, at *6 (E.D. Tenn. Sept. 10, 2014) (agreeing with the "[n]umerous federal courts [that] have specifically considered the issue of whether post-conservatorship [Fannie Mae] qualifies as a state actor under the test set forth in *Lebron* and have consistently found that [Fannie Mae] is not a state actor")

31.     *Colyer v. Freddie Mac*, No. 13-cv-10425, 2014 WL 1048009, at *6 (E.D. Mich. Mar. 18, 2014) (dismissing plaintiff's § 1983 claim because "Freddie Mac is not a governmental actor")

32.     *Smalls v. Riviera Towers Corp.*, No.16-cv-847, 2017 WL 4180115, at *4 n.4 (D.N.J. Sept. 21, 2017) (Fannie Mae is "not considered to be a state actor for purposes of Section 1983 or constitutional claims.")

33.     *Narra v. Fannie Mae*, No. 2:13-cv-12282, 2014 WL 505571, at *4 (E.D. Mich. Feb. 7, 2014) ("Federal courts . . . have comprehensively examined the issue and found that neither Fannie Mae nor Freddie Mac are governmental actors post-conservatorship pursuant to the Supreme Court's decision in *Lebron*.")

A4

34.   *Williams v. Fannie Mae*, No. 13-cv-12776, 2013 WL 5445883, at *2 (E.D. Mich. Sept. 30, 2013) ("Fannie Mae is not a state actor [for 'constitutional due process . . . violations.']")

35.   *Yousif v. Fannie Mae*, No. 12-cv-12427, 2013 WL 980159, at *2 n.2 (E.D. Mich. Mar. 13, 2013) ("Fannie Mae is neither a governmental entity nor a state actor" subject to plaintiff's due process claim)

36.   *Freddie Mac v. Montague*, No. 1:13-cv-1162, 2014 WL 4313633, at *5 (W.D. Mich. Sept. 2, 2014) (Freddie Mac "is not a state actor who can be held liable for violations of the Due Process Clause.")

II.   Decisions Holding That FHFA As Conservator Is Not A Government Actor Subject To Constitutional Claims

1.   *Herron v. Fannie Mae*, 861 F.3d 160, 169 (D.C. Cir. 2017) (as conservator, "FHFA shed its government character and became a private party.") (international quotation marks and alterations omitted)

2.   *Parra v. Fannie Mae*, No. 13-cv-4031 FMO SHX, 2013 WL 5638824, at *3 (C.D. Cal. Oct. 16, 2013) ("FHFA, which took over as Fannie Mae's conservator, also does not qualify as a government actor.")

3.   *Dias v. Fannie Mae*, 990 F. Supp. 2d 1042, 1061 (D. Haw. 2013) ("Similarly, the FHFA, which took over as Fannie Mae's conservator, also does not qualify as a government actor.")

4.   *Fannie Mae v. Mandry*, No. 12-cv-13236, 2013 WL 687056, at *5 (E.D. Mich. Feb. 26, 2013) ("Fannie Mae and FHFA are not government actors that can be held liable for [a] Fifth Amendment due process violation.")

5.   *Herron v. Fannie Mae*, 857 F. Supp. 2d 87, 95 (D.D.C. 2012) ("FHFA as conservator for Fannie Mae is not a government actor.")

A5