IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| **Bryndon Fisher**, **Bruce Reid**, and **Erick Shipmon**, derivatively on behalf of **Federal National Mortgage Association**,<br><br>            Plaintiffs,<br>   v.<br><br>**The United States of America**,<br><br>            Defendant,<br><br>and **Federal National Mortgage Association**,<br><br>            Nominal Defendant. | No. 13-608C<br>(Judge Sweeney) |
| **Bruce Reid** and **Bryndon Fisher**, derivatively on behalf of **Federal Home Loan Mortgage Corporation**,<br><br>            Plaintiffs,<br>   v.<br><br>**The United States of America**,<br><br>            Defendant,<br><br>and **Federal Home Loan Mortgage Corporation**,<br><br>            Nominal Defendant. | No. 14-152C<br>(Judge Sweeney) |

**Derivative Plaintiffs' Reply to Government's Response to Show Cause Order**

In response to the Court's Show Cause Order, on March 15, 2023, Derivative Plaintiffs indicated that they believed that *Fairholme* was wrongly decided but recognized the Federal Circuit's decision was binding precedent this Court must follow. Accordingly, Derivative Plaintiffs recognized at the time that the Federal Circuit's decision required this Court to dismiss the above-captioned actions. However, because they do not agree *Fairholme* was correctly decided, Derivative Plaintiffs also indicated that they intended to seek *en banc* review in the Federal Circuit of any dismissal of their complaints and/or file a petition for a writ of certiorari in the U.S. Supreme Court.

Circumstances have changed. On May 25, 2023, two months after Derivative Plaintiffs' response to the show cause order, the U.S. Supreme Court decided *Tyler v. Hennepin County, Minnesota*, 143 S. Ct. 1369 (2023). *Tyler* asked whether the Government can extinguish a property right through the passage of a statute—the same question at issue in *Fairholme*. The *Tyler* Court held that the Government cannot "sidestep the Takings Clause by disavowing traditional property interests in assets it wishes to appropriate." *Id.* The same is true here.

In light of the Supreme Court's decision in *Tyler*, Derivative Plaintiffs no longer believe that *Fairholme* binds this Court. As explained below, *Tyler* effected a sea change in regulatory takings law, which seriously calls into question, if not abrogates, *Fairholme*'s holding on the merits of plaintiffs' takings claim, and requires this Court to consider whether it is still good law.

Nor, as the Government argues, does *Fairholme* bar Derivative Plaintiffs from proceeding based on either issue or claim preclusion. The Government is wrong for three reasons.

First, the Supreme Court's unanimous decision in *Tyler* abrogates the Federal Circuit's decision in *Fairholme* concerning the merits of derivative takings claims. It is binding on this Court. Accordingly, this Court cannot simply dismiss these actions under *Fairholme* but must reevaluate

1

whether Derivative Plaintiffs have stated a takings claim on the merits under the new analytical framework the Supreme Court announced in *Tyler*.

Second, *Tyler* also constitutes intervening controlling authority that undermines the Federal Circuit's decision in *Fairholme* and negates any basis for claim or issue preclusion. In light of this change in controlling precedent, neither this Court nor the Court of Appeals is precluded from considering Derivative Plaintiffs takings claims on the merits.

Third, even if this Court were to conclude that it is bound by *Fairholme*, that decision does not have any preclusive effect because the *Fairholme* plaintiffs did not adequately represent the Enterprises' interests. The *Fairholme* plaintiffs and their counsel faced serious conflicts of interest in litigating derivative takings claims and instead focused almost exclusively on their direct claims, as evidenced by the way they prosecuted their case both in this Court and the Federal Circuit. The *Fairholme* plaintiffs' indifference or even hostility to the Enterprises' derivative claims may have contributed to the Federal Circuit's decision on the merits. In fact, the *Fairholme* plaintiffs did not even brief the merits of the derivative takings claim on appeal, undermining any notion that the Federal Circuit's decision on those issues—which the Government contends should have preclusive effect—was the product of litigation by parties adequately representing the Enterprises' interests.

Given the changed legal landscape and the inadequacy of the representatives of the Enterprises in the related cases, the Court should afford Derivative Plaintiffs a full opportunity to litigate their derivative takings claim on behalf of the Enterprises.

