# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| **Bryndon Fisher, Bruce Reid,** and **Erick Shipmon**, derivatively on behalf of **Federal National Mortgage Association,**<br><br>                    Plaintiffs,<br>v.<br><br>**The United States of America**<br><br>                    Defendant,<br><br>and **Federal National Mortgage Association**<br>                    Nominal Defendant. | No. 1:13-cv-00608-MMS |

## SECOND AMENDED CONSOLIDATED DERIVATIVE COMPLAINT

# TABLE OF CONTENTS

I.   SUMMARY OF THE ACTION ......................................................................................... 1

II.  JURISDICTION AND VENUE ........................................................................................ 6

III. PARTIES ........................................................................................................................... 6

IV.  NON-DEFENDANT DIRECTORS ................................................................................. 7

V.   CONSTITUTIONAL PROVISION ................................................................................. 9

VI.  FACTUAL ALLEGATIONS ............................................................................................ 9

     A.   History of Fannie Mae and Relevant Statutes ......................................................... 9

     B.   The Financial Crisis of 2007 and the Enactment of HERA ................................. 10

     C.   The Conservatorship ............................................................................................. 14

     D.   The Preferred Stock Purchase Agreement ........................................................... 17

     E.   FHFA's Role as Conservator Was Compromised by Its Concurrent Role as
          Regulator and Its Relationship with Treasury ..................................................... 19
          1)   FHFA's Failure to Separate Its Role as Conservator from its Role as
               Regulator Compromised Its Role as Conservator .................................... 19
          2)   FHFA's Relationship with Treasury Compromised Its Role as Conservator
               .................................................................................................................. 22

     F.   Accounting Judgments Exercised During the Conservatorship Caused Fannie Mae
          to Record Massive Non-Cash Losses ................................................................... 26

     G.   Prior to Executing the Third Amendment, FHFA and Treasury Knew that Fannie
          Mae's Non-Cash Losses Would Soon Have to Be Reversed ............................... 27

     H.   The Third Amendment Was an Agreement by the Government with the
          Government to Seize All of Fannie Mae's Future Earnings for the Government 35
          1)   The Terms of the Third Amendment ...................................................... 35
          2)   Treasury Developed the Third Amendment to Seize All of Fannie Mae's
               Earnings for Taxpayers ............................................................................ 36
          3)   Treasury Dictated the Timing of the Third Amendment to Take Massive
               Profits from Fannie Mae .......................................................................... 42
          4)   The Net Worth Sweep Seized All of Fannie Mae's Future Earnings for
               Public Use ................................................................................................ 44

     I.   FHFA Acted as an Agent of the United States When It Approved the Third
          Amendment. ........................................................................................................... 48

i

J.     The Government Reaped a Massive Windfall ........................................................ 52

VII. THE NET WORTH SWEEP WAS AN UNLAWFUL TAKING OF FANNIE MAE'S PRIVATE PROPERTY WITHOUT JUST COMPENSATION ..................................... 55

    A.     Fannie Mae Had a Cognizable Property Interest in Its Future Earnings Prior to the Imposition of the Third Amendment. .................................................................. 55

    B.     The Government's Permanent Expropriation of Fannie Mae's Right to Its Future Earnings Constitutes a Compensable Taking. ...................................................... 56

VIII.   IN THE ALTERNATIVE, THE NET WORTH SWEEP CONSTITUTED AN ILLEGAL EXACTION FOR WHICH COMPENSATION IS DUE .................................................. 58

IX.   DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS ........................................... 60

    A.     Demand on Fannie Mae's Board Would Be Futile and Is Excused ..................... 60

    B.     Demand on FHFA Would Be Futile and Is Excused ............................................ 62

X.   CLAIMS FOR RELIEF ........................................................................................... 64

XI.  PRAYER FOR RELIEF ........................................................................................... 67

Upon personal knowledge as to their own acts and status, and based upon their investigation, their counsel's investigation, and information and belief as to all other matters, Plaintiffs Bryndon Fisher, Bruce Reid, and Erick Shipmon ("Plaintiffs"), derivatively on behalf of the Federal National Mortgage Association ("Fannie Mae" or the "Company"), allege as follows:

## I.   SUMMARY OF THE ACTION

1.      This is a shareholder derivative action on behalf of Fannie Mae against the United States of America ("United States" or the "Government"). This derivative action seeks just compensation for the taking or, in the alternative, an illegal exaction of the private property of Fannie Mae for public use by the United States, including the Department of the Treasury ("Treasury"), the Federal Housing Finance Agency ("FHFA"), and their respective agents through execution on August 17, 2012 of a Third Amendment to the Amended & Restated Senior Preferred Stock Purchase Agreement (the "Third Amendment") between Fannie Mae and Treasury.

2.      Since 1968, Fannie Mae has been a privately-owned corporation, charged with maintaining a stable and liquid secondary mortgage market by purchasing mortgage loans from other financial institutions, issuing and purchasing mortgage-backed securities, and guaranteeing privately owned mortgage-backed securities. Since 1968, Fannie Mae has obtained funding from private capital, including common and preferred shareholders, and its stock traded on the New York Stock Exchange until July 7, 2010. From July 8, 2010 through the present, Fannie Mae's stock has publicly traded on the OTC Bulletin Board under the symbol "FNMA."

3.      During the mortgage-related financial crisis that began in 2007, Congress created FHFA to serve as Fannie Mae's regulator, overseeing Fannie Mae's operations, and if necessary, to also serve as the Company's conservator or receiver. Congress also authorized Treasury to provide financial assistance to Fannie Mae by purchasing securities issued by the Company.

Treasury was authorized to make such purchases if it determined that they would help stabilize financial markets, prevent disruptions in the mortgage markets, and protect taxpayers.

4.      On September 6, 2008, FHFA's Director placed Fannie Mae into conservatorship in order to "operate the [Company] until [it was] stabilized."

5.      On September 7, 2008, Treasury and FHFA executed a preferred stock purchase agreement ("PSPA"). Under the initial PSPA, Treasury purchased one million shares of newly issued, senior preferred stock (the "Government Preferred Stock") from Fannie Mae in exchange for a funding commitment that allowed the Company to draw up to $100 billion from Treasury as needed to ensure it maintained a positive net worth. The Government Preferred Stock would have a liquidation preference equal to $1 billion plus the sum of all draws by the Company against Treasury's funding commitment (the "Liquidation Preference"). The Government was entitled to either a cumulative annual cash dividend equal to 10% of the outstanding Liquidation Preference or a 12% increase in the amount of the Liquidation Preference (the "PSPA Dividend"), to be paid in quarterly installments. The PSPA also granted Treasury warrants to purchase up to 79.9% of the Company's common stock for a nominal price.

6.      Shortly after FHFA placed Fannie Mae into conservatorship, the Company declared massive non-cash losses, primarily because it wrote down tens of billions of dollars of deferred tax assets and substantially increased its loan loss reserves. These accounting adjustments, which reflected an overly pessimistic view of Fannie Mae's future prospects and the value of the mortgages it owned, depleted the Company's operating capital and required the Company, in turn, to borrow massive amounts from Treasury in order to maintain a positive net worth. Between the onset of the conservatorship and August 2012, Treasury advanced $117.1 billion to Fannie Mae, approximately $100 billion of which had been needed to cover non-cash losses, and accordingly, caused the Company to owe approximately $11.7 billion in annual

2

PSPA Dividends to Treasury. Between the time FHFA placed Fannie Mae into conservatorship and the date the Third Amendment was executed on August 17, 2012, Fannie Mae paid the Government approximately $25 billion in PSPA Dividends.

7.      Despite recording massive non-cash losses, on an operational basis, Fannie Mae's revenues had regularly exceeded its expenses during the conservatorship, and as the housing crisis began to improve in 2011, so, too, did Fannie Mae's fortunes. By the end of the first quarter of 2012, Fannie Mae had earned enough that it was able to record a net profit after paying the substantial PSPA Dividend in cash. Furthermore, its future projections indicated that it would soon have to reverse much of the non-cash losses it had incurred during the conservatorship and therefore would soon experience unprecedented profits. If Fannie Mae was able to use those unprecedented profits to redeem the Government Preferred Stock by paying down the Liquidation Preference, the Company could potentially emerge from conservatorship as a financially solvent and valuable private entity.

8.      The Government would not allow this to happen. Instead, FHFA and Treasury acted to ensure that Fannie Mae would remain under the Government's control in perpetuity, serving as a cash cow to prop up its budget. The tool that they employed to achieve this goal was the Third Amendment, executed on August 17, 2012.

9.      Pursuant to the Third Amendment, beginning on January 1, 2013, the PSPA Dividend was replaced with a quarterly Net Worth Sweep. The Net Worth Sweep was calculated as "the total assets of the Company" less the "total liabilities of the Company," as reflected on its balance sheet each quarter, less a small, temporary capital reserve, which would steadily decline to zero by 2018. The Net Worth Sweep dividends, regardless of their size, would never reduce the Government's outstanding Liquidation Preference.

3

10.     Following the execution of the Third Amendment, Fannie Mae earned record profits. Within a week after the Third Amendment became effective, FHFA announced a settlement of Fannie Mae's claims against Bank of America valued at over $10 billion. Within three months after it became effective, Fannie Mae determined that it would reverse its write-down of over $58 billion in deferred tax assets. And within the first year, Fannie Mae recorded historically high profits of $84 billion, all of which the Government seized pursuant to the terms of the Third Amendment.

11.     From January 1, 2013 through December 30, 2017, Fannie Mae paid the Government $139.52 billion in Net Worth Sweep dividends—approximately $81 billion more than it would have paid under the prior PSPA Dividend—and yet Fannie Mae's debt to the Government was entirely unaffected: the Liquidation Preference remains at $117.1 billion.

12.     Had Fannie Mae instead been able to use its quarterly profits in excess of the prior PSPA Dividend to pay down the Liquidation Preference, Fannie Mae's debt to the Government would have been fully extinguished by the end of the first quarter of 2017, and the Company could have potentially emerged from conservatorship as a profitable, private entity.

13.     As set forth below, FHFA's dual role as Fannie Mae's regulator and conservator and its relationship with Treasury gave rise to a manifest conflict of interest that compromised its role as Fannie Mae's advocate when FHFA negotiated and executed the Third Amendment.

14.     According to both Treasury and FHFA, the very purpose of the Third Amendment was to benefit the Government—not Fannie Mae. Treasury has stated that the Third Amendment's goal was to take "every dollar of earnings [Fannie Mae] generates … to benefit taxpayers." FHFA has similarly stated that the Third Amendment's goal was to "fully capture financial benefit for taxpayers."

4

15.     Both Treasury and FHFA have also trumpeted the Third Amendment as a way of ensuring that Fannie Mae would never again retain profits, rebuild capital, or return to the market as a going concern. For Treasury and FHFA, one of the virtues of the Third Amendment was that it would expedite "winding down" Fannie Mae.

16.     Given FHFA and Treasury's shared goals of benefiting taxpayers while ensuring that Fannie Mae would never emerge from conservatorship, it is evident that FHFA was not acting as a "conservator" in the traditional sense of that word—or as any kind of independent third party—when it negotiated and executed the Third Amendment on Fannie Mae's behalf. Instead, it was acting as a Government agent. The Third Amendment was an agreement by the Government with the Government to appropriate private property for Government use.  The Third Amendment nationalized Fannie Mae.

17.     The Government has maintained in other litigation that FHFA was *required* to act as a government agent when it was appointed to serve as Fannie Mae's conservator. FHFA has argued that the Housing and Economic Recovery Act of 2008 ("HERA"), the act that permitted FHFA to place Fannie Mae into conservatorship, "preempt[ed] any fiduciary duties" that FHFA otherwise owed the Company. Further, FHFA has argued that HERA required FHFA to give primary importance to "supporting the stability of the housing finance markets," rather than preserving and conserving Fannie Mae's assets.

18.     If the Government's contention is correct, and HERA authorized FHFA to execute the Third Amendment, the Third Amendment nonetheless violates the law. Through the Third Amendment, the Government transferred to itself all of the Company's rights to its future earnings, thereby siphoning off all economically viable use of Fannie Mae. Statutory authorization does not permit the Government to expropriate private property, let alone transfer all economically viable use of a private company to the Government, without paying just

compensation. If authorized, the Third Amendment violates the Takings Clause of the Fifth Amendment.

19.     Alternatively, if FHFA, by entering the Third Amendment, acted beyond the authority provided to it by HERA, its conduct constituted an illegal exaction in violation of the Due Process Clause of the Fifth Amendment.

20.     Either way, the result of the Government's action is a total taking of all economically viable use of Fannie Mae. The purpose of this litigation is to recover just compensation for that taking.

21.     Plaintiffs additionally allege that FHFA breached its fiduciary duties to Fannie Mae, established when it took on the role of conservator under HERA, when it executed the Third Amendment.

## II.     JURISDICTION AND VENUE

22.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1491(a). Venue is proper in this Court pursuant to 28 U.S.C. § 1491(a).

23.     Pursuant to Rule of the Court of Federal Claims 23.1(b)(2), this is not a collusive action to confer jurisdiction that this Court would otherwise lack.

## III.     PARTIES

24.     Plaintiff Bryndon Fisher ("Fisher") is a citizen of Washington. Fisher has owned Fannie Mae common stock prior to, at the time of, and continuously since the Government imposed the Third Amendment on August 17, 2012. Fisher currently owns 13,725 shares of Fannie Mae common stock.

25.     Plaintiff Bruce Reid ("Reid") is a citizen of Washington. Reid currently owns and, at all relevant times, has owned 29,000 shares of nominal defendant Fannie Mae's common

stock. Reid has owned Fannie Mae common stock prior to, at the time of, and continuously since the Government imposed the Third Amendment on August 17, 2012.

26.     Plaintiff Erick Shipmon ("Shipmon") is a citizen of Arizona. Shipmon currently owns and, at all relevant times, has owned shares of nominal defendant Fannie Mae's common stock. Shipmon purchased 68,100 shares of Fannie Mae common stock prior to Government's imposition of the Third Amendment on August 17, 2012, has owned these shares continuously since that time, and continues to own these shares.

27.     Defendant United States of America ("United States") includes Treasury and agents acting at the direction of Treasury. Defendant United States also includes FHFA and agents acting at the direction of FHFA.