**I.   The Supreme Court's Decision in *Tyler* Abrogates *Fairholme*'s Holding on the Merits.**

From the start, Derivative Plaintiffs' fundamental theory of liability has been that the Fifth Amendment's Takings Clause constrains the FHFA from taking the entire net worth of the Enterprises in perpetuity for public use without just compensation. Although HERA conferred broad authority on FHFA as conservator to conduct the business of the Enterprises, including

permitting FHFA to consider both the interests of the Enterprises and the interests of the public, that authority is necessarily limited by the Constitution.

In *Fairholme*, the Federal Circuit sidestepped whether HERA's succession clause barred derivative takings claims and instead decided the merits.[1] It ruled that the plaintiffs failed to state a claim because HERA "gave the FHFA the unrestricted authority to place the Enterprises into conservatorship" and that when the FHFA exercised that authority, "the Enterprises lost their right to exclude the government from their property, including their net worth." *Fairholme Funds, Inc. v. United States*, 26 F.4th 1274, 1303 (Fed. Cir. 2022). The Federal Circuit assumed that the Takings Clause did not constrain how FHFA exercised its statutory authority. Instead, it concluded that, given the "Enterprises lacked the right to exclude the government from their net worth," they "had no investment-backed expectation that FHFA would protect their interests and not dilute their equity." *Id.* Accordingly, the Federal Circuit held that even though the FHFA exercised its power as conservator to cause the Enterprises to hand over their entire net worth every quarter to the Government, that did not constitute a taking. *Id.*

Following the Federal Circuit's decision in *Fairholme*, the Supreme Court issued a landmark takings clause decision that directly addressed how property is defined. *Tyler* concerned a state statute that permitted the government to obtain a judgment against real property for unpaid real estate taxes. *Tyler*, 143 S. Ct. at 1373–74. If the taxpayer did not pay outstanding tax debts within a specified period, the government could sell the property and retain *all* proceeds, even if the proceeds far exceeded the tax debt and costs of sale. *Id.* The district court had dismissed the plaintiff's takings claim for failure to state a claim, and the Eighth Circuit affirmed, ruling, in terms similar to *Fairholme*,

---

[1] The parties on appeal in *Fairholme* did not brief the merits of any derivative takings claims. Instead, their briefing was focused on other issues, including whether various claims (including the takings claim) were derivative or direct and whether HERA's succession clause barred such claims.

that because the state law recognized no property interest in the surplus proceeds from the sale, there can be no unconstitutional taking. *Id.* at 1374.

The Supreme Court reversed. In so doing, the Court constrained the government's ability to redefine property interests to permit it to take private property that it otherwise could not, without providing just compensation. The Court held that the government cannot "sidestep the Takings Clause by disavowing traditional property interests in assets it wishes to appropriate." *Id.* at 1375 (quotations omitted). In other words, the government cannot make an end-run around the Takings Clause by redefining property interests in a manner that excludes any expectation that a private property owner will be able to retain an interest.

As the Supreme Court explained, because the Takings Clause itself does not define property, courts draw on existing rules and understandings about property rights. *Id.* Although a government statute is one important source, it "cannot be the only source." *Id.* Indeed, the Takings Clause "would be a dead letter if a state could simply exclude from its definition of property any interest that the state wished to take." *Id.* (quoting *Phillips v. Wash. Legal Foundation*, 524 U. S. 156, 165–168 (1998)).[2] Rather, under the *Tyler* framework, courts must also "look to 'traditional property law principles,' plus historical practice and [Supreme Court] precedents." *Id.*

The Federal Circuit in *Fairholme*, however, failed to conduct any such analysis.[3] Its discussion of the relevant property interest under the Takings Clause focused entirely on the effect of HERA on plaintiffs' property rights and failed to consider traditional property law principles. Considering

---

[2] Although *Tyler* concerned a state statute, the Fifth Amendment's Takings Clause likewise constrains the Government's ability to redefine property interests under federal law.

[3] The *Fairholme* Plaintiffs also failed to brief traditional property law principles and their application to the definition of the relevant property interests in these actions. That failure further demonstrates that *Fairholme* has no preclusive effect.

4

the new framework the Supreme Court announced in *Tyler*, *Fairholme*'s analysis of what constitutes a cognizable property interest is now incomplete and inadequate.