28.     Nominal Defendant Fannie Mae is a federally chartered, government-sponsored enterprise, which supplies capital and liquidity for residential mortgages. Fannie Mae is a publicly traded private corporation, has a Board of Directors ("Board"), and is required to report to the Securities and Exchange Commission ("SEC"). Fannie Mae's by-laws expressly provide that Delaware General Corporation Law applies to the conduct of the Company.

## IV.    NON-DEFENDANT DIRECTORS

29.     Amy E. Alving ("Alving") has served as a member of the Board of Directors of Fannie Mae since October 2013.

30.     Hugh R. Frater ("Frater") has served as a member of the Board of Directors of Fannie Mae since January 2016.

31.     Renee L. Glover ("Glover") has served as a member of the Board of Directors of Fannie Mae since January 2016.

32.     Frederick B. "Bart" Harvey III ("Harvey") initially became a member of the Board of Directors of Fannie Mae in August 2008, before the conservatorship, and FHFA reappointed him to Fannie Mae's Board in December 2008.

33.     George W. Haywood ("Haywood") has served as a member of the Board of Directors of Fannie Mae since November 2016.

34.     Michael J. Heid ("Heid") has served as a member of the Board of Directors of Fannie Mae since May 2016.

35.     Robert H. Herz ("Herz") has served as a member of the Board of Directors of Fannie Mae since June 2011.

36.     Timothy J. Mayopoulos ("Mayopoulos") has served as a member of the Board of Directors of Fannie Mae since June 2012.

37.     Diane C. Nordin ("Nordin") has served as a member of the Board of Directors of Fannie Mae since November 2013.

38.     Egbert L. J. Perry ("Perry") has served as a member of the Board of Directors of Fannie Mae since December 2008.

39.     Jonathan Plutzik ("Plutzik") has served as a member of the Board of Directors of Fannie Mae since November 2009.

40.     Ryan Zanin ("Zanin") has served as a member of the Board of Directors of Fannie Mae since September 2016.

41.     FHFA has effectively assumed all of the powers of Fannie Mae's Board of Directors. Each of Fannie Mae's Board members was appointed to the Board after FHFA became conservator and each serves at FHFA's discretion. According to the Company's 2017 Form 10-K filed with the Securities and Exchange Commission ("SEC") on February 14, 2018, Fannie Mae's directors "do not have any fiduciary duties to any person or entity except to the

conservator and, accordingly, are not obligated to consider the interests of the company, the holders of our equity or debt securities, or the holders of Fannie Mae MBS unless specifically directed to do so by the conservator." The members of Fannie Mae's Board of Directors are therefore not indispensable parties to this action.

## V. CONSTITUTIONAL PROVISION

42. Plaintiffs' claims are governed by the Fifth Amendment to the United States Constitution, which provides in pertinent part that no person shall "be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."

## VI. FACTUAL ALLEGATIONS

### A. History of Fannie Mae and Relevant Statutes

43. Fannie Mae was created by federal statute in 1938, at the request of President Franklin D. Roosevelt, to provide much-needed capital to the nation's home mortgage industry. Initially, Fannie Mae was authorized to purchase only those mortgages that were insured by the Federal Housing Administration ("FHA"). For the first thirty years of its existence, Fannie Mae was operated by the federal government.

44. In 1968, pursuant to the Housing and Urban Development Act of 1968 ("1968 Act"), Fannie Mae was reorganized as a privately-owned corporation. Since that time, Fannie Mae has obtained funding from private capital, including common and preferred stock, which was publicly traded on the New York Stock Exchange.[1]

---

[1] On June 16, 2010, Fannie Mae announced that, at the direction of FHFA, its stock would be delisted from the NYSE. On July 7, 2010, Fannie Mae stock ceased trading on the NYSE, and on the following day, July 8, 2010, the Company began trading on the OTC Bulletin

45.     Together with its subsequently created sister entity, the Federal Home Loan Mortgage Association ("Freddie Mac") (together, the "GSEs"),[2] Fannie Mae purchases mortgages originated by private banks and bundles these mortgages into mortgage-related securities that can be sold to investors. By creating this secondary mortgage market, the GSEs increase liquidity for private banks, allowing them to make additional loans to individuals to purchase homes.

46.     In 1992, Congress enacted the Federal Enterprises Financial Safety and Soundness Act (the "Safety and Soundness Act"). The Safety and Soundness Act created the Office of Federal Housing Enterprise Oversight ("OFHEO") as the new regulator for the GSEs, imposed minimum capital requirements on the GSEs, and gave OFHEO the authority to impose a conservatorship if either of the GSEs became critically undercapitalized.

**B.     The Financial Crisis of 2007 and the Enactment of HERA**

47.     In 2007, the nation's mortgage market began a precipitous decline as part of the global financial crisis, and an increasing number of mortgages fell into delinquency and default. However, the GSEs were well-positioned to weather the decline in home prices. While banks and other financial institutions involved in the mortgage markets had heavily invested in increasingly risky mortgages in the years leading up to the financial crisis, the GSEs had taken a more

---

Board under the symbol FNMA. Fannie Mae stock continues to be publicly traded on the OTC Bulletin Board.

[2] The term "GSEs" often also references a third company, the Government National Mortgage Association ("Ginnie Mae"). However, for the purpose of this Complaint, "GSEs" refers only to Freddie Mac and Fannie Mae.

conservative approach: the mortgages that they insured (primarily 30-year fixed rate conforming mortgages) were far safer than those insured by the nation's largest banks.[3]

48.     Prior to 2007, Fannie Mae had been consistently profitable, reporting profits every year since 1985. And, although Fannie Mae experienced losses in 2007 and the first two quarters of 2008—losses that largely reflected a temporary decline in the market value of its holdings caused by declining home prices—Fannie Mae continued to generate enough cash to pay its debts and retained billions of dollars of capital that could be used to cover any future losses.

49.     In the Spring and Summer of 2008, OFHEO Director James B. Lockhart ("Lockhart") viewed the GSEs as "safe and sound." On March 19, 2008, he issued a statement in which he predicted that the GSEs would "continue to be safe and sound" and dismissed the idea that they would need a bailout as "nonsense in my mind." On July 8, 2008, Lockhart told CNBC that "both of [the GSEs] are adequately capitalized, which is our highest criteria." On June 9, 2008, OFHEO confirmed Lockhart's statement, publishing a news release stating that it classified both GSEs as "adequately capitalized as of March 31, 2008."

50.     Treasury Secretary Henry Paulson ("Paulson") reiterated Lockhart's observations, testifying to the House Committee on Financial Services on July 10, 2008, that the GSEs' "regulator has made clear that they are adequately capitalized." And on July 13th, Lockhart issued a statement emphasizing that "the Enterprises' $95 billion in total capital, their substantial

---

[3] The subsequent performance of loans owned or guaranteed by the GSEs, as compared to those owned or guaranteed by commercial or private banks, demonstrates their superior quality. Between 2008 and 2014, the average loss rate on residential mortgages owned or guaranteed by the GSEs was 0.45 percent per year, whereas the loss rate for residential mortgages owned by commercial banks was 1.43 percent per year—more than three times higher. And estimates of loss rates on private-label mortgage-backed securities were even higher, well over 2.0 percent per year, or more than four times the rate experienced by GSE loans.

cash and liquidity portfolios, and their experienced management serve as strong supports for the Enterprises' continued operations."

51.     On August 8, 2008, Fannie Mae filed its Form 10-Q with the SEC for the period ended June 30, 2008. In its 10-Q, Fannie Mae reported that the Company's "sources of liquidity remain adequate to meet our short-term and long-term needs for funding." The 10-Q further reported that the Company's estimated regulatory core capital was $47 billion—approximately $14.3 billion in excess of its statutory minimum capital requirement and $9.4 billion above the 15% mandatory target capital surplus. Its assets exceeded its liabilities by more than $41 billion and the Company had more than $300 billion of unencumbered assets. Fannie Mae was not in any danger of insolvency.

52.     However, behind the scenes, Treasury was advocating a legislative plan to authorize Treasury to inject capital into the GSEs by temporarily increasing their lines of credit with Treasury while allowing Treasury to purchase their securities, and replaces OFHEO with a new agency, FHFA, with the power to place the GSEs into conservatorship or receivership. Secretary Paulson told the Senate that regulators needed "a bazooka" at their disposal.

53.     On July 30, 2008, Congress gave Paulson his bazooka by enacting HERA. HERA gave Treasury the power to extend secured lines of credit to the GSEs, to purchase their securities, and to inject capital into the Companies. HERA also created FHFA as the successor to OFHEO and granted FHFA expanded regulatory powers, including the power to place the GSEs into either conservatorship or receivership under certain statutorily defined circumstances. One of the necessary conditions that would permit FHFA to place the GSEs into either conservatorship or receivership would be the consent of each GSE's Board of Directors to the conservatorship or receivership. 12 U.S.C. § 4617(a)(I).

54.     On August 22, 2008, FHFA confirmed that the GSEs were adequately capitalized, even under additional capital requirements imposed by FHFA under its risk-based capital stress test, sending both GSEs letters advising them that FHFA had found them to be safe and adequately capitalized.

55.     Nonetheless, Paulson set out to persuade Lockhart to reverse FHFA's position, urging him to declare the GSEs not financially viable and place them under Government control before Lehman Brothers announced a "dreadful loss" for the second quarter of 2008. Paulson later wrote, "FHFA had been balky all along [about the imposition of a conservatorship]. … We had to convince its people that [conservatorship] was the right thing to do, while making sure to let them feel they were still in charge." HENRY M. PAULSON, JR., ON THE BRINK 36 (2d ed. 2013).

56.     Reporting indicates that Paulson's position was premised on political considerations, not the GSEs' financials. As the *New York Times* reported, the administration sought "to shrink drastically [the GSEs'] outsize influence on Wall Street and on Capitol Hill while at the same time counting on them to pull the nation out of its worst housing crisis in decades." *In Rescue to Stabilize Lending, U.S. Takes Over Mortgage Finance Titans*, N.Y. TIMES (Sept. 7, 2008). And "In the end, [Treasury Secretary] Paulson's decision seems to have been a philosophical one, rather than one forced by imminent crisis. Of course, for stagecraft purposes, it was played as an impending disaster." *Paulson's Itchy Finger, on the Trigger of a Bazooka*, N.Y. TIMES (Sept. 9, 2008).

57.     Treasury Secretary Paulson's position won out. On September 6, 2008, less than three weeks after declaring the GSEs adequately capitalized, FHFA Director Lockhart placed both GSEs into conservatorship. On September 6, 2008, at the request of the Treasury Secretary, the Chairman of the Board of Governors of the Federal Reserve, and the Director of FHFA,

Fannie Mae's Board adopted a resolution consenting to the conservatorship as required under 12 U.S.C. § 4617(a)(3)(I).

58.     Not only Paulson himself, but other key insiders, credited Paulson with the decision to place the GSEs into conservatorship. For example, Timothy Geithner ("Geithner"), who was president of the Federal Reserve Bank of New York at the time, and who shortly thereafter would replace Paulson as Treasury Secretary, characterized the decision to place the GSEs into conservatorship as a "Treasury operation." A Treasury White Paper issued in February 2012 took a more mediated stance, stating that FHFA placed the GSEs into conservatorship "in consultation with the Bush Administration."

### C.     The Conservatorship

59.     After the GSEs were placed in conservatorship, FHFA wore two hats: regulator and conservator. As regulator, FHFA was responsible for ensuring that the GSEs operated in a "safe and sound manner," "consistent with the public interest," while "foster[ing] liquid, efficient, competitive, and resilient national housing finance markets." 12 U.S.C. § 4513(a)(1)(B). As conservator, FHFA was empowered to "take such action as may be— (i) necessary to put the regulated entity in a sound and solvent condition; and (ii) appropriate to carry on the business of the regulated entity and preserve and conserve the assets and property of the regulated entity." 12 U.S.C. § 4617(b)(2)(D). These statutory powers are distinguished from the powers of a receiver set forth in the statute, which include the power to "place the regulated entity in liquidation."  12 U.S.C. § 4617(b)(2)(E).

60.     Regulations promulgated by the FHFA governing its operations as conservator preserve this distinction. "A conservator's goal is to continue the operations of a regulated entity, rehabilitate it and return it to a safe, sound and solvent condition." 76 Fed. Reg. 35,724, 35,730. In contrast, when FHFA acts as a receiver, it "shall place the regulated entity in liquidation…."

12 C.F.R. § 1237.3(b) (emphasis added). An FHFA Advisory Bulletin similarly distinguishes between its duties in the two roles: "in the case of a conservator, to put the regulated entity in a sound and solvent condition, and to carry on its business and preserve and conserve its assets, and in the case of a receiver, to liquidate the regulated entity."

61.    FHFA Director Lockhart described conservatorship as "a statutory process designed to stabilize a troubled institution with the objective of returning [the GSEs] to normal business operations." FHFA stated that "FHFA as conservator is required to preserve assets," that one of the "[l]egal [c]onstraints" imposed on FHFA is its "mandate[ ] to 'conserve assets,'" and that "FHFA has a responsibility to take such actions as may be necessary to put the Enterprises in a sound and solvent condition and to preserve and conserve their assets and property." FHFA pledged to act as the GSEs' conservator until the companies were stabilized.

62.    As the examples set forth below illustrate, FHFA has consistently publicly stated that HERA requires that FHFA as conservator must preserve and conserve the GSEs' assets and restore them to a sound and solvent condition:

- "As the conservator, FHFA's most important goal is to preserve the assets of Fannie Mae and Freddie Mac over the conservatorship period. That is our statutory responsibility." *The Present Condition and Future Status of Fannie Mae and Freddie Mac: Hearing Before the Subcomm. of Capital Markets, Ins. & Gov't Sponsored Enters. of the H. Comm. on Fin. Servs.*, 111th Cong. 136 (2009) (statement of James B. Lockhart III, Dir., FHFA).

- FHFA as conservator "preserves and conserves the assets and property of the Enterprises . . . and facilitates their financial stability and emergence from conservatorship." FHFA, STRATEGIC PLAN: 2009-2014 at 33, http://goo.gl/UjCxf6. "The conservatorship of Fannie Mae and Freddie Mac

allows the FHFA to preserve the assets of the [Companies], ensure they focus on their housing mission and are positioned to emerge from conservatorship as financially strong . . . ." *Id.* at 20.

- "The statutory role of FHFA as conservator requires FHFA to take actions to preserve and conserve the assets of the Enterprises and restore them to safety and soundness." FHFA, REPORT TO CONGRESS: 2009 at 99 (May 25, 2010), http://goo.gl/YOOgzC.