Moreover, although *Tyler* and this case concern very different statutes, the property analysis is remarkably similar. Here, in nationalizing the Enterprises to avoid the Takings Clause requirement of just compensation, the FHFA disavowed the Enterprises' interests in their own net worth.[4] As Derivative Plaintiffs have consistently maintained, whatever authority HERA granted the FHFA, that authority must be construed consistent with the Takings Clause. The FHFA's *statutory* authority conferred by HERA thus must be limited by its *constitutional* obligation for just compensation.

The *Tyler* Court reached a similar conclusion. There, although the case concerned real property, the Supreme Court held that government could not simply rely on a statute to abrogate a homeowner's interest in the surplus value following the sale of her home and the satisfaction of her debts. *Id.* Property rights "cannot be so easily manipulated." *Id.* at 1379 (quoting *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063 (2021)). Government "may not extinguish a property interest … to avoid paying just compensation when it is the one doing the taking." *Id.*

Nor could the Government "use the toehold of the tax debt to confiscate more property than was due." *Id.* at 1376. Likewise, the FHFA could not, consistent with the Takings Clause, use the toehold of conservatorship to nationalize the Enterprises for public use merely because the Enterprises owed the government money. It could not use conservatorship as an excuse to extract money from the Enterprises that far exceeded what the Enterprises owed to the Government. Even if the FHFA had the *statutory* discretion to do so, it had the *constitutional* obligation to pay just

---

[4] To be clear, Derivative Plaintiffs allege that the taking occurred at the time of the Net Worth Sweep, not the time of conservatorship. Although HERA gave the FHFA authority to consider the interests of the public in exercising its authority as conservator, nothing compelled it to do so by confiscating the Enterprises' value for the public. Even if FHFA was intent on nationalizing the Enterprises for public use, nothing precluded it from doing so *and* paying just compensation.

5

compensation consistent with the Takings Clause. Because it failed to do so, Derivative Plaintiffs have stated a takings claim under *Tyler*.

## II. Changes in Controlling Law Prevent the Preclusive Effect of Prior Decisions.

*Fairholme* also does not bar Derivative Plaintiffs from proceeding based on either issue or claim preclusion both because (a) *Tyler* changed the law and (b) the *Fairholme* Plaintiffs failed to adequately represent the Enterprises' interests.

First, "[e]ven if the core requirements for issue preclusion had been met, an exception to the doctrine's application [is] warranted [in the event of an] intervening decision" that changes the law. *Bobby v. Bies*, 556 U.S. 825, 836 (2009); Restat 2d of Judgments, § 28(2) ("relitigation of the issue in a subsequent action … is not precluded [when] a new determination is warranted in order to take account of an intervening change in the applicable legal context"). An intervening Supreme Court decision that contradicts the legal rule applied in the prior proceeding negates the application of any preclusion doctrines. *Bobby*, 556 U.S. at 836; *Herrera v. Wyoming*, 139 S. Ct. 1686, 1698 (2019) ("[A] change in law justifies an exception to preclusion.").

For all the reasons explained earlier, *Tyler* undermines the core premise of the Federal Circuit's merits decision in *Fairholme* on the Enterprises' derivative takings claim. It announces an entirely new legal test courts must apply in defining property. And it abrogates existing cases, like *Fairholme*, that exclusively rely on a statute to nullify the right to exclude the Government from a plaintiff's property under the Fifth Amendment. At a minimum, Derivative Plaintiffs should be afforded the opportunity—either in this Court or the Federal Circuit—to litigate their derivative takings claims under the legal framework announced in *Tyler*.

## III. The *Fairholme* Plaintiffs Did Not Adequately Represent the Enterprise's Interests.

As the Government acknowledges, preclusion applies to a subsequent derivative lawsuit only where "'the shareholder [in the first action] fairly and adequately represented the corporation.'" Gov.

6

Response 6 (quoting *In re Sonus Networks, v. S'holder Derivative Litig.*, 499 F.3d 47, 74 (1st Cir. 2007)); 18 Moore's Federal Practice - Civil § 131.40 (2023) ("A person who represents another in litigation must be properly constituted as such, limit his or her participation to the matters within his representative authority …, and must faithfully discharge that responsibility."). Where, as here, a party serves in a representative capacity, "judgment for or against [them] is res judicata in a suit on the same claim by" the party in interest only if "no conflict of interest made the [representative's] representation inadequate." *In re Met-L-Wood Corp.*, 861 F.2d 1012, 1017 (7th Cir. 1988).