- "By law, the conservatorships are intended to rehabilitate [Fannie and Freddie] as private firms." Letter from Edward DeMarco, Acting Director, FHFA to Senators at 1 (Nov. 10, 2011), http://goo.gl/hbBe25.

- FHFA has a "'preserve and conserve' mandate." A FHFA Strategic Plan for Enterprise Conservatorship: The Next Chapter in a Story that Needs an Ending at 7 (Feb. 21, 2012), http://goo.gl/uXreKX ("A Strategic Plan for Enterprise Conservatorship").

- FHFA's "statutory mandates obligate" it to "[c]onserve and preserve the assets of the Enterprises while they are in conservatorship." Statement of Melvin L. Watt, Dir., FHFA, Before the U.S. Senate Comm. on Banking, Housing, and Urban Affairs (May 11, 2017), https://goo.gl/h44qRf.

- FHFA has "statutory obligations to operate the [Companies] in a safe and sound manner." Prepared Remarks of Melvin L. Watt, Dir., FHFA, at American Mortgage Conference (May 18, 2017), https://goo.gl/rT3f6C.

- The provisions of 12 U.S.C. § 4617(b)(2)(D) are "statutory mandates" and as conservator FHFA "must follow the mandates assigned to it by statute." FHFA,

STRATEGIC PLAN: FISCAL YEARS 2018-2022 at 3–4 (Jan. 29, 2018),

https://goo.gl/yDZmir.

63.     On September 7, 2008, when FHFA Director Lockhart announced that the GSEs

had been placed in conservatorship, Lockhart stated that "in order to conserve over $2 billion in

capital every year, the common and preferred stock dividends will be eliminated, but the

common and all preferred stocks will continue to remain outstanding. Subordinated debt interest

and principal payments will continue to be made." The conservatorship did not expropriate any

of the outstanding preferred or common stock in Fannie Mae, and the terms of Fannie Mae's

stock were not formally modified. Fannie Mae remained a private company.

64.     Lockhart's announcement envisioned that the conservatorships would be

temporary, that the GSEs would eventually be returned to profitability, and the conservatorships

would be lifted. He made clear that the conservatorships would be run with an eye toward

attracting additional private investment to the GSEs, noting that "some of the key regulations

will be minimum capital standards, prudential safety and soundness standards and portfolio

limits." Lockhart stated that the purpose of the new regulations was "so that any new investor

will understand the investment proposition."

### D.     The Preferred Stock Purchase Agreement

65.     On September 7, 2008—the day after the GSEs were placed into

conservatorships—Treasury executed a PSPA with Fannie Mae under which Treasury would

receive one million shares of a newly-issued series of preferred stock that was senior in priority

to all other Fannie Mae stock (the "Government Preferred Stock") and warrants to purchase

79.9% of the Company's common stock at $0.00001 per share. In exchange, Fannie Mae was

permitted to draw up to $100 billion from Treasury as needed to maintain a positive net worth.

For quarters in which the Company's liabilities exceeded its assets under Generally Accepted

Accounting Principles ("GAAP"), the PSPA authorized Fannie Mae to draw upon Treasury's commitment in an amount equal to the difference between its liabilities and its assets.

66. Treasury's Government Preferred Stock had an initial Liquidation Preference of $1 billion. The Liquidation Preference would increase by one dollar for each dollar Fannie Mae drew on Treasury's funding commitment. If Fannie Mae were ever liquidated, Treasury would be entitled to recover the full amount of the Liquidation Preference before any other preferred or common shareholder received anything.

67. In addition to entitling Treasury to payments if Fannie Mae were liquidated, the Government Preferred Stock entitled Treasury to receive, on a quarterly basis, either a cash dividend computed based upon an annual rate of 10% of the Liquidation Preference, or an in-kind dividend paid in the form of additional Government Preferred Stock, calculated based upon an annual rate of 12% of the Liquidation Preference. If Fannie Mae elected to pay an in-kind dividend, the dividend rate would increase to 12% (payable either in cash or in-kind, as just described) until full cumulative dividends were again paid in cash, at which point the rate would return to 10%. The Congressional Research Service explained that payment of the PSPA Dividend in-kind would not affect Treasury's remaining funding commitment, and therefore Fannie Mae could "pay a 12% annual senior preferred stock dividend indefinitely." Thus, the initial PSPA included a built-in protection for Fannie Mae's solvency: the PSPA Dividend obligation would never threaten the Company's solvency, because Fannie Mae could always elect to pay the Government's preferred stock dividend in-kind.

68. Finally, the PSPA provided for Fannie Mae to pay Treasury a quarterly periodic commitment fee ("PCF") pursuant to mutual agreement between the Company and Treasury. Treasury had the option of waiving the PCF for up to a year at a time. No PCF was ever mutually agreed upon, and Treasury exercised its option to waive the PCF. Treasury never received a PCF

under the PSPA. Had a PCF been mutually agreed upon and charged, Fannie Mae could have elected to pay the PCF in-kind. *See* PSPA § 3.2(c) ("At the election of [Fannie Mae], the Periodic Commitment Fee may be paid in cash or by adding the amount thereof ratably to the liquidation preference of each outstanding share of Senior Preferred Stock….").

69.    In approving Treasury's entry into the PSPA, Secretary Paulson determined (1) "[u]nder conservatorship, Fannie Mae and Freddie Mac will continue to operate as going concerns"; (2) "Fannie Mae and Freddie Mac may emerge from conservatorship to resume independent operations"; and (3) "[c]onservatorship preserves the status and claims of the preferred and common shareholders."

70.    On May 6, 2009, FHFA and Treasury amended the PSPAs to increase Treasury's funding commitment from $100 billion to $200 billion.

71.    On December 24, 2009, FHFA and Treasury again amended the terms of Treasury's funding commitment. Instead of resetting the commitment at a specific dollar amount, the second amendment established a formula that allowed Treasury's total commitment to each of the GSEs to exceed (but not fall below) $200 billion depending upon any net worth deficiencies experienced in 2010, 2011, and 2012, and any surplus existing as of December 31, 2012.

### E.    FHFA's Role as Conservator Was Compromised by Its Concurrent Role as Regulator and Its Relationship with Treasury

#### 1)    FHFA's Failure to Separate Its Role as Conservator from its Role as Regulator Compromised Its Role as Conservator

72.    Throughout the conservatorships, FHFA played a dual role as the GSEs' conservator and regulator. Its failure to separate those roles compromised FHFA's role as conservator.

19

73.     In enacting HERA, Congress authorized FHFA to "appoint [FHFA] as conservator or receiver for a regulated entity … for the purpose of reorganizing, rehabilitating, or winding up [its] affairs." 12 U.S.C. § 4617(a)(1)(2). As stated above, FHFA appointed itself conservator, not receiver, and received authorizations from the GSEs Board to serve as conservator, not receiver. As conservator, FHFA is empowered to "take such action as may be (i) necessary to put the regulated entity in a sound and solvent condition; and (ii) appropriate to carry on the business of the regulated entity and preserve and conserve the assets and property of the regulated entity." 12 U.S.C. § 4617(b)(2)(D). During the conservatorship, FHFA has publicly stated that its responsibilities as conservator are to continue the operations of the GSEs; to preserve and conserve their assets and property; and to return the GSEs to a safe, sound, and solvent condition.

74.     In contrast, as regulator, FHFA is charged with ensuring that the GSEs fulfill a public mission. As such, its principal duties include ensuring that the GSEs "operate[] in a safe and sound manner," "foster liquid, efficient, competitive, and resilient national housing finance markets (including activities relating to mortgages on housing for low- and moderate-income families involving a reasonable economic return that may be less than the return earned on other activities)," and conduct their operations in a manner "consistent with the public interest." 12 U.S.C. § 4513(a)(1)(B).

75.     FHFA's Office of Inspector General ("OIG") has recognized the "potential for conflicts due to FHFA's dual missions as conservator and regulator of the Enterprises." In a White Paper dated March 28, 2012, OIG stated:

> FHFA faces significant challenges such as the unique nature of the conservatorships; inherent tensions between the Enterprises' affordable housing goals and their profitability; and inherent tensions between the Enterprises' concurrent roles as conservator and regulator. Additionally, FHFA's extensive and

complex operations may further complicate the latter challenge by limiting its ability to separate its dual roles as conservator and regulator.

76. Notwithstanding the inherent potential for conflicts in concurrently serving as regulator and conservator, FHFA did not create an internal structure to segregate those responsibilities. As of 2012, although FHFA had created a small, six-person department, entitled the Office of Conservatorship Operations (OCO), intended to oversee FHFA's responsibility to preserve and conserve the GSEs' assets, the OCO received assistance on an as-needed basis from other FHFA personnel who were not dedicated to the conservatorship mission. FHFA's Acting Director, Edward DeMarco, who oversaw the OCO, was responsible for both regulation and conservatorship, and Alfred Pollard, who was FHFA's general counsel, simultaneously advised FHFA regarding both its regulatory and conservatorship functions. Other high ranking FHFA executives from departments other than the OCO, including the Office of the Director, the Division of Enterprise Regulation, the Division of Examination and Programs Support, the Office of Housing and Regulatory Policy, and the Office of Policy Analysis, met weekly to address issues related to the conservatorships.

77. Mario Ugoletti was a key FHFA employee who concurrently served as a policy advisor for both regulatory and conservatorship matters. Serving as the primary point person for FHFA negotiating the Third Amendment, Ugoletti viewed FHFA's regulatory responsibilities of protecting the public as being part and parcel of its responsibilities as conservator of the GSEs. During his deposition, Ugoletti, asked to compare FHFA's regulatory role with its role as conservator, was unable to meaningfully distinguish the two. He testified: "███████████████ ████████████████████████████████████████████████████████."

78. As set forth in greater detail below, in executing the Third Amendment, FHFA abandoned the traditional role of a conservator, advocating for its conservatee's interests.

21

Instead, FHFA acted as an agent of the Government, promoting its regulatory mission of ensuring that Fannie Mae would benefit United States taxpayers.

> **2)**      **FHFA's Relationship with Treasury Compromised Its Role as Conservator**

79.      FHFA's relationship with Treasury also compromised its role as Fannie Mae's conservator.

80.      Treasury had been responsible for FHFA's genesis and directed, or at a minimum, heavily influenced FHFA's decision to place the GSEs into conservatorships.

81.      Once the GSEs had been placed in conservatorships, Treasury exercised control over FHFA's conservatorship of the GSEs. The Congressional Budget Office ("CBO") determined that, because the federal government controlled the GSEs following the placement of the GSEs into conservatorship, the GSEs' financial transactions should be treated as part of the federal budget going forward. CBO Assistant Director for Financial Analysis Deborah Lucas placed that government control in Treasury, telling Congress that the GSEs are subject to "ownership and control by the Treasury." And in its SEC filings, Fannie Mae claimed that it and Treasury were "related parties," as defined by Statement of Financial Accounting Standards No. 57.

82.      Because of its conflicted relationship with Treasury, FHFA could not provide an independent check on Treasury's control. The OIG observed that, unlike other conservators such as the Federal Deposit Insurance Corporation (FDIC), the National Credit Union Administration (NCUA), and the Farm Credit Insurance Corporation (FCIC), which have funding sources that render them structurally independent, FHFA was largely dependent upon Treasury for its funding: "[W]hereas premiums paid by healthy depositary institutions and credit unions fund, or at least defray, the conservatorship operations of the FDIC and NCUA, FHFA's conservatorships

of the Enterprises are supported entirely by money derived from Treasury." In its March 2012 White Paper, OIG warned that FHFA's dependence upon Treasury for funding for its conservatorships could compromise FHFA's role as conservator: "This funding may result in FHFA's conservatorships being tasked with responsibilities outside the normal goals of returning the conserved entities to safe and sound conditions." Further, Treasury and the Department of Housing and Urban Development ("HUD") held two of four seats on the Federal Housing Finance Oversight Board, which is statutorily required to "advise the [FHFA] Director with respect to overall strategies and policies in carrying out the duties of the Director under [HERA]." The other two members were the Chairman of the SEC and FHFA's Director.

83.    FHFA's negotiation of the Third Amendment on the GSEs' behalf was further compromised, because the two key FHFA employees responsible for those negotiations—Acting Director DeMarco and Policy Advisor Ugoletti—had been long-time Treasury employees who had worked on GSE-related issues while at Treasury, and who continued to advocate for Treasury's interests after they had moved to FHFA.

84.    DeMarco had worked at Treasury from 1993–2003, where he was directly involved in setting policy related to the GSEs. While at Treasury, he viewed promoting taxpayers' interests to be of most importance when assessing the "safety and soundness" of the GSEs. To DeMarco, the phrase "safety and soundness concerns" was synonymous with the risks that the GSEs posed to taxpayers. After he became FHFA's Acting Director in 2009, his views did not change. As FHFA's Acting Director, DeMarco continued to believe that FHFA's responsibility to ensure the GSEs' safety and soundness was synonymous with protecting the taxpayers' interests.

85.    Ugoletti had also worked for Treasury for the bulk of his career before working at FHFA. He had begun working for Treasury immediately after receiving his Ph.D. in 1995, and

continued there through 2008, when he worked directly with then-Treasury Secretary Paulson on advocating for HERA's enactment and the placement of the GSEs into conservatorship, as well as devising, drafting and implementing the initial PSPAs. While working at Treasury, Ugoletti formed the belief that, after the initial PSPA had been executed, all of FHFA's duties were owed to Treasury and by extension to the taxpayers, and that FHFA owed nothing to the GSEs' other shareholders. Ugoletti testified that he believed ███████████████████████████████ ████████." The GSEs' other preferred and common shareholders were owed nothing, according to Ugoletti, because he had concluded that without Treasury's investment, the GSEs would have been worthless and would have had to have been placed in receivership.

86.     In September 2009, Ugoletti was transferred from Treasury to FHFA. However, Treasury requested and FHFA agreed that Ugoletti "detail back" to Treasury, so that he was working for both agencies simultaneously. Ugoletti commented: "[I]t was much easier then because our office was right on the other side of the White House, so [I would work] a half a day at Treasury and a half a day at FHFA." This continued for approximately one year.