There are significant reasons to doubt that the *Fairholme* plaintiffs satisfy this standard, given the serious, manifested conflicts of interest they faced in focusing their efforts on prosecuting their direct claims to the detriment of the Enterprises' derivative claims. This conflict undermines any notion that those plaintiffs adequately represented the Enterprises' interests in pursuing derivative constitutional claims. Therefore, the Derivative Plaintiffs are not bound by the product of the *Fairholme* plaintiffs' conflicted representation.

### A. The *Fairholme* Plaintiffs' Conflicts.

The *Fairholme* plaintiffs filed their complaint on July 9, 2013, asserting exclusively direct claims. *Fairholme* ECF 1.[5] The Derivative Plaintiffs filed their action on behalf of Fannie Mae the next month. Nearly five years after filing their direct claims, on March 8, 2018, following jurisdictional discovery and multiple appellate decisions in other cases that claims concerning the Net Worth Sweep were indeed derivative, Fairholme filed an amended complaint. In addition to their longstanding direct claims, they added a new plaintiff, Andrew T. Barrett, who, for the first time, asserted derivative claims. *Fairholme* ECF 401.

---

[5] "*Fairholme* ECF" refers to the ECF entries in the Court of Federal Claims in *Fairholme Funds, Inc. v. United States*, No. 13-465C (Fed. Cl.).

The other twelve *Fairholme* plaintiffs continued to exclusively assert direct claims. *Fairholme*, ECF. 422 ¶¶ 19-31, 166-287. Those twelve plaintiffs are each investment funds and insurance companies with substantial holdings in Fannie Mae and Freddie Mac. *Id.* These large investor plaintiffs would benefit more from a direct recovery (which would directly provide them with individual damages or settlement payments) than a derivative recovery (which would be paid to the Enterprises and benefit shareholders only indirectly and equally).

Even after adding a derivative plaintiff, the *Fairholme* plaintiffs steadfastly maintained in this Court that their claims were direct, not derivative. See *Fairholme* ECF 428 at 21-25. They made their position clear at argument on the motion to dismiss. Counsel for the plaintiffs in another related case, who argued on behalf of Fairholme whether the claims were direct or derivative, asserted: "[T]he claims we've pled as direct, are, in fact, direct." *Fairholme* ECF 445 at 180:14:17. The direct plaintiffs then argued, at length, why they believed the core claims in all the related cases, including the takings claim, were direct rather than derivative. *Id.* at 180:9-189:4; *see also id.* at 189:1-189:4 ("I think it's crystal clear they are direct claims."); *id.* at 314:5-315:6 ("The central property right at issue here … are the rights of both the junior preferred and the common shareholders to receive dividends or distributions. … I want to emphasize that's the centerpiece."). Counsel for Mr. Barrett—the sole *Fairholme* plaintiff asserting derivative claims—did not defend the derivative claims either in his supplemental brief on the motion to dismiss or at oral argument.

Among all the plaintiffs in the related cases, the Derivative Plaintiffs alone argued that all claims arising from the Net Worth Sweep, including Mr. Barrett's, are derivative. *Fairholme* ECF No. 445 at 189-206, 213-14.

On appeal, the *Fairholme* plaintiffs maintained their position that the claims were direct, spending nearly half their opening appellate brief seeking to *reverse* this Court's decision holding that

8

the shareholder claims were derivative. Appeal ECF. 35.[6] The *Fairholme* plaintiffs spent the rest of the brief defending the direct claims over jurisdictional and statutory challenges.

By focusing almost exclusively on shareholders' purported *direct* claims, the *Fairholme* plaintiffs failed to adequately defend the merits of the Enterprises' *derivative* claims. In fact, their only substantive argument on the merits of the takings claims concerned whether direct plaintiffs have standing to seek just compensation for the "takings of their derivative claims" under the theory that the "appropriation of their right to bring derivative claims" was *itself* a taking. By arguing that any derivative claims they once held had already been taken—despite this Court's holding to the contrary—the *Fairholme* plaintiffs not only failed to adequately defend the Derivative claims but actively contradicted and undermined those claims on appeal. Appeal ECF 58 at 106–13. Thus, when the Federal Circuit resolved the merits of the derivative takings claims, it did so without the benefit of *any* relevant briefing by the *Fairholme* plaintiffs. That is textbook inadequacy.