87.     Ugoletti testified that, after he began working at FHFA, he never reconsidered his belief that FHFA owed all of its fiduciary duties to Treasury. Ugoletti never asked anyone whether his prior work for Treasury, including advocating for HERA or putting the GSEs into conservatorship, or devising, drafting and implementing the initial PSPAs for Treasury, raised conflict of interest problems when he was later negotiating an amendment to those PSPAs on FHFA's behalf. Ugoletti testified, "I don't understand what conflict of interest rule would apply between two government agencies."

88.     Once the GSEs were placed in conservatorship, Treasury wielded substantial power over the GSEs' accounting reporting. In an email dated July 1, 2011, Senior Treasury Policy Advisor Jeff Foster explained that Treasury "can require the GSEs to revalue their assets,

given our current authorities to trigger purchase accounting rules…. Today there is roughly a $187 billion difference between the market value and the GAAP value at the GSEs….”

89.     During the conservatorships, Treasury also dictated whether the GSEs' PSPA Dividends would be made in cash or in-kind. When asked whether Fannie Mae had ever considered paying Treasury in-kind, rather than a cash dividend, Susan McFarland, Fannie Mae's Chief Financial Officer, testified that " ████████████████████████████████ ████████████████████████████████████████████.”

90.     Treasury dictated which payments made by the GSEs to the Government would be counted toward their PSPA Dividend obligations. McFarland testified that in 2012, when Congress required the GSEs to increase their guarantee fees by ten basis points as a way to fund the unemployment benefit extension, " ████████████████████████████████ ████████████████████.” Following those discussions, the substantial guarantee fees that were paid over to the Government were not counted toward—i.e., did not defray—the GSEs' PSPA Dividend owed to Treasury.

91.     And Treasury dictated under what circumstances and how much the GSEs would be paid for their work on Treasury's behalf. During the conservatorships, the GSEs served as Treasury's financial agents for a joint program of Treasury and HUD, the Home Affordable Modification Program ("HAMP"), which encouraged mortgage servicers including the GSEs themselves to modify mortgage terms (such as the amount of monthly payments) for borrowers facing imminent default or foreclosure. The GSEs contracted with Treasury to perform HAMP-related work through Financial Agency Agreements ("FAAs"). However, according to the OIG, FHFA failed to exercise its oversight role with respect to the FAAs, and, as a result, the GSEs performed substantial work for Treasury on HAMP for which they were never compensated.

25

F.    **Accounting Judgments Exercised During the Conservatorship Caused Fannie Mae to Record Massive Non-Cash Losses**

92.    Following FHFA's placement of Fannie Mae into conservatorship, the Company began to adopt unduly pessimistic assumptions regarding its future financial prospects, which caused it to incur massive non-cash losses. Those non-cash losses primarily took the form of write-downs of deferred tax assets and the establishment of loan loss reserves.

93.    A deferred tax asset is a loss carry forward that can be used to offset future tax liability. Under GAAP, if a company determines that it is unlikely that some or all of a deferred tax asset will be used, the company must establish a "valuation allowance" in the amount that is unlikely to be used. In other words, a company must write down a deferred tax asset if it is unlikely to be used to offset future taxable profits.

94.    Within three weeks of FHFA's oversight, Fannie Mae dismissed fifty years of profitability, and instead assumed for accounting purposes that it would *never be profitable again*. This assumption caused the Company to immediately write down $23 billion in deferred tax assets. By the end of 2008, Fannie Mae's write-downs of its deferred tax assets had swelled to approximately $62 billion.

95.    Loan loss reserves are liabilities recorded on a company's balance sheet to reflect anticipated losses on mortgages or mortgage-backed securities that it owns. Immediately after FHFA took control of Fannie Mae, Fannie Mae increased its loan loss reserves for certain of its mortgage backed securities from $3 billion to $25 billion, even though the Company's auditors had just a few months earlier certified that $3 billion represented an accurate estimate of the anticipated loan losses.

96.    The abrupt and dramatic increase in the Company's loan loss reserves was premised on the assumption that Fannie Mae's mortgage-backed securities were entirely worthless. That assumption was absurd. All loans insured by Fannie Mae were required to have

an 80% loan-to-value ratio. As a result, Fannie Mae would not lose *any* money on those mortgages unless less than 80% of the value of the homes for which the mortgages were obtained was recovered, and Fannie Mae certainly would not lose its entire investment.

97.     Furthermore, Fannie Mae had the ultimate protection against bad mortgages—it had the right to require the mortgage companies that originated bad loans and the Wall Street banks that packaged them into securities to repurchase those bad loans from Fannie Mae. During the conservatorship, FHFA filed suits on behalf of the Company to require those mortgage companies and Wall Street banks to repurchase the GSEs' bad loans. FHFA ultimately settled those lawsuits for tens of billions of dollars. However, from the time FHFA placed Fannie Mae into conservatorship until shortly after the Third Amendment was executed, Fannie Mae assumed that its repurchase rights had zero value.

98.     During the first few years of the conservatorship, Fannie Mae's net operating revenue exceeded its net operating expenses each year on an annual basis. Nonetheless, Fannie Mae incurred massive non-cash losses due to excessive deferred tax asset write-offs and loan loss reserves. As a result, pursuant to the PSPAs, the Company was required to borrow heavily from Treasury to maintain a positive net worth, and then to borrow more in order to pay its PSPA Dividends in cash. From the inception of the conservatorship until the Third Amendment was executed on August 17, 2012, Fannie Mae was forced to borrow $116.1 from Treasury, approximately $100 billion of which had been needed to cover non-cash losses. During that same time, Fannie Mae paid the Government $25.6 billion in PSPA Dividends.

**G.     Prior to Executing the Third Amendment, FHFA and Treasury Knew that Fannie Mae's Non-Cash Losses Would Soon Have to Be Reversed**

99.     Prior to executing the Third Amendment, FHFA and Treasury knew that Fannie Mae was entering a period of sustained profitability, and that the massive non-cash losses it had

recorded during the conservatorship, which were due to unwarranted, overly pessimistic accounting judgments, would soon have to be reversed.

100.    Both FHFA and Treasury knew that the housing market was a very important determinant of Fannie Mae's profitability. During 2011, the housing market had begun to recover. It became evident that Fannie Mae's actual realized losses on mortgages written prior to the conservatorship had been far less than anticipated, and more recent mortgages had applied stricter underwriting standards, causing them to perform even better than the earlier loans. In June 2011, a Treasury official observed that "[a]s Fannie and Freddie continue to work through their legacy book of business, the actual realized losses are expected to decline significantly."

101.    On November 8, 2011, Treasury's accountant, Grant Thornton, completed its valuation of Treasury's investment in the GSEs as of September 30, 2011. It found that conditions were improving. Grant Thornton recognized that earlier projections used to justify the Company's accounting decisions related to its loan loss reserves and deferred tax assets had been overly pessimistic, and that the "actual net losses were typically lower than predicted in the optimistic and base cases . . . and far lower than forecasted in the stress cases." Grant Thornton predicted that Fannie Mae would become profitable in 2013 and the Company would generate at least several billion in profits each year from 2013 through 2026. Furthermore, although Grant Thornton predicted that the dividends Fannie Mae would owe to Treasury during 2012 would exceed its profits, it also predicted that Fannie Mae's draws from Treasury would substantially diminish going forward, allowing Treasury's remaining funding commitment to last until 2026. Therefore, by Treasury's own accountant's estimation, after the GSEs' funding caps were set on December 31, 2012, Fannie Mae would not be in any imminent danger of exhausting its funding.

102.    At Fannie Mae's Board meeting in November 2011, FHFA learned that Fannie Mae's 2011 credit-related expenses were $3.9 billion lower than previously projected, and net

revenues were $2.3 billion higher. Fannie Mae informed FHFA that the "███████████████
████████████████████████████████████████████████████████████." In
light of these improvements, Fannie Mae's Board discussed the possibility that the Company's
deferred tax assets, which had previously been written down, could be written back up, causing
the Company to experience an enormous increase in its net worth in the near future.

103.    On December 14, 2011, Under Secretary of the Treasury for Domestic Finance
Mary Miller sent Treasury Secretary Geithner an information memo advising that "Fannie was
expected to be "net income positive (before dividends) on a stable, ongoing basis after 2012."
According to Miller, this change would likely prevent Treasury from having to take future draws.
Senior Treasury Policy Advisor Jeff Foster forwarded this report to Jim Parrott at the National
Economic Council ("NEC"), asking Parrott to "please keep as close hold [between] me and you."

104.    In the ensuing months, Fannie Mae's financial performance and outlook
continued to improve even more. On January 9, 2012, FHFA Acting Director DeMarco and
others at FHFA learned that Fannie Mae was expected to generate a $1.5 billion profit in 2012.
Further, Fannie Mae was at an "inflection point" in its credit cycle, and loss allowance and
credit-related expenses were projected to fall going forward.

105.    At a January 20, 2012, Board of Directors meeting attended by FHFA officials,
Fannie Mae's Senior Vice President for Financial Planning and Analysis, Ann Gehring, reviewed
the Company's 2012 Financial Plan, which projected comprehensive net income of $1.5 billion.
This prompted a discussion about ███████████████████████████████
████████████████████████████████████████████████████
██████████████████

106.    By February, as the Company told Treasury, Fannie Mae's projections for 2012
had grown to $11 billion in net income, and FHFA expected that both GSEs would not only

achieve earnings in excess of their PSPA Dividends starting in 2013, but "███████████
████████████████████████████████████████████████████████████
███████████████"

107. On May 9, 2012, Fannie Mae filed its Form 10-Q with the SEC for the first quarter of 2012. It disclosed the Company's first quarterly profit since the imposition of the conservatorship: a net quarterly income of $2.7 billion and a positive net worth of $268 million (after its payment to Treasury of a $2.8 billion PSPA Dividend). The Company would not need a draw from Treasury to pay its PSPA Dividend for that quarter.

108. A June 2012 Treasury presentation showed that Fannie Mae had not recently needed to borrow from Treasury to fund operating losses. Instead, it had needed to make draws only to fund its PSPA Dividend obligation. However, going forward, Fannie Mae expected to achieve sustained profitability sufficient to cover its PSPA Dividend obligation without needing further draws from Treasury.

109. On June 11, 2012, Fannie Mae forwarded the Company's preliminary closing results for May 2012 to FHFA. Those results showed that the Company expected to generate comprehensive income for the second quarter of 2012 of $4.6 billion, far in excess of its PSPA Dividend of $2.9 billion.

110. In a May 10, 2012, analysis of the GSEs' status sent to Mario Ugoletti at FHFA, BNP Paribas wrote:

> At the current quarterly 'burn rate' of Treasury preferred stock – that is, within epsilon of zero – Fannie and Freddie's capital backstops of $125 bn and $149 bn, respectively, should last them quite a while after the unlimited period expires at the end of this year. Their capital draws over the past two years have so far been below even the most optimistic scenario projections by FHFA.

111. On July 13, 2012, FHFA Acting Director DeMarco and Mario Ugoletti received a summary of a Fannie Mae executive management meeting. The summary showed that Fannie Mae's outlook was continuing to improve. Fannie Mae's comprehensive income for the second quarter was projected to be double that of the first quarter of 2012. Lower credit-related risks were projected to eliminate the need for a Treasury draw during 2012, and the Company was expected "to achieve sustained profitability." The meeting summary recounted that Fannie Mae's Treasurer had "referred to the next 8 years as likely to be 'the golden years of GSE earnings.'"

112. On July 19, 2012, Fannie Mae's Board of Directors held its annual strategic planning session. According to the Strategic Update, which was provided to FHFA, Fannie Mae expected "to see a trend where dividend payments [would] exceed capital drafts in the future." As reflected in the following chart contained in the Strategic Update, the Company's baseline projection indicated that cumulative dividends paid to Treasury would exceed the Government's investment by 2020.

## Annual view of net "repayment" to the US Government

| ($ in Billions) | | 2008-2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Fannie Mae | Comprehensive Income | | 11.6 | 7.5 | 11.0 | 12.5 | 13.9 | 13.2 | 12.2 | 11.4 | 10.9 | 10.5 | 10.5 |
| | Preferred Dividend Payment | 19.8 | 11.6 | 11.8 | 12.1 | 12.2 | 12.2 | 12.2 | 12.2 | 12.2 | 12.2 | 12.3 | 12.5 |
| | Residual Equity | 0.0 | 0.0 | 0.0 | 0.0 | 0.2 | 1.8 | 2.8 | 2.7 | 1.9 | 0.5 | 0.0 | 0.0 |
| | Cumulative Dividends | 19.8 | 31.4 | 43.2 | 55.3 | 67.6 | 79.8 | 92.1 | 104.3 | 116.6 | 128.8 | 141.1 | 153.6 |
| | Cumulative Infusion | (116.1) | (116.1) | (119.0) | (121.2) | (121.5) | (121.5) | (121.5) | (121.5) | (121.5) | (121.5) | (122.9) | (124.8) |
| | Net "Repayment" to Gov't | (96.3) | (84.7) | (75.8) | (65.9) | (53.9) | (41.7) | (29.4) | (17.2) | (4.9) | 7.3 | 18.3 | 28.8 |
| | SPSPA Funding Cap | 240.9 | 240.9 | 240.9 | 240.9 | 240.9 | 240.9 | 240.9 | 240.9 | 240.9 | 240.9 | 240.9 | 240.9 |
| | Remaining Funding under SPSPA | 124.8 | 124.8 | 122.0 | 119.7 | 119.5 | 119.5 | 119.5 | 119.5 | 119.5 | 119.5 | 118.1 | 116.1 |

Combined GSE "repayment" could occur in 2020

Notably, these projections did not include any income due to recognition of deferred tax assets, reversed loan loss reserves or settlements of Fannie Mae's claims against financial institutions that had sold it bad loans. Together, those items ultimately added over $75 billion to Fannie Mae's bottom line during 2013 alone.

113.    At a Board of Directors Meeting on July 20, 2012, attended by representatives of FHFA, Fannie Mae provided a financial update, which noted a number of significant improvements, including that:

- May comprehensive income of $3.3B is more than double April results.…

- Q2 comprehensive income projected at $6.2B which is double Q1 comprehensive income of $3.1B….

- Full year 2012 projection continues to be favorable to Plan….

- Current five year forecast is for the years 2012-2016. Cumulative forecasted comprehensive income is $56.6B, which is $12.3B higher than the May BOD forecast for that period due to an improved credit outlook….

114.    By July 2012, according to Fannie Mae's CFO, Susan McFarland, Fannie Mae was "in a sustainable profitability [mode]." She predicted that Fannie Mae "would be able to deliver sustainable profits over time."