### B. The *Fairholme* Plaintiffs' Manifested Conflict Renders Them Inadequate Representatives of the Enterprises.

The history of the related cases reveals that *Fairholme* counsel's simultaneous representation of both an individual plaintiff suing derivatively on behalf of Fannie and Freddie and large institutional investors suing directly for their own damages created a conflict of interest. *St. Clair Shores Gen. Emples. Ret. Sys. v. Eibeler*, 2006 U.S. Dist. LEXIS 72316,*23 (S.D.N.Y. Oct. 4, 2006) ("[P]laintiffs attempting to advance derivative and direct claims in the same action face an impermissible conflict of interest …."); *Ryan v. Aetna Life Ins. Co.*, 765 F. Supp. 133, 135-37 (S.D.N.Y. 1991) (party is "subject to a conflict of interest in pursuing both direct and derivative claims," given inconsistent proof required for each claim).

---

[6] "Appeal ECF" Refers to the docket entries in *Fairholme Funds, Inc. v. United States*, No. 2020-1912 (Fed. Cir.).

To be clear, the Derivative Plaintiffs do not contend that no party may ever assert both direct and derivative claims arising from a common set of facts. The assertion of derivative and direct claims is common, for example, where a securities fraud has occurred, in which case there are often direct securities fraud claims on behalf of defrauded shareholders and derivative claims for damage inflicted upon a company related to the fraud. In those circumstances—where the claims are not mutually exclusive—direct and derivative claims can coexist.

*Fairholme*, however, presents the opposite circumstance. Because both direct and derivative claims predicated on the Government's Net Worth Sweep arise from the same harm and concern the same damages, they must be *either* direct or derivative. It would not have been possible for both the direct plaintiffs to recover damages on behalf of shareholders for taking the Enterprises' assets and for Derivative Plaintiffs to recover the same damages for the Enterprises based on the same constitutional claims. That would have been an impermissible double recovery.

Faced with that choice, the *Fairholme* plaintiffs made the strategic decision to put all their eggs in the direct basket. To be clear, Derivative Plaintiffs in no way impugn the actions or motives of counsel for the *Fairholme* plaintiffs. They no doubt used their best judgment as highly capable and experienced attorneys to serve the best interests of their clients. But they were faced with a Sophie's choice. By focusing almost exclusively on their direct claims, which disproportionately benefited their institutional clients at the expense of the Enterprises' derivative claims, the Federal Circuit did not have the benefit of adequate briefing on the merits of the derivative takings claims.

Under these circumstances, the "conflict of interest made the [representative's] representation inadequate." *Met-L-Wood*, 861 F.2d at 1017. Accordingly, Derivative Plaintiffs' claims are not precluded by the Federal Circuit's decision *Fairholme*.

### III.  CONCLUSION

For the foregoing reasons, in light of the Supreme Court's decision in *Tyler*, this Court is no longer bound by the Federal Circuit's decision in *Fairholme* on the merits of the derivative takings claims. Accordingly, Derivative Plaintiffs should be permitted to litigate the merits of their takings claims on behalf of the Enterprises through discovery and trial.

Dated: July 21, 2023                              **Schubert Jonckheer & Kolbe LLP**

By: /s/ Robert C. Schubert

Robert C. Schubert
Attorney of Record
*rschubert@sjk.law*

2001 Union St Ste 200
San Francisco, CA 94123
Ph: 415.788.4220
Fx: 415.788.0161

Of Counsel:                              **Schubert Jonckheer & Kolbe LLP**

Amber L. Schubert
*aschubert@sjk.law*

2001 Union St Ste 200
San Francisco, CA 94123
Ph: 415.788.4220
Fx: 415.788.0161

**Shapiro Haber & Urmy LLP**

Edward F. Haber
*ehaber@shulaw.com*

One Boston Pl Ste 2600
Boston MA 02108
Ph: 617.439.3939
Fx: 617.439.0134

*Attorneys for Derivative Plaintiffs*

11