115.    On August 6, 2012, McFarland wrote to DeMarco, advising him that Fannie Mae would not be requesting any funds from Treasury for the quarter that ended June 30, 2012.

116.    On August 8, 2012, Fannie Mae filed its Form 10-Q for the second quarter of 2012 with the SEC. In the 10-Q, Fannie Mae reported net income of $5.1 billion for the quarter and $7.8 billion for the first half of 2012. Its reported net worth was $2.8 billion.

117.    The Form 10-Q stated:

We experienced significant improvement in our financial results for the second quarter and first half of 2012… As described under "Summary of Our Financial Performance for the Second Quarter and First Half of 2012," we generated positive net worth for the second quarter, paid Treasury its quarterly dividend and was not

32

required to draw funds from Treasury for the quarter under the senior preferred stock purchase agreement. We expect our financial results for 2012 to be significantly better than our 2011 results.

Although our financial condition continues to be impacted by elevated mortgage delinquencies and foreclosures as well as home prices that are significantly below their peak in 2006, we saw improvement in the housing market in the first half of 2012. In addition, we have seen further improvement in the performance of our book of business, including lower delinquency rates and higher re-performance rates for our modified loans. These factors have resulted in a reduction in our loan loss reserves and a corresponding recognition of a benefit (rather than a provision) for credit losses for the second quarter and first half of 2012.

118.    A *Wall Street Journal* article following the Company's announcement of these results advised, "The results hint at the tremendous earnings potential at Fannie and Freddie once home prices have stabilized and now that they have replaced the risky loan books with the new credit portfolio."

119.    On August 9, 2012, FHFA Acting Director Demarco received an analysis from BNP Paribas highlighting Freddie Mac's and Fannie Mae's "███████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████

120.    FHFA and Treasury both knew during the summer of 2012 that the Company would soon have to reverse the massive deferred tax asset write-off it had recorded during the conservatorship. The assumption underlying the Company's deferred tax asset write-off of over $62 billion—namely, that the Company would never again be profitable—was no longer tenable. Treasury and Grant Thornton had already discussed "[r]eturning the deferred tax asset to the GSE balance sheets" in May of that year. During an August 9, 2012 meeting between Fannie Mae executives and senior Treasury officials, Fannie's CFO Susan McFarland informed Treasury, not only that the criteria for reversing the deferred tax assets write-off could be met in the not-so-distant future, but that would likely happen by mid-2013. She later testified that FHFA was also aware of her conclusion at that time. On August 14, 2012, internal FHFA

33

correspondence showed that Acting Director DeMarco had been advised that both of the GSEs' Boards had recently discussed the need to write back up the deferred tax assets "based on the view that they were going to be profitable going forward."

121. Before the Third Amendment was executed on August 17, 2012, FHFA and Treasury also knew that Fannie Mae's reserves for loan losses were grossly excessive and would soon have to be reduced. In April 2012, Fannie Mae had told FHFA that updated financial models were "███████████████████████████████████████████████ ███████████████████████████████████." In July 2012, a FHFA presentation showed that, starting in 2008, the GSEs had set aside loan loss reserves far in excess of their actual losses, and a Treasury official observed that the release of loan loss reserves could "increase the [Company's] net [worth] substantially." A Treasury document from early August 2012 observed that Fannie Mae was about to report "[r]ecord earnings" that would be "driven by [a] large credit loss reserve release." An internal briefing memorandum prepared for Under Secretary Miller in advance of an August 9, 2012 meeting between Treasury officials and Fannie Mae executives revealed that the number one question Treasury had for Fannie Mae's executives at that meeting would be "how quickly they forecast releasing credit reserves."

122. Moreover, FHFA and Treasury were well aware that the Company retained valuable rights to require Wall street banks and other financial institutions that had sold bad loans to Fannie Mae to repurchase those loans. FHFA had filed 18 suits in 2011, seeking to recover based upon those repurchase rights, and those suits were entering the settlement stage. Fannie Mae would recover $17.9 billion from that litigation during 2013 alone, starting with a settlement with Bank of America for over $10 billion that was announced on January 7, 2013.

123. In sum, during the summer of 2012, both FHFA and Treasury knew that Fannie Mae was profitable and would continue to be profitable going forward, and that the massive non-

34

cash losses recorded during the conservatorship would soon have to be reversed. It was foreseeable that Fannie Mae could earn enough going forward to pay off the Liquidation Preference, redeem the Government Preferred Stock, and emerge from conservatorship as a financially solvent entity. FHFA and Treasury would not allow that to happen.

### H. The Third Amendment Was an Agreement by the Government with the Government to Seize All of Fannie Mae's Future Earnings for the Government

#### 1) The Terms of the Third Amendment

124.   On August 17, 2012, FHFA and Treasury executed the Third Amendment.

125.   Under the terms of the Third Amendment, Fannie Mae was required to pay Treasury a quarterly dividend equal to the amount by which the Company's total assets (excluding Treasury's funding commitment and any unfunded amounts related to the commitment) exceeded its total liabilities (excluding any obligation in respect of capital stock), as reflected on the Company's balance sheet applying GAAP, less a nominal, temporary capital reserve. The capital reserve amount would start at $3 billion and steadily decrease by $600 million each year until it would be eliminated on January 1, 2018.

126.   Treasury's press release announcing the change stated that the Third Amendment "Will Make Sure That Every Dollar of Earnings Fannie Mae and Freddie Mac Generate Will Benefit Taxpayers."

127.   Starting January 1, 2013, the effective date of the Third Amendment, all of Fannie Mae's earnings would be paid to Treasury quarterly in cash, even if those earnings were due to non-cash accounting adjustments, such as changes in the Company's deferred tax asset valuations or loan loss reserves. As a result, Fannie Mae inevitably would have to sell non-liquid assets or issue additional debt to make the required payments.

128.    The Net Worth Sweep would also permanently prevent the Company from ever accumulating any capital, redeeming the Government Preferred Stock, investing in its business, or retaining any profits. So long as Fannie Mae remained in operation, all of its earnings would be transferred to Treasury, while the Government's outstanding Liquidation Preference would remain at $117.1 billion.

129.    On August 17, 2012, Treasury and FHFA converted Fannie Mae's entire economic value into an unlimited Government slush fund.

130.    As a Staff Report from the Federal Reserve Bank of New York subsequently acknowledged, the Net Worth Sweep "effectively narrows the difference between conservatorship and nationalization, by transferring essentially all profits and losses from the firms to the Treasury."

> **2)      Treasury Developed the Third Amendment to Seize All of Fannie Mae's Earnings for Taxpayers**

131.    During the Obama Administration, the Executive Branch developed the policy underlying the Third Amendment. The policy working group consisted of representatives from the NEC, the Domestic Policy Council ("DPC"), the Council of Economic Advisors, Treasury, and HUD, with input from the Federal Reserve. NEC representatives included Director Gene Sperling, Deputy Director Brian Deese, Senior Advisor Jim Parrott, and Senior Policy Advisor Pascal J. Noel. Council of Economic Advisors representatives included Carl Shapiro. Treasury representatives included Miller, Deputy Assistant Treasury Secretary for Financial Stability Timothy Bowler, Assistant Treasury Secretary for Financial Stability Timothy Massad, Acting Assistant Treasury Secretary for Economic Policy John Bellows, Chief of the Homeownership Preservation Office Phyllis Caldwell, Counselor to the Secretary for Housing Finance Policy Michael Stegman, Senior Policy Advisor Jeff Foster and Under Secretary for Domestic Finance

Jeffrey Goldstein. HUD's representatives included Deputy Assistant Secretary for Risk Management and Regulatory Affairs Robert C. Ryan.

132.　　The Third Amendment was an element of the Executive Branch's broader plan to eliminate the GSEs and transform the housing finance market. The Third Amendment was devised by Treasury as way to capture all of Fannie Mae's earnings for the benefit of the Government, while the Executive Branch was working to wind down the GSEs.

133.　　In early 2012, Treasury drafted a housing finance reform plan that proposed "restructur[ing] the PSPAs to allow for variable dividend payment based on positive net worth"—i.e., implementing a Net Worth Sweep—as among the first steps to take in transforming the housing finance market. That plan also included developing a single securitization utility to be used by both Fannie Mae and Freddie Mac—and by other entities once Fannie Mae and Freddie Mac had been eliminated. FHFA made developing that utility a central priority of the conservatorships.

134.　　Treasury's Jeff Goldstein first articulated the seeds of the plan in a December 20, 2010 memorandum for Secretary Geithner. His plan turned on setting a PCF for the GSEs. As previously noted, the original PSPA had specified that, beginning on March 31, 2010, the GSEs would each pay a PCF to Treasury at a rate to be "mutually agreed upon" between each GSE and Treasury "on or before December 31, 2009." The PSPAs also provided that the PCF could be paid in-kind, and that Treasury could waive the PCF. No PCF rate had been agreed upon. Freddie Mac had forecast its "sensitivity" to imposition of a PCF as follows: "Our sensitivity to a commitment fee based on remaining commitment available beginning in 2013 of $149 billion shows that a 25 bps fee results in a $0.4 billion annual impact on Stockholders' Equity." Fannie Mae's "sensitivity" would likely be similar. Treasury had exercised its option to waive the PCF.

135.    In late December 2010, Goldstein proposed setting the PCF as a variable dividend comprised of the GSEs' net earnings. Goldstein's memo noted that such a variable dividend would "make[] clear the Administration's commitment to ensure existing common equity holders will not have access to any positive earnings from the GSEs in the future."

136.    On February 11, 2011, the Executive Branch made its plan for the GSEs public. Treasury and HUD released a joint report to Congress entitled, "Reforming America's Housing Finance Market." Treasury Senior Policy Advisor Jeff Foster testified that he "helped author and coordinate comments on" the report, and that individuals from the White House, Treasury, and HUD had all provided comments. The report stated that the Administration, working with FHFA, would substitute private capital for the GSEs' role in the mortgage market and ultimately wind down the GSEs. Further, "[a]s members of the Federal Housing Finance Oversight Board … , the Secretaries of Treasury and HUD will make recommendations on the appropriate mix of incentives and deadlines for FHFA to pursue to wind down these institutions at a pace that recognizes the fragile state of the housing market."

137.    During July 2011, Foster discussed the idea of a Net Worth Sweep with FHFA Acting Director DeMarco and Ugoletti. According to Foster, neither raised any concerns regarding funneling all of the GSEs' future earnings to Treasury—their only questions concerned the mechanics of how such a sweep would work.

138.    As Fannie Mae's financial outlook brightened by mid-2011, Treasury developed "non-legislative Administration reform" proposals for the Company. As reflected in a December 14, 2011 information memorandum from Under Secretary Miller to Secretary Geithner, one non-legislative option under consideration was "restructure[ing] the calculation of Treasury's dividend payments from a fixed 10 percent annual rate to a variable payment based on available net worth (i.e. establish an income sweep)." According to the memorandum, one of the policy

objectives that Treasury wanted to accomplish was to "clearly indicate to taxpayers that the GSEs will be wound down," and one of the benefits of this approach was that "it would apply all future net income/profits as reimbursement to taxpayers."

139.    On January 2, 2012, Ugoletti advised DeMarco that Secretary Geithner might want to discuss amending the PSPAs during an upcoming meeting. Ugoletti advised that the amendment could involve "setting the commitment fee as a net income sweep."

140.    A few days later, Foster advised Geithner to "[e]xpress willingness [to DeMarco, during their upcoming meeting] to consider restructuring the calculation of Treasury's dividend payments from a fixed 10 percent annual rate to a variable payment based on available positive net worth."

141.    On January 19, 2012, after DeMarco and Geithner had met, DeMarco followed up on their discussion, sending Geithner a presentation which stated:

> FHFA is willing to consider PSPA changes that add to the stability of the market. Let's develop a list of items for consideration, establish a FHFA-Treasury working group to work through the list, and set a timetable to wrap this up before the end of the second quarter.

142.    In February 2012, Treasury's development of the Net Worth Sweep accelerated. On February 26, 2012, Foster sent Joseph Tracy at the New York Federal Reserve Bank a draft reform proposal for the GSEs, which included a plan to "[r]estructure PSPAs to allow for variable dividend payment based on positive net worth." In his email to Tracy, Foster advised that the draft "builds upon discussions with you and a two-year interagency working group process, which has included participation from Treasury, HUD, NEC, CEA, DPC and input from the Federal Reserve."

143.    The next day, on February 27, 2012, Deputy Assistant Treasury Secretary Bowler emailed NEC Senior Policy Advisor Parrott, stating that he wanted to update Parrott on "how we

are thinking about the PSPAs" before the two were to meet later that day to discuss the GSEs. Parrott emailed Miller the next day, suggesting that they pull together a group including Ryan from HUD and Deese from NEC to negotiate the PSPAs.

144.   On March 5, 2012, Foster sent Bowler a memo outlining a GSE transition plan that "Treasury could approve." The plan included substituting a net income sweep for the current PSPA Dividend. The plan was forwarded to DeMarco shortly thereafter. On March 23, 2012, Bowler proposed meeting with Ugoletti "next week" to discuss "next steps" for the PSPAs, and NEC Senior Advisor Jim Parrott proposed getting together with Bowler and Stegman, along with Robert Ryan from HUD and Brian Deese from NEC, for a "principals' meeting next week to get them locked in on strategy for GSE policy."

145.   On April 24, 2012, DeMarco and Ugoletti met with Geithner, along with Treasury's Janice Eberly, Tim Massad, Neil Wolin, and Michael Stegman, to discuss a strategic plan for the conservatorships. Geithner's briefing memo for the meeting stated: "We would like to modify the dividend calculation for the preferred stock by the end of May. You should ask for DeMarco's commitment to work toward this goal."

146.   On May 5, 2012, DeMarco met with Under Secretary Miller and discussed the proposed Net Worth Sweep. On May 31, 2012, a briefing memo for Geithner regarding an upcoming meeting with DeMarco stated that "FHFA has agreed to the net worth sweep dividend proposal, replacing the current 10 percent dividend."

147.   There had been no negotiations between FHFA and Treasury in which FHFA sought alternatives to the Net Worth Sweep, and FHFA had not even tried to determine Fannie Mae's fair market value before FHFA agreed to pay Treasury all of Fannie Mae's net profits in perpetuity.

148.    During a June 21, 2012 meeting with Treasury, DeMarco stated that the GSEs would be generating large revenues over the coming years, thereby enabling them to pay the PSPA Dividend well into the future, and consequently did not believe it was urgent that the proposed Third Amendment be executed during 2012. However, DeMarco's view that the amendment was not urgent did not dissuade Treasury from moving forward with its plan.

149.    On July 20, 2012, Under Secretary Miller circulated a draft document representing "our collective thoughts on how to signal a plan to amend the PSPAs" to various people at Treasury, as well as to Brian Deese at the NEC. In her cover email, Miller wrote that DeMarco "is on record to work with us on the PSPAs." The talking points concerning the proposed amendment stated that the "key points to make" were:

- The Administration remains committed to winding down the GSEs in an orderly and financially prudent fashion.

- We believe it is an appropriate time to simplify the financial support agreements Treasury has with the GSEs (the PSPAs).

- We are in the process of working with FHFA to modify the dividend Treasury earns on its preferred stock investment. The current fixed 10% dividend rate will be changed to one where the GSEs will pay to Treasury the net income they earn over time as they are wound down.

- This is important for a number of reasons:

    o It means the taxpayer will benefit from all future earnings of the GSEs. Under the current framework we are limited to the 10% dividend.

    o It will stop the circular process of the GSEs drawing on Treasury PSPA support in order to pay dividends back to Treasury.

    o Future PSPA draws will only be made in the event that the GSEs have operating losses.

    o It is consistent with our commitment that the GSEs will be wound down.

- The agreement is expected to be finalized later this year, but has been agreed to in principle by both Treasury and FHFA.

- We believe the taxpayers will be in a better position to benefit from any GSE profits as they are wound down.

- In no way does this change impact our pledge to stand behind these institutions' ability to meet their commitments.

150.    Internally, Treasury acknowledged that the Third Amendment would result in a windfall to the Government. In a July 20, 2012 email, Bowler advised other Treasury officials that, if asked whether the Third Amendment would be a better outcome for taxpayers, they should respond by pointing out that "WE ARE TAKING ALL." On August 7, 2012, Bowler emailed Under Secretary Miller, stating, "Taxpayers are in a stronger position as all future net income from the GSEs will be paid directly to Treasury."

### 3)    Treasury Dictated the Timing of the Third Amendment to Take Massive Profits from Fannie Mae

151.    FHFA and Treasury would later attempt to justify the Third Amendment by claiming that it was executed to address the risk that Treasury's funding commitment would be exhausted by draws made by Fannie Mae going forward. This explanation was mere pretext. Not only did Fannie Mae always have the option of paying the PSPA Dividends in-kind, which would not reduce Treasury's funding commitment at all, but projections from as far back as September 2011 had shown that even if it never exercised the in-kind payment option, Fannie Mae would not exhaust Treasury's funding commitment at any time in the near future. And Fannie Mae's results had been better than expected since September 2011. By the summer of 2012, Fannie Mae's results indicated not only that the Company would not exhaust Treasury's funding commitment in the foreseeable future, but that Fannie Mae would soon reverse the enormous non-cash losses it had recorded during the conservatorship, causing it to experience record profits and making it foreseeable that the Company could pay off the Liquidation

Preference in its entirety, redeem the Government Preferred Stock, and emerge from conservatorship as a profitable, private entity.

152. The real risk that Treasury and FHFA averted by executing the Third Amendment was not the risk that Fannie Mae would exhaust Treasury's funding commitment, but instead the risk that Fannie Mae would soon sufficiently rebuild its capital so that it could exit conservatorship as a viable private entity. Treasury and FHFA had already agreed that Fannie Mae would *not* be allowed to exit conservatorship in its current form. Allowing Fannie Mae to rebuild its capital would make that decision more difficult to enforce.

153. On August 1, 2012, a Treasury official emphasized that the Net Worth Sweep should be announced in mid-August because the GSEs' reported "[e]arnings will be in excess of current 10% dividend paid to Treasury."

154. On August 6, 2012, Deputy Assistant Treasury Secretary Bowler emailed Stegman from Treasury and Parrott from NEC, attaching a memo outlining the terms of the Third Amendment, including the Net Worth Sweep and the elimination of the GSEs' capital reserves by 2018. The memo suggested timing the announcement of the Third Amendment to follow "each GSE release[ of] 'record' second quarter earnings. Earnings will be in excess of current 10% cash dividend paid to Treasury. Record earnings will be driven by large credit loss reserve release." In his cover email, Bowler advised, "Now very timely."

155. On August 8, 2012, Fannie Mae filed its 10-Q for the second quarter of 2012, confirming that the Company would not need a draw from Treasury for that quarter. The Company had recorded $8.5 billion in earnings during the first two quarters of the year, leaving $2.7 billion in net profits after paying Treasury PSPA Dividends of $5.8 billion

43

156.     On August 9, 2012—one day after Fannie Mae reported those profits—Ugoletti emailed DeMarco: "Close Hold…. [T]here appears to be a renewed push to move forward on PSPA amendments."

157.     On August 15, 2012, Treasury explained in a "talking points" memo that, "[b]y taking all of their profits going forward, we are making clear that the GSEs will *not* ever be allowed to return to profitable entities." An August 16, 2012 document prepared for internal Treasury use listed Fannie Mae's "improving operating performance," the "potential for near-term earnings to exceed the 10% dividend," and the desire to "put[] in place a better deal for taxpayers," as the reasons for the timing of the execution of the Third Amendment.

158.     On that same day, Treasury informed Fannie Mae's CEO about the Third Amendment during a meeting at its offices. Secretary Geithner's briefing memo for the meeting advised that he tell the GSEs that the Third Amendment was a joint decision between Treasury and FHFA.

### 4)      The Net Worth Sweep Seized All of Fannie Mae's Future Earnings for Public Use

159.     The Net Worth Sweep fundamentally changed the nature of Treasury's investment in Fannie Mae. Instead of quarterly dividend payments at an annual rate of 10% (if paid in cash) or 12% (if paid in-kind) of the total amount of Treasury's Liquidation Preference, the Net Worth Sweep entitled Treasury to quarterly payments of all of Fannie Mae's earnings in perpetuity.

160.     Internal memoranda make clear the Government's intent to take Fannie Mae's entire economic value for public use. According to an April 6, 2012 Treasury memorandum, the Net Worth Sweep would accomplish Treasury's goal of "ensuring that every dime of positive earnings that the GSEs produce in the future will be used to pay back taxpayers." Another Treasury memorandum, dated July 1, 2012, reiterated that the Net Worth Sweep would "ensure

44

that every that every single dime of positive earnings that the GSEs produce in the future will be used to pay back taxpayers."

161.    Just days before the execution of the Third Amendment, on August 13, 2012, Jim Parrott wrote to his fellow NEC executive, Brian Deese, suggesting ways to respond to anticipated questions regarding the Third Amendment:

> **We are making sure that each of these entities pays the taxpayer back every dollar of profit they make, not just a 10% dividend.**
>
> The buffer is simply to help the entities manage their short term losses, so that they ultimately don't cost the taxpayers still more money.
>
> **The taxpayer will thus ultimately collect more money with the changes.**
>
> **With the overall set of changes we have removed any doubt about the long term fate of these entities: they will NOT be allowed to return to profitable entities at the center of our housing finance system, but instead wound down and replaced with a system driven by private capital and lower risk to the taxpayer.**

(Emphasis added.)

162.    The Government designed the Net Worth Sweep to benefit the Government at Fannie Mae's expense. Its purpose was not to put Fannie Mae on sound financial footing or conserve its assets. Instead, it was intended to expropriate the Company's entire economic value to benefit taxpayers.

163.    In this aim, the Government was remarkably transparent. Treasury stated that the Net Worth Sweep would "expedite the wind down of Fannie Mae and Freddie Mac," and it emphasized that the "quarterly sweep of every dollar of profit that each firm earns going forward" would make "sure that every dollar of earnings that Fannie Mae and Freddie Mac generate will be used to benefit taxpayers." Treasury explained that the Net Worth Sweep would fulfill "the commitment made in the Administration's 2011 White Paper that the GSEs will be wound down and will not be allowed to retain profits, rebuild capital, and return to the market in

their prior form." Treasury noted that the Net Worth Sweep would "help expedite the wind down" of the GSEs and "support the continued flow of mortgage credit during a responsible transition to a reformed Housing market."

164.    Communications involving White House official Jim Parrott likewise show that the Net Worth Sweep was intended to seize all of Fannie Mae's rights to its future earnings for the benefit of taxpayers. On August 17, 2012, Parrott sent a series of emails to Treasury, White House, and Congressional aides, stating that the Third Amendment had achieved an important policy goal. He wrote to Miller and Stegman: "Team Tsy, You guys did a remarkable job on the PSPAs this week. You delivered a policy change of enormous importance that's actually being recognized as such by the outside world . . ., and as a credit to the Secretary and the President." Parrott emailed a Congressional aide, stating that the amendment does not "reduc[e] their dividend [to Treasury] but includ[es] in it every dime these guys make going forward and ensur[es] that they can't recapitalize." And Parrott emailed Deputy Assistant Treasury Secretary Bowler, stating that the Third Amendment "closed off possibility that [the GSEs] ever go (pretend) private again and sped up the clock on the wind-down of their portfolio."

165.    Parrott's communications with outside groups further underscored that theme. On August 17, 2012, Parrott wrote to Peter Wallison of the American Enterprise Institute, who had been quoted in *Bloomberg* as saying that the Third Amendment "deprive[s] [GSEs] of all their capital" so that they cannot recapitalize and return as private companies. Parrott agreed with Wallison, stating that the GSEs "can't repay their debt and escape," and stated that Wallison's comments to *Bloomberg* were "exactly right on substance and intent." Parrott also received an email from a market analyst stating that the Net Worth Sweep "should lay to rest permanently the idea that the outstanding privately held pref[erred stock] will ever get turned back on." He

forwarded the email to Treasury officials and commented that "all the investors will get this very quickly."

166.     Parrott's emails conveyed his understanding that the Third Amendment enabled the Government to seize the Company's entire economic value without just compensation. An email Parrot sent at that time makes the point: "We are making sure that each of these entities pays the taxpayer back *every dollar of profit they make*, not just a 10% dividend" and that "[t]he taxpayer will thus ultimately collect more money with the changes." Thanks to the Net Worth Sweep, Parrott explained, Treasury would "ultimately collect more money" from Fannie Mae.

167.     Fannie Mae CFO Susan McFarland testified that she believed that FHFA and Treasury imposed the Net Worth Sweep because they knew that Fannie Mae was entering a sustained period of profitability that would include reversal of massive non-cash losses, ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ McFarland testified that Fannie Mae ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ In an email dated August 17, 2012, Ugoletti confirmed that FHFA also ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ In his email, Ugoletti assured Acting Director DeMarco and other FHFA officials that, "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮

168.     The *Economist* stated the obvious in reporting that the Net Worth Sweep "squashe[d] hopes that [Fannie] may ever be private again" and, as a result, "the companies' status as public utilities . . . appear[ed] crystal clear." Fannie Mae and Freddie Mac, *Back to Black*, THE ECONOMIST, Aug. 25, 2012.

169.     Similarly, *Fortune Magazine*'s Term Sheet blog explained:

47

Why did the Treasury enact the so-called Third Amendment that so radically altered the preferred-stock agreement? By mid-2012, Fannie Mae and Freddie [were] beginning to generate what would become gigantic earnings as the housing market rebounded. If the original agreement remained in place, the GSEs would build far more than $100 billion in retained earnings, and hence fresh capital, in 2013 alone. That would exert pressure for Congress to allow the GSEs to pay back the government in full, and reemerge as private players. [Treasury Secretary] Timothy Geithner was strongly opposed to the rebirth of the old Fannie Mae and Freddie. The "sweep clause" that grabbed the entire windfall in profits was specifically designed to ensure that Fannie Mae and Freddie remained wards of the state that would eventually be liquidated.

I. **FHFA Acted as an Agent of the United States When It Approved the Third Amendment.**

170. FHFA's own words and deeds demonstrate that FHFA was acting as an agent of the United States when it executed the Third Amendment.

171. Traditionally, a "conservator" steps into the shoes of a company in conservatorship in order to preserve and conserve its assets and assist the company in returning to a sound and solvent financial condition. Conservators, therefore, in most contexts, operate in the interests of their conservatee.

172. FHFA, however, has repeatedly admitted that it did not act in Fannie Mae's interests. Whatever its title, FHFA was not a "conservator" in the traditional sense of acting in the Company's interests. Instead, it prioritized the Government's interests, even when those interests directly conflicted with the interests of the Company.

173. FHFA's strategic plan for the GSEs, dated February 21, 2102, showed that FHFA was not operating Fannie Mae to preserve and conserve its assets, but instead was operating it to "minimize losses on behalf of taxpayers." In that plan, FHFA made clear that its "overriding objectives" were to operate the Company to serve the Government's stated policy goals of "[g]etting the most value for taxpayers and bringing stability and liquidity to housing finance . . . ."

174.     At the time the Third Amendment was announced, FHFA parroted the same goal. In an August 17, 2012 press release, FHFA extolled the benefits the Third Amendment would have for taxpayers, rather than discussing its adverse effects on Fannie Mae. FHFA stated that the Third Amendment was intended to "fully capture financial benefits for taxpayers," and referred to the GSEs' recent recovery and the substantial profits they anticipated generating in coming years. This press release thus acknowledged that FHFA was acting in the interests of "taxpayers" rather than the interests of its conservatee, Fannie Mae.

175.     After the Third Amendment went into effect, Acting Director DeMarco reconfirmed the FHFA's priorities, stating in a report to Congress that "FHFA has reported on numerous occasions" that FHFA's "mandate" is to "minimize losses on behalf of taxpayers." DeMarco explained further that the Net Worth Sweep "ensures all the [Company's] earnings are used to benefit taxpayers." That is, the primary purpose of FHFA's decision to enter the Third Amendment was to benefit taxpayers, even if that came at Fannie Mae's expense.

176.     Melvin Watt, who became Director of FHFA in 2014, summed up the situation succinctly when stating that he does not "lay awake at night worrying about what's fair to the shareholders" but rather focuses on "what is responsible for the taxpayers." Nick Timiraos, *FHFA's Watt 'Comfortable' with U.S. Sweep of Fannie Mae, Freddie Profits*, WALL STREET JOURNAL MONEY BEAT BLOG (May 16, 2014, 3:40 PM), http://goo.gl/xolQDC.

177.     The process by which FHFA acceded to the Third Amendment further confirms that it was acting as an agent of the Government and not of Fannie Mae. Rather than being the subject of an arm's length negotiation between FHFA and Treasury, Treasury unilaterally devised, drafted and imposed the Third Amendment. FHFA simply capitulated to Treasury's plan, without considering its fairness to the Company or proposing more favorable alternatives.

178.     FHFA understood that stripping capital out of a financial institution was the antithesis of operating it in a sound manner. Indeed, DeMarco has testified that capital levels are "a key component of the safety and soundness of a regulated financial institution," and that, as a general matter, providing more capital to Fannie Mae would increase its safety and soundness. Regulators require other financial institutions to retain minimum levels of capital to ensure that they can withstand the vicissitudes of the economic cycle. Regulators also frequently prohibit financial institutions from paying dividends when they are not adequately capitalized. In contrast, FHFA mandated that Fannie Mae retain no capital and pay its entire net worth to Treasury. Federal regulators well understand such an arrangement is fundamentally unsafe and unsound.

179.     Moreover, FHFA made no effort to determine the fair market value of Fannie Mae to determine whether the Third Amendment provided Fannie Mae just compensation for the transfer of all of Fannie Mae's rights to its future earnings to the Government. FHFA did not even consult with Fannie Mae or its auditors regarding the Third Amendment. Rather, Treasury informed Fannie Mae's CEO of the Third Amendment just two days before it was formally executed. FHFA's capitulation to Treasury confirms that FHFA was acting as an agent of the Government rather than as an independent conservator looking out for its conservatee's interests.

180.     As discussed in section VI.E., FHFA did not, at the time of the events at issue in this case, segregate its role as conservator from its role as Fannie Mae's regulator, and allowed the interests of the United States to usurp the private interests of the Company. Rather than looking out for Fannie Mae's interests, FHFA fully embraced Treasury's interests, so that when the Third Amendment was executed, it was not a contract between two parties negotiating at arms' length, but instead represented a contract in which the same party—the United States—represented both sides.

181.    FHFA's own description of the process leading up to the Third Amendment encapsulates FHFA's capitulation to Treasury's demands:

> **Treasury decided** to focus on ways to ensure that the Enterprises would no longer be required to take draws just to make dividend payments. A number of options were considered for reformulating the dividend structure. In the end, in 2012, **Treasury settled** on the "positive net worth" model, in which **Treasury would simply take**, as dividends, the entire positive net worth of each Enterprise each quarter.

(Emphasis added.)

182.    In other litigation relating to the Third Amendment, FHFA has explicitly confirmed that FHFA understood its own mandate as acting primarily in the interests of the Government rather than Fannie Mae. That is, FHFA has made judicial admissions on repeated occasions that it has a statutory duty to act against the interests of Fannie Mae and in favor of the interests of the public, the Government, and FHFA itself. As examples:

(a) In its opposition to a motion to dismiss in *Perry Capital v. Lew*, No. 13-cv-1025 (D.D.C.) ("*Perry*"), FHFA argued that "HERA and the Enterprises' [Fannie Mae's and Freddie Mac's] charters preempt any fiduciary duties the [FHFA] might owe to shareholders [of the GSEs] to the extent such duties are inconsistent with [FHFA's] responsibility to promote the public mission of the Enterprises: supporting the stability of the housing finance markets.

(b) In the same brief, FHFA argued that it was obligated to help Treasury meet its "statutory obligation" to structure the Third Amendment to "**protect the taxpayer**," rather than to act in the GSEs' interests. (Emphasis added.)

(c) In the same brief, FHFA argued: "Plaintiffs [in *Perry*] contend that the [FHFA] has a fiduciary duty to promote the interests of the Enterprises' shareholders above any public interests…. [FHFA], however, is subject to an **obligation under federal law**

51

**to pursue the public interest**," rather than acting in the GSEs' interests. (Emphasis added.)

(d) In its reply brief on the same motion, FHFA argued: "The [FHFA's] director is obligated to ensure that the Agency acts 'consistent with the public interests,' 12 U.S.C. § 4513(a)(1)(B), and courts have recognized that the public interests may be inconsistent with the interests of private shareholders; **in such circumstances, private interests must yield to the superior federal interest**." (Emphasis added.)

(e) In its brief on the appeal in *Perry*, FHFA repeated the same mantra: federal law required that the Third Amendment "be structured 'to protect the taxpayer.' 12 U.S.C. § 1719(g)(1)(B)–(C)."

183.     That is, according to FHFA itself, HERA imposed special obligations on FHFA to act in the interests of the Government, and FHFA understood that where Fannie Mae's interests conflicted with the interests of the Government, FHFA was required to act in the Government's interests, and that Fannie Mae's interests would have to "yield" to the Government's interests.

184.     In short, FHFA has expressly admitted that when it entered the Third Amendment, it sacrificed the interests of the Company in favor of the Government's interests. In short, it acted as an agent of the United States and not as a private entity.

**J.     The Government Reaped a Massive Windfall**

185.     Shortly after the Third Amendment became effective on January 1, 2013, and consistent with FHFA and Treasury's expectations, Fannie Mae began to earn record revenues. The speed at which those profits were recorded was eye popping. On January 7, 2013, FHFA announced a $10.3 billion settlement of Fannie Mae's claims against Bank of America, based upon Bank of America's alleged sale of bad loans to the Company prior to 2008. A few months later, the Company announced that it would reverse its deferred tax asset valuation of $58.3 billion, effective March 31, 2013. By the end of 2013, Fannie Mae had reversed excessive loan

loss reserves totaling $14.7 billion, and had obtained $17.9 billion in income from settlements with financial institutions. The reversal of the Company's deferred tax assets and loan loss reserves, and its settlement of some of Fannie Mae's claims against financial institutions, combined to cause the Company in 2013 to experience the highest annual profits of any company in history -- $83.9 billion. Every cent of those profits was paid over to Treasury.

186.    The Net Worth Sweep dividends were so large that they even affected the debt-ceiling crisis in 2013. According to a report published by *Politico*, "A Treasury Department official confirmed that the funds returned by [the GSEs] will be deposited into the general fund and will be factored into how long the department can continue to pay the government's bills before running up against the debt ceiling." *Politico* further reported that the Bipartisan Policy Center had advised that the GSEs' dividend payments "would likely push back the date when the government will breach the debt ceiling until October, if it is not raised before then."

187.    Fannie Mae's payments made to Treasury pursuant to the Net Worth Sweep through the end of 2017 are set forth in the table below:

Dividend Payments Under the Net Worth Sweep (in billions)

| Dividend for Quarter Ending | Net Worth Sweep Dividend Amount |
| --- | --- |
| 3/31/2013 | $59.4 |
| 6/30/2013 | $10.2 |
| 9/30/2013 | $8.6 |
| 12/31/2013 | $7.2 |
| 3/31/2014 | $5.7 |
| 6/30/2014 | $10.2 |
| 9/30/2014 | $4.0 |

| | |
|---|---|
| 12/31/2014 | $1.9 |
| 3/31/2015 | $1.8 |
| 6/30/2015 | $4.2 |
| 9/30/2015 | $2.2 |
| 12/31/2015 | $2.9 |
| 3/31/2016 | $0.9 |
| 6/30/2016 | $2.9 |
| 9/30/2016 | $3.0 |
| 12/31/2016 | $5.5 |
| 3/31/2017 | $2.8 |
| 6/30/2017 | $3.1 |
| 9/30/2017 | $3.0 |
| **Total** | **$139.5** |

188.    Had Fannie Mae instead been paying 10% cash dividends (without any pay down of principal), the Company would have paid Treasury approximately $36.15 billion over the same period. The Net Worth Sweep allowed the Government to reap an additional windfall of $81 billion during this time.

189.    Furthermore, had Fannie Mae been able to use its quarterly profits in excess of the 10% cash PSPA Dividend to retire the Government Preferred Stock, that stock would have been fully redeemed by the first quarter of 2017.

190.    Instead, on August 17, 2012, all of Fannie Mae economic value was transferred by FHFA and Treasury to the Government. None of the principal owed to Treasury has been reduced. Fannie Mae still owes the Government $117.1 billion, which it is prohibited from ever repaying

## VII. THE NET WORTH SWEEP WAS AN UNLAWFUL TAKING OF FANNIE MAE'S PRIVATE PROPERTY WITHOUT JUST COMPENSATION

### A. Fannie Mae Had a Cognizable Property Interest in Its Future Earnings Prior to the Imposition of the Third Amendment.

191.    Prior to the Government's imposition of the Third Amendment, Fannie Mae operated as a private corporation, which secured capital from private investors and was traded on a public stock exchange.

192.    Prior to the Third Amendment, Fannie Mae had a property interest in its right to its future earnings. Indeed, the Government itself has stated in a brief in another case that an "interest in residual profits is the defining feature of an equity interest in a corporation." Reply Brief of the United States at 24, *Starr Int'l co. v. United States*, No. 15-5103 (Fed. Cir. June 1, 2016).

193.    Fannie Mae's bylaws expressly adopted Delaware General Corporation Law as governing all conduct of the company. Consistent with Delaware law, federal law, and the PSPAs—and prior to the Government's imposition of the Third Amendment—Fannie Mae possessed the following property rights:

- The inherent and exclusive right to possess, control, and use its current and future earnings, at its discretion, including whether to accumulate capital, invest in its business, or retain profits.

- The inherent and exclusive right to transfer its current and future earnings, including whether, when, and in what amounts to pay dividends to shareholders (subject only to the terms of the second amended PSPA); and

- The inherent and exclusive right to exclude others, including the Government, from its current and future earnings, including by not deciding to pay any dividends in excess of those required by the second amended PSPA.

55

194.     Prior to the Third Amendment, Fannie Mae reasonably expected that the FHFA
would exercise its powers as Conservator consistent with HERA's regulatory framework.
Specifically, Fannie Mae reasonably expected that the FHFA, consistent with HERA, would only
take such actions that were "necessary to put the [Company] in a sound and solvent condition"
and those that "preserve[d] and conserve[d] the assets and property of the [Company]." 12
U.S.C. § 4617(b).

195.     Prior to the Third Amendment, Fannie Mae further reasonably expected that the
FHFA and Treasury would comply with the terms of the second amended PSPA. It did not
expect and did not consent to the Government's unilateral imposition of the Third Amendment or
to the permanent transfer of all of its future earnings to the Government.

196.     Prior to the Third Amendment, Fannie Mae therefore had a cognizable property
interest in its right to its future earnings.

197.     On August 17, 2012, when FHFA and Treasury executed the Third Amendment,
they transferred Fannie Mae's right to its future earnings in perpetuity to the Government. In so
doing, the Government transferred Fannie Mae's entire reasonable economic value to itself.

**B.     The Government's Permanent Expropriation of Fannie Mae's Right to Its
         Future Earnings Constitutes a Compensable Taking.**

198.     On August 17, 2012, the Government executed the Third Amendment, which
immediately and permanently transferred Fannie Mae's property right to its future earnings to
the Government. The Third Amendment permanently deprived the Company of its inherent and
exclusive rights to possess, use, and control its future earnings; its rights to decide whether to
transfer those earnings to others, including the Government; and its rights to exclude others,
including the Government, from receiving dividends in excess of those required by the second
amended PSPA.

56

199.     By unilaterally imposing the Third Amendment, the Government permanently deprived Fannie Mae of all of its reasonable economic value. Historically, private businesses have been valued using a discounted future value methodology, which relies upon estimates of their future earnings. By the Third Amendment's express terms, Fannie Mae cannot retain any of those future earnings. It cannot accumulate any capital, invest in its business, or retain profits. And, since the Net Worth Sweep applies now and forever, Fannie Mae's predicament is permanent; it will never have any reasonable economic value. Following the imposition of the Net Worth Sweep, Lockhart, the former chief of the FHFA, told *Reuters* that, although the GSEs' shares continued to trade, "The stock and the preferred [stock] is worthless and should be worthless."

200.     Additionally, the Third Amendment defeated the reasonable, investment-backed expectations of the Company under HERA's regulatory framework and the second amended PSPA and unilaterally abrogated the Company's rights under HERA and the second amended PSPA.

201.     Through the Third Amendment, the Government took all of Fannie Mae's reasonable economic value for public use. As Treasury has admitted on numerous occasions, its plan is to maximize the Company's return, not for Fannie Mae itself, but for the Government. And it has generated massive new revenues for that purpose. Its payments to date under the Third Amendment already far exceed the Government's Liquidation Preference without having reduced the Government's Liquidation Preference by a penny.

202.     By permanently depriving Fannie Mae of its property rights to all of its future earnings, the Government nationalized Fannie Mae.

203.     While the Government has collected approximately $140 billion dollars in dividend payments from Fannie Mae since the Third Amendment was executed—and is on track

to collect billions more—the Company has never been provided with just compensation for the Government's seizure of its right to its future earnings in perpetuity.

204.    Because Fannie Mae always had the option of paying the PSPA Dividend in-kind, the Net Worth Sweep does not provide the Company with any additional flexibility. Further, Treasury had always waived the PCF, and could only set the PCF with the Company's consent. In August of 2012, Fannie Mae was profitable and was no longer drawing from Treasury's funding commitment. Therefore, the market rate for a PCF in 2012 and after would have been zero. Further, even if the Company had agreed to pay a PCF greater than zero after 2012, Fannie Mae had sufficient market power to pass the entire amount of this fee through to its customers— as it does for other operating and financing costs—without sacrificing profitability.

205.    Therefore, the Third Amendment constitutes an unlawful taking without just compensation in violation of the Fifth Amendment to the United States Constitution.

## VIII.  IN THE ALTERNATIVE, THE NET WORTH SWEEP CONSTITUTED AN ILLEGAL EXACTION FOR WHICH COMPENSATION IS DUE

206.    "Fifth Amendment taking claims and illegal exaction claims are two sides of the same coin: taking claims are based upon authorized actions by government officials, whereas illegal exaction claims are based upon unauthorized actions of government officials." *Starr Int'l Co. v. United States*, 121 Fed. Cl. 428, 464 (2015)

207.    The Government has contended in other litigation relating to the Net Worth Sweep that the Government's imposition upon Fannie Mae of the Net Worth Sweep was authorized under HERA because HERA permits FHFA to consider FHFA's own interest, not only the interests of Fannie Mae, when FHFA acts as the "conservator" for Fannie Mae. This conception of a "conservator" is different from a traditional conservator, whose duty is to conserve and preserve the assets of a company. That is, that FHFA felt itself duty bound to

protect the interests of the Government over the interests of Fannie Mae confirms that whatever its title, FHFA acted as a Government agent and was not simply "standing in the shoes" of Fannie Mae.

208.    The Government, however, may be wrong when it contends that HERA authorized it to disregard Fannie Mae's interests in favor of the Government's interests. HERA arguably limits FHFA's powers as conservator to those "necessary to put the [Company] in a sound and solvent condition" and those that "preserve and conserve the assets and property of the [Company]." 12 U.S.C. § 4617(b). The purposes of the Third Amendment—to enrich Treasury and prepare to wind down Fannie Mae as a private company—are directly at odds with these statutory duties imposed upon FHFA as conservator.

209.    Moreover, FHFA has arguably acted as a receiver, not a conservator, in executing the Third Amendment. Under HERA, FHFA can elect to exercise its power to take control of the Company through one of two means—as a "conservator" or as a "receiver" —but cannot simultaneously act as both. *See id*. § 4617(a)(4)(D) ("The appointment of [FHFA] as receiver … shall immediately terminate any conservatorship."). HERA requires FHFA to obtain the GSEs' Board's authorization upon its election to place the Company into conservatorship or receivership, and FHFA's choice of conservatorship or receivership affects its authority. As a conservator, FHFA may "take such action as may be – (i) necessary to put the [GSEs] in a sound and solvent condition; and (ii) appropriate to carry on the business of the [GSEs] and preserve and conserve the assets of the property of the [GSEs]." *Id.* § 4617(b)(2)(D). If FHFA chooses to act as a receiver, rather than a conservator, then HERA grants it the "additional" power to "place the [Company] in liquidation and proceed to realize upon the assets of the [Company] in such manner as [FHFA] deems appropriate." *Id.* § 4617(b)(2)(E) (emphasis added). The distinct powers bestowed upon FHFA as receiver, including liquidation, are arguably the very powers

59

that FHFA exercised when it executed the Third Amendment. To the extent that FHFA has in effect acted as a receiver rather than a conservator, without obtaining the consent of Fannie Mae's Board of Directors (see *id.* § 4617(a)(3)(I)) or following the proper procedures for liquidating a company in receivership, including resolving creditors' claims under prescribed rules (*id.* § 4617(b)(5)(B), (C)), FHFA has acted beyond its authority under HERA.

210.    In the event this Court agrees with the Government's position that HERA provided FHFA as conservator the authority and discretion to enter the Net Worth Sweep, then FHFA's exercise of its discretion to enter the Third Amendment constituted a taking without compensation in violation of the Takings Clause of the Fifth Amendment of the Constitution. If, however, the Court finds that the Government exceeded its authority under HERA when it executed the Third Amendment, Plaintiffs allege in the alternative that the Government's seizures of Fannie Mae's net worth through Net Worth Sweep dividends were each an illegal exaction in violation of the Due Process Clause of the Fifth Amendment to the Constitution. Through Plaintiffs' illegal exaction claim, Plaintiffs alternatively seek on behalf of Fannie Mae return of each Net Worth Sweep dividend payment that the Government improperly required Fannie Mae to pay in contravention or in excess of FHFA's authority provided by HERA.

## IX.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

### A.    Demand on Fannie Mae's Board Would Be Futile and Is Excused

211.    Demand on Fannie Mae's Board to institute this litigation would be futile and is excused. Because FHFA has assumed all of the powers of the Board, there are no independent directors who could consider a pre-suit demand.

212.    As reported in the Company's public filings, on September 6, 2008, at the request of the Treasury Secretary, the Chairman of the Board of Governors of the Federal Reserve, and the Director of FHFA, Fannie Mae's Board adopted a resolution consenting to the Company's

placement into conservatorship. The Director of FHFA then appointed FHFA as Fannie Mae's Conservator on September 6, 2008, in accordance with the Regulatory Reform Act and the Federal Housing Enterprises Financial Safety and Soundness Act.

213.    As confirmed by the Company's public filings, upon its appointment, FHFA "immediately succeeded to all rights, titles, powers and privileges of Fannie Mae, and of any … director of Fannie Mae with respect to Fannie Mae and its assets, and succeeded to the title to all books, records and assets held by any other legal custodian or third party [of Fannie Mae]. The conservator has the power to take over [Fannie Mae's] assets and to operate [Fannie Mae's] business … and to conduct all business of the company." FHFA has overall management authority over Fannie Mae's business when it acts in accordance with its statutory authority as Conservator.

214.    On September 7, 2008, in announcing FHFA's appointment as Fannie Mae's Conservator, FHFA's Director James Lockhart stated that "FHFA will assume the power of the Board and management." Fannie Mae's 2012 Form 10-K discloses: "Our directors do not have any fiduciary duties to any person or entity except to the conservator and, accordingly, are not obligated to consider the interests of the company, the holders of our equity or debt securities or the holds of Fannie Mae MBS unless specifically directed to do so by the conservator." Fannie Mae's Board of Directors is prohibited from taking action on "matters that relate to the conservator's powers" or "the legal effect of the conservatorship on contracts," such as this litigation, without prior written approval of FHFA.

215.    Even if Fannie Mae's directors did have the power to initiate this action, which they do not, Fannie Mae's directors, and each of them individually, lack the necessary independence to do so. After FHFA put Fannie Mae into conservatorship, FHFA reconstituted Fannie Mae's Board by handpicking and appointing Fannie Mae's directors. Since that time,

FHFA's consent is required for new Board of Directors' appointments. Fannie Mae's bylaws further provide that FHFA determines the number of directors to serve on the Company's Board.

216.    Since the Board is completely controlled by FHFA and lacks the authority to take action against the Government, demand on the Board would be futile and is excused.

### B.    Demand on FHFA Would Be Futile and Is Excused

217.    To the extent that demand would, or should, be made on FHFA itself, such demand also would be futile because FHFA has manifest, disabling, and irreconcilable conflicts of interest with respect to this action and lacks the independence necessary to consider a pre-suit demand.

218.    It would be impractical, if not absurd, for FHFA, an agency of the United States government, to sue the United States government, alleging claims based on both Treasury's and its own actions. FHFA's conduct is at the heart of this action, which challenges the same unconstitutional actions in which FHFA participated. As an agency of the federal government, FHFA is interested in and benefits from the Third Amendment and cannot reasonably be expected to initiate litigation for the Fifth Amendment takings claims alleged herein.

219.    As discussed in section VI.E., FHFA's dual role as conservator and regulator can give rise to conflicts of interest, as can FHFA's relationship with Treasury. These conflicts caused FHFA to act in the Government's interests and to allow those interests to usurp the interests of Fannie Mae.

220.    FHFA has repeatedly admitted in other litigation challenging the lawfulness of the Net Worth Sweep that it favored the interests of the public over the interests of its conservatee, Fannie Mae. In fact, it has argued that under HERA, it had authority to act in the Government's interest and to ignore the interests of Fannie Mae, and this is precisely what it did when it entered the Third Amendment. FHFA has made judicial admissions on repeated occasions that it has a

statutory duty to act against the interests of Fannie Mae and in favor of the interests of the public, the Government, and FHFA itself. As noted above, FHFA believed its duty was to "protect the taxpayer" rather than to protect Fannie Mae, perceived itself as having "an obligation under federal law to pursue the public interest" over any "fiduciary duty to promote the interests of the Enterprises," and assumed that where Fannie Mae's interests conflicted with those of the Government, Fannie Mae's interests "must yield to the superior federal interest." In short, FHFA has expressly admitted that it has a disabling conflict imposed upon it by federal law, which precludes it from considering any demand made upon it to sue the Government.

221.    Consistent with its admissions in related litigation, on March 4, 2013, FHFA Acting Director DeMarco delivered remarks to the National Association for Business Economics' annual policy conference, entitled "FHFA's Conservatorship Principles for 2013." DeMarco explained, "FHFA has reported on numerous occasions that, with taxpayers providing capital supporting [Fannie Mae's] operations, this 'preserve and conserve' mandate directs FHFA to minimize losses on behalf of taxpayers." Instead of "preserving and conserving" the assets of Fannie Mae for the Company, DeMarco unmasked FHFA's and Treasury's real directive: to seize the private assets of Fannie Mae for public use by the Government.

222.    Moreover, any takings action initiated by FHFA against the United States would necessarily implicate not only itself but also Treasury. Yet, as explained in section VI.E., *infra*, FHFA and Treasury have close and disabling ties, and acted in concert to promote the Government's interests over those of the Company through the Third Amendment. As a result, FHFA will not bring action against the Government based upon its joint conduct with Treasury.

223.    As a result of these manifest, disabling, and irreconcilable conflicts of interest, FHFA is incapable of pursuing a derivative claim for an unlawful taking or an illegal exaction on

behalf of the Company against the United States. Therefore, to the extent demand would, or should, be made on FHFA, such demand would be futile and is excused.

## X.     CLAIMS FOR RELIEF

### Count I:

### Unlawful Taking Without Just Compensation
### Under the Fifth Amendment to U.S. Constitution

224.     Plaintiffs incorporate by reference and reallege each and every allegation of the preceding paragraphs, as though fully set forth herein.

225.     The Fifth Amendment to the United States Constitution provides that no person shall "be deprived of life liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."

226.     By imposing the Third Amendment, which in Treasury's own words was designed to take "every dollar of earnings [Fannie Mae] generates … to benefit taxpayers," the Government took the Company's right to its future earnings in perpetuity. As such, the Government took Fannie Mae's entire economic value for public use.

227.     When the Government takes private property for a public use or a public purpose, the Fifth Amendment requires the payment of "just compensation."

228.     The Government did not pay—and under the Third Amendment will not pay— just compensation to Fannie Mae for its taking of the Company's right to its future earnings in perpetuity. As a result, Fannie Mae has been injured and is entitled to just compensation in a sum equal to its economic value on August 17, 2012.

## Count II:

### Illegal Exaction in Violation of the Fifth
### Amendment to the U.S. Constitution

229.     Plaintiffs incorporate by reference and reallege each and every allegation of the preceding paragraphs, as though fully set forth herein.

230.     The Fifth Amendment to the United States Constitution provides that no person shall "be deprived of life liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."

231.     Where the Government requires a party to pay money to the Government, directly or in effect, in contravention of the Constitution, a statute, or a regulation, such payments reflect illegal exactions that violate the Due Process Clause of the Fifth Amendment, and the party who paid money over to the Government may seek return of all or part of that money that was improperly required to be paid.

232.     Here, the Third Amendment required Fannie Mae to pay directly to the Government its net worth as of the end of each fiscal quarter beginning January 1, 2013.

233.     To the extent the Government, in enacting the Third Amendment, acted beyond the authority of or contravened HERA, the payments the Government required Fannie Mae to make pursuant to the Third Amendment constituted illegal exactions, and Fannie Mae has been injured and is entitled to just compensation in a sum equal to those payments.

234.     By necessary implication, HERA and all other related policies and regulations promulgated by FHFA provide that the remedy for their violation entails a return of money unlawfully exacted. By directing limiting the powers of a "Conservator" to acting to preserve and conserve the assets of the Company, HERA and all other related policies and regulations promulgated by FHFA lead to the ineluctable conclusion that they provide a monetary remedy for money FHFA exacted for actions taken beyond the authority under HERA.

65

235.    Fannie Mae is HERA's intended beneficiary. HERA was enacted to conserve and preserve the Company's assets and return it to a sound and solvent financial condition.

236.    The Government has retained the funds it unlawfully collected from Fannie Mae and has not reimbursed or otherwise compensated Fannie Mae.

237.    Fannie Mae has therefore been injured and seeks return of all funds improperly paid, exacted, or taken through the Third Amendment in contravention of HERA.

## Count III:

## Breach of Fiduciary Duty

238.    Plaintiffs incorporate by reference and reallege each and every allegation of the preceding paragraphs, as though fully set forth herein.

239.    Pursuant to HERA, FHFA assumed the position of conservator for Fannie Mae.

240.    By taking on the role of conservator pursuant to HERA, FHFA owed the utmost fiduciary duties to Fannie Mae, its conservatee, as set forth in HERA, federal common law and Delaware state law.

241.    FHFA was accordingly obligated to take actions in Fannie Mae's interests, including such actions as were necessary to put Fannie Mae in a sound and solvent condition and were appropriate to carry on its business and preserve and conserve its assets and property.

242.    In gross violation of its fiduciary duties to Fannie Mae, FHFA entered into the Third Amendment, thereby destroying Fannie Mae's entire economic value and expropriating its assets for the benefit of the Government.

243.    The Net Worth Sweep was a self-dealing transaction with a sister agency of the Government.

244.    The Net Worth Sweep was neither entirely nor intrinsically fair to Fannie Mae.

245.    The Net Worth Sweep constituted a waste of Fannie Mae's assets.

246.    The Net Worth Sweep did not further any valid business purpose or reasonable business objective of the Company.

## XI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of Fannie Mae, demand judgment against the United States of America as follows:

A.    Finding that the United States has unlawfully taken the private property of Fannie Mae for public use without just compensation in violation of the Takings Clause and/or the Due Process Clause of the Fifth Amendment to the U.S. Constitution;

B.    Determining and awarding Fannie Mae just compensation for the Government's taking of its property;

C.    Finding that FHFA breached its fiduciary duties as conservator, and awarding Fannie Mae all damages resulting therefrom;

D.    Awarding Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, experts' fees, costs, and other expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

DATED: March 8, 2018                    **SCHUBERT JONCKHEER & KOLBE LLP**


BY: _____/s/Robert C. Schubert_____
                        Robert C. Schubert
Attorney of Record
*rschubert@sjk.law*
Three Embarcadero Ctr., Ste. 1650
San Francisco, CA 94111-4018
Ph: 415-788-4220
Fx: 415-788-0161


OF COUNSEL:                    **SCHUBERT JONCKHEER & KOLBE LLP**
Noah M. Schubert
*nschubert@sjk.law*
Miranda P. Kolbe

*mkolbe@sjk.law*
Three Embarcadero Ctr., Ste. 1650
San Francisco, CA 94111-4018
Ph: 415-788-4220
Fx: 415-788-0161

**SHAPIRO HABER & URMY LLP**
Edward F. Haber
*ehaber@shulaw.com*
53 State Street
Boston, MA 02109
Ph: 617-439-3939
Fx: 617-439-0134

*Attorneys for Plaintiffs*